C 246

## APPLICATION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2254 BY A PERSON IN STATE CUSTODY

| United States District Court | Eastern District of Michiga | Case: 2:08-cv-12955 |
|---|---|---|
| **Name:** GILBERT LEE POOLE | **Inmate Number:** 202095 | Judge: Steeh, George Caram MJ: Komives, Paul J Filed: 07-10-2008 At 03:02 PM HC POOLE V WOODS (EW) |
| **Place of Incarceration:** KINROSS CORRECTIONAL FACILITY | | |

| Name of Petitioner (Include the name under which you were incarcerated) Respondent  (authorized person having custody over you) | | Name of |
|---|---|---|
| GILBERT LEE POOLE | **vs.** JEFFREYWOODS | |
| **The Attorney General of the State of:** | MIKE COX | |

### PETITION

1. Name and location of court which entered the judgement of conviction under attack:

    OAKLAND COUNTY CIRCUIT COURT, 1200 N. TELEGRAPH,  PONTIAC, MICHIGAN

2. Date of judgment of conviction:

    JUNE 6, 1989

3. Length of Sentence: _____ LIFE

4. Nature of offense involved (all counts):

    FIRST DEGREE AND FELONY MURDER

5. What was your plea?  (check one)

    (a)  Not guilty  ☒
    (b)  Guilty  ☐
    (c)  Nolo contendere  ☐

    If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details: _____

11.  If your answer to 10 was "yes", give the following information:

    (a)    (1)    Name of court: _____

           (2)    Nature of proceeding: _____

_____

           (3)    Grounds raised: _____

_____

_____

_____

           (4)    Did you receive an evidentiary hearing on your petition, application, or motion?

                    Yes  ☐        No  ☐

    (b)    As to any second petition, application, or motion give the same information:

           (1)    Name of court: _____

           (2)    Nature of proceeding: _____

_____

_____

           (3)    Grounds raised: _____

_____

_____

_____

           (4)    Did you receive an evidentiary hearing on your petition, application, or motion?

                    Yes  ☐        No  ☐

    (c)    Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?

           (1)    First petition, etc.     Yes  ☐    No  ☐

           (2)    Section petition, etc.    Yes  ☐    No  ☐

    (d)    If you did *not* appeal from the adverse action on any petition, application, or motion explain briefly why you did not: _____

_____

_____

_____

(D)   Ground four: _____

_____

Supporting FACTS (tell your story *briefly* without citing cases or law: _____

_____

_____

_____

_____

(13)   If any of the grounds listed in 12 A, B, C, and D were not previously presented in any other court, state or federal, state briefly what grounds were not so presented, and give your reasons for not presenting them:

_____

_____

_____

(14)   Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?

Yes ☐          No ☒

(15)   Give the name and address, if known, of each attorney who represented you in the following states of the judgment attacked herein:

1.   At preliminary hearing: _____ THOMAS WILHELM _____

2.   At arraignment and plea: _____
     _____ THOMAS WILHELM _____

3.   At trial: _____ THOMAS WILHELM _____
     _____

4.   At sentencing: _____
     _____ THOMAS WILHELM _____

5.   On appeal: _____
     _____ RONALD KAPLOVITZ _____

6.   In any post-conviction proceeding: _____
     _____

7.   On appeal from any adverse ruling in a post-conviction proceeding: _____
     _____

ATTACHMENT A -- ANSWER TO 9(d)

GROUNDS RAISED IN MICHIGAN COURT OF APPEALS

I     WHETHER THE TRIAL COURT ERRED IN FAILING TO PROVIDE THE JURY WITH ANY EXPLANATION OF MALICE WHEN REQUESTED BY THE JURY.

II    WHETHER THE TRIAL COURT ERRED IN ADMITTING BITE-MARK EVIDENCE AT THE TIME OF TRIAL, AND REFUSING TO CONDUCT A DAVIS-FRYE HEARING.

II    WHETHER THE PROSECUTIONS FAILURE TO PROVIDE DEFENDANT WITH IMPEACHMENT EVIDENCE PREVENTED DEFENDANT FROM ADEQUATELY PREPARING FOR TRIAL THUS DENYING DEFENDANT HIS RIGHT TO A FAIR TRIAL.

IV    WHETHER THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR DISCOVERY OF EXCULPATORY EVIDENCE.

V    WHETHER THE WAS INSUFFICIENT EVIDENCE PRESENTED AT TRIAL TO JUSTIFY DEFENDANT'S CONVICTION OF FIRST DEGREE OR FELONY MURDER.

VI    WHETHER THE THERE WAS INSUFFICIENT EVIDENCE PRESENTED AT THE PRELIMINARY EXAMINATION TO LEGALLY SUPPORT THE BIND OVER FOR MURDER.

VII    WHETHER DEFENDANT-APPELLANT'S CONVICTION FOR BOTH FIRST DEGREE MURDER AND FELONY MURDER VIOLATE THE PRINCIPLES OF DOUBLE JEOPARDY.

Motion to Strike Prosecution's Brief in Opposition:

A.    Subsequent to [Appellate Counsel's] filing Defendant-Appellant's brief, Defendant attempted to file an in pro per supplemental brief which was rejected and sent to Appellate Counsel for filing; no further action was taken upon the fact that the prosecutor had failed to file any brief in the case.

B    Seventeen (17) months after Appellant's brief was filed and served, and fifteen months after the case was docketed by the Court of Appeals, the prosecutor elected to file a brief in opposition.

C.    The prosecutor's belated filing of the brief in opposition has prejudiced defendant by causing Appellate Counsel to delay the filing of defendant's supplemental brief.

Supplemental brief:

I    DEFENDANT'S COUNSEL INEFFECTIVENESS AND SERIOUS MISTAKES DENIED DEFENDANT HIS SIXTH AMENDMENT RIGHT TO COUNSEL AND A FAIR TRIAL.

        a. Failure to assert defense theory.
        b. Failure to impeach contradictory testimony.
        c. Failure to object to improper argument.

II.    DEFENDANT WAS DENIED DUE PROCESS OF LAW AND A FAIR TRIAL BY THE PROSECUTOR'S INFLAMMATORY AND PREJUDICIAL REMARKS IN CLOSING ARGUMENT BY ATTACKING CREDIBILITY OF THE DEFENDANT AND THE DEFENSE THEORY, APPEALING TO THE SYMPATHY OF THE JURY AND MAKING REPEATED EMOTIONAL REFERENCES TO THE BAD CHARACTER OF THE DEFENDANT.

ATTACHMENT A -- ANSWER TO 9(d) CONTINUED

III.     TRIAL COURT ERRED N FAILING TO INSTRUCT AND THEREBY SUBMIT TO THE
JURY THE ISSUE OF MALICE AS A NECESSARY ELEMENT OF FIRST DEGREE
MURDER.

ATTACHMENT B -- ANSWER TO 9(e)(4)

GROUNDS RAISED IN MICHIGAN SUPREME

I     WHETHER THE TRIAL COURT ERRED BY FAILING TO INSTRUCT THE JURY ON ALL THE CRIME(S) AND FAILING TO ANSWER THE JURY'S QUESTIONS WHEN THE JURY EXPRESSED CONFUSION DURING DELIBERATION.

II    WHETHER THE DEFENDANT WAS DENIED HIS RIGHT TO A FAIR TRIAL AND DUE PROCESS BY THE COURT'S REFUSAL TO SUBJECT EXPERT TESTIMONY REGARDING BITE-MARK EVIDENCE TO A DAVIS/FRYE HEARING PRIOR TO TRIAL WHEN EVIDENCE IS CHALLENGED BY DEFENDANT PRIOR TO TRIAL.

III    WHETHER THE PROSECUTION'S FAILURE TO PROVIDE DEFENDANT WITH IMPEACHMENT EVIDENCE PREVENTED DEFENDANT FROM ADEQUATELY PREPARING FOR TRIAL THUS DENYING DEFENDANT HIS RIGHT TO A FAIR TRIAL.

IV.    WHETHER THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR DISCOVERY OF EXCULPATORY EVIDENCE THUS ALLOWING THE PROSECUTOR TO SUPPRESS IMPEACHMENT EVIDENCE.

V.    WHETHER THERE WAS SUFFICIENT EVIDENCE PRESENTED ADT PRELIMINARY EXAMINATION TO LEGALLY SUPPORT BIDING DEFENDANT OVER FOR TRIAL ON THE CHARGES OF MURDER.

VI.    WHETHER DEFENDANT'S CONVICTION AND SENTENCE FOR THE OFFENSES OF FIRST DEGREE MURDER ARE UNCONSTITUTIONAL AS THEY VIOLATE DEFENDANT'S CONSTITUTIONAL RIGHT TO BE FREE FROM DOUBLE JEOPARDY FOR A SINGULAR EVENT.

VII.    WHETHER DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY THE PROSECUTOR'S INFLAMMATORY AND PREJUDICIAL REMARKS, COMMENTS, AND LINES OF QUESTIONING, AND WHETHER REVERSIBLE ERROR OCCURRED.

VIII.    WHETHER DEFENDANT'S TRIAL COUNSEL'S INEFFECTIVENESS AND SERIOUS MISTAKES DURING TRIAL AND DURING PRE-TRIAL PROCEEDINGS DENIED DEFENDANT HIS SIXTH AMENDMENT RIGHT TO COUNSEL AND A FAIR TRIAL.

IX.    WHETHER APPELLATE COUNSEL'S MISCONDUCT DURING POST-TRIAL REVIEW OF DEFENDANT'S CONVICTION DENIED DEFENDANT HIS CONSTITUTIONAL RIGHT TO ADEQUATE APPELLATE REVIEW AND THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL AS GUARANTEED BY THE MICHIGAN CONSTITUTION AND THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GILBERT LEE POOLE,

     Petitioner,

                                        Civil Action No. _____

vs.

JEFFERY WOODS, Warden,

     Respondent.
_____/

## MOTION FOR FOR DNA TESTING[1]

NOW COMES Gilbert L. Poole, Petitioner, *pro se*, moves this Court pursuant to 18 U.S.C. 3600 to grant his request for DNA testing of all the biological material obtained during the investigation in the instant case for the following reasons:

1. On June 6, 1989, Petitioner was convicted following a jury trial of both premeditated murder and felony murder, MCL 750.316, in the death of Robert Mejia, before this Oakland County Circuit Court. Petitioner was sentenced on June 22, 1989 to mandatory life.

## FACTS & ITEMS SOUGHT TO BE TESTED PURSUANT TO 18 U.S.C.A. § 3600

2. **CAR CONSOLE.** Subsequent to a North Carolina search warrant, a car console was displayed at Petitioner's trial. It was described to the jury as having type "O" blood on the same type as the victim. Thereafter, the console was described as having the "victim's blood" in it. DNA testing of the console should be compared to the victim's DNA and disprove the prejudicial inference and prove that it was not the victim's blood.

3. **BIOLOGICAL EVIDENCE** from the crime scene. A search warrant was issued in Michigan for blood and hair from the Petitioner to be compared to samples collected form the crime scene that did not match the victim. Although the actual results were suppressed from the jury by stating "all samples collected were from the victim." DNA testing of the blood and hair samples collected from the crime scene will conclusively disprove the Prosecutor's statement and show that someone other than Petitioner or the

_____

1. 18 U.S.C.A. § 3600(a)(1) Upon a written motion by an individual under a sentence of imprisonment ...
    (ii) in the case of a State offense --
    (I) the applicant demonstrates that there is no adequate remedy under State law to permit DNA testing of the specified evidence relating to the State offense --
    (II) to the extent available, the applicant has exhausted all remedies available under State law for requesting DNA testing of specified evidence relating to the State offense.
    (2) The specified evidence to be tested was secured in relation to the investigation or prosecution of the ... State offense referenced in applicant's assertion under paragraph (1).

victim was the contributor of the samples from the crime scene.

4. The homicide was purportedly to have occurred on June 6-7, 1988. During the course of the investigation by the police, and, Dr. Lynda Biedrzycki, Chief Deputy Medical Examiner of Oakland County, (who performed the autopsy), various items of evidence were collected that could contain DNA material. Items #8-11 -- police; #12-28 -- autopsy. See Exhibit A dated 6-23-88, by Albert W. Rayner.

5. David J. Woodford, laboratory specialist, conducted tests on the material listed in Exhibit A, the results were reported by Mr. Woodford and are contained in Exhibit B.

6. During autopsy, 10 fingernails were taken from the victim for testing. See Exhibit B, page 1, No. 8. Exhibit B, page 3, paragraph 3, dated 10-5-88, states that "Microscopic examination of the fingernails of Robert Mejia failed to detect anything of immediate evidential value. However, Exhibit C, page 2, paragraph 1, dated 3-22-89, states that the 10 fingernails revealed the presence of blood. And the conclusion stated "The blood detected on the fingernails could have originated from Roberto Mejia and not Gilbert Poole." Exhibit C was generated by Melinda G. Jackson, a forensic serologist.

7. ABO testing of the blood found under the fingernail clippings has blood-type "O". It was assumed that since the Victim had Blood-type "O" that the blood was his. However, DNA testing would determine whether that blood was the Victim's or belonging to the perpetrator of the homicide.

8. During autopsy clothing was removed from the victim, Items #19-25, see Exhibit A, page 2, paragraph 6.

9. Exhibit B, page 3, paragraph 2, dated 10-5-88, states "Due to the fact that autopsy whole blood sample from Robert Mejia was hemolyzed and had deteriorated, A,B,O analysis was not possible. However, Exhibit C, page 1, under Results; Chemical and serological analysis of the samples obtained from the shirt of Roberto Mejia and blood and hair samples from Gilbert L. Poole, Petitioner, that the evidence could be analyzed.

10. Petitioner was arrested on December 27, 1988. A search warrant, (Exhibit F), that was issued on January 18, 1989, was based in part on a letter from Dr. Allan J. Warnick. Exhibit E. The following biological material was obtained from the Petitioner; saliva and blood samples.

11. Exhibit F indicates 20 pulled head hairs and 20 pulled pubic hairs were also sought from Petitioner.

12. Exhibit F, page 3, H states:

> #3. That the blood on the stone recovered from Mejia's clothing was compared with the know sample of Mejia's blood and they did not match.
>
> #4. That is she [Melinda Jackson, laboratory Specialist], was provided a whole blood sample from the suspect in this case she would be able to compare it with the blood on the stone recovered at the homicide scene and determine whether [Petitioner] was the source of the blood on the stone.
>
> #5. That if she [Melinda Jackson] was provided with human hair samples from the suspect she would be able to compare them with the hair recovered on Mejia's body and determine

2

whether or not Petitioner was the source of the hair.

13. Exhibit C, page 2, paragraph 2, states that "Hair samples were removed from the submitted evidence for future analysis." DNA testing would be valuable if that hair was forcibly removed by the Victim from the perpetrator. In this instance, it may be possible to extend the amount of information given up by the hair by amplifying the DNA from the root.

14. Shortly after Petitioner's arrest in North Carolina, a search warrant was issued to search Petitioner's mother's house for items pertaining to Petitioner. Obtained were a gold-tone Pulsar watch and a gold & brown pocket knife. These items were tested. See Exhibit D, page 2.

15. Some time in January, 1989, a car belonging to Petitioner, and driven exclusively by witness Connie Cook, was taken into evidence. The console of the car was removed and tested for blood. The results are contained in Exhibit D. The report, prepared by Ms. Jackson, states "The blood detected in the car console could have originated from Roberto Mejia and did not originate from Petitioner."

16 Blood-type "O", that was reportedly located in the console, was consistent with the Victim's blood type. However, DNA testing of that sample could determine if the blood originated from the Victim or some other source.

17. The Prosecutor in this case used the biological evidence that was obtained to convict the Petitioner. Ms. Melinda G. Jackson testified at Petitioner's trial.

18. The prosecutor in this case introduced the hearsay reports prepared by Mr. Woodford at trial. MRE 801(c). These reports were introduced in violation of MRE 403 and MRE 702. "The source of information or the method or circumstances of preparation indicate lack of trustworthiness." *People v McDaniel*, 469 Mich 409 (2003).

19. The Prosecutor referred in his closing argument to the reports prepared by Mr. Woodford in order to convict the Petitioner.

"However, in the case of Mr. Woodford, we did put in his report; rather than delay the trial and wait for him or wait for his availability. And his report is also significant because it does talk about some of the blood types on the stones; and it all matches Bob Mejia's blood type."

The above statement was a misrepresentatin of what the report actually says! The above statement was a means of distraction to hide type "A" blood evidence.

20. The Cooley Law School has discovered that there is biological material available for DNA testing. Exhibit G.

21. The prosecutor admits in his supplemental brief to the trial court that biological evidence has been found and preserved.

22. The trial court in rejecting Petitioner's proof of availability of the biological evidence, also rejected the Prosecutor's confession of misleading the court to believe that the evidence did not exist and that it was being held awaiting further instructions, by making the following ruling:

"... MCL 770.16(3)(b)(i) requires that the defendant in this case establish by clear and

3

convincing evidence that a biological material identified during the investigation in this case is available for DNA testing. The defendant has failed to establish that requirement. The defendant's motions state that such biological material evidence once existed, but does not establish by clear and convincing evidence that such biological material is available for DNA testing 18 years after the offense."

23. None of the biological material that was obtained in this case has been subjected to DNA testing.

24. That DNA testing of the biological evidence "would establish the actual innocence" of Petitioner. 18 U.S.C.A. § 3600(a)(6)(B).

25. That DNA testing of "ALL" specific evidence would produce a reasonable probability that the Petitioner did not commit the offense. 18 U.S.C.A. § 3600(a)(8)(B).

## APPLICABLE LAW FOR DNA TESTING

26. The materiality of DNA evidence is highlighted by *House v Bell*, ___ U.S. ___; 126 S.Ct. 2064 (2006). in which a defendant attempted to use new, exculpatory DNA evidence to clear the procedural hurdles imposed on his habeas claim. The Court held that because the DNA evidence undermined the only physical evidence that linked House to the crime scene. House was able to meet the stringent "actual innocence" showing necessary to clear the procedural bars. *Id.* at 2076-86.

27. Due Process Clause provides a substantive right to post-conviction DNA testing in cases where testing could raise serious doubts about the original verdict. *Wade v Brady*, 460 F.Supp.2d 226 (D.Mass. 2006).

28. Purpose of Innocence Protection Act (18 U.S.C.A. § 3600) is to permit collateral review of convictions through DNA testing, no matter how much time has transpired, or what other deadlines have passed; what the statute seeks, with its narrow tailoring, is JUSTICE itself. *United States v Boose*, 498 F.Supp.2d 887 (N.D.Miss. 2007). (Emphasis added).

29. Pursuant to 18 U.S.C. § 3600(a)(1)(B)(ii)(II) Petitioner has exhausted all remedies under State law for DNA testing. He presented to the trial court, Michigan's Court of Appeals and Supreme Court requests for DNA testing pursuant to Michigan Complied Law ("MCL") 770.16(3) testing of the biological evidence. MCL 770.16(3) states that the court SHALL order testing if the defendant does all of the following;

(a) presents prima facie proof that the evidence sought to be tested is material to the issue of the convicted person's identity as the perpetrator of, ...the crime that resulted in the conviction.
(b) Establishes all of the following by clear and convincing evidence;
(i) A sample of identified biological material described in subsection (1) is available for DNA testing.
(ii) The identified biological material described in subsection (1) was not previously subjected to DNA testing or, if previously tested, will be subject to DNA testing technology that was not available when the defendant was convicted.
(iii) The identity of the defendant as the perpetrator of the crime was at issue during his trial.

4

30. The trial court denied the request for DNA, even after Petitioner presented the letters from Cooley Law School, and, even AFTER the prosecutor informed the trial court that biological evidence had been found and was being preserved for appellate purposes. Michigan's Court of Appeals and Supreme Court refused to remand for DNA testing.

## ISSUE OF MATERIALITY FOR DNA TESTING

31. Petitioner has established that in ¶'s 2-21, *supra*, and Exhibits A-G that biological material was collected and used to convict the Petitioner at trial.

32. That at the time of Petitioner's trial DNA testing was not available.

33. the search warrant (Exhibit F), was sought to obtain material from Petitioner (blood, hair, etc.), to compare to biological evidence collected from the crime scene that did not match the victim.

34. The identity of the perpetrator was the central issue at trial.

35. There was no evidence used to exclude Petitioner, even though it was determined that no evidence collected matched samples taken from the Petitioner.

36. The Prosecutor and experts asserted that "ALL" biological evidence that was collected originated from the victim. Of which, was not the assertion made in the search warrant. See Exhibit F, page 3, H.

37. DNA testing can prove that the blood from Petitioner's car console did not originate from the victim.

38. DNA testing can prove if someone with the same blood type as the victim contributed to the samples collected from the homicide scene, thus excluding the Petitioner.

39. Pursuant to 18 U.S.C.A. § 3600(b)(1) - (2)[2] Petitioner asks this Court to "notify" and issue an "order" the Oakland County Prosecutor to "preserve" all the evidence related to this motion.

40. Pursuant to 18 U.S.C.A. § 3600(b)(3) Petitioner asks this Court to appoint counsel in this matter.

41. Pursuant to 18 U.S.C.A. § 3600(c)(1) Petitioner asks this Court to order that "all" the biological evidence in this matter be tested by the Federal Bureau of Investigation.

42. Pursuant to 18 U.S.C.A. § 3600(3)(B) Petitioner asks this Court to access all costs associated with DNA testing be paid by the Oakland County Prosecutor. as Petitioner is indigent. His only means of funds is from his prison assignment.

_____

2. Upon receipt of a motion filed under subsection (a), the court shall notify the Government; ... To the extent necessary to carry out proceedings under this section, the court shall direct the Government to preserve the specific evidence relating to a motion under subsection (a).

RELIEF

For the above reasons, and for those reasons in Argument IV, Brief in Support of Petition for Writ of Habeas Corpus, Petitioner, Gilbert L. Poole, asks that this Court to grant this motion.

Respectfully submitted,

*Gilbert Lee Poole jr.*

Gilbert Lee Poole #202095
Petitioner, *pro per*
Kinross Correctional Facility
16770 Watertower Drive
Kincheloe, MI 49788

Dated: July 7th, 2008

6

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GILBERT LEE POOLE,

        Petitioner,

vs.

JEFFERY WOODS, Warden,

        Respondent.

_____/

Civil Action No. _____

## DECLARATION IN SUPPORT OF
## MOTION FOR FOR DNA TESTING

GILBERT LEE POOLE states:

1. I am the Petitioner in the above entitled action. I make this declaration in support of my Motion for DNA testing pursuant to 18 U.S.C.A. § 3600(a)(1) "The applicant asserts, under penalty of perjury, that the applicant is actually innocent of --" the crimes that he was convicted of in the Oakland Circuit Court of premeditated and first-degree murder in the death of Robert Mejia.

2. That the biological evidence taken in this matter from Robert Mejia, the crime scene or from Petitioner's car console will if DNA tested exclude the Petitioner as the perpetrator.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 7th, 2008.

Gilbert Lee Poole

*Gilbert Lee Poole*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GILBERT LEE POOLE,

       Petitioner,

vs.

                               Civil Action No. _____

JEFFERY WOODS, Warden,

       Respondent.

_____/

## APPENDIX

Exhibit A -- 06-06-88 Supplement Report listing biological material

Exhibit B -- 10-05-88 Biological test report by David J. Woodford

Exhibit C -- 03-21-89 Biological test report by Melinda G. Jackson

Exhibit D -- 01-27-89 Biological test report by Melinda G. Jackson

Exhibit E -- Letter from Dr. Allan Warnick in support of search warrant for biological material

Exhibit F -- 01-18-89 Search warrant seeking biological material from Gilbert L. Poole, Defendant

Exhibit G -- 07-13-06 Cooley Law School declaring that there is biological material available for DNA
        testing

EXHIBIT A

POLICE DEPT.
CITY OF PONTIAC, MICHIGAN     SUPPLEMENTAL PROGRESS REPORT     CASE NO. 8831841

```
Incident - Homicide Page 1
Victim   - Roberto Mejia
Location - Field near
Date     - 6-6-88
```

On 6-7-88 I recieved an ID request for services on a missing person (PPD #8831628) and as a result I went to the PPD garage and processed a blue 1978 BMW 2 door, 88Mi 038UCC, VIN 5442379 which had been towed under PPD impound #03761. The driver door window of the vehicle was rolled down and the doors and trunk were unlocked. As I attempted to dust the exterior of the vehicle for prints, I observed that the finish on the vehicle was very rough and that there was no indication of prints in the areas normally associatted with use of a vehicle. No lifts were made from the exterior of the car.

I opened the car and photographed the interior. Over the visor of the car was a pair of glasses and some religious papers. between the driver door and the driver seat was a button, brown and white with light green thread (item 2). Between the seats was a white piece of plastic with a BMW emblem and some ink pens. In the rear seat there were four muscle shirts, 2 dark and 2 white(1 large (item 26) and 1 small(item 5)). On the floor of the car on the passenger side was a paper sack and under the passenger seat was a green melmac cup and a Miller Lite bottle(item 4). Under the drivers seat was 2 pepsi bottles (item 3). On the back seat on the passenger side was a doper folded piece of a magazine page with some white powder residue (item 1). The glove box was locked. Initially the dope packet, the bottles, and the button were taken into evidence and all others items were placed in the trunk. The interior front glass was lightly dusted for prints with negative results. The button and bottles and dope packet were processed for latent prints and a single lift was made from one of the pepsi bottles. A #1 uncle cup found under the driver's seat was also placed in the trunk of the vehicle as it appeared, as did the melmac cup, to have been in the vehicle for some length of time. Only the button appeared to be "out of place" in the passenger compartment of the car. The powder residue field tested positive for cocaine by Off Vansen.

I spoke with Detective Baldes about the missing person and it was decided that he and I should check the area around where the car was recovered for possible evidence. Having no precise location for the recovery of the car, we went to the rear of the Glenwood plaza and cheked the lot, the hill behind, the Oakland County Drain access, and the field to the south all to no avail. However we did note that a vehicle had been driven into and back out of the field to the south of the lot.

At 2145 hours, I was called in and directed to the field near the apartments on Gambrell by Sgt Smith to assist Officer Milosic on a homicide, the victim of which was Robert Mejia.

At that scene I found Officers Pittman, Pummill and Milosic as well as Detectives Trepte and Gottschall. I assisted Milosic in the evaluation of the scene, measurements for his sketch and with taking some red men's (item 27) jockey shorts into evidence. There did not appear to be any tracks in the pathway other than those of a tractor type ATV track. Milosic had already taken 4 stones from the path that appeared to have blood on them (item 12). The Medical Examiner's office was called and an investigator

APPROVED _____
             (Commanding Officer)

Case 2:08-cv-12955-GCS-LJM   ECF No. 1, PageID.17   Filed 07/10/08   Page 17 of 50

Homicide page 2

came to the scene, took photos and released the body to Classic Removal for transport to the Oakland County Morgue.

On 6-8-88 I was ordered to a meeting at in the DB along with Sgt Hutchinson and Officer Milosic. As a result of that meeting Sgt Hutchinson and I went to ⬛⬛⬛⬛⬛⬛ and Detective Baldes pointed out 2 suspicious spots on the carpet that he requested I take samples of to test for blood. Before I could get those samples, Detectives Pender and Gottschall arrived and ordered me into the field where the body had been found to collect evidence and take photographs. I was met there by detectives Kraft and Trepte and advised to take blood samples from both the north and south sides of the bush next to where the body had been found. I took those samples (items 8-11) and a broken beer bottle, budwieser, (item 7) from the middle of the path. A black tie string (item 6) was taken into evidence by Sgt Hutchinson.

I was advised by Sgt Gracey that the helicopter from the Warren PD would pick me up at 1230 hours to take me for aerial photos of the shopping center and the field where the body had been found. At 1330 hours I boarded the helicopter and took photos of the shopping center. At 1330 hours I boarded the field to the south, the apartment complex and the field near the complex where the body had been found.

At 1500 hours another meeting was convened and as a result of that meeting Capt Hitchuk ordered that I again search the field and the area behind the shopping center for poassible evidence. Detective Baldes and I did just exactly that with negative results.

On 6-9-88, Detective Mathes advises that an Everett Coffelt has been mentioned as a suspect and I pulled a copy of his arrest card from the file but a comparison to the lift from the pepsi bottle fails to produce an identification.

Later in the day I went to the Oakland County Morgue to assist Dr Warnick and Dr Biedrzycki process the bitemark on Mejia's right arm. At Dr Warnick's direction I took several Black and White photographs. I also took the left hand fingerprints of Mejia.

I returned to PPD and put the prints on the fingerprint card in M. Milosic's file. I hung all of the clothes collected at the autopsy by Off Milosic in the PPD garage to dry (items 19-25). While doing this I found that the white & Blue polo shirt (item #19) had what appeared to be a knife cut between the 2nd and 3rd buttons on the right side of the neck of the shirt. I also got the small white muscle shirt out of the trunk of The car as I had noticed that it had some stains on it (item 5). I processed the shirt with luminol but it showed negative for blood. I processed the broken beer bottle (item 7) for latent prints with negative results, no latent prints were developed.

On 6-14-88 I transported the blood samples (items 8-11), the blood from the autopsy (item 12), the stones from the path collected by Milosic (item 13) and the stones recovered at the autopsy and brought to PPD by Milosic (item 14) to the MSP Lab Madison Heights for comparison of the blood.

POLICE DEPT.
CITY OF PONTIAC, MICHIGAN        SUPPLEMENTAL PROGRESS REPORT        CASE NO. 8838841

homicide page 3

The brown vial taken into evidence by Milosic at the autopsy was scraped by me on 6-10-88 and the residue gained that way was field tested positive for cocaine by Sgt McNeary (item 16)

On 6-16-88 I packaged the clothing that had been drying in the PPD garage. From the blue and white shirt I recovered several hair samples which were packaged separately in four envelopes as they were collected. The first, a light brown or blond hair, 4-5" in length, was found embedded in the blood and dirt in the area of the mid chest. From the left chest area of the shirt, running down from the vee of the shirt. From the left chest area of the shirt, running down from the appeared to be consistent with a pubis type hair was found and also placed in a separate envelope. Several hairs were recovered and placed in envelopes from the neck and the inside of the shirt. The four envelopes were then tagged (item 28) and placed in a single evidence envelope. There was also a second stab found in the shirt to the left of the vee, just about opposite of the first and slightly farther from the mid line of the chest. The large white muscle shirt was also removed from the trunk of the car and tagged (item 26)

At 1530 hours the BMW was towed by Adlers from the PPD garage to the OCSD garage and turned over to D. Fournier for processing for prints and trace evidence with the laser.

At 1600 hours I recieved from Milosic a folding knife that he said he had recieved from S. Serna. I t appeared to have a reddish brown residue on it and Milosic and I sprayed it with luminol and got a positive reaction, however luminol is not specific for blood so the knife was also packaged for transport to the MSP lab. (item30). What about the

On 6-17-88 at 11:45 the clothes from the autopsy (items 19-23), the red under shorts (item 27) and the large white muscle shirt (item 26) were transported to the OSSD for examination with the laser by D. Fournier.

At 14:00 the hair (item 28) samples recovered from the shirt, the rape kit (item 29), and the knife (item 30) were transported to the MSP Lab Madison Heights for examination and comparison.

On 6-20-88 at 1630 hours, I met with Sgt Gracey and Officer G.Clark behind the Glenwood Plaza and took photos of Sgt Gracey's car when Clark parked it where he says Mejia's BMW was when he recovered it on 6-6-88.

Albert W Rayner
Identifcation
6-23-88

APPROVED _____

(Commanding Officer)

EXHIBIT B

STATE OF MICHIGAN



9-30-88

JAMES J. BLANCHARD, GOVERNOR
## DEPARTMENT OF STATE POLICE
714 SOUTH HARRISON ROAD, EAST LANSING, MICHIGAN 48823
COL. R. T. DAVIS, DIRECTOR

1-63-6

FORENSIC SCIENCE DIVISION
MADISON HEIGHTS LABORATORY
30001 STEPHENSON HIGHWAY
MADISON HEIGHTS, MICHIGAN 4607
PHONE (313) 585-7521

313-585-55a

### LABORATORY REPORT

Laboratory No. :
Received By    :   22313-88
Delivered By   :   David J. Woodford
Agency         :   S.P.O. Albert Rayner
Agency No.     :   Pontiac P. D.
                   8831841

Record No.       :
Date Received    :   3262,40
Time Received    :   3351
File Class        :   06-14-8:
Date Completed   :   2:30PM
                     0900-1
                     9-30-88

Nature of Offense:

　　　　Murder/Nonnegligent Manslaughter

Victim:

　　ROBERT MEJIA

Evidence Received:

1. One sealed manila envelope (Item #8) with label "Blood Sample from tree south of body" containing a suspected blood sample.

2. One sealed manila envelope (Item #9) with label "Weeds/blood from shoulder area" containing suspected blood samples.

3. One sealed manila envelope (Item #10) with label "Weeds/blood from hip area" containing suspected blood samples.

4. One sealed manila envelope (Item #11) with label "weeds/blood from area 6' south of body" containing suspected blood samples.

5. One sealed manila envelope (Item #12) containing one tube of autopsy whole blood from Robert Mejia.

6. One sealed manila envelope (Item #13) with label "4 stones in plastic bagging" containing one plastic bag containing 4 stones bearing suspected blood.

7. One sealed manila envelope (Item #14) with label "2 stones recovered at autopsy" containing two manila envelopes each containing a stone (from chest area and pants).

8. One sealed manila envelope (Item #17) containing the fingernails of Robert Mejia collected at the autopsy.

Additional following evidence submitted on 6-17-88 at 2:06PM from SPO Albert Rayner.

9. One sealed manila envelope (Item #28) containing a hair sample.

(continued)

When property of evidence is returned to agencies other than the State Police, this liability with associated this form enhanced only by the affirmative source status and signature

page 2 - 22313-88

1- Sealed Sexual Assault Evidence Kit from Roberto Mejia containing the following:
   1- sealed envelope labeled "inside rectum" swab(s) - containing one swab.
   1- sealed envelope containing (2) rectal swab(s).
   1- sealed envelope containing (2) oral swabs(s).
   1- secured plastic slide holder labeled "inside rectum" smear(s) - containing (2) smear(s).
   1- secured plastic slide holder containing (2) rectal smear(s).
   1- secured plastic slide holder containing (2) oral smear(s).
   1- sealed envelope containing pulled head hair.
   1- sealed envelope containing head combings.
   1- sealed envelope containing pulled pubic hair.
   1- sealed envelope containing pubic combings.
11.. One sealed manila envelope containing a dried blood sample(s). (Item #30).

One sealed manila envelope containing one "Old Timer" kni

Additional following evidence submitted on 7-26-88 at 9:21AM from PO Gerald Hopkins:

12. One sealed manila envelope containing the following ites of evidence:
   a) Six sealed manila envelopes each containing a hair sample (Drivers floor board, front passenger floor board, front passenger seat, front counsel, driver seat and rear seat and floor board).
   b) Four sealed manila envelopes each containing vacuume debris (rear floor board, backseat, front passenger seat, drivers seat).
   c) One sealed manila envelope containing a cigarette butt.
   d) One sealed manila envelope containing candy papers.

Results:

Chemical and serological analysis revealed the following:

| Item # | Blood | Human Blood | A,B,O Blood Group Substances Detected |
|---|---|---|---|
| 8 | + | + | QNS* |
| 9 | + | + | 0 |
| 10 | + | + | 0 |
| 11 | + | + | 0 |
| 13 | + | + | QNS* |
| 14 (pants) | + | + | A,0 |
| 14 (chest) | + | + | QNS* |

(continued)       * QNS - Quanrity of blood not sufficient for analysis.

page 3 - 22313-88

Chemical analysis and microscopic examination failed to demonstrate the presence of semen on items of the Criminal Sexual Assault Kit.

Due to the fact that the autopsy whole blood sample from Robert Mejia was hemolyzed and had deteriorated, A,B,O analysis was not possible.

Microscopic examination of the fingernails of Robert Mejia failed to detect anything of immediate evidential value.

Examination of the knife (Item #30) failed to demonstrate the presence of blood.

David J. Woodford
Laboratory Scientist

DJW:gj
10/5/88

EXHIBIT C

STATE OF MICHIGAN

1-63-673

JAMES J. BLANCHARD, GOVERNOR

## DEPARTMENT OF STATE POLICE
714 SOUTH HARRISON ROAD, EAST LANSING, MICHIGAN 48823
COL. R. T. DAVIS, DIRECTOR

FORENSIC SCIENCE DIVISION
MADISON HEIGHTS LABORATORY
26880 STEPHENSON HIGHWAY
MADISON HEIGHTS, MICHIGAN 48071
PHONE (313) 585-7521

Supplemental **LABORATORY REPORT**

| | |
|---|---|
| Laboratory No.: | 22313-88 |
| Received By : | Melinda G. Jackson |
| Delivered By : | Melinda G. Jackson |
| Agency : | Pontiac P. D. |
| Agency No. : | 88-31841 |

| | | |
|---|---|---|
| Record No. | : | 8222 |
| Date Received | : | 02-24-89 |
| Time Received | : | 09:57 AM |
| File Class | : | 0900-1 |
| Date Completed | : | 03-21-89 |

Nature of Offense:

   Murder/Nonnegligent Manslaughter

Victim:

   ROBERTO MEJIA

Suspect:

   GILBERT LEE POOLE, JR.

Evidence Received:

   One Sexual Assault Kit from Roberto Mejia - previously examined
   (known hair samples removed for examination).

   One sealed manila envelope (Item #30) - previously examined.

   One sealed manila envelope containing Item #8 through #14 and
   #17 (Items #8 through #14 previously examined)  Item #17
   contains ten (10) coin envelopes each containing a fingernail

   One sealed manila envelope containing several manila envelopes-
   previously examined (envelopes with hair samples and cigarette
   butt removed for examination).

   One sealed manila evidence envelope (Item #28) containing
   four (4) coin envelopes of hair samples.

   One sealed manila envelope (Item #3) containing two (2) Pepsi
   bottles.

Results:

   Serological analysis of the two (2) Pepsi bottles and cigarette
   butt failed to detect the presence of saliva.

(continued)

page 2 - 22313-88

Serological analysis of the ten (10) fingernails revealed th
presence of human blood with the following A,B,H(0) Blood
Group Substances.

|      |     |      |     |
|------|-----|------|-----|
| L-1: | H   | R-1: | QNS |
| L-2: | QNS | R-2: | H   |
| L-3: | QNS | R-3: | H   |
| L-4: | H   | R-4: | H   |
| L-5: | H   | R-5: | H   |

\* QNS - quantity not sufficient for analysis.
\*\* H - is indicative of Blood Type 0

Hair samples were removed from the submitted evidence for
future analysis.  See subsequent report.

Conclusion:

The blood detected on the fingernails could have originated
from Roberto Mejia and not Gilbert Poole.

*Melinda G. Jackson*
Melinda G. Jackson
Laboratory Scientist

MGJ:gj
3/22/89
Evidence held on #3

THIS IS THE EVIDENCE
Ms JACKSON CANT ...
... CONTENTS

EXHIBIT D

STATE OF MICHIGAN



1-27-89

JAMES J. BLANCHARD, GOVERNOR

## DEPARTMENT OF STATE POLICE
714 SOUTH HARRISON ROAD, EAST LANSING, MICHIGAN 48823
COL. R. T. DAVIS, DIRECTOR

1-63-673

FORENSIC SCIENCE DIVISION
MADISON HEIGHTS LABORATORY
30003 STEPHENSON HIGHWAY
MADISON HEIGHTS, MICHIGAN 48071
PHONE: (313) 585-7521

### Supplemental  LABORATORY REPORT

| | | |
|---|---|---|
| Laboratory No.: | Supplemental | 22313-88 |
| Received By : | Melinda G. Jackson | |
| Delivered By : | Officer Michael Milosic Jr. | |
| Agency : | Pontiac P. D. | |
| Agency No. : | 8831841 | |

| | | |
|---|---|---|
| Record No. | : | 7455 |
| Date Received | : | 01-19-89 |
| Time Received | : | 11:06 AM |
| File Class | : | 0900-1 |
| Date Completed: | | 01-27-89 |

Nature of Offense:

Murder/Nonnegligent Manslaughter

Victim:

ROBERTO MEJIA

Suspect:

GILBERT LEE POOLE JR., W/M, 01/14/65

Evidence Received:

1. One sealed sexual assault kit from Gilbert Poole containing the following:
   a) one sealed plastic packet containing two (2) whole blood samples labeled Gilbert Poole.
   b) one white envelope containing pulled head hair from Gilbert Poole.
   c) one white envelope containing pulled pubic hair from Gilbert Poole.
2. One secured brown paper bag containing a blue and white polo shirt reportedly from Roberto Mejia.
3. One sealed manila envelope containing a goldtone Pulsar watch.
4. One sealed manila envelope containing a gold & brown pocket knife.
5. One black car console with compartment.

Results:

Chemical and serological analyses of the above samples revealed the following:

| | A,B 0 Blood Type |
|---|---|
| Blood from Gilbert Poole | AB |
| Blood off shirt of Roberto Mejia | H (0)* |

(continued)

When properly or evidence is returned to agencies other than the State Police, the laboratory will add use this form in lieu of a letter by allowing the proper name and signature.

page 2 - 22313-88

| Items | Human Blood | A,B,O(H) Blood Group Substances Detected | |
|---|---|---|---|
| Watch | − | N/A | (N/A-not applicable) |
| Knife | − | N/A | (N/A-not applicable) |
| Car Console | + | H* | |

*H is indicative of Blood Type O

Conclusion:

The blood detected in the car console could have originated from Roberto Mejia and did not originate from Gilbert Poole.

*Melinda G Jackson*
Melinda G. Jackson
Laboratory Scientist

MGJ:gj
1/31/89
Evidence held in Bin #5

EXHIBIT E

willow wood professional village
31632 schoolcraft road
livonia, michigan 48150
(313) 425-6920

LLAN J. WARNICK D.D.S., P.C.
Consultant Forensic Odontology.

## BITE MARK CASE MANAGEMENT

Evidence:   Search Warrant to contain the following:

1. photographs of suspect (frontal and lateral views)
   photographs of suspects dentition frontal and lateral
   views, occlusal and incisal views - both intra-oral
   and extra oral views.

2. Saliva sample

3. Blood sample.

4. Dental impressions of the suspects teeth - utilizing a
   resiliant dental impression material

5. Occlusal and incisal wax bite registrations.

6. Oral examination and dental charting of the suspects
   dentition and surrounding oral structures.

If there is any question about the Warrant - please
contact me!

Sincerely,

Allan J. Warnick D.D.S.
Senior Dental Consultant
Wayne County M.E.O.

EXHIBIT F

SEARCH WARRANT

STATE OF MICHIGAN)
              ) SS
COUNTY OF OAKLAND)

TO THE SHERIFF OR ANY PEACE OFFICER OF SAID COUNTY:

    THE ATTACHED AFFIDAVIT having been sworn to by the affiant,
Det. Oliver Mathes, before me this day, based upon the facts
stated therein, probable cause having been found, in the name of
the People of the State of Michigan I command that you take the
following described person:

Gilbert Lee Poole Jr., DOB: 1/14/65, aka a white male,
approximately 5'7", 160 lbs. who is presently incarcerated in the
Oakland County Jail, 1201 N. Telegraph, City of Pontiac, State of
Michigan.

therein to search for, seize, secure, tabulate and make return
according to law the following things:

Dental impression of his teeth using a resilient dental
impression material, occlusal and incisal with bite registration,
an oral examintaion and dental charting of his oral structures as
well as frontal and lateral intra oral and extra oral photographs
as well as a whole blood sample in a red top tube as well as 20
pulled head hairs and 20 pulled pubic hairs. All evidence to be
recovered at the Oakland County Jail, 1201 N. Telegraph, City of
Pontiac, County of Oakland, State of Michigan by medical
personnel.

ISSUED UNDER MY HAND this _18_ day of January, 1989.

                 _____

                 _____, Judge in and for the
                 _____, Court,

      County of Oakland, State of Michigan.

AFFIDAVIT FOR SEARCH WARRANT

STATE OF MICHIGAN)
               ) SS
COUNTY OF OAKLAND)

        Det. Oliver Mathes, affiant, being first duly sworn, on oath deposes and says:

        (1)   That the following property constitutes evidence of criminal conduct:

Dental impression of his teeth using a resilient dental impression material, occlusal and incisal with bite registration, an oral examination and dental charting of his oral structures as well as frontal and lateral intra oral and extra oral photographs as well as a whole blood sample in a red top tube as well as 20 pulled head hairs and 20 pulled pubic hairs. All evidence to be recovered at the Oakland County Jail, 1201 N. Telegraph, City of Pontiac, County of Oakland, State of Michigan by medical personnel.

        (2)   Affiant further says that the above-mentioned person is located at the following described place:

Gilbert Lee Poole Jr., DOB: 1/14/65, aka a white male, approxmately 5'7", 160 lbs. who is presently incarcerated in the Oakland County Jail, 1201 N. Telegraph, City of Pontiac, State of Michigan.

        (3)   Affiant further says that he has probable cause to believe the above-listed property to be searched for and seized is now located upon said described person, based upon the following facts:

        A.   That he is a Detective with the Pontiac Police Department and presently is in charge of the investigation and prosecution of Gilbert Lee Poole Jr., DOB: 1/14/65 for the murder of Robert Meija.

        B.   That on June 7, 1988 the body of Robert Meija was found in a field in the City of Pontiac.

        C.   That he has spoken with Al Reyner who indicates:

            1. That he is a expert in processing crime scenes and is employed as a Identification Technician with the Pontiac Police Department.

            2. That on June 7, 1988 he was dispatched to the field where the body of Robert Meija was found and he processed it for evidence.

            3. That he located a stone in the clothing of Robert Meija which was covered with dried blood and he placed it into evidence for analysis at the Michigan State Police Crime Lab.

            4. That he also recovered and placed into evidence for lab analysis, several loose hairs from the body of Robert Meija which based upon their color did not belong to Meija.

        D.   That he has spoken with Dr. Lynda Biedrzycki who indicates:

            1. That she is a Medical Doctor who is employed by Oakland County as the Chief Deputy Medical Examiner.

            2. That on June 8, 1988 she conducted the autopsy on Robert Meija and determined that he died of multiple stab wounds to the face and neck.

3. That during the autopsy she observed and teeth impression in the form of a bite mark on the back of Meija's right upper arm and she subsequently called in Allan J. Warnick, D.D.S. for consultation as a forensic odontologist.

4. That she retrieved a blood sample from Robert Meija to be furnished to the crime lab for further analysis.

E. That on December 1, 1988, Affiant obtainted an arrest warrant for Gilbert Lee Poole Jr. charging him with Open Murder in the death of Robert Meija

F. That Gilbert Lee Poole Jr. was subsequently arrested in North Carolina and was returned to the State of Michigan on January 12, 1989 and he presently resides in the Oakland County Jail, 1201 N. Telegraph, Pontiac, Michigan.

G. That on Janary 17, 1989, Affiant spoke with Allan J. Warnick, D.D.S, who indicated:

1. That he is a Board Certified expert in forensic odontology which in part deals with the comparison of bite marks.

2. That he was called to the Oakland County Medical Examiner's office to assist Dr. Lynda Biedrzycki at the autopsy of Robert Meija where he obscured, photographed and recovered the tissue bearing the bit marks.

3. That if he was provided with photographs, dental impressions, bite registration and dental charting of a suspects oral structure from Gilbert Poole Jr. he would be able to determined whether or not the suspect was the source of the bite mark.

H. That on January 17, 1989, Affiant spoke with Melinda Jackson who indicated:

1. That she is employed at the Michigan State Police Crime Lab as a laboratory specialist and is an expert in making scientific comparisions of blood and hair samples.

2. That she assisted another specialist David Woodford in making his initial evaluation of the physical evidence in the Meija homicide and she presently is in charge of the laboratory evaluation of the evidence.

3. That the blood on the stone recovered from Meija's clothing was compared with the known sample of Meija's blood and they did not match. Whose blood?

4. That if she was provided with a whole blood sample from the suspect in this case she would be able to compare it with the blood on the stone recovered at the homicide scene and determine whether Gilbert Poole Jr. was the source of the blood on the stone.

5. That if she was provided with human hair samples from the suspect she would be able to compare them with the hair recovered on Meija's body and determine whether or not they matched Gilbert Poole Jr. was the source of the hair.

Who?

I.   That therefore, Affiant requests authority to secure the requested evidence to be obtained by medical personal at the Oakland County Jail, in order to have experts compare it with the bite mark on the victims body as well as the other recovered physical evidence, hair and blood samples.

_Det. Oliver Mathes_
Det. Oliver Mathes, Affiant

Subscribed and sworn to before me this _14_, day of January, 1989.

_____, Judge in and for the

_____, Court,

Oakland County, State of Michigan.

EXHIBIT G



# Innocence Project
### THOMAS M. COOLEY LAW SCHOOL
January 31, 2006

Gilbert Lee Poole, Jr. #202095
Kinross Correctional Facility
16770 Water Tower Drive, Kinchcloe AFB
Kincheloe, MI 49788

Dear Mr. Poole:

I know it has been some time since our last correspondence, so I am writing to update you on the investigation of your case. We have spent a significant amount of time trying to locate evidence in your case. Most of the evidence was tested by the Michigan State Police Crime Lab and returned to the City of Pontiac Police Department. Although the City of Pontiac Police Department has not confirmed in writing that the evidence has been destroyed, they have responded that a physical check of the property control room produced nothing. However, we have located some items of evidence that were tested by the Michigan State Police and preserved in frozen storage.

Even though we have located some evidence in your case, we do not want to give you false hope. The statute specifically requires prima facie proof that the evidence sought to be tested is "material to the issue of the convicted person's identity as the perpetrator." Based on my review of your case thus far, we may not be able to prove this element of the statute.

In your case, to meet the materiality requirements of the statute, we must prove that the biological evidence sought to be tested belongs to the perpetrator of the crime. It is often difficult to make this materiality argument in a murder case because that biological evidence could have possibly come from the victim's contacts prior to the crime and not from the perpetrator of the crime.

Even if the court grants a motion for DNA testing of the located evidence, the samples are tested, and the samples do not match your genetic profile, it will be difficult to argue that those tests prove you are not the perpetrator. After a motion for DNA testing is granted, even if the inmate is excluded, the burden is on the petitioner (the inmate) to make a motion for and meet the statutory requirements for a new trial.

Despite these difficulties, we are continuing to investigate your case. I expect to give you a final answer regarding whether we will pursue your case in court very soon. Please remember that during this investigatory stage, we will neither enter an appearance on your behalf nor act as your legal advisor or attorney.

January 31, 2006
Page Two

In addition, should we decide to pursue your case in court, you must consider some of the ramifications of pursuing DNA testing. DNA testing is considered to be an exact science. If any biological material (for example, blood) on the samples sought to be tested belongs to you, then your DNA will be found. It is also likely, in the event your DNA does match the samples, that people in your community, including your family, could hear this as it may become public information. Further, if there is a match, your DNA sample will be placed into the state-wide database system and could be compared to other unsolved crimes.

However, if your DNA does not match the samples that are tested, it does not necessarily mean that you will be immediately released from prison, or even released from prison at all. If your DNA does not match, the prosecutor can request that the biological material be retested. The next step is to petition the court for a new trial. Please be advised that we will not represent you in any new trial that may be granted by the court.

Finally, should we pursue DNA tests, the parole board may learn that you are asserting a claim of innocence. I mention these issues so you aware of the impact of pursing DNA testing.

We will contact you as soon as we have more information for you.

Cooley Innocence Project

By: _____
Marla L. Mitchell-Cichon (P54259)
Supervising Attorney

MLM:kmb
cc:      file
2801-02111



# Innocence Project
THOMAS M. COOLEY LAW SCHOOL

December 21, 2006

Gilbert Lee Poole, Jr. #202095
Kinross Correctional Facility
16770 S. Watertower Drive
Kincheloe, MI 49788

Dear Mr. Poole:

I am writing to update you on the investigation of your case. According to the Oakland County Medical Examiner's Office, the bite mark impression (and saliva) and fingernails taken from the victim are no longer in existence. The only evidence we have located are the stones taken from the victim's body. We are continuing our investigation for additional evidence. However, it may be that the stones are all the evidence that still exists in your case. This poses significant challenges under M.C.L. 770.16 because you were already excluded as the source of the blood on the stones and this fact was before the jury during your trial. Nevertheless, some of the items we have not been able to locate, also contain the same blood type as the stones.

We will continue with our investigation and will update you when we have more information for you. If you have any information that may be helpful to our investigation, please let me know. We will keep you informed as to our progress.

Sincerely,

Marla L. Mitchell-Cichon (P54259)
Co-Director

MLMC:cl
cc:      file
2801-02805

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GILBERT LEE POOLE,

     Petitioner,

vs.

                                    Civil Action No. _____

JEFFERY WOODS, Warden,

     Respondent.
_____/

## MOTION AND BRIEF IN SUPPORT FOR EVIDENTIARY HEARING'S[1]

NOW COMES Gilbert L. Poole, Petitioner, *pro se*, moves this Court to grant his request for *Daubert*,[2] and, ineffective assistance of trial and appellate counsel hearing's,[3] based upon the following:

On June 6, 1989, Petitioner was convicted following a jury trial of both premeditated murder and felony murder, MCL 750.316, in the death of Robert Mejia, before the Oakland County Circuit Court. Petitioner was sentenced on June 22, 1989 to mandatory life.

## FACTS -- *DAUBERT* HEARING

Prior to trial, defense counsel filed a motion in limine to suppress the bite-mark identification evidence that the prosecutor was planning to use via Dr. Allan Warnick. The trial court denied the hearing based upon *People v Marsh*, 177 Mich App 161 (1989).

At the beginning of trial defense counsel renewed his request to exclude bite-mark testimony of Dr. Warnick. Counsel asked the trial court to allow Petitioner to make a separate record outside the presence of the jury of Dr. Warnick's credentials and the method that he used. (T-I, 5). The trial court stated:

"Well, I think that the admissibility question appears to have been taken care of in terms of *Marsh* which does indicate that the *Frye/Davis* test is met without hearing with regard to bite mark

_____

1. Under 28 U.S.C. § 2254(e)(2), if the petitioner has "failed to develop the factual basis of a claim in State court proceedings," the district court may hold an evidentiary hearing only if the petitioner has shown that: (1) the claim relies either on a new rule of constitutional law made retroactive on collateral review by the Supreme Court or on a "factual predicate that could not have been previously discovered through the exercise of due diligence" (§ 2254(e)(2)(A)(i)); and (2) the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable factfinder would have convicted the petitioner. § 2254(e)(2)(B).
2. *Daubert v Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579; 113 S.Ct. 2786 (1993), *People v Davis*, 343 Mich 348 (1955), *Frye v United States*, 293 F. 1013 (1923), (To ensure that proffered expert testimony is sufficiently (a) relevant and (b) reliable to justify its submission to the trier of fact.)
3. Evidentiary hearing not barred because petitioner requested an evidentiary hearing on her ineffectiveness claim at every stage of post-conviction proceedings in state court. *McFarland v Yukins*, 356 F.3d 688, 712-13 (6th Cir. 2004).

1

evidence. Obviously, it still requires that the expert, (a), be qualified and, (b) that the methodology used is consistent with admissible testimony. So, you know, I don't know whether you need a separate hearing but when -- who is the doctor in this case?

MR. SPEAKERMAN: Dr. Allan Warnick, Your Honor.

THE COURT: Okay, I'll allow you an opportunity to voir dire him, if you wish, outside the presence of the jury as to qualifications, if that's what you wish.

MR. WILHELM: Thank you, Your Honor. (T-I, 5-6).

<u>No voir dire was ever conducted</u>. Dr. Warnick was erroneously allowed to testify as a bite-mark expert.[4]

He testified about photographing and removing the tissue from the Victim's arm and preserving it in formalin until he was provided with a suspect to compare the tissue to. (T-III-A, 16) He then testified how he took an impression -- **SIX MONTHS LATER** -- of Petitioner's teeth and pictures . (T-III-A, 20). He testified how he attempted to match the bite-mark found on the victim with the Petitioner's teeth. (T-III-A, 21-25). He testified that the bite-mark on the Victim's arm was placed there by the Petitioner's teeth and "the chance of the same individual making all these patterns are 2.1 billion to one." (T-III-A, 26).

On cross-examination Dr. Warnick admitted that there is no specialty in Forensic Odontology. That it was a new area of dentistry (T-III-A, 32-33), and that in bite-mark cases distortions can occur because the skin itself is not a very good medium for holding dental imprints. Dr. Warnick also testified that distortion of the skin can be highlighted if a bite is made through clothing, or the movement of the struggle, and that the preservation of the excised tissue in formalin for six months can also cause changed. (T-III-A, 34,36).

Dr. Warnick admitted on cross-examination that the point system that the American Board of Forensic Odontologists ("ABFO") came up with to identify bite-marks could not be used because it was very subjective. (T-III-A, 38). He went on to testify that the comparison of bite marks is susceptible to subjective interpretation by the viewer. (T-III-A, 41). He then stated that he did not compare the bite-mark with anyone else's teeth other than the Petitioner. (T-III-A, 42). And if provided with other suspects, his opinion may change. (T-III-A, 45-46).

On re-direct, he stated that even though skin can be distorted and the Victim was wearing a long-sleeved shirt, that it did not change his opinion that Petitioner made the bite-mark. (T-III-A, 47).

## APPLICABLE LAW FOR *DAUBERT* HEARING

*Daubert* and *Kumho Tire Co. v Carmichael*, 526 U.S. 137; 119 S.Ct. 1167 (1999) require that

---

4. If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

judges to act as "gatekeepers" of expert testimony, to ensure that proffered expert testimony is sufficiently (a) relevant and (b) reliable to justify its submission to the trier of fact. *Kumho Tire*, 526 U.S. at 152; *Daubert*, 509 U.S. at 589.

The issue here is reliability. The gatekeeping requirement is designed "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167. In *Daubert* the Court identified several factors that may be relevant in evaluating the reliability of an expert's method for developing a relevant professional opinion. These include whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether there is a high known or potential rate of error; whether there are standards controlling the techinque's operations; and whether the theory or techinque enjoyes general accetance within a relevant scientific or expert community. See *Kumho Tire*, 526 U.S. at 149-50; 119 S.Ct. 1167, citing *Daubert*, 509 U.S. at 592-94, 113 S.Ct. 2786.

In *Kumho Tire*, the Court explained that the *Daubert* gatekeeping function applies to all kinds of experts, without drawing distinctions between scientific experts and other types. The Court explained in *Kumho Tire* that the *Daubert* factors on reliability were neither mandatory nor exclusive. Rather, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." 526 U.S. at 152; 119 S.Ct. 1167.

In this case, the trial court at trial stated: "Obviously it still requires that the expert, (a), be qualified and, (b) that the methodology used is consistent with admissible testimony." The trial Court commenced trial without first applying MRE 104(A) which provides that "[p]reliminary questions concerning the qualifications of a person to be a witness ... SHALL be determined by the court." (Emphasis added). the requirements of MRE 104(a) extended to the application of MRE 702 because it requires a trial court to determine the evidentiary reliability or trustworthiness of the fact and data underlying an expert's testimony before that testimony may be admitted. *Nelson v American Sterilizer (On Rem)*, 223 Mich app 485 (1997). MRE 702's reference to "scientific" evidence "implies a grounding in the methods and procedures of science," and the rule's reference to "knowledge" "connotes more than subjective belief or unsupported speculation. *Daubert*.

At trial, Dr. Warnick admitted that there no specialty as "forensic odontolgy" be he classified himself an expert in that field. He also admitted that a point system that the American Board of Forensic Odontology could not be used because it was not subjective. Dr. Warnick, so-called expert, then testified that based upon "statistical/mathematical/probability" that "the chance of the same individual making all these patterns are 2.1 billion to one." (T-III-A, 26).

The disapproval of statistical evidence based on the product theory has been a consistent refrain

from courts over the years. See, e.g., Hart v Sec'y of Health and Human Servs., 60 Fed.cl 598, 606 (2004). Forensic dentists[5] have not yet gathered the data to perform those types of calculations, so opinion testimony based on that information cannot reflect a certainty in the information given to the factfinders.

Petitioner sought a hearing[6] at the trial court level. It was denied. Petitioner sought remands from Michigan's Court of Appeals and Supreme Court. The remands were also denied.

In People v Wright, following the hearing on remand to the trial court, the Michigan Supreme Court **ADOPTED** the circuit court's **CONCLUSIONS OF LAW**, vacated the conviction and remanded the case to the trial court for a new trial. based upon:

> 1. The identification of suspected biters from marks in skin to a statistical/probabilistic degree of certainty is not supported by recognized scientific knowledge and is, therefore, not admissible against an accused in a criminal prosecution.
> 2. It is misleading and unfairly prejudicial to an expert to claim a statistical degree of uniqueness for a bite mark, or to claim that no one else in the world could have made certain bite marks.
> 3. The claims of uniqueness, statistical improbability of another biter, and certainty of guilt were extremely misleading and unfairly prejudicial to Mr. Wright's ability to have a fair trial.

In People v Moldowan, 446 Mich 862 (2002), in which, Dr. Warnick testified, the court in reversing the conviction stated:

> "The prosecutor's two expert witnesses with respect to 'bite-mark' evidence have either recanted testimony which concluded that both marks on the victim were made by the defendant or presented opinion evidence which has now been discredited.

In Ege v Yukins, 380 F.Supp.2d 852, 880-81 (E.D.Mich 2005) ("Ege I") aff'd in part, rev in part, 485 F.3d 364 (6th Cir. 2007) ("Ege II") the court Ege I, in addressing Dr. Warnick's mathematical probability testimony stated:

> "Since the bite-mark evidence was the only physical evidence tying the petitioner to the crime, its erroneous admission put the petitioner at an actual and substantial disadvantage.
> Admission of the bite-mark evidence and opinion testimony violated the petitioner's right under the Due Process Clause to a fair trial, the court finds that the evidence, already found by the state judge to be improperly admitted, "had a substantial and injurious effect or influence in determining the jury's verdict." There can be no question that the bite-mark evidence together with Dr. Warnick's 3.5 Million-to-one odds making was powerful evidence against the petitioner. The evidence plainly was "material in the sense of a crucial, critical highly significant factor.
> Dr. Warnick's evidence was unreliable and grossly misleading. The evidence was so extremely unfair that it's admission violates fundamental concepts of justice.
> The court is not convinced that the trial, which included Dr. Warnick's testimony produced a just result."

———
5. David L. Faigman, David H. Kaye, Michael J. Sacks & Joseph Sanders, Modern Scientific Evidence the Lay and Science of Expert Testimony, Identification from Bitemarks; The scientific Questions; Uniqueness of the Human Dentition, 30-2.1.5, 552 (1997). (Exhibit A).

6. People v Wright, 463 Mich 905 (2001) (Case remanded to the trial court to conduct Davis-Frye[2] hearing on the matter of Dr. Warnick's testimony regarding the application of the statistical probabilities to the comparison between defendant's dentition and the bite marks on the victim. The trial court was ordered to rule on the question whether the testimony of Dr. Warnick was admissible under the Davis-Frye standards.

In *Ege II* addressing Dr. Warnick's testimony held:

> Trial court's erroneous admission of prosecution expert's testimony in murder trial that among 3.5 million residents of the Detroit metropolitan area, petitioner's teeth, and only her teeth, could have made the mark on victim's cheek substantial prejudiced the outcome of petitioner's trial, even in light of other circumstantial evidence against her, and deprived petitioner of her due process right to a fair trial.

The Court stated that Dr. Warnick's statistical probability testimony "WAS BUNK." *Id.*   485 F.3d at 373.

Since the record is not complete about these matters, this court should conduct a *Daubert* hearing.

Petitioner incorporates his Argument II, from  Petitioner's Brief in Support for Petition for Writ of Habeas Corpus

## INEFFECTIVE ASSISTANCE OF TRIAL & APPELLATE COUNSEL

Petitioner in pursuit of his post-conviction appeal -- (the instant matter) -- sought *Ginther*[7] hearing's at the trial court, Michigan's Court of Appeals and Supreme Court in relationship to retained  trial counsel Thomas Wilhelm, and, Ronald E. Kaplovitz, appointed appellate counsel. The trial court denied the request:

> The defendant alleges that he was deprived of the effective assistance of counsel by the performances of his trial and appellate attorneys. The defendant did not preserve this issue by raising it in this Court. The defendant did, however, raise this issue in his appication to the Supreme Court. The defendant's application was denied by an order of the Supreme Court and the defendant may not, therefore, be granted relief based upon this issue. MCR 6.508(D)(2). Furthermore, the record in this case establishes that the Petition was afforded competent representation by his trial and appellate attorneys.  The defendant was convicted and his conviction was affirmed because there was strong evidence of the defendant's guilt and because the Appellant received a fair trial." The defendant is not entitled to any relief from judgment based  upon his claim of ineffective assistance of counsel.

The trial court misstated the record. Petitioner sought to have Mr. Kaplovitz file ineffective assistance of trial counsel. He refused. Thereby, Petitioner filed a supplemental brief with the Michigan ~~Supreme Court~~ Court of Appeals. That court sent the supplemental brief to Mr. Kaplovitz for him to file, and subsequently denied permission to file.

Secondly, the ~~Michigan Supreme Court~~ brief that Petitioner filed *pro se* alleged that appellate counsel was not acting on Petitioner's behalf when he (1) failed to assist in filing Petitioner's supplement brief; (2) refused to visit and discuss issues germane; (3) filing appellate brief without first showing it to Petitioner to determine if the facts were correct; (4) failed to obtain Petitioner's trial file from trial attorney; and (5) **FOUND GUILTY OF VIOLATING ETHICS AFFECTING** Petitioner's **APPEAL RIGHTS** by the Michigan Attorney Grievance Commission.

The Michigan Supreme Court accepted the ~~supplemental~~ brief but denied the brief by  stating that

---

7. *People v Ginther*, 390 Mich 436 (1973) (A defendant who wishes to advance claims that depend on matters not of record can properly be required to seek at the trial court level an evidentiary hearing for the purpose of establishing his claims with evidence as a precondition to invoking the process of the appellate courts.)

the issues should not be reviewed by that court, giving the impression that Petitioner should first file the constitutional claims with the trial court. Therefore, there was no ruling on Petitioner's constitutional claims of ineffective assistance of trial and appellate counsel for failing to raise ineffective assistance of trial counsel.

Whether the allegedly ineffective assistance of Petitioner's appellate counsel excuses Petitioner's failure to raise the issue of his trial counsel's ineffectiveness on direct appeal presents a complex question. As the Court in *Howard v Bouchard*, 405 F.3d 459, 478 (6th Cir. 2005) held: "ineffectiveness of appellate counsel can suffice to show sufficient cause and prejudice for failure to raise an ineffective-assistance-of-counsel claim." Counsel's failure to raise an issue on appeal, however, constitutes ineffective assistance "only if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *Id.* Whether raising the issue might have changed the result of the appeal, in turn, gores to the merits of the claim itself. Thus, in order to determine whether the procedural default of Petitioner's ineffective-assistance-of-trial-counsel claim may be excused by the ineffective assistance of appellate counsel, this Court must examine the merits of his ineffective-assistance-of-trial-counsel claim by conducting an evidentiary hearing. *McFarland.*[3] See also *Bryan v Mullin*, 335 F.3d 1207, 1215 (10th Cir. 2003) (evidentiary hearing properly granted on ineffective assistance claim because petitioner diligently sought to develop factual basis of his claim in state court.)

INEFFECTIVE TRIAL COUNSEL:

From an examination of the record, it is apparent that defense counsel in 1988 was constitutionally ineffective in the following ways:

A. Failed to object to a composite drawing (that bore a striking resemblance to Petitioner's driver's license), that was not the original drawing that appeared in the Oakland press. Whenever an identification procedure is "[u]nnecessarily suggestive and conductive to irreparable misidentification," it must be suppressed. *Stovall v Denno*, 388 U.S. 293; 87 S.Ct. 1967 (1967). Where identification evidence is at issue, no such special consideration justify a departure from the presumption that juries will follow instructions. It is the reliability of a identification evidence that primarily determines its admissibility. *Watkins v Sowders*, 449 S.Ct. 341; 101 S.Ct. 654 (1981).

B. Failed to object when statistical analysis testimony was allowed without a proper foundation when it is required for statistical analysis testimony. *People v Adams*, 195 Mich App 267 (1992). In this case, Dr. Warnick, testified that the odds of anyone other than Petitioner's teeth making the same patterns are "2.1 billion to one." (T-III-A, 26). Trial by mathematics is not permitted. Id. "The flaw in Dr. Warnick's statistical opinion should have been obvious and its admissibility readily assailable. The opinion was based on the mathematical product theory, a proposition that long has been condemned, one might expect that lodging a contemporaneous objection would be a standard operating procedure for a competent lawyer." *Ege I.*

C. Failed to obtain an expert witness to rebut Dr. Warnick's statistical/mathematical

certainty that "anyone other than defendant's teeth making the same patterns are 2.1 billion to one." (T-III-A, 26). Trial by mathematics is not permitted. *People v Adams, supra.*

D. Failed to investigate blood evidence. The victim had blood type "O"; Petitioner has blood type "AB". Counsel failed to present to the jury that blood found at the crime scene and on the victim's body was type "A". Whose blood was found? Counsel's failure to investigate key evidence and present it to the jury or to make a reasonable decision that a particular investigation is not necessary constitutes ineffective assistance, and thus precludes an argument that counsel's course of action was based on legitimate choice. *Sims v Livesay*, 970 F.2d 1575 (6th Cir. 1992).

E. Counsel did not contact Mr. David Woodford, laboratory specialist, who examined biological evidence, before trial. He only talked with Mr. Woodford during trial on the telephone. And, without Petitioner's consent. Counsel waived Petitioner's confrontation rights to cross-examine laboratory specialist Mr. Woodford. Petitioner's are entitled to confront authors of testimonial police lab reports because the reports are prepared in anticipation of litigation. *United States v Diaz*, 223 U.S. 442 (1912). The right to confrontation is personal and fundamental and cannot be waived by counsel. *Brookhart v Janis*, 384 U.S. 1, 7; 86 S.Ct. 1245, 1248 (1966). The Woodford report was given to the jury by the prosecutor, who then gave false statements about its contents.

F. When the prosecutor moved to strike Mrs. Christina Mejia, the victim's mother, without consent counsel waived Petitioner's confrontation rights to cross-examine her. Mrs. Mejia's testimony would have refuted the testimony of the prosecutor's chief witness, Connie Cook, who stated that Petitioner went to the victim's apartment before and after the homicide. Mrs. Mejia's statement to the police was that she heard her son arrive around 2:00 a.m. at their apartment and said "Hi Mom." He statement indicated that she got up later and after looking around the apartment did not see her son. Ms. Cook's testimony was that the Petitioner went to the victim's apartment before the homicide to have a drink with the victim. And went to the apartment after the homicide looking for car keys and to clean blood from himself. Mrs. Mejia's testimony would have established that defendant was never at the apartment and the apartment keys were on the victim's car key ring. A defendant has a constitutional right to confront the witnesses against them to expose any falsehoods and to reveal the truth. *Pointer v Texas*, 380 U.S. 400; 85 S.Ct. 1065 (1965).

Petitioner seeking new trial because of prosecution's failure to produce witnesses was required to request an evidentiary hearing which would have provided a complete record for review on appeal. *People v Kaigler*, 81 Mich App 34 (1978). Petitioner is entitled to a hearing to produce a complete record of being denied cross examination of Mrs. Mejia and Mr. Woodford.

G. Mr. Wilhelm, trial counsel impeded Petitioner's appeal of right by withholding reports, records and transcripts until Petitioner filed a compliant with the Attorney Grievance Commission.

7

proposition that long has been condemned, one might expect that lodging a contemporaneous objection be standard operating procedure for a competent defense lawyer." *Ege I, supra.* In *Ege II* the Court stated that Dr. Warnick's statistical probability testimony "WAS BUNK." *Id.* 485 F.3d at 373.

D. Refused to visit Petitioner and discuss the trial and review issues raised in the appellate brief prior to filing in the Michigan Court of Appeals. Denial of an opportunity to communicate with counsel is a constitutional error requiring reversal. Counsel means open and complete communication. *Lakin v Stine*, 44 F.Supp.2d 897 (E.D.Mich. 1999).

E. Omitted viable issues from appeal without investigation. *Mapes v Coyle, supra.* Appellate counsel raised: (1) trial court instructions on elements of both premeditated and felony first degree murder were incorrect: (2) trial court erred by allowing evidence of bite mark without a *Davis-Frye* hearing; (3) the jury was not apprised of promises made to witnesses by the prosecutor; (4) Petitioner was not provided with full discovery; (5 not enough evidence to support verdict of the jury; (6 the district court erred in binding Petitioner over to circuit court for trial; (7) Petitioner was not properly convicted of first and felony murder.

It must be noted that appellate counsel failed to properly present that Petitioner was convicted of two theories. The Michigan Court of Appeals stated:

> "Even though the defendant was sentenced only on the first-degree murder charge, the jury may not return a guilty verdict on first-degree murder and felony murder where only one murder occurred. Accordingly, we modify the judgment of sentence to show that his conviction is for one count of first-degree murder supported by two theories: first-degree premeditated murder and first-degree felony murder." Where one of two alternative theories of guilt is legally insufficient to support a conviction, and where it is impossible to tell on which theory the jury relied, defendant is entitled to reversal of his conviction and a new trial. *People v Grainger*, 117 Mich App 740 (1982).

Appellate counsel omitted raising:

(1) Dr. Warnick's statistical/mathematical testimony was a trial by mathematics. (Even after being notified by letter, from trial counsel Thomas V. Wilhelm, that "bite mark materials should be reviewed carefully.";

(2) The testimony of Dr. Warnick of "certainty of guilt" is false evidence and misrepresentation of articles and tests by other experts. *People v Wright*, 463 Mich 905 (2001).

(3) Denial of Confrontation rights by allowing testimonial hearsay laboratory reports of Mr. Woodford a testimonial witness's statement into evidence without confrontation;

(4) Refused to raise ineffective assistance of trial counsel. "Appellate counsel's failure to raise ineffective assistance of trial counsel on direct appeal establishes both a separate constitutional defect and establishes cause and prejudice sufficient to excuse procedural default." *Carver v Straub*, 349 F.3d 340 (6th Cir. 2003).

F. Refused to assist Petitioner in filing a supplemental Brief on appeal. *Fields v Bagley,*

275 F.3d 478 (6th Cir. 2001).

Petitioner wrote to appellate counsel asking him to file two issues: Petitioner was denied a fair trial by prosecutor misconduct, and ineffective assistance of trial counsel. Appellate counsel refused to file the issues. Petitioner, in turn, filed a supplemental brief raising the two issues. The supplemental brief was returned by the court with a letter stating that all pleadings must go through counsel.

G. Failed to file a timely notice of appeal. Petitioner filed a grievance with the attorney Grievance Commission. Appellate counsel was found guilty of violating MCR 9.104(1)-(4); MRPC 1.1(C), 1.3 and 8.4(a) and (c). The right to effective assistance of counsel includes the right to the effective assistance of appellate counsel. *Evitts v Lucey, supra.*

H. Refused to raise ineffective assistance of trial counsel. i.e., trial counsel waiving Petitioner's confrontation rights. A claim raising trial counsel ineffectiveness will no longer be considered waived because new counsel on direct appeal did not raise a claim related to prior counsel's ineffectiveness. *Massaro v United States,* 538 U.S. 500; 123 S.Ct. 1690 (2003).

Petitioner incorporates Argument VIII from his Brief in Support of Petition for Writ of Habeas Corpus in support of ineffective assistance of appellate counsel.

An evidentiary hearing is mandated on ineffective assistance of appellate counsel.

Since the record is not complete about these matters, this court should hold an evidentiary hearing. *McFarland.*

WHEREFORE, for these reasons, Gilbert L. Poole, Petitioner, asks this court grant his request for an evidentiary hearing, or a new trial, or the alternative, reinstate his appeal of right.[8]

Respectfully submitted,

*Gilbert Lee Poole A.*

Gilbert Lee Poole #202095
Petitioner, *pro se*
Kinross Correctional Facility
16770 Watertower Drive
Kincheloe, MI 49788

Dated: July 7th, 2008

---

8. Appellate counsel's ineffectiveness warrants reinstatement of appeal. *Allen v United States,* 938 F.2d 664 (6th Cir. 1991).

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GILBERT LEE POOLE,

      Petitioner,

                                                    Civil Action No. _____

vs.

JEFFERY WOODS, Warden,

      Respondent.

_____/

Appendix

A -- David L. Faigman, David H. Kaye, Michael J. Sacks & Joseph Sanders, Modern Scientific Evidence the Lay and Science of Expert Testimony, Identification from Bitemarks; The scientific Questions: Uniqueness of the Human Dentition, 30-2.1.5, 552 (1997).

B -- Composite Drawing done by Robert Lisk

C -- Drawing done from Petitioner's driver's license

D -- July 16, 1988 Oakland Press composite drawings by Robert Lisk

E -- December 5, 2007, Affidavit of Petitioner in support of evidentiary hearing in state court

EXHIBIT A