§ 30–2.1.4                    FORENSIC SCIENCES                              Pt. 4

Ch. 30

the time of the orig
dimensions (i.e., too

**Table 3**
**Various Overlay Fabrication Techniques Ranked
According to Accuracy**

[2]  **Bruising and**

Recognition of
requires that the in
to be teeth are an a

| Rank | Area | Rotation |
|------|------|----------|
| 1 | Computer-based | Computer-based |
| 2 | Radiopaque wax | Xerographic |
| 3 | Hand-traced from wax | Hand-traced from wax |
| 4 | Hand-traced from study casts | Hand-traced from study casts |
| 5 | Xerographic | Radiopaque wax |

After Sweet and Bowers (1998)

§ 30–2.1.5   **The Scientific Limitations of Bitemark Testimony**

The following section describes several scientific issues involving bite-
mark analysis. This is presented to illuminate the interface between the rules
of scientific admissibility and reliability issues involving forensic dentistry.

[1]   **The Accuracy of Skin as a Substrate for Bitemarks**

Central to bitemark analysis are the characteristics of the skin receiving
the mark, because, in cases of physical assault having skin injuries, the
anatomy and physiology of the skin, and the position of the victim, affect the
detail and shape of the bitemark. DeVore[31] showed how the positioning of the
test bite (actually, it was an inked circle) on a bicep varied depending upon
whether the arm was flexed or pronated. (See Figure 2.) What is significant in
casework and report writing is the need to experimentally control or establish
the amount of positional variation in an actual bitemark case. Use of a live
victim in a reenactment is difficult and a deceased individual will not be
available. No important papers have been published on this subject since
DeVore's in 1971.

**Figure 2**
*Two Identical Marks on Human Skin. The Lower Has Been
Distorted by Applying Pressure to the Area
(Duplicating Devore's Test)*



Another issue is the amount of detail present in the bitemark. Skin is a
poor impression material. The injury may be a series of reddened bruises at

31.  *Supra* note 14.

548

Dailey and Bov
gists and other fore
of discoloration pre
response to a suffic
fading from visual
tissue due to the r
appearance of bruis
invalid by numerou
studies of these d
unlikely that a bi

The bitemark
ments, angles, and
teeth of any suspec
the determinations
to the dentist com
dimensional (i.e., b
unique) features i
spaces, rotations, a
this type of injury.

[3]   **The Issue of**

Another foun
arrangement of s
Attempts to deter
has a history in
demonstration of
more than one pe
case is the challen

If, however, i
the task is made
registration and

32.  J. Curtis Dail
*Aging of Bitemarks, A
FORENSIC Sci. 791 (199

33.  *Id.*

34.  DOMINICK J. D
MAIO, FORENSIC PATHOL

35.  N.E.I. Langlo
*Aging of Bruises: A .
Colour Changes with
INT'L 227 (1991).*

the time of the original photograph. It is rare to see the presence of three-dimensions (i.e., tooth indentations) which could be used for increased detail.

## [2]  Bruising and Other Considerations

Recognition of the fact that bruising is actually subcutaneous bleeding[32] requires that the investigator not assume that the reddened areas that appear to be teeth are an accurate representation of individual teeth.

Dailey and Bowers[33] describe the shortcomings of attempts by odontologista and other forensic experts to "age" skin injuries according to the degree of discoloration present in the mark. During the process of healing, or skin response to a sufficient force, the bruise will go through color changes before fading from visual recognition. A bruise is an "area of hemorrhage into soft tissue due to the rupture of blood vessels caused by blunt trauma."[34] Using appearance of bruises for the purpose of aging a wound has been judged to be invalid by numerous investigators. A review of research reporting controlled studies of these discolorations over time concluded that, "it would seem unlikely that a bruise could be reliably aged from appearance alone."[35]

The bitemark should be thoroughly analyzed *first*. That means measurements, angles, and other features should be exhaustively studied before the teeth of any suspect(s) are viewed.[36] This provides a modicum of control where the determinations of the forensic value of the bitemark are established prior to the dentist comparing the suspect's dental evidence. The realities of two-dimensional (i.e., bruises) bitemarks suggest that finding individualizing (i.e., unique) features in bitemarks is extremely rare. The details of intertooth spaces, rotations, and blank spaces between teeth are the principal features of this type of injury.

## [3]  The Issue of Individuality of Human Dentition

Another foundation of bitemark analysis is the belief that the total arrangement of a person's dentition creates a dental "profile" of sorts. Attempts to determine, or demonstrate, the uniqueness of human dentition has a history in bitemark analysis that stretches over four decades. The demonstration of uniqueness is a blend of art and opinion. The probability of more than one person producing a similar or identical bitemark in a specific case is the challenge in every bitemark case.[37]

If, however, it can be said that no two humans have the same dentition, the task is made easier, because (putting aside technical problems of the registration and reading of the bitemark[38]) the theoretical probability of a

---

**32.** J. Curtis Dailey & C. Michael Bowers, *Aging of Bitemarks, A Literature Review*, 42 J. FORENSIC SCI. 791 (1997).

**33.** *Id.*

**34.** DOMINICK J. DIMAIO & VINCENT J.M. DIMAIO, FORENSIC PATHOLOGY (1993).

**35.** N.E.I. Langlois & G.A.Gresham, *The Aging of Bruises: A Review and Study of the Colour Changes with Time*, 50 FORENSIC SCI. INT'L. 227 (1991).

**36.** Reidar F. Sognnaes, *Forensic Bitemark Measurements*, 55 DENTAL SURVEY 34 (1979).

**37.** John Beckstead et al., *Review of Bitemark Evidence*, 99 J. AM. DENTAL ASSOC. 69 (1979).

**38.** For example, Rawson & Ommen, *supra* note 28, utilized teeth impressions in wax which were then hand traced and computer analyzed. Because bitemarks in skin were not the target of the 397 sets of wax teeth marks

coincidental match becomes zero, and then no probability need be worried about, much less calculated. Legal commentaries from the 1970s and 80s attacked bitemark analysis as a "new and unfounded science of identification"[39] and pointed out that the "uniqueness of the human dentition hasn't been established."[40] The odontology response then and now has been to base its assertion of uniqueness on a small number of journal articles which are less than persuasive in their efforts to prove uniqueness scientifically.[41]

One approach to trying to prove uniqueness has been the comparison of identical twins.[42] The notion is that if "even" identical twins show differences, then every individual on earth "must therefore" be different from every other individual on earth. The logic that goes from the evidence to the conclusion is not especially clear, but we can understand why, as a means of proving uniqueness, it is fundamentally unsound. When it is shown that identical twins do not have identical dentition (or fingerprints, or hair, or anything else), what that establishes is that the genotype for these traits is not isomorphic with the phenotype. Thus, genetics cannot be relied upon as a basis for concluding that those forensically relevant traits vary in accord with all that we know about genetics. Rather, it means that non-genetic, presumably random, factors introduce some disconnection between the genes and their physical expression. Rather than proving that, because identical twins show differences, everyone else must also, it proves that even the attributes of identical twins reflect these random factors and those random factors must be taken into account in determining the probability of a coincidental match. Rather than obviating the need for objective calculations, it brings us right back to the need to calculate probabilities of coincidental matches.

The heavy use of probability theory is seen in the seminal bitemark articles of the last four decades.[43] Their implication is that so much variation exists in the morphology and position of teeth that, when the product rule is applied, the probability of two being alike approaches the vanishing point. For example, some authors point to hypothetical frequencies of occurrence of more rare or "uncharacteristic" features, multiply them according to the product rule per Keiser–Neilsen, based on the assumption that these features are independent of one another, and arrive at vanishingly small probabilities.[44] Keiser–Neilsen was not, however, talking about bitemarks (far more limited representations of dentition) when he introduced the use of the "product-rule"[45] in 1960. He was offering a purely theoretical application of

he choose to investigate out of a larger cohort of 1200, the generalizability of the findings to actual bitemarks is questionable.

39.  A. Wilkinson & R. Gerughty, *Bitemark Evidence: Its Admissibility is Hard to Swallow*, 12 W. St U. L. Rev. 519 (1985).

40.  Adrian Hales, *Admissibility of Bitemark Evidence*, 51 S. Cal. L. Rev. 309 (1978).

41.  Sognnaes & Rawson, *supra* note 28; Rawson & Ommen, *supra* note 28.

42.  *See* discussion, *infra* § 2.1.6 [2].

43.  S. Keiser-Nielsen, Person Identification by Means of the Teeth (1980); Gerald L. Vale,

Reidar F. Sognnaes & Thomas T. Noguchi, *Unusual Three-Dimensional Bitemark Evidence in a Homicide Case*, 21 J. Forensic Sci. 642 (1976); Rawson & Ommen, *supra* note 28.

44.  Rawson & Ommen, *supra* note 28.

45.  The product rule applied to dentition states that the probability of the joint occurrence of several attributes is the product of each separate attribute's frequency in the relevant population. This assumes each component occurs independently, something which is not yet known to be true.

basic notions of probability, assuming that each dental feature was independent of the next and that the product of each frequency of occurrence could be used to establish the frequency of all the features occurring at once. He was actually talking about missing and filled teeth, not bitemarks. Thus, because bitemarks involve many fewer attributes than full sets of teeth, the probabilities can never get as small as Keiser–Nielsen's and the identifications can never be as individuating.

Another problem is that the use of the product rule requires that the separate attributes going into the calculation be independent of each other, otherwise the probability arrived at understates the improbability of the joint occurrence of the attributes. None of studies taking the probability approach to uniqueness of dentition have achieved, or even attempted, to determine whether the attributes of dentition are uncorrelated with each other. To the contrary, some research indicates that the distribution of some tooth positions are less random than others.[46] For example, Figure 3 shows the tooth position data sets for six upper and lower teeth. The frequency of occurrence varies within each upper and lower sample. If each tooth position were occurring independently, the numbers would be similar. For instance, the lower set values of 116.0 and 153.5 are for the two lower front teeth, a considerable difference.[47] The lack of randomness of dental values (shape and position) was reported in a much earlier British paper.[48]

Figure 3. Number of Different Tooth Positions Found for Sets of Six Upper and Lower Teeth.



After Rawson et al. (1984).

The largest problem with using probability theory to prove unique individuality is that it is simply incapable of doing so, something that other forensic identification sciences realized some time ago.[49] Probability leads only

46. Rawson & Ommen, *supra* note 28.

47. *Id.*

48. *Supra* note 15.

49. HAROLD CUMMINS & CHARLES MIDLO, FINGER PRINTS, PALMS AND SOLES: AN INTRODUCTION TO DERMATOGLYPHICS (1943); David A. Stoney, *What Made Us Ever Think We Could Individualize Using Statistics*, 31 J. FORENSIC SCI. SOC'Y 197 (1991).

Case 3:09-cv-12935-GCS-LJM   ECF No. 1-2, PageID.54   Filed 07/30/09   Page 4 of 50

§ 30–2.1.5          FORENSIC SCIENCES                    Pt. 4                Ch. 30

to probabilities, never to unique, one-of-a-kind certainties. Though it may be the best route to uniqueness, it is incapable of arriving at the desired destination.[50]

What the mathematics of probability can be used for is to calculate the probability of a coincidental match, and that probability can be reported to the trial factfinder. A forensic dentist can never say that the apparent similarity between a bitemark and a suspect's dentition links the suspect with certainty to the crime scene, but the jury could be informed of the probability that a person selected at random would have so similar a match. This is exactly what DNA typing leads to: not assertions of unique matches but a probability of coincidental matches. And that is precisely what other forensic identification sciences such as odontology could do.[51] Unfortunately, forensic dentists have not yet gathered the data to perform these calculations and so their opinions and testimony cannot give such information to factfinders. Thus, while it is true that we could calculate the necessary probabilities based on "missing teeth, pattern of rotation, angulation or position of each tooth ... if the frequency of certain positions is known for the general population,"[52] the unfortunate state of affairs is that obtaining those frequencies has not yet been accomplished by the field of forensic odontology.

In practice, then, forensic dentists have no choice but to fall back on intuition about frequencies and leaps of inference to reach their conclusions. The forensic dentist intuits the forensic weight (value) that various characteristics possess. The ABFO Workshop #4 data indicating a high false positive error rate may reflect an over-estimation of the individualizing value of various features. Not all bitemarks have the level of forensic value necessary to identify just one individual. Toolmark terminology was adopted early on by odontologists for discussing the types of dental features seen in bitemarks and the human dentition. A characteristic within a bitemark or in a person's dentition is a distinguishing feature, trait, or pattern. A class characteristic reflects a feature of generic value to a large population. Each human tooth has shape and position features common to the human species. Determining whether an injury is a human bitemark depends on these class characteristics being present in the injury.

Individual dental characteristics are said to be features that are unique to an individual variation within a defined group. The presence of worn, fractured or restored teeth is valued as unique features. If a bitemark possesses the reflection of such a feature, the degree of confidence in a match increases.[53] The odontological literature is silent regarding the frequency of these traits. It is actually rather counter-intuitive to assume enamel chips, fractures, and dental restorations are inherently unique. The shape of human teeth is quite constant in nature and their changes over time is based on

**59.** "It is unfortunate that this approach carries the implication that a complete correspondence of two patterns might occur ..." "... it is impossible to offer decisive proof that no two fingerprints bear identical patterns." CUMMINS & MIDLO, *supra* note 49.

**51.** Michael J. Saks & Jonathan J. Koehler, *What DNA "Fingerprinting" Can Teach the Law About the Rest of Forensic Science*, 13 CARDOZO L. REV. 361 (1991).

**52.** DAVID L. FAIGMAN, DAVID H. KAYE, MICHAEL J. SAKS & JOSEPH SANDERS, MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY, *Identification from Bitemarks: The Scientific Questions: Uniqueness of the Human Dentition*, § 24–2.1.1[1], 168(1997).

**55.** *Id.* at 167.

EXHIBIT B





EXHIBIT C



*Robert Lisk*

EXHIBIT D

ARTICLE # 011

up 06/16/08

011615 2215modrack, composites, MedisRobert, release,
Pontiac, Police Department, reward, Silent Observer, sketches,
DetSSantiago, Poppers of Pontiac, Glenwood Avenue????
=medis
a3 thurs w/two composites
add end of —
Eds: there are two separate composites, prepared under the
instruction of two separate people. They are quite similar,
though one has a hat. To tie would like us to run both, if
this is not possible, perhaps we can run one tomorrow, and
one at another time. Thank you for your support, bam.
re-cut 105
836 30/2

#636~sw34"

for man

who left bar with Medis
x105
Composite 1
Composite 2

BY RIA MODRACK
Of The Oakland Press

Two similar
composites of a strawberry blond man with a scruffy beard
who is believed to have left a Pontiac bar with Robert Medis
have been released by the Pontiac Police.
The composite drawings were prepared under the instruction
of two people who were in the bar June 6, on what is believed
to be the last night of Medis's life. One depicts the man
wearing a hat, and one is hatless.
Medis, 35, Oakland County's equal opportunity specialist
and the former Latin Affairs supervisor for the city of
Pontiac, was found slain June 7 in a secluded field near
the Pontiac apartment he shared with his mother. An autopsy
revealed he died of multiple stab wounds.
Police now believe he was killed elsewhere and his body
was dumped near a sandy trail, passable with difficulty
in cars or more easily by a truck or off-road vehicle.
Medis was last seen around 2 a.m. leaving Poppers of
Pontiac, a bar on Glenwood Avenue, with a man matching the
description of the composites.
It was not a man anyone in the crowd of regulars had
ever seen before. He is described as white with reddish blond
hair, a scruffy, four- or five-day growth of beard around
5 feet 9 inches tall, weighing between 155 and 175 pounds.
"I can't call him the killer, but I want to talk to
him," said Det. Santiago Serna of the Pontiac Police.
A reward of up to $2,000 is available under the Silent
Observer program sponsored by the Oakland County Chamber
of Commerce for information leading to the arrest and conviction
of a suspect in this crime. Persons with information should

call Serna at 857-7912.

(Copyright, the Oakland Press 1988)

Case 2:07-cv-12955-GCS-LJM   ECF No. 1-2, PageID.63   Filed 07/10/08   Page 13 of 50

residents are the student family the two other unnamed people is assigned to Judge ser.

## ports record usage

hourly electricity use in set Tuesday by Michigan customers of on. In the hour ending at 4 nd peaked at 7,995,000 te previous record, set 23 ', was 7,878,000 kilowatts. record, set in July 1987, is kilowatts. The company buted the high usage to current hot sp—

### cases wai

Held Townsi sitened a ha aid Supervi lcIntosh sal itering was as in the case of saving an water between midm. The ban was put into e several residents had or pressure problems. sities, including Waterp and Rochester, have har water use restric-

### for killing fowl

d in an attack that killed undeterred franchise in the old Oakland County Ko. Ann Wakeham cross 0 township Australian a last week, police said. te place in a field in the ancient. One dog escaped over a fence, but the second and placed in the helter.

### tures strike some

atures and light rain land County electrical esday. Traffic lights on Township went dark 7:30 p.m. Homes in afield Hills were still laity at 11 p.m. Sections Township, Lake Orion, ester and Waterford had minor power

### stereo equipment

ombler man was robbed earlier Tuesday men and two other found the three firea items that remained yard sale in the 1100 workers and ripping stereo equipment said Pontiac Police ith. He hit one with a id one of the others m and ordered the back off. The three is white man in their 1968 Pontiac.

---

By MIKE SMITH
Of The Oakland Press

## LOCAL



The Oakland Press
Thursday, June 16, 1988   ★ ★ ★ ★ A-3

Administrative charges seeking the dismissal of a Rochester teacher accused of fondling seven middle school students were abruptly withdrawn Wednesday, after an agreement was reached requiring the teacher to resign if convicted.

Under terms of the agreement announced by school board President Roger Conley, 46-year-old Lawrence Simmons was put on unpaid suspension Wednesday until the charges pending against him are resolved.

Simmons, who had been on paid suspension since May 24, will resign if

counts of criminal sexual conduct after female students at the West Middle School complained he had fondled them. He has pleaded not guilty to all counts, and is scheduled to face Circuit Court arraignment on the charges June 22.

The school district "sincerely believes in due process," Superintendent John M. Schultz told a large audience gathered for the board's weekly meeting. "A tenure hearing would certainly be difficult for all involved."

Schultz added that the agreement allows the district to hold off on deciding Simmons' future with the district "until the courts have made their decision."

Some observers had questioned

TIP US OFF: If you have news about events in your community, call Susan Belnial city editor, at 332-8181, Ext. 298.

---

# Police searching for man who left bar with Mejia

By E.A. RUDBACK
Of The Oakland Press

Two similar composites of a strawberry blond man with a bushy beard who is believed to have left a Pontiac bar with Robert Mejia have been released by the Pontiac Police.

The composite drawings were prepared under the supervision of two people who were in the bar June 5, on what is believed to be the last night of Mejia's life. One depicts the person wearing a hat, and one is hatless.





Mejia, an Oakland County's equal opportunity specialist and the former Latin America supervisor for the city of Pontiac, was found slain June 7 in a secluded field near the Pontiac apartment he shared with his mother. An autopsy revealed he died of multiple stab wounds.

Police now believe he was killed elsewhere and his body was dumped near a sandy trail, passable with difficulty by a car or more easily by a truck or off-road vehicle.

Mejia was last seen around 2 a.m. leaving Peppers of Pontiac, a bar on Glenwood Avenue, with a man matching the description of the composites.

It was not a man anyone in the crowd of regulars had ever seen before. He is described as white with reddish-blond hair, a barrelly "four- or five-day" growth of beard, around 5 feet 3 inches tall, weighing between 185 and 175 pounds.

"I can't call him the killer, but I want to talk to him," said Det. Santiago Serna of the Pontiac Police Department.

A reward of up to $1,000 is available under the Silent Observer program sponsored by the Oakland County Chamber of Commerce for information leading to the arrest and conviction of a suspect in this crime. Persons with in-

A Brandon Township fire department to make arson which began at about 5 p.m. probably was started by the two the scene of a cemetery r said, Damage estimate investigation.

---

# New city hikes for s

By BOB ORTZINGER
Of The Oakland Press

Increases in Pontiac water rates and other fees charged services must be approved b Pontiac City Council voted say.

Most city departments have on revenue from fee increase budgets for the coming fiscal Councilman Michael Willis proving a city budget depe unapproved fee increases was same as approving an illeg budget.

Mayor Walter Moore's $123.5 million 1988-89 budge layoffs and maintains servic cluding revenue from a propos cent water and sewer rate inc revenue from special "user" fe

The proposed water and se increase is needed to offset losses caused by General...

EXHIBIT E

STATE OF MICHIGAN
IN THE MICHIGAN SUPREME COURT

PEOPLE OF MICHIGAN
        Plaintiff-Appellee,

v.

GILBERT LEE POOLE,
        Defendant-Appellant.
——————————————/

Supreme Court No.
Court of Appeals No. 276973
Lower Court No. 89-90203-FC

AFFIDAVIT IN SUPPORT OF A
MOTION FOR *WRIGHT* HEARING IN LIEU OF LEAVE TO APPEAL

Gilbert L. Poole, being duly sworn, deposes and says;

1. That I am the Defendant-Appellant in the above entitled matter.

2. That my conviction in June, 1989 was based in large part on the statistical/mathematical certainty testimony of Dr. Warnick that the odds of anyone else making the same bite-mark on the victim is 2.5 billion to one.

3. That Dr. Warnick's bite mark evidence in Defendant-Appellant's case was almost identical testimony used and been discredited in *People v Moldowan*, 466 Mich 862 (2002); *People v Wright*, 463 Mich 905 (2001); and *Ege v Yukins*, 380 F.Supp.2d 852 (E.D.Mich. 2005).

4. that at a hearing I will prove that the testimony provided by Dr. Warnick in Defendant-Appellant's case is the same that he has provided in other cases that have now been reversed based on statistical mathematical certainty that has never been accepted by forensic dentists.

Respectfully submitted,

*Gilbert L. Poole*

Gilbert Lee Poole #202095
Defendant-Appellant
Kinross Correctional Facility
16770 Watertower Drive
Kincheloe, MI 49788

Dated: December 5ᵗʰ, 2007

Sworn to befoe me this 5ᵗʰ day of December,    2007.
Notary public

*William H. Bonnee*

William Herman Bonnee
Notary Public, State of Michigan, County of Chippewa
My Commission Expires on 3-24-2012
Acting In The County of Chippewa

5

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GILBERT LEE POOLE,
    Petitioner,

                                          Civil Action No. _____ ___

vs.

JEFF WOODS, Warden,
    Respondent.
_____/

PETITION FOR WRIT OF HABEAS CORPUS
BASED UPON NEWLY PRESENTED EVIDENCE OF
ACTUAL INNOCENCE AND A MISCARRIAGE OF JUSTICE

Petitioner, Gilbert Lee Poole, in *pro per*, respectfully states:

### PROCEDURAL HISTORY

1. Petitioner is a citizen of the United States, is a resident of Chippewa County, Michigan, and is currently imprisoned in Kincheloe, Michigan.

2. Petitioner is currently unconstitutionally detained and imprisoned by the Respondent, at the Kinross Correctional Facility, where Petitioner is serving a term of mandatory life, imposed by Judge Edward Sosnick, of the Oakland County Circuit Court, after a jury found Petitioner guilty of premeditated first-degree murder and felony murder on June 6, 1989. His original appeal of right was affirmed by the Michigan Court of Appeals and Supreme Court.

### FACTS SHOWING EXHAUSTION OF FEDERAL CONSTITUTIONAL ISSUES

3. Petitioner has exhausted all state remedies available to him with regard to the Sixth and Fourteenth Amendment issue's raised in this petition by taking the following steps:

    a. Defense Counsel prior to, and at the beginning trial, made a motion to exclude the bite mark testimony of Dr. Allan Warnick. The trial court allowed the prosecutor to introduce Dr. Warnick's positive identification and "statistical mathematical probability" testimony of the odds that anyone other than Petitioner making a bite mark like that one was 2.1 billion to one, and that in all dental certainty it was Petitioner's teeth that bit the Victim. The trial court ruled that the question of admissibility was taken care of in the case of *People v Marsh*, 177 Mich App 161 (1989), without the need for *Davis/Frye* hearing.[1]

    b. Dr. Warnick testified that "scientific mathematical probability" of the reproduction of

_____

1. *People v Davis*, 343 Mich 348 (1955); *Frye v United States*, 293 F 1013 (CADC, 1923).

bite mark(s) in skin was established and accepted in the scientific community. Petitioner filed a motion for new trial based upon MCL 769.26 (improper admission of evidence), 770.1, 770.2, and a petition for DNA testing pursuant to MCL 770.16. Petitioner alleged that Dr. Warnick's testimony lacks acceptable scientific foundation and was inherently false. *Ege v Yukins*, 380 F.Supp.2d 852 (E.D.Mich 2005), (*"Ege, I"*) aff'd in part, rev in part, 485 F.3d 364 (6th Cir. 2007), (*"Ege II"*). The court denied this issue first relying on MCR 6.500 by stating that the question turns whether Dr. Warnick's testimony was harmless error in nature. The court, to determine whether it was harmless, used the analogy of great weight of evidence at trial. The court stated that Petitioner was seen leaving the bar with the Victim;[2] that Petitioner described the homicide to his girlfriend.[3] The court stated that because of these two factors that Petitioner has not established that, but for Dr. Warnick's testimony,[4] it is more probable than not that a different outcome would have resulted.

      c. Petitioner raised the Fourteenth Amendment issue in both the Michigan Court of Appeals (276973) and Michigan Supreme Court (135398), along with a Motion for *Wright* Hearing.[5] The point heading of this issue presented in Petitioner's Brief on Appeal was:

II     THE APPELLANT WAS DENIED A FUNDAMENTALLY FAIR TRIAL IN VIOLATION OF DUE PROCESS OF LAW THROUGH THE ADMISSION OF AN ERRONEOUS EXPERT OPINION THAT THERE WAS A "STATISTICAL/MATHEMATICAL PROBABILITY" THAT THE ODDS ARE "2.1 BILLION TO ONE" THAT THE BITE MARK WAS MADE BY ANYONE OTHER THAN THE APPELLANT, WHERE THIS OPINION WAS WITHOUT SCIENTIFIC FOUNDATION AND WHERE SUBSEQUENT CASES HAVE SHOWN THIS PARTICULAR EXPERT TO BE COMPLETELY UNRELIABLE WITH A SERIES OF DEMONSTRABLY ERRONEOUS BITE MARK IDENTIFICATION IN CAPITAL CASES. THEREFORE, THE TRIAL COURT'S DETERMINATION THAT THE ADMISSION OF DR. WARNICK'S FALSE TESTIMONY WAS **HARMLESS ERROR**, WAS ALSO AN ABUSE OF DISCRETION.

A.     ERROR WAS NOT HARMLESS, HAD A SUBSTANTIAL AND INJURIOUS EFFECT UPON JURORS.

---

    2. It must be noted that police sketches made by the witnesses that appeared in the Oakland Press came did not resemble the Petitioner at all, but other suspects. See Exhibit O attached to Brief in Support. With the drawing introduced at trial made from Petitioner's driver license. Exhibit P

    3. Ms. Connie Cook told the police that the date of the homicide occurred six months before it happen. Ms. Cook also made the statement to the police only after Petitioner had a fight with Ms. Cooks brother. And she failed a polygraph examination.

    4. Petitioner placed before the court that the prosecutor in his closing argument provided that doubt. "You got three eyewitnesses, the three people at Poppers. That alone should be enough. Throw that out. You got a full confession that matches the facts, detail by detail from Connie Cook. That alone is enough. Throw that out. You got Dr. Warnick, who's the foremost bite mark expert around He says it's those teeth. That alone is enough." (T-VI, 125-129).

    5. *People v Wright*, 463 Mich 905 (2001) (Case remanded to the trial court to conduct *Davis-Frye*[1] hearing on Dr. Warnick's testimony regarding the application of the statistical probabilities to the comparison between defendant's dentition and the bite marks on the victim. The trial court was ordered to rule on the question whether the testimony of Dr. Warnick was admissible under the Davis-Frye standards.)

d. Petitioner raised the issue that he has "newly presented evidence" on whether bite mark interpretation has met the *Davis/Frey/Daubert*[6] standard for scientific admissibility.

Even though the trial court ruled on the merits (without a *Wright* hearing), both appellate courts denied the application for leave to appeal, and the Motion for *Wright* Hearing. "If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal court review that might otherwise have been available." *Ylst v Nunnemaker,* 501 U.S. 797, 801; 111 S.Ct. 2590 (1991).

e. Petitioner was convicted in 1989. In 2005 *Ege I* was published, that Dr. Warnick's positive identifications of defendant's through mathematical probability testimony regarding bite marks have violated the fundamental concepts of justice and it's admission was substantial, injurious and prejudicially influential. The court in *Ege I* also ruled that Michigan's decisions to the contrary are unreasonable applications of federal law as established by *Brecht v Abrahamson,* 507 U.S. 619; 113 S.Ct. 1710 (1993), and *O'Neal v McAninch,* 513 U.S. 432; 115 S.Ct. 992 (1995). *Ege I* was affirmed in *Ege II* where the Court added that Dr. Warnick's "positive identification through mathematical probability date was the advancement of "junk science and unreliable."

f. Based upon the information from those cases (overturned) that Dr. Warnick testified in, Petitioner was able to place his newly presented evidence (citing *House v Bell,* ___ U.S. ___ ; 126 S.Ct. 2064 (2006) and *Schlup v Delo,* 513 U.S. 298; 115 S.Ct. 851 (1995)), before the trial court, Michigan Court of Appeals and Michigan Supreme Court as:

III   NEWLY PRESENTED EVIDENCE REQUIRES A COURT TO EITHER REVERSE THE CONVICTIONS OR PROVIDE A HEARING TO DETERMINE WHETHER BITE MARK INTERPRETATION HAS MET THE *DAVIS/FRYE/DAUBERT* STANDARD FOR ADMISSIBILITY PURPORTEDLY SCIENTIFIC EVIDENCE UNDER MRE 702.

A. NEWLY PRESENTED
B. DR WARNICK'S PREVIOUS FALSE TESTIMONY ON PROBABILITY STATISTICS
C. NEWLY PRESENTED IS NOT CUMULATIVE
D. NEWLY PRESENTED EVIDENCE WOULD RENDER A DIFFERENT RESULT PROBABLE ON RETRIAL
E. APPELLANT COULD NOT HAVE PRODUCED THE NEWLY PRESENTED EVIDENCE AT TRIAL

g. The trial and appellate courts did not address this constitutional issue of newly presented evidence in spite of, *inter alia, Ege I* and *Ege II.*. Petitioner also sought a *Wright* hearing.[5] The courts refused to conduct the hearing. Federal courts may deny preclusive effect to state court judgments only "where state law did not provide fair procedures for the litigation of constitution claims, **OR WHERE A STATE COURT FAILED TO EVEN ACKNOWLEDGE THE**

_____

6. *Daubert v Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579; 113 S.Ct. 2786 (1993).

3

EXISTENCE OF THE CONSTITUTIONAL PRINCIPLE ON WHICH A LITIGANT BASED HIS CLAIM." *Allen v McCurry*, 449 U.S. 90,101; 101 S.Ct. 411 (1980). (Emphasis added).

h. Petitioner raised the Fourteenth Amendment issue that he was entitled to DNA testing of biological material to prove his actual innocence and that the Victim was killed by someone else according to the evidence. In support of the petition for DNA testing, Petitioner submitted a letter from the Innocence Project, Thomas M. Cooley Law School stating that biological evidence was being kept in frozen storage. Exhibit N.

The Prosecutor initially asserted to the trial court that Petitioner could not prove that the evidence still existed. Subsequently, the Prosecutor submitted a supplemental rely brief to the trial court admitting that the evidence was being held by the crime lab awaiting possible court ordered testing.

The trial court in rejecting Petitioner's proof of availability of the biological evidence, also rejected the Prosecutor's confession of misleading the court to believe that the evidence did not exist and that it was being held awaiting further instructions, by making the following ruling:

"... MCL 770.16(3)(b)(i) requires that the defendant in this case establish by clear and convincing evidence that a biological material identified during the investigation in this case is available for DNA testing. The defendant has failed to establish that requirement. The defendant's motions state that such biological material evidence once existed, but does not establish by clear and convincing evidence that such biological material is available for DNA testing 18 years after the offense."

i. Petitioner placed this constitutional issue of actual innocene before the trial court, Michigan Court of Appeals and Michigan Supreme Court as:

IV   PURSUANT TO MCL 770.16, APPELLANT IS ENTITLED TO DNA TESTING OF ALL BIOLOGICAL EVIDENCE PRESENTED AT TRIAL, DUE TO THE PREJUDICIAL IMPACT OF THE PROSECUTOR'S USE OF BLOOD-TYPE TESTIMONY, WHEN DNA TESTING WOULD SIGNIFICANTLY UNDERMINE THE PROSECUTOR'S THEORY IF TEST RESULTS WERE AVAILABLE AT THE TIME OF TRIAL.

ITEMS SOUGHT TO BE TESTED PURSUANT TO 18 U.S.C. 3600:[7]

A.   Car console. Subsequent to a North Carolina search warrant, a car console was displayed at Petitioner's trial. It was described to the jury as having type "O" blood on the inside; the same type as the Victim. Thereafter, the console was described as having the "victim's blood" in it. DNA testing of the console could be compared to the victim's DNA and disprove the prejudicial inference.

B.   Biological evidence from the crime scene. A search warrant was issued in Michigan for blood and hair from the Petitioner to be compared to samples collected form the crime scene that did not match the Victim. Although the actual results were suppressed form the jury by stating "all samples collected were from the victim." DNA testing of the blood and hair samples collected from the crime scene will conclusively disprove the Prosecutor's statement and show that someone other than Petitioner or the Victim was the contributor

_____

7. See Petitioner's accompanying Motion for DNA testing pursuant to 18 U.S.C. 3600.

of the samples from the crime scene.

j. In addition to this constitution issue, Petitioner also filed with the Michigan Court of Appeals and Michigan Supreme Court, pursuant to *People v Gruenberg*, 469 Mich 986 (2004), (Remand for DNA Testing MCL 770.16), to grant his request for DNA testing of all the biological material obtained during the investigation in the instant case). The motion was denied.

k. Petitioner raised his Confrontation Clause claim with the trial court alleging that the prosecutor introduced a composite drawing that was represented to be the one and only drawing produced, and that the drawing "NAILS THE DEFENDANT," when there were at least two other drawings suppressed by the prosecution that appeared in the Oakland Press; that a non-testifying/missing (David Woodford) forensic scientist's report was misrepresented to the jury and placed into evidence by the prosecutor; that Mr. Woodford's presence was waived by defense counsel without Petitioner's consent; when the report contained suppressed exculpatory information; when the Victim's mother, a res gestae witness was waived as a witness by defense counsel without Petitioner's consent, when the witness would have refuted the testimony of Ms. Connie Cook, the person who stated that Petitioner had told her that Petitioner went to the Victim's apartment and had drinks with the Victim, and returned to the apartment after the homicide to clean up and search for car keys. The court denied by stating:

> The defendant argues that in three instances he was denied his right to confront witnesses against him. The defendant did not preserve this issue in the trial court. The defendant also did not raise this issue in his prior appeal as of right and, therefore, may not raise it for the first time in a motion from judgment. If the defendant had raised this issue in a timely manner, the standard of review for this question of law would be novo review. *People v Sierb*, 456 Mich 519, 522 (1998); *People v Connor*, 209 Mich App 419, 423 (1995).

As for the trial court stating that Petitioner cannot raise the issue of confrontation of witnesses, but states that if Petitioner had raised the issue timely, the standard of review would be different. The doctrine of law of the case is inapplicable where different questions of law are presented in prior and "subsequent appeals." *People v Goliday*, 153 Mich App 29 (1986). The issue of confrontation in this petition is different than previously submitted. The trial court in this matter pursuant to MCL's 769.26, 770.1, 770.2 was the "gatekeeper of justice" for Petitioner's constitutional claims that he was denied his right to Confrontation. "Failure to get past the gatekeeper does not by itself block federal habeas review unless the single Justice clearly bases his denial of leave to on a procedural bar." *Phoenix v Matesanz*, 189 F.3d 20 (1st. Cir. 1999). The denial by the "gatekeeper" sends a mixed message as why this claim was denied.

l. Petitioner was able to place before the trial court, Michigan Court of Appeals and Michigan Supreme Court as:

V    APPELLANT'S CONFRONTATION RIGHTS UNDER THE SIXTH AMENDMENT AND DUE PROCESS RIGHTS TO A FAIR TRIAL UNDER THE FOURTEENTH AMENDMENT WERE VIOLATED WHEN:

A.    A composite drawing was represented as the sole drawing that "nails Defendant", when there were other drawings that were suppressed by the prosecution.

m. The prosecutor withheld the original composite drawings that were released to the media by the police in July of 1988, (those drawings appeared in the Oakland Press Newspaper with a plea for assistance from the public). Instead, the prosecutor presented a composite drawing with Petitioner's drivers license clipped to it, that bore a remarkable resemblance to the picture. The prosecutor represented to the jury that the (driver license composite "that was the sole drawing made, six months before the police knew anything about the Petitioner, and that drawing (driver license composite) nails him."

Post-trial and appeal discoveries establish that there were at least two other drawings that were printed in the Oakland Press shortly after the homicide, at the Pontiac Police that were suppressed during trial. Had the jury known that prosecutor was (at best) picking the drawing that was a closest match of Petitioner from a stack of drawings and then represented to be "**the only drawing done that 'NAILS HIM**,'" the prejudicial impact would have been muted. However, the prosecutor's implication of personal knowledge that the case was cinched by the drawing is not debatable among reasonable minded jurors.

It is well established that a conviction obtained through use of false evidence, know to be such by representation of the State, must fall under the Fourteenth Amendment. *Napue v Illinois*, 360 U.S. 264; 79 S.Ct. 1173 (1959).

B.    Forensic scientist David Woodford's presence as a res gestae witness was waived by defense counsel (WITHOUT [PETITIONER'S] CONSENT), (and Mr. Woodford's hearsay report was misrepresented to the jury and entered into evidence), when the report actually established that blood type A was found on the Victim, and that blood type did not match the Defendant or the Victim.

Prior to trial the prosecutor asked the court to strike David Woodford, forensic examiner, from the witness list due to illness. In lieu of his presence, the prosecutor stated that Mr. Woodford's assistant Ms. Melinda Jackson, reproduce the tests performed by Mr. Woodford and come to court in his place. Without Petitioner's consent, defense counsel waived Petitioner's confrontation rights and agreed to the substitution. However, when called to testify Ms. Jackson only reproduced the tests that the prosecutor intended to use, and **"LOST"** the evidence that Mr. Woodford had tested that exonerated the Petitioner. (I.e., clothing and stones that contained blood that did not belong to the Victim, and which was used to obtain a search warrant for blood samples from Petitioner). When asked about the tests that Mr. Woodford had reported, Ms. Jackson either did not do the tests or lost the evidence.

6

In light of defense counsel's questions about the tests performed by Mr. Woodford, the prosecutor entered Mr. Woodford's report into evidence and ████████ lied to the jury by stating "All the evidence tested came from the Victim. It was all the Victim's blood. But the report's there if you want to see it."

Petitioner's rights to confront Mr. Woodford about the contents of the report that stated the Victim had type "O" blood, while Petitioner's blood type is "AB", were waived by defense counsel -- without Petitioner's consent. Petitioner placed this issue before the Michigan Courts by citing *Crawford v Washington*, 541 U.S. 36; 124 S.Ct. 1354 (2004), and *People v Lonsby*, 268 Mich App 375 (2005):

> "We hold that under the guidelines articulated in *Crawford*, the non-testifying serologist's notes and lab report constitute testimonial hearsay and that the admission of these statements though Woodford's testimony violated defendant's right under the Confrontation Clause."

C.  The Victim's mother's presence was waived by defense counsel, (WITHOUT [PETITIONER'S] CONSENT), when she was a res gestae witness that would have refuted the testimony/theory that the Victim and Defendant were present at the Victim's apartment, that the Defendant "cleaned up and searched for car key at the apartment after killing the Victim."

n. The prosecutor's theory was based upon one witness, Ms. Connie Cook, who testified that "after" Petitioner killed the Victim outside, went back to the Victim's apartment had a few drinks, looked for the Victim's car keys and to clean up after the killing. Unbeknown to Ms. Cook, the Victim lived with his mother (Christina Mejia), in a small apartment. Defense counsel allowed the prosecutor to waive Ms. Mejia's presence from trial, even though the prosecutor acknowledge the "significant importance" of her testimony to the defense. A defendant has a constitutional right to confront the witnesses against him and to cross-examine them to expose any falsehoods and to reveal the truth. *Pointer v Texas*, 380 U.S. 400; 85 S.Ct. 1065 (1965). Petitioner was unable to reveal the falsehood testimony of Ms. Cook, by way of questioning Ms. Mejia as to whether it was possible for Petitioner to rummage through the Victim's apartment, drink and clean up, without Ms. Mejia's knowledge or hearing someone.

o. Petitioner raised the constitution issue that he was denied a fair trial when the prosecutor made comments in his rebuttal closing argument what a missing forensic witness would have testified to had he been at trial. This error of Petitioner not being able to cross-examine the prosecutor to expose the falsehood of his testimony to the jury when he acted as a witness except by objection. The trial court in denying this claim stated:

> The record in this case establishes that the assistant prosecutor did not engage in any improper conduct which deprived the defendant of a fair trial. Therefore, the defendant was not deprived of a fair trial by the conduct of the assistant prosecutor and is not granted relief from judgment because of this error.

7

p. Petitioner placed the following claim  before the trial court, Michigan Court of Appeals and Michigan Supreme Court as:

VI     APPELLANT WAS DENIED A FAIR TRIAL BASED UPON THE PROSECUTOR'S IMPROPER COMMENTS DURING REBUTTAL CLOSING ARGUMENT BECAUSE DEFENSE COUNSEL WAS UNABLE TO RESPOND EXCEPT BY OBJECTION.

q. Petitioner placed his Sixth Amendment claim in that he was denied effective assistance of trial counsel, before the trial court, Michigan Court of Appeals and Michigan Supreme Court as:

VII    APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AMENDMENT WHEN COUNSEL:

A. Failed to present evidence available to him that would have substantially undermined the prosecution's theory and given Appellant a reasonable probability of a different outcome:

FAILING TO OBJECT TO FALSE EVIDENCE OF COMPOSITE DRAWING.

FAILING TO OBJECT THAT MATHEMATICAL PROBABILITY ANALYSIS DID NOT HAVE A PROPER FOUNDATION.

FAILING TO RETAIN AN EXPERT WITNESS TO REBUT DR. WARNICK'S TESTIMONY OF MATHEMATICAL PROBABILITY.

FAILING TO INVESTIGATE BLOOD EVIDENCE.

FAILING TO INTERVIEW WITNESSES.

r. The trial court in denying this claim and appellate counsel *infra*, stated that:

The defendant did not preserve this issue by raising it in this court. The defendant did , however, raise this issue in his application to the Supreme Court. The defendant's application was denied by an order of the Supreme Court and the defendant may not, therefore, be granted relief based upon this issue.

The trial court's statement is not accurate. Petitioner submitted a *pro per* supplemental brief to the Michigan Court of Appeals on his appeal of right and the court denied Petitioner permission to file the issues. The rejected brief contained issues of ineffective assistance of trial counsel, b ut not the same issues as listed. (On a structural note; the prosecutor was allowed to submit a response to Petitioner's supplemental brief and have the court of appeals consider the reply without the benefit of Petitioner's side). Petitioner's brief on direct appeal was limited to the issues properly raised in the court of appeals. At that time new issues of ineffective assistance of appellate counsel had surfaced and Petitioner added them as well. The Michigan Supreme Court denied the appeal by a form letter order" stating "we are not persuaded that this court should hear these arguments."

A claim raising trial counsel ineffectiveness will no longer be considered waived because new counsel on direct appeal did not raise a claim related to prior counsel's ineffectiveness. *Massaro v United States*, 538 U.S. 500; 123 S.Ct. 1690 (2003).

8

s. Petitioner placed his Sixth Amendment Counsel claim in that he was denied effective assistance appellate before the trial court, Michigan's Court of Appeals and Supreme Court in the following manner:

VIII.  APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL UNDER THE SIXTH AMENDMENT ON APPELLANT'S APPEAL OF RIGHT WHEN COUNSEL FAILED TO RAISE DEAD BAND WINNERS ON APPEAL:

A.  Refused to adequately prepare and investigate constitutional claims of error asserted by Petitioner and/or request Petitioner's file from trial counsel. *Mapes Coyle*, 171 F.3d 408 (6th Cir. 1999).

B.  Failed to raise, after being notified, that exculpatory information -- original composite drawings, were withheld from the jury. *Freels v Hills*, 843 F.2d 958 (6th Cir. 1988).

C.  Failed to raise that Dr. Warnick's statistical/mathematical certainty testimony was a trial by mathematics. *People v Adams*, 195 Mich App 267 (1992).

D.  Refused Petitioner's request to visit Petitioner and discuss the trial and review issues to be raised in the appellate brief, prior to filing in the Michigan Court of Appeals. Denial of opportunity to communicate with counsel is constitutional error requiring reversal. *Lakin v Stein*, 44 F.Supp.2d 897 (E.D.Mich. 1999).

E.  Omitted viable issues from appeal without investigation. *Mapes v Coyle, supra.*

F.  Refused to assist Petitioner in filing a supplemental brief on appeal. *Fields v Bagley*, 275 F.3d 478 (6th Cir. 2001).

G.  Failed to file a timely notice of appeal and was found guilty by the Attorney Grievance Commission of violating MCR 9.104(1)-(4); MRPC (c), 1.3, and 8.4(a)(c). *Strickland v Washington*, 466 U.S. 668; 104 S.Ct. 2051 (1984). The right to the effective assistance of counsel includes the right to the effective assistance of appellate counsel. *Evitts v Lucey*, 469 U.S. 387; 105 S.Ct. 830 (1985).

H.  Refused to raise ineffective assistance of trial counsel. I.e., trial counsel waving Petitioner's confrontation rights. A claim raising trial counsel ineffectiveness will no longer be considered waived because new counsel on direct appeal did not raise a claim related to prior counsel's ineffectiveness. *Massaro, supra.*

Appellate counsel refused to raise the issue of ineffective assistance of counsel in Petitioner's appeal of right. Petitioner attempted to raise the issues in a *pro per* supplemental brief to the Michigan Court of Appeals. The brief was sent to by the clerk of the court to Petitioner's appellate counsel. He refused to file the brief until he was instructed by the Attorney Grievance Commission. Petitioner attempted to have appellate counsel removed by sending a motion to the trial court for substitution of counsel for lack of cooperation and communication. The motion was never disposed of or ruled upon.

Appellate counsel eventually filed the supplemental brief on Petitioner's behalf but permission to file a supplemental was denied by order of the Michigan Court of Appeals.

9

t. The trial court addressed this constitutional claim in the same breath of trial counsel, *supra*. The trial court stated: "Furthermore, the record in this case establishes that the defendant was afforded competent representation by his trial and appellate attorneys." The trial court made no attempt to hold a hearing to evaluate the attorney's reasoning for not protecting Petitioner rights. Instead, the court equated the word "COMPETENCE" with "PERFORMANCE". Having a degree does not mean the lawyer performed his duties in accordance with *Stickland*. Nor, did the court consider any of the non-record proofs presented in support of Petitioner's claims. A state court adjudication "involves 'an unreasonable application of Supreme Court precedent under § 2254(d)(2), 'if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular ... case,' OR IF THE COURT UNREASONABLY REFUSES TO EXTEND, ... precedents to a new context." *Smith v Hofbauer*, 312 F.3d 809, 813 (6th Cir. 2002), (quoting *Williams v Taylor*, 529 U.S. 362; 120 S.Ct. 1495 (2000).

DUE DILIGENCE:

4. Under 28 U.S.C. § 2244(d)(1)(D), a habeas petition may be brought within on year of "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of DUE DILIGENCE." Petitioner's habeas corpus is timely.

5. Petitioner became aware of *Ege, I*, at the beginning of September, 2005, when the soft bound copy of *Ege I*, appeared in the prison law library. On November 27, 2005, Petitioner filed in the trial court the issues raised in the instant petition for writ of habeas corpus.

6. The Court in *Easterwood v Champion*, 213 F.3d 1321 (10th Cir. 2000) held that § 2244(d)(1(D) requires the one year limitation to run from the date that for a prisoner, a case is discoverable by "due diligence" on the date that an opinion became accessible in the law library, not the date the opinion. the one year limitation to run

7. As set forth in the accompanying Memorandum of Law, Gilbert Lee Poole is being detained in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

5. Gilbert Lee Poole has not filed any previous Petition for Writ of Habeas Corpus in this or any federal district court.

## RELIEF REQUESTED

For these reasons, Petitioner, Gilbert Lee Poole, asks:

A. Accept jurisdiction over this case pursuant to 28 U.S.C. 2254;

B. Require the Respondent to answer the allegations of this Petition and Brief in Support;

C. Hold such evidentiary hearings as this Court may deem necessary or appropriate;

D. Grant Petitioner's 18 U.S.C. § 3600 Motion for DNA testing;

E. That after full consideration, this Court grant this Petition and order that Petitioner Gilbert Lee

Poole either be promptly retried or released from custody;

  F. That this Court grant such other, further, and different relief as the Court may deem just and proper under the circumstances;

  G. That this Court appoint counsel;

  H. That this Court grant oral argument.

<div style="margin-left:40%">

Respectfully submitted,

*Gilbert Lee Poole Jr.*

Gilbert Lee Poole #202095
Kinross Correctional Facility
16770 Watertower Drive
Kincheloe, MI 49788

</div>

Dated: July 7th 2008

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GILBERT LEE POOLE,

     Petitioner,

                                      Civil Action No. _____ _____

vs.

JEFFERY WOODS, Warden,

     Respondent.
_____ _____ /


# BRIEF IN SUPPORT OF

# PETITION FOR WRIT OF HABEAS CORPUS

# BASED UPON NEWLY PRESENTED EVIDENCE OF

# ACTUAL INNOCENCE AND A MISCARRIAGE OF JUSTICE

# ORAL ARGUMENT AND ATTORNEY REQUESTED


RESPONDENT COUNSEL:
Mike Cox
Michigan Attorney General
Habeas Corpus Division
POB 30212
Lansing, MI 48909

PETITIONER:
Petitioner, in *pro se*
Gilbert L. Poole #202095
Kinross Correctional Facility
16770 Watertower Drive
Kincheloe, MI 49788

DATED: July    , 2008

TABLE OF CONTENTS

INDEX OF AUTHORITIES ............................................................................................................ iv-ix

STATEMENT OF JURISDICTION ................................................................................................. x

PROCEDURAL HISTORY AND STATEMENT OF FACTS ....................................................... 1

PRESENT PROCEEDINGS ........................................................................................................... 8

STANDARD OF REVIEW ............................................................................................................. 10

DUE DILIGENCE ........................................................................................................................... 10

ARGUMENTS:

I     THE TRIAL COURT DENIED PETITIONER'S FOURTEENTH AMENDMENT RIGHTS WHEN WHEN IT DENIED PETITIONER'S DELAYED MOTION FOR NEW TRIAL BASED UPON MCL 769.26, 770.1, 770.2, 770.16, BY USING MCR 6.500. ........................ 11

II     PETITIONER WAS DENIED A FUNDAMENTALLY FAIR TRIAL IN VIOLATION OF DUE PROCESS OF LAW THROUGH THE ADMISSION OF POSITIVE IDENTIFICATION AND AN ERRONEOUS EXPERT OPINION THAT THERE WAS A "STATISTICAL/ MATHEMATICAL PROBABILITY" THAT THE ODDS ARE "2.1 BILLION TO ONE" THAT THE BITE MARK WAS MADE BY ANYONE OTHER THAN THE PETITIONER, WHERE THIS OPINION WAS WITHOUT SCIENTIFIC FOUNDATION AND WHERE SUBSEQUENT CASES HAVE SHOWN THIS PARTICULAR EXPERT TO BE COMPLETELY UNRELIABLE WITH A SERIES OF DEMONSTRABLY ERRONEOUS BITE MARK IDENTIFICATION IN CAPITAL CASES. THEREFORE, THE TRIAL COURT'S DETERMINATION THAT THE ADMISSION OF DR. WARNICK FALSE TESTIMONY WAS **HARMLESS ERROR**, WAS ALSO AN ABUSE OF DISCRETION. ................................................................................... 13

A. ERROR WAS NOT HARMLESS, HAD A SUBSTANTIAL AND INJURIOUS EFFECT UPON JURORS. ............................................................................................................. 15

III     NEWLY PRESENTED EVIDENCE REQUIRES A COURT TO EITHER REVERSE THE CONVICTIONS OR PROVIDE A HEARING TO DETERMINE WHETHER BITE MARK INTERPRETATION HAS MET THE *DAVIS/FRYE/DAUBERT* STANDARD FOR ADMISSIBILITY PURPORTEDLY SCIENTIFIC EVIDENCE UNDER MRE 702. ..................... 22

A. NEWLY PRESENTED ........................................................................................... 22
B. DR WARNICK'S PREVIOUS FALSE TESTIMONY ON PROBABILITY STATISTICS ....... 22
C. NEWLY PRESENTED IS NOT CUMULATIVE ............................................................. 25
D. NEWLY PRESENTED EVIDENCE WOULD RENDER A DIFFERENT RESULT PROBABLE ON RETRIAL .................................................................................................. 25
E. PETITIONER COULD NOT HAVE PRODUCED THE NEWLY PRESENTED EVIDENCE AT TRIAL. .......................................................................................................... 26

IV     PURSUANT TO 18 U.S.C.A. § 3600, PETITIONER IS ENTITLED TO DNA TESTING OF ALL BIOLOGICAL EVIDENCE PRESENTED AT TRIAL, DUE TO THE PREJUDICIAL IMPACT OF THE PROSECUTOR'S USE OF BLOOD-TYPE TESTIMONY, WHEN DNA TESTING WOULD SIGNIFICANTLY UNDERMINE THE PROSECUTOR'S THEORY IF TEST RESULTS WERE AVAILABLE AT THE TIME OF TRIAL. ................................................ 26

A. TESTING OF CAR CONSOLE ........................................................................................ 27
B. BIOLOGICAL TESTING OF OTHER EVIDENCE ............................................................ 28

ii

TABLE OF CONTENTS (Continued)

V     PETITIONER'S CONFRONTATION RIGHTS UNDER THE SIXTH AMENDMENT AND
      DUE  PROCESS  RIGHTS  TO  A  FAIR  TRIAL  UNDER  THE  FOURTEENTH
      AMENDMENT WERE VIOLATED WHEN: ................................................................ 29

      A. The composite drawing that was represented as the sole drawing that "nails Petititioner"
      when there were other drawings that were suppressed by the prosecution: ................................ 29

      B. Forensic scientist David Woodford's presence as a res gestae witness was waived by
      defense counsel (WITHOUT PETITIONER'S CONSENT), (and Mr. Woodford's hearsay
      report was misrepresented to the jury and entered into evidence), when the report actually
      established that blood type A was found on the Victim, and that blood type did not match
      the Petitioner or the Victim. ........................................................................................ 31

      C. The Victim's mother's presence was waived by defense counsel, (WITHOUT
      PETITIONER'S CONSENT), when she was a res gestae witness that would have refuted
      the testimony/theory that the Victim and Defendant were present at the Victim's apartment,
      that the Defendant "cleaned up and searched for car keys at the apartment after killing the
      Victim." ........................................................................................................................ 35

VI    PETITIONER WAS DENIED A FAIR TRIAL BASED UPON THE PROSECUTOR'S
      IMPROPER COMMENTS DURING REBUTTAL CLOSING ARGUMENT BECAUSE
      DEFENSE COUNSEL WAS UNABLE TO RESPOND EXCEPT BY OBJECTION. ................... 37

VII   PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE
      SIXTH AMENDMENT WHEN COUNSEL: ............................................................. 40

      A. Failed to present evidence available to him that would have substantially undermined
      the prosecution's theory and given Petitioner a reasonable probability of a different
      outcome: .......................................................................................................................... 40

      a. FAILING TO OBJECT TO FALSE EVIDENCE OF COMPOSITE DRAWING. ..................... 42

      b. FAILING TO OBJECT THAT EXPERT TESTIMONY ON MATHEMATICAL
      PROBABILITY ANALYSIS DID NOT HAVE A PROPER FOUNDATION. .......................... 43

      c. FAILING TO RETAIN AN EXPERT TO REBUT DR. WARNICK'S TESTIMONY OF
      MATHEMATICAL PROBABILITY. ............................................................................... 43

      d. FAILING TO INVESTIGATE BLOOD EVIDENCE. ..................................................... 44

      e. FAILING TO INTERVIEW WITNESSES. ..................................................................... 44

VIII  PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL
      UNDER THE SIXTH AMENDMENT ON PETITIONER'S APPEAL OF RIGHT WHEN
      COUNSEL FAILED TO FOLLOW PETITIONER'S INSTRUCTIONS REGARDING THE
      APPEAL OR RAISE THE ABOVE DEAD BANG WINNERS ON APPEAL. .......................... 47

RELIEF SOUGHT ................................................................................................................ 49

INDEX OF AUTHORITIES

U.S. CONSTITUTION:
*Const. Art. 6, cl. 2* ............................................................................................................................ 47

*Sixth Amenndment* ............................................................................................................................ 29, 33, 36

*Fourteenth Amendment* .................................................................................................................... 12, 32

U.S. SUPREME COURT CASES:
*Berger v United States*, 295 U.S. 78; 55 S.Ct. 629 (1935) .................................................. 32

*Brady v Maryland*, 373 U.S. 83; 83 S.Ct. 1194 (1963) ........................................................ 29

*Brecht v Abrahamson*, 507 U.S. 619; 113 S.Ct. 1710 (1993) .............................................. 29

*Brookhart v Janis*, 384 U.S. 1; 86 S.Ct. 1245 (1966) ......................................................... 13

*Caterpiller Inc., v Wiliiams*, 482 U.S. 386; 107 S.Ct. 2425 (1987) ................................... 8

*Chambers v Mississippi*, 410 U.S. 284; 93 S.Ct. 1038 (1973) ........................................... 19

*Crawford v Washington*, 541 U.S. 36; 124 S.Ct. 1354 (2004) ................................... 33, 34, 36, 39

*Davis v Alaska*, 415 U.S. 308; 94 S.Ct. 1105 (1974) .......................................................... 37

*Davis v Washington*, ___ U.S. ___; 126 S.Ct. 2266 (2006) ............................................... 33

*Daubert v Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579; 113 S.Ct. 2786 (1993) ........... 9

*Delaware v Van Arsdall*, 475 U.S. 673; 106 S.Ct. 1431 (1986) .......................................... 17

*Estelle v McGuire*, 502 U.S. 62; 112 S.Ct. 475 (1991) ....................................................... 19

*Evitts v Lucey*, 469 U.S. 387; 105 S.Ct. 83 (1985) .............................................................. 47

*Fahy v Connecticut*, 375 U.S. 85; 84 S.Ct. 229 (1963) ....................................................... 18, 25

*General Electric Co. v Joiner*, 522 U.S. 136; 118 S.Ct. 512 (1997) .................................. 19

*Giglio v United States*, 405 U.S. 150; 92 S.Ct. 763 (1972) .......................................... 17, 30, 37

*Giles v Maryland*, 386 U.S. 66; 87 S.Ct. 793 (1967) .......................................................... 28

*Harrington v California*, 395 U.S. 250; 89 S.Ct. 1726 (1969) ............................................ 17

*Hathorn v Lovorn*, 457 U.S. 255; 102 S.Ct. 2421 (1982) ................................................... 11

*Hicks v Oklahoma*, 447 U.S. 343; 100 S.Ct. 2227 (1980) .................................................. 12

*House v Bell*, ___ U.S. ___; 126 S.Ct. 2064 (2006) .................................................... 9, 12, 22

*Kotteakos v United States*, 328 U.S. 750; 66 S.Ct. 1239 (1946) ................................... 9, 30

*Kyles v Whitney* 514, U.S. 419; 115 S.Ct. 1555 (1995) ...................................................... 30

*Lee v Kemma*, 534 U.S. 362; 122 S.Ct. 877 (2002) ........................................................... 11

*Massaro v United States*, 538 U.S. 500; 123 S.Ct. 1690 (2003) ........................................ 48

*Miller v Pate*, 386 U.S. 1; 87 S.Ct. 785 (1967) ........................................................... 17, 30

*Mitchell v Esparza*, 540 U.S. 12; 124 S.Ct. 7 (2003) ................................................... 15, 48

*Murray v Carrier*, 477 U.S. 478; 106 S.Ct. 2639 (1986) .................................................... 11

*Napue v Illinois*, 360 U.S. 264; 79 S.Ct. 1173 (1959) ................................................... 30, 46

# INDEX OF AUTHORITIES

**U.S. SUPREME COURT CASES:**

*O'Neal v McAninch*, 513 U.S. 432; 115 S.Ct. 992 (1995) ................................................. 40

*Pointer v Texas*, 380 U.S. 400; 85 S.Ct. 1065 (1965) ....................................................... 36

*Rose v Clark*, 478 U.S. 57; 106 S.Ct. 3101 (1986) ........................................................ 15, 17

*Schlup v Delo*, 513 U.S. 298; 115 S.Ct. 851 (1995) ...................................................... 15, 17

*Strickland v Washington*, 466 U.S. 668; 104 S.Ct. 2051 (1984) ................................ 11, 22, 26

*United States v Agurs*, 427 U.S. 97; 96 S.Ct. 2392 (1976) ........................................... 41, 42, 44

*United States v Bagley*, 473 U.S. 667; 105 S.Ct. 3375 (1985) ............................................ 17

*United States v Cronic*, 466 U.S. 648; 104 S.Ct. 2039 (1984) ........................................... 30

*Wiggins v Smith*, 539 U.S. 510; 123 S.Ct. 2527 (2003) .................................................... 42

*United States v Bagley*, 473 U.S. 667; 105 S.Ct. 3375 (1985) ........................................... 21

*Washington v Texas*, 388 U.S. 14; 87 S.Ct. 1920 (1967) ................................................. 30

*Williams v Taylor*, 529 U.S. 362; 120 S.Ct. 1495 (2000) ................................................. 35

*Wiggins v Smith*, 539 U.S. 510; 123 S.Ct. 2527 (2003) ................................................ 26, 46

**OTHER FEDERAL CASES:**

*Allen v United States*, 938 F.2d 664 (6th Cir. 1991) ....................................................... 49

*Alley v Bell*, 307 F.3d 380 ( 6th Cir. 2002) .................................................................... 32

*Barker v Yukins*, 199 F.3d 867 (6th Cir. 1999) .............................................................. 46

*Brown v O'Dea*, 227 F.3d 643 ( 6th Cir. 2000) ............................................................. 40

*Bugh v Mitchell*, 329 F.3d 496 (6th Cir. 2003) .............................................................. 19

*Carver v Straub*, 394 F.3d 340 ( 6th Cir. 2003) ............................................................. 48

*Clemmons v Delo*, 124 F.3d 954 (8th cir. 1997) ............................................................ 35

*Dando v Yukins*, 461 F.3d 791 (6th Cir. 2006) .............................................................. 46

*Doan v Brigano*, 237 F.3d 722 (6th Cir. 2001) .............................................................. 47

*Easterwood v Champion*, 213 F.3d 1321 (10th Cir. 2000) ............................................... 10

*Eddleman v McKee*, 471 F.3d 576 (6th Cir. 2006) ......................................................... 15

*Ege v Yukins*, 380 F.Supp.2d 852 (E.D.Mich. 2005) .................................................. 6, 24, 43
     aff'd in part, rev in part, 485 F.3d 364 (6th Cir. 2007)

*Ege v Yukins*, 485 F.3d 364 (6th Cir. 2007) ........................................................ 18, 20, 22, 24

*Elmore v Foltz*, 768 F.2d. 773 ( 6th Cir. 1985) .............................................................. 30

*Franklin v Anderson*,  434 F.3d 412 (6th Cir. 2006) ....................................................... 48

*Fulcher v Motley*,  444 F.3d 791 (6th Cir. 2006) ............................................................ 13

*Frye v United States*, 293 F 1013 (CADC, 1923) ........................................................ x, 1

*Griffin v Johnson*, 350 F.3d 956 (9th Cir. 2003) ............................................................ 25

*Hart v Sec'y of Health and Human Servs.*, 60 Fed.cl 598 (2004) ...................................... 21

INDEX OF AUTHORITIES (Continued)

OTHER FEDERAL CASES:

*Hicks v Straub*, 377 F.3d 538 (6th Cir. 2004) ............................................................................ 41

*Howard v Boucard*, 405 F.3d 459 (6th Cir. 2005) ..................................................................... 41

*In Re Shelton*, 295 F.3d 620 (6th Cir. 2002) ............................................................................ 11

*Ivory v Jackson*, 509 F.3d 284 (6th Cir. 2007) .................................................................... 40, 47

*Mapes v Coyle*, 171 F.3d 408 (6th Cir. 1999) ......................................................................... 48

*Matthews v Abramajtys*, 92 F.Supp.2d 615; (E.D.Mich 2000), aff'd in part, .................... 46, 48
    rev in part, 319 F.3d 780 (6th Cir. 2003)

*McFarland v Yukins*, 356 F.3d 688 (6th Cir. 2004) ................................................................. 47

*Mitchell v Mason*, 325 F.3d 732 (6th Cir. 2003) ................................................................... 42

*O'Guinn v Dutton*, 88 F.3d 1409 (6th Cir. 1996), *cert.denied*, 117 S.Ct. 742 (1997) ............... 33

*Ramonez v Berghuis*, 490 F.3d 482 (6th Cir. 2007) ................................................................ 47

*Riley v Jones*, 476 F.Supp.2d 696 (E.D.Mich. 2007) .............................................................. 49

*Sawyer v Hofbauer*, 299 F.3d 605 (6th Cir. 2002) ................................................................. 47

*Sims v Livesay*, 970 F.2d 1575 (6th Cir. 1992) ..................................................................... 44

*Sizemore v Fletcher*, 921 F.2d 67 (6th Cir. 1990) ................................................................. 32

*Souter v Jones*, 395 F.3d 577 (6th Cir. 2005) ....................................................................... 26

*Taylor v Maddox*, 366 F.3d 992 (9th Cir. 2004) .................................................................... 22

*Tomlin v Myers*, 30 F.3d 1235 (9th Cir. 1994) ...................................................................... 42

*Towns v Smith*, 395 F.3d 251 (6th Cir. 2005) ....................................................................... 45

*Turpin v Kassulke*, 26 F.3d 1392 (6th Cir. 1994) ................................................................. 21

*United States v Boose*, 498 F.Supp.2d 887 (N.D.Miss. 2007) ................................................ 26

*United States v Carter*, 236 F.3d 777 (6th Cir. 2001) .......................................................... 39

*United States v Hernandez*, 779 F.2d 456 (8th Cir. 1985) ..................................................... 38

*United States v Johnson*, 968 F.2d. 768 (8th Cir. 1992) ....................................................... 39

*United States v Massey*, 594 F.2d 676 (8th Cir. 1979) ......................................................... 15

*United States v Morrow*, 977 F.2d 222 (6th Cir. 1992), ...................................................... 42
    (en banc), cert denied, 113 S.Ct. 2969 (1993)

*Vasquez v Jones*, 486 F.3d 135 (6th Cir. 2007) ........................................................... 10, 11, 29

*Williams v Coyle*, 260 F.3d 684 (6th Cir. 2001) ................................................................... 22

*Workman v Tate*, 957 F.2d 1339 (6th Cir. 1992) .................................................................. 46

UNITED STATES CODE:

18 U.S.C. § 3600 ................................................................................................................. 26

18 U.S.C. § 3600(a)(8)(B) .................................................................................................... 28

28 U.S.C. § 2244(D)(1)(d) .................................................................................................... 10

vi

INDEX OF AUTHORITIES (Continued)

**MICHIGAN SUPREME COURT CASES:**

Gilbert v Daimler Chrysler Corp., 470 Mich 749 (2004) ........................................
McDougal v Schanz, 461 Mich 15 (1999) ........................................................ 20
People v Bennett, 393 Mich 445 (1975) ......................................................... 11
People v Bigge, 288 Mich 417 (1939) ........................................................... 37
People v Davis, 343 Mich 348 (1955) ........................................................... 11
People v Ginther, 390 Mich 436 (1973) ....................................................... x, 11
People v Lukity, 460 Mich 484 (1999) ........................................................ x, 9
People v Mateo, 453 Mich 203 (1996) ........................................................... 20
People v McDaniel, 469 Mich 409 (2003) ....................................................... 20
People v McQuillian, 392 Mich 511 (1974) ..................................................... 32
People v Moldowan, 466 Mich 862 (2002) ....................................................... 12
People v Nichols, 159 Mich 355 (1909) .......................................................... 6
People v Nichols, 341 Mich 311 (1954) ......................................................... 39
People v Wright, 463 Mich 905 (2001) .......................................................... 18
People v Young, 418 Mich 1 (1983) ............................................................ 6, 9
Perrin v Pueller (On Rehearing), 373 Mich 531 (1964) ...................................... x, 19
Shannon v Ottawa Circuit Judge, 245 Mich 220 (1928) ......................................... 11
Terrill v Michigan United Traction Co., 214 Mich 478 (1921) ................................. 21

**MICHIGAN COURT OF APPEALS CASES:**

Otero v Warnick, 241 Mich App 143 (2000) .................................................... 23
People v Adams, 195 Mich App 267 (1992) ...................................................... 19, 43
People v Bart, 220 Mich App 1 (1996) .......................................................... 9
People v Belleville, 56 Mich App 275 (1974) ................................................... 36
People v Berry, 10 Mich App 469 (1968) ........................................................ 11
People v Canter, 197 Mich App 550 (1992) ..................................................... 22
People v Drake, 64 Mich App 671 (1975) ....................................................... 33
People v Erb, 48 Mich App 622 (1973) ......................................................... 39
People v Goliday, 153 Mich App 29 (1986) ..................................................... 12
People v Jones, 64 Mich App 659 (1975) ....................................................... 32
People v Lonsby, 268 Mich App 375 (2005) ..................................................... 34
People v LoPresto, 9 Mich App 318 (1967) ..................................................... 22, 25
People v Marsh, 177 Mich app 161 (1989) ...................................................... 13
People v Montevecchio, 32 Mich App 163 (1971) ................................................ 39

INDEX OF AUTHORITIES (Continued)

MICHIGAN COURT OF APPEALS CASES:
*People v Skowronski*, 61 Mich App (1975) ............................................................................ 11

*People v Sterling*, 154 Mich App 223, (1986) ..................................................................... 28

*People v Thomas*, 184 Mich App 480 (1990) ...................................................................... 42

*People v Viaene*, 119 Mich App 69 (1982) .......................................................................... 28

*Pertraszewsky v Keeth*, 201 Mich App 55 (1993) ................................................................. 9

MICHIGAN STATUTES:
MCL 750.316a, b ............................................................................................................. passim

MCL 769.26 .......................................................................................................... 11, 18, 20

MCL 770.1 ...................................................................................................................... passim

MCL 770.2 ...................................................................................................................... passim

MCL 770.16(3)(b)(i) ................................................................................................................ 26

MICHIGAN COURT RULES:
MCR 6.500 ..................................................................................................................... passim

MCR 6.502(D)(2) .................................................................................................................. 41

MICHIGAN RULES OF EVIDENCE:
MRE 104(A) ............................................................................................................................. 9

MRE 702 ................................................................................................................................ 9, 19

MRE 801(c) .............................................................................................................................. 32

MICHIGAN RULES OF PROFESSIONAL CONDUCT:
MRPC 1.1(c) ............................................................................................................................. 8

MRPC 8.4(a)(c) ......................................................................................................................... 8

OTHER AUTHORITIES:
David L. Faigman, David H Kays, Michael J. Saks and Joeseph Sanders, Modern Scientific ................. 21
    Evidence The Law and Science of Expert Testimony, Identification from Bitemarks:
    The Scientific Questions: Uniqueness of the Human Dendtition. 3-2.1.5, 552 (1997).

David L. Faigman, David H. Kaye, Michael J. Saks & Joseph Sanders, Modern Scientific ..................... 43
    Evidence The Law and Science of Expert Testimony, Science Methods Applied to
    Comparison Techniques. 30-2.1.5, 552 (1997).

Hale, A., *The Admissibility of Bite Mark Evidence*, 51 Cal L Rev 309 (1978) ....................... 15

Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* ............... 22
    § 5.2b n. 45 (5th ed. 2005)

Reidar F. Sognnaes & Raymond D. Rawson, Computer Comparison of Bitemark Patterns ................. 43
    in Identical Twins, 105 J. AM Dental Assoc. 449 (1982): Raymond D. Rawson &
    Ronald K. Ommen, Statistical Evidence for the Individuality of the Human Dentition, 29 J.
    Forensic Sci. 245 (1984)

viii

INDEX OF AUTHORITIES (Continued)

OTHER AUTHORITIES:

*Howard v State*, 697 So2d 415 (Miss SCt 1997) ............................................................................. 15

*People v Amolsch*, Western District Court No. 94-419057 ............................................................ 6, 23

*People v Christini*, Macomb County Circuit Court ........................................................................ 6

*People v Collins*, 68 Cal.2d 319 (1968) ................................................................................... 43, 48

*People v Otero*, Detroit Recorders Case No. 94-13624 .................................................................. 6, 23

*Perry v State*, 586 So2d 242 (Ala SCT 1991) ............................................................................ 14, 15

*State v Carlson*, 267 NW2d 170 (Minn SCt 1978) ........................................................................ 15

## STATEMENT OF JURISDICTION

Petitioner, pro per, on November 21, 2005, filed with the Oakland County Circuit Court a Delayed Motion for New Trial Based Upon Newly Presented Evidence of Actual Innocence and a Miscarriage of Justice pursuant to MCL 769.26, 770.1, 770.16. Petitioner also filed with the Oakland County Circuit Court a Motion's for *Ginther** and *Wright*** Hearings, Petition for DNA Testing pursuant to MCL 770.16.

On August 1, 2006, the trial Court erroneously denied these motions pursuant to MCR 6.500. Exhibit I.

The Court of Appeals on October 23, 2007 denied Petitioner's Motion's for *Ginther* and *Wright* hearing's, Remand for DNA hearing and the delayed application pursuant to MCR 6.508(D). Exhibit Q.

The Michigan Supreme Court on April 28, 2008 denied Petitioner's application for leave to appeal and Motion's for *Ginther* and *Wright* hearing's, Remand for DNA hearing. Exhibit S.

Where a high state court has denied a claim without explanation, federal courts "look through" that denial to the last reasoned state decision. *Ylst v Nunnemaker*, 501 U.S. 797, 803-806; 111 S.Ct. 2590 (1991). In this case, the trial court made the last reasoned decision.

A habeas court will apply modified Antiterrorism and Effective Death Penalty Act (AEDPA) deference in circumstances where the state court adjudicated a claim but with little analysis on the substantive constitutional issue. *Vasquez v Jones*, 486 F.3d 135 (6th Cir. 2007).

---

* *People v Ginther*, 390 Mich 436 (1973) (A defendant who wishes to advance claims that depend on matters not of record can properly be required to seek at the trial court level an evidentiary hearing for the purpose of establishing his claims with evidence as a precondition to invoking the process of the appellate courts.)

** *People v Wright*, 463 Mich 905 (2001) (Case remanded to the trial court to conduct *Davis-Frye*** hearing on the matter of Dr. Warnick's testimony regarding the application of the statistical probabilities to the comparison between defendant's dentition and the bite marks on the victim. The trial court was ordered to rule on the question whether the testimony of Dr. Warnick was admissible under the Davis-Frye standards.

*** *People v Davis*, 343 Mich 348 (1955); *Frye v United States*, 293 F 1013 (CADC, 1923).

x

## PROCEDURAL HISTORY

Gilbert L. Poole, Petitioner, was charged in Oakland County Circuit Court with premeditated first-degree murder and felony murder for the alleged armed robbery of Mr. Roberto Mejia in the city of Pontiac on June 6, 1988.

On June 6, 1989, Petitioner was convicted following a jury trial of both first-degree murder and felony murder, MCL 750.316a and b. The Honorable Edward Sosnick sentenced him to two terms of life without parole.

The Michigan Court of Appeals modified the conviction to one count of first-degree murder supported by two theories (premeditated and felony murder), on January 21, 1993. The Michigan Supreme Court denied Petitioner's application for leave to appeal.

## FACTS

On or about June 6, 1988, Robert Mejia (Victim), was killed by an unknown assailant. On June 16, 1988, two composite drawings were printed in the "Oakland Press" seeking a suspect in the homicide. The case remained open with no progress for 6 months until December of 1988, when Ms. Connie Cook contacted the North Carolina police and informed them that her boyfriend, (Petitioner), had recently confessed that he had killed Mr. Mejia. Law enforcement officials in Oakland County Michigan were contacted with this information and a complaint was issued on December 19, 1988. An arrest warrant was issued and Petitioner was arrested on December 27, 1988. Petitioner waived extradition and was returned to Michigan. On January 18, 1989, Detective Oliver Mathes obtained a search warrant, Exhibit A, to obtain blood, hair, and dental casts from the Petitioner based upon a letter from Dr. Allen J. Warnick, D.D.S., Exhibit B. Exhibit A attests that blood collected from the crime scene did not match the Victim and if compared with blood from the Petitioner, it would be determined if the Petitioner was the source of the blood. Exhibit A further attests that hair samples obtained from the Victim's shirt did not match the Victim's hair, and if provided with hair from Petitioner's head, chest and pubic areas it would be determined if Petitioner was the source of the hair. Exhibit A further attests that a bite mark was found on the Victim's arm, and if provided with casts of Petitioner's teeth, it could be determined if Petitioner was the one who bit the victim before he died.

Defense counsel filed a motion in limine to suppress the bite-mark identification evidence the prosecution was planning to use, and requested a *Davis/Frye*[1] hearing to determine it's admissibility. The trial court denied the hearing based upon *People v Marsh*, 177 Mich App 161 (1989).

Prior to trial, defense counsel was provided with two composite drawings of a person that police had sought to question in June of 1988. Those drawings were released to the Oakland press who ran the drawings on June 16, 1988. The drawings were represented as the only two drawings done in connection

_____

1. *People v Davis*, 343 Mich 348 (1955); *Frye v United States*, 293 F 1013 (CADC, 1923).

1

with the Mejia case.

At the beginning of trial the prosecutor made a motion to "shorten" the witness list by proposing to strike several unnecessary witnesses from the list. One of those proposed witnesses (with defense counsel approval), was Laboratory Specialist David Woodford due to illness. (T-I, 9). [2] The prosecutor proposed to have Laboratory Assistant Melinda Jackson recreate the tests that Woodford had reported. (T-I, 9).2 The other res gestae witness that was stricken was the Victim's mother Christina Mejia. (T-I, 1415).

> MR. SPEAKERMAN (prosecutor): Christina Mejia, Your Honor, is the mother of the deceased. She lived with him at the time and **SHE DOES HAVE SOME TESTIMONY THAT MIGHT BE SIGNIFICANT TO THE TRIAL**; however, I spoke to counsel. I'm going to ask to use any statements she may have made in the police report. She's elderly, she's sickly, and this would be a terrible -- (emphasis added).

> THE COURT: In other words, you want to strike her provided you stipulate to certain testimony?

> MR. WILHELM:(Defense counsel): That is correct, Your Honor.

At trial, the prosecutor had a second set of composites supposedly done with the assistance of Robert Lisk and the other one by Kerry Johnson. The composites bear a striking resemblance to a blowup of Petitioner's drivers license.

At trial Mr. Lisk testified that he helped compose a composite on June 8, 1988. (T-II, 113-114). That composite does not match or come close to the drawings printed in the Oakland Press.

The prosecutor called Det. S. Serna and questioned him about the composite drawing. (T-III-A, 96).

Q   Exhibit 9, did you direct Robert Lisk to compile that Composite?

A   Yes, I did. I --

Q   When and where was that done?

A   It was done at the Oakland County Sheriff's Department and it was a couple of days after the homicide. ...

In the prosecutor's **CLOSING ARGUMENT** he made the implication that "it nails him -- that composite nails him." (T-IV, 96).

The composite shown by the prosecutor to the jury, was **NOT** either one of those drawings given to defense counsel, and had no resemblance to those appearing in the "Oakland Press." When defense counsel objected to the admission of the composite, he made one simple question "You did not do the actual drawing?" -- "No." Defense counsel was aware  that the composite was not provided in discovery or one of those appearing in the Oakland Press six months prior.

The People's first witness was Dr. Lynda Biedrzkycki. She testified about stab wounds to the face, neck, and, there was a bite mark on the Victim's right arm. (T-I, 175). She concluded that the Victim

---

2. Trial transcript volume and page number.

2

had died from multiple stab wounds. (T-I, 192).

On cross-examination Dr. Biedrzycki admitted that there were changes in the skin area of the bite mark from the time that the body was discovered and the time of the autopsy. (T-I, 204). She then testified that she acted as Dr. Warnick's assistant in obtaining an impression and preserving the impression. (T-I, 209-210). Dr. Biedrzycki testified the chemical "formalin," in which the excised tissue was placed, can shrink the tissue. (T-I, 211). She stated that the Victim had been dead for at least 48 hours before the body was discovered and that it had turned black from drying. (T-I, 214).

Dr. Biedrzycki further testified that she had observed numerous bite marks in other cases and has helped write articles regarding bite marks. However, she was not able to tell which part was the upper an which part was the lower teeth. (T-I, 218-219).

Kerry Johnson, a bartender at Popper's Bar, was called to the stand. He testified that he had seen Mejia at closing with Hank Clayton. (T-III, 11).

Q   Did you see at all who he [Mejia] talked to during that period after he returned?

A   He was standing with a few people, Hank was there. I saw him because -- Hank I knew was there because Hank's loud, --

On cross-examination Johnson stated that he had seen Mejia leave with bar with Clayton between 1:45 and 2:00 a.m. (T-III, 17).

Tony Taylor was called by the prosecutor. He testified that Mejia pounded on his door at 2:00 a.m. to buy some cocaine. Taylor also stated the Mejia would not bring a stranger by his house, and that after purchasing the cocaine, Mejia left. (T-III, 24).

Hank Clayton was next called to testify. He contradicted Johnson and Taylor's testimony by stating the he had left the bar between 11:30 p.m. and midnight, after drinking and smoking drugs with Mejia. (T-III, 34.)

Ms. Connie Cook, Petitioner's ex-girlfriend, was called. She testified that they were living together at the time of the homicide. Her testimony was that on the day the Victim was killed, of which, she stated was six months prior to the actual homicide, Petitioner returned home with his face, chest and arms scratched and with blood on his watch. (T-III, 60-62). She then stated that Petitioner told her that he picked up a guy at a bar, went to the Victim's apartment to do some cocaine, and then for a walk. During the walk she testified that Petitioner demanded money from the Victim but he refused. (T-III, 64). She stated that the Victim and the Petitioner got into a fight, that ended after Petitioner cut the Victim's throat and watched him drown in his own blood. (T-III, 62-65). She then stated that the Petitioner took six dollars and some change from the Victim's body. He then went to the Victim's apartment to clean up, (oddly as it may sound), then returned to the body to find the Victim's car keys -- (one would think that house and car keys would be on the same key ring). Oddly enough Cook claimed that Petitioner drove back to the bar, switched cars, and returned home to her.

The prosecutor later questioned Ms. Cook as to why she changed her story to the police. She

3

related that confession with the incident of the Petitioner fighting her brother. (T-III, 74). The prosecutor then had the jury excused and the following colloquy took place.

> MR. SPEAKERMAN: Just to caution Mr. Wilhelm that if it should come up -- that if the question were asked why she finally decided to tell the Pontiac police that Gilbert told her back in June, rather than just recently, was because the knew, she had to take a polygraph, and that would be the answer to that question. So, I mean, if that questions asked, she's got no way out.

> THE COURT: Do you understand it Mr. Wilhelm?

> MR. WILHELM: I understand.

After the prosecutor mislead the court to believe that Cook had passed the polygraph test, he used the opportunity to coach Cook while she was on the witness stand. The prosecutor essentially informed Cook as to how to respond if defense counsel challenged her testimony. The prosecutor literally cautioned defense counsel that he could not ask the same question. The prosecutor proceeded to elicit further testimony from Cook regarding prior uncharged bad acts that were unrelated to the death of Mejia. (T-III, 60, 67-68, 74, 106).

Pontiac ID Technician Albert Rayner was called to testify. (T-III, 110). While Rayner was testifying as to evidence collected at the scene, and whether or not the Victim had died at the location or not, [issues significant to defense], the court took a break for lunch. After lunch, the prosecutor asked for and was granted permission to suspend Rayner's testimony and call Dr. Allen J. Warnick out of turn, and return to Rayner's testimony later. This took defense counsel by suprise, of which, resulted in Counsels failure to voir dire Dr. Warnick outside the presence of the jury -- as promised by the trial court.

Dr. Warnick was called to testify as a bite-mark expert. He testified about photographing and removing the tissue from the Victim's arm and preserving it in Formalin until he was provided with a suspect to compare the tissue to (T-III, 16). He then testified how he took photographs and an impression of the Petitioner's teeth. (T-III-A, 20). He testified how he attempted to match the bite mark found on the Victim's arm with the impression of the Petitioner's teeth. (T-III-A, 21-25). He testified that the bite-mark on the Victim's arm was placed there by the Petitioner's teeth and that chance of the same individual making all these patterns are 2.1 billion to one." (T-III-A, 26).

On cross-examination Dr. Warnick admitted that there is no specialty in Forensic Odontology. That it was a new area of dentistry (T-III-A, 32-33), and that in Bite-mark cases distortions can occur because the skin itself is not a very good medium for holding dental imprints. Dr. Warnick also testified that distortion of the skin can be highlighted if a bite is made through clothing, or the movement of the struggle, and the preservation of the excised tissue in formalin for six months can also cause changes. (T-III-A, 34-36).

Dr. Warnick admitted on cross-examination that the point system that the American Board of Forensic Odontologists ("ABFO") came up with to identify bite marks could not be used because it was very subjective. (T-III-A, 38). He went on to testify that he comparison of bite-marks is susceptible to

4

subjective interpretation by the viewer. (T-III-A, 41). He then stated that he did not compare the bite mark with anyone ease's teeth other than the Petitioner. (T-III-A, 45-46).

On re-direct, Dr. Warnick stated that even though the skin can be distorted and the Victim was wearing a long-sleeved shirt, that it did not change his opinion that Petitioner made the bite mark. (T-III-A, 47).

The prosecutor after calling Detective Serna, brought it to the Court's attention that as a stipulation the Victim's mother, Christina Mejia's statement to the police would be read to the jury. (T-III-A, 88-89). Det. Serna testified that he had talked with Ms. Mejia and she stated that the Victim arrived at the apartment at 1:30 a.m. And that she looked in his bedroom at 2:00 a.m. and the Victim was not there. (T-III-A, 89). Petitioner's counsel waived Petitioner's Sixth Amendment Confrontation rights by stipulating as to what her testimony would be (T-III-A, 89).

Detective Serna further testified that he had Mr. Lisk come to the Pontiac Police Department and do a composite of the suspect in the homicide. (T-III-A, 96). However, the composite drawing the police released to the Oakland Press was not the one that the prosecutor introduced at trial.

Melinda Jackson, Laboratory Assistant, was called to testify in lieu of David Woodford. Ms. Jackson was late for trial. When questioned by the trial court about her tardiness, she stated that she received a phone call from the lab stating that **SOME EVIDENCE IN THIS CASE WAS MISSING**. There was not inquiry as to the missing evidence with the exception of one question by defense counsel; "In this case?"

Ms. Jackson testified that blood taken from the Victim's shirt was Blood Type "O" and that Petitioner's Blood Type was "**AB**". (T-IV, 9). She then testified that she tested the fingernail clippings taken from the Victim. And that on seven of the ten clippings she detected human blood consisting of Blood Type "O". (T-IV, 12). She was then asked about the hair samples that were taken as evidence. She stated that she was not qualified in hair analysis and was not able to match any of the hair samples collected with anyone. (T-IV, 13).

On cross-examination she stated that she **DID NOT** find any "AB" type blood under the Victim's fingernails. She did however, find type "O", of which, is consistent with 43% of the white population. "AB" blood type is an rare type, found in only 3% of population. She **DID NOT FIND** any "**AB**" type blood on any of the evidence that she tested. (T-IV, 17).

On cross-examination she testified that the hairs found on the Victim did not match the Petitioner. (T-IV, 20-21). She was asked if she examined the hairs found on the Victim with anyone else. She stated that the hair samples were just compared against the Petitioner and the Victim. (T-IV, 21). She was then asked if she conducted any test on the blood found on the stones that were found at the homicide scene, or on the body. She stated that the examination was done by David Woodford, serologist. (T-IV, 22).

On re-direct the prosecutor asked her if Mr. Woodford was back at work. She responded that he was. (T-IV, 22). It must be noted that Mr. Woodford had conducted tests on numerous items of evidence

that Ms. Jackson had not reproduced.

After the state rested, the prosecutor confessed to the court that he almost deceived the defense and the court regarding Ms. Jackson's substitution for Woodford. (T-IV, 25-26). He offered to delay the trial and bring in Mr. Woodford, or suggested defense counsel could talk with Mr. Woodford on the telephone. Defense counsel declined the offer of a delay and opted to speak with the person who the prosecutor claimed was Mr. Woodford. Shortly thereafter the court reconvened and the prosecutor stated that defense counsel had spoken with Mr. Woodford concerning his report, and by stipulation would enter the report into evidence for the jury to see if they wanted to. (T-IV, 28). The prosecutor then rested. The prosecutor then asked the court to offer Petitioner's past record to the jury if the Petitioner took the stand. (T-IV, 29). Defense counsel objected. The court stated the it would disallow impeachment. (T-IV, 31). The prosecutor asked the court if he could impeach if the Petitioner opens the door. The court responded:

> If you ask a question like, you've never been convicted of anything, I think that would be an example of opening the door.

Defense counsel wasn't going to call any witnesses, even though a police report prepared by Det. Mathes indicated that an individual named Mike Saylor had overheard two subjects discuss killing Mejia, dragging his body out in a field, and making plans to "do someone else." Exhibit K.

Petitioner demanded to be put on the stand. Defense counsel during direct brought out Petitioner's past record, drug abuse and being made to report to AA meetings. On cross-examination the prosecutor capitalized on defense counsel's opening the door of Petitioner's past record and his character. (T-IV, 29-72).

The prosecutor's closing argument consisted of misconduct that went uncorrected by the trial court or any objection by defense counsel. (T-IV, 75-99). Such as stating that after Lisk did "the" composite "Now we have a picture of what Petitioner looked like," (83). The prosecutor testified what the absent witness "Woodford" would have testified to. (84). He then argued extensively about Dr. Warnick's (NOW DISCREDITED)[3] testimony. (85-87). Falsely stating that Dr. Biedrzycki said "bite-mark was at the time of death." (86). The prosecutor then proceeded to go over the jury instructions and tell the jury how the prosecution has proved each element. (87-90). He then suggested that poverty and drug addiction undermined Petitioner's character. (90). He then falsely told the jury the prosecution witness Cook was RIGHT about detail after detail of the crime. (95). He mischaracterized the Bar patron's testimony of having seen Petitioner as identifying the killer. (96). He bolstered Dr. Warnick's accomplishments and his certainty of Petitioner's guilt. (96-97). He falsely told the jury that Petitioner's

---

3. Dr. Warnick's testimonial bite-mark evidence has now been discredited because he attached statistical certainty to his findings, which the courts have ruled were unreliable. *See e.g.* Exhibit M -- *People v Arnolsch*, Western District Court No. 94-419057; *People v Otero*, Detroit Recorders Case No. 94-13624; *People v Moldowan*, 466 Mich 862 (2002); *People v Wright*, 463 Mich 905 (2001); Exhibit N -- *People v Christini*; and *Ege v Yukins*, 380 F.Supp.2d 852 (E.D.Mich 2005), "*Ege, I*", aff'd in part, reversed in part *Ege v Yukins*, 485 F.3d 364 (6th Cir. 2007), ""*Ege II*"..

"alleged full confession" matches detail for detail, when there is no evidence to support any alleged confession. (97). He again tells the jury that the "foremost expert in this part of the country says those teeth bit the Victim." (97). He went on to tell the jury that the case has been proven beyond a reasonable doubt to the jury's satisfaction -- "he's the man that left the bar, those teeth bit Mejia." (97). "And he deserves to be convicted." (98).

Defense counsel's closing argument told the jury to use Kerry Johnson as the barometer of how to judge all the people from the bar. Counsel told the jury that Johnson came to the court with the intent of lying to convict the Petitioner and he got it from the newspaper. (T-IV, 102-104). Counsel was mistaken because Johnson did not identify Petitioner as the person that left with Mejia at closing time. (Johnson's name was written on the composite drawing given to counsel prior to trial, but suppressed by the prosecution). Counsel's closing argument was an abandonment of any defense.

The prosecutor's rebuttal argument started by telling the jury to throw out the constitutionally required reasonable doubt standard because defense was using Hank Clayton as a "red herring", and Petitioner "has to come up with something to cause you to have a reasonable doubt." (T-IV, 120). The prosecutor imputed personal knowledge of undisclosed evidence by stating that "everybody at the bar said Mejia left with Petitioner." (T-IV, 120). The prosecutor then mockingly told the jury that Petitioner's defense was that three people lied to convict an innocent man, that Cook is a monster and that Dr. Warnick is incompetent. "That's the defense." (T-IV, 125-126). The prosecutor went on to bolster the credentials of Dr. Warnick and his subsequent positive identification of Petitioner by way of non-testifying expert mathematical probability. (T-IV, 126).

After both the prosecution and defense counsel rested, Petitioner was removed from the courtroom. After the court reconvened, Defense counsel waived Petitioner's right to have his theory submitted to the jury. (T-IV, 73-74).     On June 6, 1989, Petitioner was convicted of first-degree murder and felony murder and sentenced to two terms of life without parole.

Counsel was appointed to represent Petitioner on appeal. On September 22, 1989, Ronald Kaplovitz, filed an untimely claim of appeal which the Court of Appeals treated as an application for delayed appeal. On November 13, 1989 the Court of Appeals issued an "ORDER" granting the application and assessed Kaplovitz an $100 fine for causing the delay.

On March 22, 1990 Petitioner filed with the trial court a motion (Exhibit D), to have Kaplovitz removed for lack of communication, refusal to provide assistance to Petitioner, and refusal to investigate and contact trial counsel Mr. Wilhelm. The trial court has never ruled on the motion.

Petitioner also wrote letters to the Michigan Assigned Appellate Counsel System. (MAACS). They contacted both Wilhelm and Kaplovitz to warn them of the complaints.[4]

---

4. Trial attorney Wilhelm was withholding Petitioner's file until after the appeal of right, because he was still extorting money from Petitioner's family by representing to them that he was still working on Petitioner's case. Mr. Kaplovitz refused Petitioner's request to meet with him in person and discuss issues, or to obtain Petitioner's permission before filing anything in the courts on his behalf. Petitioner had

Mr. Kaplovitz, without doing any investigation other than reading the trial transcripts, filed a boiler-plate brief containing seven issues with the Court of Appeals on November 1, 1990.

On December 27, 1990, Petitioner attempted to file a supplemental brief with the Court of Appeals. However, the brief was returned to Kaplovitz on January 14, 1991, with a letter stating that all pleadings must go through appellate counsel. Kaplovitz did not file the supplemental brief.

On January 31, 1991, Petitioner filed grievances against Wilhelm--(withholding files from Petitioner),[5] and Kaplovitz--(not assisting Petitioner in filing a supplemental brief, not conducting any investigation or obtaining authorization to file in the Court of Appeals, as requested by Petitioner).   On September 20, 1991, the Attorney Grievance Commission issued their findings (Exhibit E) on Kaplovitz and "ADMONISHED" him for violations of Michigan Rules of Professional Conduct 1.1(c), 8.4(a) and (c). As a result of the findings, Kaplovitz offered to file a supplemental brief but claimed that it would jeopardize the appeal that was already won by default. Based upon Kaplovitz's assertion, Petitioner declined to file the supplemental brief.

After a 17 month delay, the prosecutor filed a brief in opposition to Petitioner's brief of April 3, 1992. On August 25, 1992, Petitioner filed an in pro per motion to strike prosecution's brief and also filed the "supplemental brief." On September 23, 1992, the Court of Appeals issued an ORDER denying the motion to strike and denied Petitioner permission to file the supplemental brief. Exhibit F.

On January 21, 1993, the Court of Appeals Affirmed the conviction in an unpublished opinion, but modified the sentence to reflect one count of first degree murder supported by two theories.

On February 19, 1993, Petitioner filed an application for leave to appeal with the Michigan Supreme Court. That court on June 25, 1993, issued a form letter DENIAL without reaching the merits of the claims presented.

## PRESENT PROCEEDINGS

On November 27, 2005, Petitioner filed with the trial court a Delayed Motion for New Trial Pursuant to MCL 769.26,[6] and 770.1 based upon "newly presented evidence" that both Michigan and Federal courts have found that the identical bite-mark identification testimony provided by Dr. Warnick to be without scientific foundation and highly prejudicial to petitioners. Petitioner had challenged Dr. Warnick's testimony in the trial, Michigan Court of Appeals and Supreme Court. These courts have departed from their previous rulings regarding admissibility of positive identifications and statistical probability testimony based upon bite-marks in skin.[3] Exhibit G.

---

demanded that counsel obtain permission from himself (Petitioner) before filing anything in the court on his behalf.

    5. In response to the grievance, Wilhelm surrendered the file to Petitioner at Jackson Prison.

    6. The presence or absence of federal-question jurisdiction is governed by the "well-pleaded complaint rule," which provides that federal jurisdiction exists only when a federal question is presented on the face of the [Petitioner's] properly pleaded complaint.   The rule makes the [Petitioner] the master of the

Petitioner also filed with the trial court Motions for a *Ginther*[7] hearing and DNA testing pursuant to MCL 770.16,[8] to have biological evidence tested if it was presented at trial and used to convict a petitioner, if identification was an issue and the evidence is available for testing.

Irrespective that Petitioner filed a MCR 769.26 and 770.1 Delayed Motion for New Trial, the prosecution opted to file a brief in opposition to motion for relief from judgment on March 27, 2006. The Prosecution instructed the trial court to treat the Petitioner's pleadings as one filed under MCR 6.500. On April 3, 2006, Petitioner filed a Motion to strike the prosecutor's brief in opposition to motion for relief from judgment, based upon the fact the prosecutor had mislead the trial court as to the availability of biological evidence and violation of the trial court's briefing schedule order.

On April 17, 2006, the prosecutor filed a supplemental brief retracting their original claim that the evidence containing biological material was not available. The prosecutor asserted that Melinda Jackson was holding the blood sample evidence and that it was being preserved for testing if the court so directs.

On August 6, 2006, Petitioner filed a Supplemental Authority with the trial court citing *House v Bell*, ___ U.S. ___; 126 S.Ct. 2064 (2006), "that a gateway claim invoking the actual innocence exception involves evidence the trial jury did not have before it, the inquiry requires the federal habeas court to assess how reasonable jurors would react to the overall newly supplemented record," of the false testimony of Dr. Warnick. The trial court issued an order denying relief on August 1, 2006, without any further consideration of *House v Bell*. It stated that Dr. Warnick's testimony was harmless error. Given the status of law on the subject, the trial court's denial of relief based upon the harmless error standard is an unreasonable application of law where such evidence had a substantial and injurious effect or influence in determining the verdict. *Kotteakos v United States*, 328 U.S. 750; 66 S.Ct. 1239 (1946). The trial court's mischaracterization of the issue presented as one regarding whether or not teeth are unique belied the court's obligation under MRE 104(A) and MRE 702 to ensure that the methodology used was consistent with admissible testimony. *Daubert v Merrell Dow Pharmaceuticals, Inc.*, 59 U.S. 579; 113 S.Ct 2786 (1993). The trial court's ruling regarding allegations of it's own misconduct has seriously affected the fairness and reputation of the judicial proceedings and has denied Petitioner a fair trial, fair appeal, Due Process of law under the United States and Michigan's Constitution as is clearly established under federal law. *People v Bart*, 220 Mich App 1 (1996); *Petraszewsky v Keeth*, 201 Mich App 535 (1993).

Petitioner filed with the Michigan Court of Appeals (#276973) a delayed application for leave to appeal, Motion's for Remand For A Evidentiary Hearing Pursuant to *People v Ginther*, 390 Mich 436 (1973); *People v Wright*, 463 Mich 993 (2001); DNA testing. That Court denied the Motion's. And denied the delayed application pursuant to MCR 6.508(D). See Exhibit Q.

---

claim; he or she may avoid federal jurisdiction by exclusive reliance on state [rule]. *Caterpillar Inc. v Williams*, 482 U.S. 386, 392; 107 S.Ct. 2425, 2429 (1987).

7. *People v Ginther*, 390 Mich 436 (1973).

8. At trial, the prosecutor contended all blood found belonged to the victim, including that reportedly found on car console belonging to the Petitioner.

Petitioner filed with the Michigan Supreme Court (#135398) an application for leave to appeal, Motion's for Remand For A Evidentiary Hearing Pursuant to *People v Ginther*, 390 Mich 436 (1973); *People v Wright*, 463 Mich 993 (2001); DNA testing. That Court denied the Motion's. And denied the application for leave to appeal pursuant to MCR 6.508(D). See Exhibit S.

STANDARD OF REVIEW:
The trial court gave a mixed ruling on Petitioner's constitutional claims, *intger alia*, based on federal law, and ruling without giving any reasonable analysis on the constitutional claims.

When a prisoner who filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA") properly raises a claim in state court, yet that court does not review the claim's merits, AEDPA deference does not apply, and the federal habeas court reviews legal issues *de novo*. A habeas court will apply modified AEDPA deference in circumstances where the state court adjudicated a claim but with little analysis on the substantive constitutional issue. *Vasquez v Jones*, 486 F.3d 135, 140 (6th Cir. 2007).

"DUE DILIGENCE"
UNDER 28 U.S.C. § 2244(d)(1)(D), a habeas petition may be brought within on year of the "date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." *Easterwood v Champion*, 213 F.3d 1321 (10th Cir. 2000).

*Ege I* was decided on July 22, 2005. However, the soft back copy decision did not appear in the Kinross prison law library until September, 2005 and the hard bound copy was placed in the prison law library on November 2, 2005. Petitioner's delayed motion for new trial was filed with the trial court on November 27, 2005.

The *Easterwood* court held that "for a prisoner, a case is discoverable by 'due diligence' on the date the opinion became accessible in the law library, not the date the opinion was issued." Therefore, the statute of limitation's began in September, 2005. This petition for writ of habeas corpus is timely.

I    THE TRIAL COURT DENIED PETITIONER'S FOURTEENTH AMENDMENT RIGHTS WHEN WHEN IT DENIED PETITIONER'S DELAYED MOTION FOR NEW TRIAL BASED UPON MCL 769.26, 770.1, 770.2, 770.16, BY USING MCR 6.500.

Petitioner submitted to the trial court that it was bound to grant relief in this case pursuant to MCL 769.26 (Miscarriage of Justice), 770.1, 770.2, and 770.16 -- DNA testing, rather than MCR 6.500 et. seq. for the reasons that the more liberal standards in the substantive statutes control these proceedings.

MCL 769.26 was enacted in 1915 and provides that a new trial may be granted if there was a misdirection of the jury, **IMPROPER ADMISSION OF EVIDENCE**, or for error as to any matter of pleading or procedure. Test to be applied in determining whether error is sufficiently prejudicial to require reversal of conviction is whether defendant had a fair trial. *People v Skowronski*, 61 Mich App 71 (1975).

In *People v Berry*, 10 Mich App 469, 474 (1968), citing *People v Bigge*, 288 Mich 417, 421 (1939), of which, interpreted MCL 769.26, the court stated:

> "[W]e approve this interpretation of the statute. Whenever the error shown amounts to a deprivation of due process of law, an adequate showing has been made to warrant the granting of an application for DELAYED APPEAL. When an accused has been denied DUE PROCESS, A MISCARRIAGE OF JUSTICE HAS OCCURRED." (Emphasis added).

Petitioner states that his petition involves Constitutional magnitude that should be reviewed in order to avoid a miscarriage of justice. Noting, *Schlup v Delo*, 513 U.S. 298; 115 S.Ct. 851 (1995), quoting, *Murray v Carrier*, 477 U.S. 478; 106 S.Ct. 2639 (1986), which held that, "[i]n appropriate cases, the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" *Schlup*, 513 U.S. at 320-321.

The trial court in this case denied Petitioner's constitutional claim of IMPROPER ADMISSION OF EVIDENCE to the jury of so-called "expert" Dr. Warnick's "statistical/mathematical probability testimony", on whether the evidence was harmless error, pursuant to MCR 6.500.[10] "When the state court actually has applied harmless error review, the federal habeas court asks whether the state court's conclusion as to harmless error was itself unreasonable A federal habeas court need not defer to the state-court factfinder's credibility determinations when reviewing an error for harmlessness." *Vasquez*, 486 F.3d at 146-148.

In *McDougall v Schanz*, 461 Mich 15 (1999), the court altered the traditional line between legislative -- substantive law [MCL 769.26]/as opposed to court rule -- procedural [MCR 6.500] supremacy. Before 1999, rule[s] whose primary areas of control was "procedural" pre-empted conflicting statutes. *McDougall* overruled *Perrin v Pueller (On Rehearing)*, 373 Mich 531 (1964):

---

9. A court may not re-characterize a motion. *In Re Shelton*, 295 F.3d 620 (6th Cir. 2002). There are exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question. *Lee v Kemna*, 534 U.S. 362; 122 S.Ct. 877 (2002). State courts may not avoid deciding federal issues by invoking procedural rules that they do not apply even handily to all similar claims. *Hathorn v Lovorn*, 457 U.S. 255; 102 S.Ct. 2421 (1982).

10. The principle that no court rule can enlarge or restrict the legislatively or constitutionally defined jurisdiction of a court is well established in Michigan jurisprudence. *Shannon v Ottawa Circuit Judge*, 245 Mich 220 (1928).

"[W]e now recognize that the *Perrin* court failed to consider the constitutionally required distinction between "practice and procedure" and substantive law and thus overstated the reach of our rule-making authority. We will not continue mechanically to characterize all statutes that resemble "rules of evidence" procedural as opposed to substantive in nature. We instead adopt a more thoughtful analysis that takes into account the undeniable distinction "between **PROCEDURAL** rules of evidence and evidentiary rules of substantive law. ... Therefore, "[i]f a particular court rule contravenes a legislatively declared principle of public policy, having as its basis something other than court administration ...the [court] rule should yield." (Emphasis in original)

In *People v McQuillian*, 392 Mich 511 (1974), the court explained the "substantive policy" of a trial court's inherent power to grant a delayed motion for new trial after an unsuccessful appeal as of right:

"Little would seem to be served by freezing a decision that later turns out to have been erroneous."

A criminal appellant is not limited to any post-conviction collateral review. The court in *People v Goliday*, 153 Mich App 29 (1986), held that the doctrine of law of the case is inapplicable where different questions of law are presented in prior and "subsequent appeals." As in this case, **"NEWLY PRESENTED EVIDENCE"**[11] of Dr. Warnick's prior "statistical/mathematical probability/positive identification testimony" in a multitude of cases has been discredited and resulted in the reversal of those convictions,[3] Without Dr. Warnick's positive identification of Petitioner, it cannot be said that no reasonable juror would lack reasonable doubt. *House v Bell*.

The equities are such that this Court must use its discretion and permit habeas review under NEWLY PRESENTED EVIDENCE, ACTUAL INNOCENCE AND A MISCARRIAGE OF JUSTICE, as the following listed Issues and Arguments will establish that "justice has not been done." Failure to do so would be allowing the State of Michigan to continue to deny him Due Process and Equal Protection rights.[12]

---

11. Comity and finality must yield to the imperative of correcting a fundamental unjust incarceration. This comes about when newly presented evidence comes to light that demonstrates that more likely than not , in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt. *House v Bell, supra*.

12. If a state court system arbitrarily withholds the benefit of a state rule of law from a defendant, due process of law is denied. If a State court system treats similarly situated defendants differently, equal protection of law is denied. U.S. Const, Amend XIV; *Hicks v Oklahoma*, 447 U.S. 343; 100 S.Ct. 2227 (1980).

12

II      PETITIONER WAS DENIED A FUNDAMENTALLY FAIR TRIAL IN VIOLATION OF DUE PROCESS OF LAW THROUGH THE ADMISSION OF POSITIVE IDENTIFICATION AND AN ERRONEOUS EXPERT OPINION THAT THERE WAS A "STATISTICAL/MATHEMATICAL PROBABILITY" THAT THE ODDS ARE "2.1 BILLION TO ONE" THAT THE BITE MARK WAS MADE BY ANYONE OTHER THAN THE PETITIONER, WHERE THIS OPINION WAS WITHOUT SCIENTIFIC FOUNDATION AND WHERE SUBSEQUENT CASES HAVE SHOWN THIS PARTICULAR EXPERT TO BE COMPLETELY UNRELIABLE WITH A SERIES OF DEMONSTRABLY ERRONEOUS BITE MARK IDENTIFICATION IN CAPITAL CASES. THEREFORE, THE TRIAL COURT'S DETERMINATION THAT THE ADMISSION OF DR. WARNICK FALSE TESTIMONY WAS **HARMLESS ERROR**, WAS ALSO AN ABUSE OF DISCRETION.

STANDARD OF REVIEW:

Federal courts on habeas review must apply the "'less strict ... measure of harmlessness'" set for in *Brecht v Abrahamson*, 507 U.S. 619; 113 S.Ct. 1710 (1993). The test "for determining whether habeas relief must be granted is whether the ... error 'had substantial and injurious effect or influence in determining the jury' verdict.'" *Id.*

ARGUMENT:

The trial court in denying this constitutional claim stated:

The question then arises, whether Dr. Warnick's testimony was error harmless in nature.

In light of the other evidence of the defendant's guilt, the alleged error concerning the testimony of Dr. Warnick was harmless in nature. The defendant is not granted any relief from judgment because of this harmless error. Exhibit E. pg 2-3.

A federal habeas court need not defer to the state-court factfinder's credibility determinations when reviewing an error for harmlessness. *Fulcher v Motley*, 444 F.3d 791, 809 (6th Cir. 2006).

Defense counsel prior to, and, at the beginning of trial made a motion to exclude bite-mark testimony of Dr. Warnick. At trial, the case of *People v Marsh*, 177 Mich App 161 (189) was brought to the attention of the court. The bite-mark testimony in the *Marsh* case was far narrower than that introduced in Petitioner's case.

Dr. Fox's testimony merely indicated that there was some consistency between the suspect bite marks on the victim's skin and defendant's teeth and that defendant could not be ruled out as the originator of the marks. **The bite-mark evidence did not positively identify defendant and was not relied on by the prosecutor for this purpose.** *Id.* at 168.

In this case defense counsel asked the court to allow the Petitioner to make a separate record outside the presence of the jury of Dr. Warnick's credentials and the method (T-I, 5). The trial court stated:

Well, I think that the admissibility question appears to have been taken care of in terms of [*Marsh*] which does indicate that the *Frye/Davis* test is met without hearing with regard to bite-mark evidence. Obviously it still requires that the expert, (a) be qualified and, (b) that the methodology used is consistent with admissible testimony. So, you know, I don't know whether you need a separate hearing but when -- who is the doctor in this case?

MR. SPEAKERMAN: DR. Allan Warnick, Your Honor.

THE COURT: Okay, I'll allow you an opportunity to voir dire him, if you wish, outside the

presence of the jury as to qualifications, if that what you wish.

MR. WILHELM: Thank you, Your Honor. (T-I, 5-6).

Even though the trial court stated "Obviously it still requires that the expert, (a) be qualified and, (b) that the methodology used is consistent with admissible testimony." The trial court commenced trial without first applying MRE 104(A) which provides that "[p]reliminary questions concerning the qualification of a person to be a witness ... **SHALL** be determined by the court." (Emphasis added). The requirements of MRE 104(A) extended to the application of MRE 702 because it requires a trial court to determine the evidentiary reliability or trustworthiness of the facts and data underlying an expert's testimony before that testimony may be admitted. *Nelson v American Sterilizer (On Rem)*, 223 Mich App 485 (1997). MRE 702's reference to "scientific' evidence "implies a grounding in the methods and procedures of science," and the rule's reference to "knowledge" "connotes more than subjective belief or unsupported speculation. *Daubert.*

At Petitioner's trial, Dr. Warnick referred to studies and conclusions of others in his field that were not part of Petitioner's trial. Exhibit H. These assertions and representations by Dr. Warnick were false and misleading. Exhibit G. Had a hearing been conducted outside the presence of the jury as requested defense counsel, it would have been discovered that the very "EXPERTS" that Dr. Warnick was basing his testimony upon had issued a warning that the tests performed and conclusions drawn were, at best, for investigative purposes only and not to be used in a court of law. Exhibit I.

Those articles predated Petitioner's trial. Therefore, Dr. Warnick knew that the data and statistical testimony that supported his opinion testimony was untestable and unreliable. Dr. Warnick's so-called statistical testimony was at large in the Michigan court system without regulation or limitation for nearly 15 years before his well-rehearsed speech was subjected to a *Davis/Frye* or *Daubert* hearing.

Courts in recent years have limited experts to pointing out "matching" characteristics, and have generally forbidden them from offering population frequency evidence. In *Perry v State*, 586 So2d 242, 254 (Ala SCT 1991), the Alabama Supreme Court articulated the difference between the permissible and impermissible opinion. Expressly outlawed is testimony like Dr. Warnick's in this case, which poses the question: "How many people would we have to look at before we saw another like this?" and gives the answer "1 in 209,100,000". *Perry*, 586 So2d at 254. By contrast, "the evidence necessary to show a 'match' does not by itself indicate the frequency with which a given DNA pattern might occur statistically or might occur in a given population." The danger inherent in latter-type testimony was described by the court in *Perry* as follows:

"[W]hile expert interpretation of scientific results is not foreclosed, a limitation on the use of population frequency statistics is necessary because of the danger that such evidence will have a 'potentially exaggerated impact on the trier of fact'.
* * *
[T]here is a real danger that the jury will use the evidence as a measure of the probability of the defendant's guilt or innocence and that the evidence will thereby undermine the presumption of