innocence, erode the values served by the reasonable doubt standard, and dehumanize our system of justice.

*Perry* 586 So2d at 254, citations omitted. In reversing Mr. Perry's conviction, expressed its concern "that the testimony unduly encourages the trier of fact in its determination of whether the State has proven guilt beyond a reasonable doubt to focus solely upon the numerical conclusion and to disregard the weight of other evidence." *Perry*, 586 So2d at 254.

The same analysis has been applied to judicially-imposed limitations in other scientific fields. In *State v Carlson*, 267 NW2d 170 (Minn SCt 1978), the head hair of the defendant matched that found on the deceased in 15 "typing characteristics". *ID* 172. Based upon these matches, the expert opined that the chances of the hair belonging to someone other than the defendant were "1-in-4500". Disapproving of testimony "couched in numerical or statistical terms", the Court held:

> Our concern over this evidence is not with the adequacy of its foundation, but rather with its potentially exaggerated impact on the trier of fact. Testimony expressing opinions or conclusions in terms of statistical probabilities can make the uncertain seem all but proven, and suggest, by quantification, satisfaction of the requirement that guilt be established "beyond a reasonable doubt."

*Carlson*, 267 NW2d at 176. *See also United States v Massey*, 594 F.2d 676 (8th Cir. 1979),

> "Mathematics, a veritable sorcerer in our computerized society, while assisting the trier of fact in the search for truth, must not cast a spell over him."

Finally, probability statistics have been outlawed as applied to bite mark identification in this and other jurisdictions. *See Howard v State*, 697 So2d 415, 429 (Miss SCt 1997); *Moldowan, supra, Wright, supra*, and *Ege I & II, supra*.

## A. ERROR WAS NOT HARMLESS, IT HAD A "SUBSTANTIAL AND INJURIOUS" EFFECT UPON JURORS:

Under AEDPA when the state court actually has applied harmless-error review, the federal habeas court asks whether the state court's conclusion as to harmless error was itself unreasonable. *Eddleman v McKee*, 471 F.3d 576, 583 (6th Cir. 2006) (citing *Mitchell v Esparza*, 540 U.S. 12; 124 S.Ct. 7 (2003) (per curiam)).

Much like the erroneous admission of a defendant's confession[13] it is unlikely that the admission of bite mark evidence would ever truly be harmless. As one authority has observed,

> "... bite marks, in the usual case, will be conclusive of the guilt issue: the logical distance between the fact of biting and the ultimate issue of guilt is short. Thus the admission of irrelevant bite mark evidence may be particularly prejudicial to the defendant."

Hale, A., *The Admissibility of Bite Mark Evidence*, 51 Cal L Rev 309, 326 (1978).

The trial court in this matter invoked "harmless error" to determine whether Dr. Warnick's "mathematical probability" testimony denied Petitioner a fair trial:

_____

13. *Rose v Clark*, 478 U.S. 570; 106 S.Ct. 3101 (1986).

Defendant contends that he was deprived a fair trial because this Court permitted Dr. Allan Warnick, a forensic dentists, to testify concerning a bite-mark on the defendant's[14] arm. The Federal District Court has ruled that the admission of this type of testimony violates due process because it lacks a scientific foundation. *Ege v Yukins, supra*. The fundamental theory underlying this evidence--that every person's dentition is unique--is not accepted by all and critics complain that "there is little research establishing the unique nature of a human bite-mark." *Id.*

The questions then arises, whether Dr. Warnick's testimony was error harmless in nature. In determining whether the error was harmless, the Court will consider the great weight of evidence at trial.

In this respect, we note the testimony from witnesses. The defendant was seen by Robert Lisk and Charles York leaving the bar with the victim and in the victim's car with the victim a short time before the victim was murdered. The defendant described in detail to his girlfriend, Connie Cook, the manner in which he murdered and robbed the victim. The defendant has not established that, but for Dr. Warnick's testimony, it is more probable than not that a different outcome would have resulted. The alleged error was, therefore, harmless in nature. Exhibit 1.

The history of the *Moldowan* and *Christini* cases in Macomb County offer a controlled experiment of sorts demonstrating beyond all doubt that the erroneous admission of Dr. Warnick's testimony is not harmless. On retrial, bite-mark identification was barred completely in Mr. Moldowan's trial, and he was acquitted. In Mr. Christini's trial, bite-mark identification was admitted, but no probability statistics were allowed, and Mr. Christini was also acquitted.

Moreover, for the trial court to classify the act of parading the false testimony of Dr. Warnick in front of a jury, to be harmless because there was so-called other evidence that could have been used to convict is clearly against precedent and inconsistent with the confessions of error made by prosecutors in Macomb and Wayne counties in the Warnick cases in Michigan. In *Moldowan*, the prosecution confessed error in this Court. *Moldowan, supra*.[15] The trial court cannot explain the outrageous credibility of its witnesses of Connie Cook, (failing a polygraph test, having the date of the homicide occurring six months before it happened; false composite drawings given by Robert Lisk; bartender Charles York stating that the Victim left the bar with someone else). Rather, Petitioner maintains that the testimony of these witnesses is not adequate to establish harmless error because their testimony was intrinsically absurd, demonstrably false, or both. As the prosecutor in his closing argument stated: "throw out the circumstantial evidence of Connie Cook, Robert Lisk and Charles York, you have the testimony of Dr. Warnick that it was his teeth."

To determine whether an error was harmless under *Chapman*, courts are to consider "a host of factors," including (1) "the importance of the witness' [Dr. Warnick] testimony in the prosecution's case," (2) "whether the testimony was cumulative [no other forensic orthodontist testified]," (3) "the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points," [no corroborating or contradicting testimony], (4) "the extent of cross-examination otherwise

---

14. Dr. Warnick's testimony was about a bite-mark on the Victim's arm that he alleged was placed there by the Petitioner.

15. In *Moldowan*, the parties agreed that the Warnick error was not harmless despite the fact that there was a live complainant in that case who had testified personally at trial that Mr. Moldowan had kidnapped, raped and bit her.

16

permitted." [no *voir dire* of Dr. Warnick's credentials], (5) "the overall strength of the prosecution's case." ["throw out the circumstantial evidence of Connie Cook, Robert Lisk and Charles York, you have the testimony of Dr. Warnick that it was his teeth."] *Delaware v Van Arsdall,* 475 U.S. 673, 684; 106 S.Ct. 1431 (1986) (citing *Harrington v California,* 395 U.S. 250, 254; 89 S.Ct. 1726 (1969)).

    The physical evidence at the scene of the homicide (blood on rocks tested postivie for type "A") and collected from the Victim (**blood type on body not belonging to Petitioner or Victim**) points to Petitioner's actual innocence.

    In *Miller v Pate,* 386 U.S. 1; 87 S.Ct. 7855 (1967), the Court held:

> "More than 30 years ago this Court held that The fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing false evidence. ... There can be no retreat from that principle."

*Accord. Giglio v United States,* 405 U.S. 150; 92 S.Ct. 763 (1972) (The remedy for such conduct required a new trial and created a mandate if the false testimony could in any likelihood have affected the judgment of the jury.) The prosecutor in this case told the jury that "it was his teeth." He relied relied upon Dr. Warnick's testimony "that anyone else other than Petitioner making that bite-mark is 2.5 billion to 1."

    In *House* the petitioner was in a similar position as the Petitioner. There, the exception for claiming actual innocence came into play when the blood on House's jeans was called into question and House put forth substantial evidence of a different suspect. There is no substantial difference between the actual innocence claim the Petitioner is asserting.

    The physical link between Petitioner and the Victim has fallen into disrepute. The bite-mark identification testimony, substantial evidence that there is a different suspect, Exhibit J, the prosecutor's trial exhibit "the Woodford report," shows blood collected from the Victim's clothing did not match the Petitioner or the Victim. There was other evidence that was suppressed by the prosecutor, but discovered on Petitioner's post-appeal, should give credibility to Petitioner's claims—(detective's progress notes indicate another party was overheard confessing to the murder and planning another. Exhibit K. "Had the jury heard all the conflicting testimony, it is more likely than not no reasonable juror viewing the record as a whole would lack reasonable doubt." *House, supra.*

    In *United States v Agurs,* 427 U.S. 97; 96 S.Ct. 2392 (1976), the Court held:

> If the state found blood on the victim that did not match the victim or accused, and no related testimony was offered, the suppression of that information unquestionably corrupts the truth-seeking process.

A trial that was fundamentally unfair at the time it took place cannot be rendered fundamentally fair in retrospect by what amounts is nothing more than an appellate review of the sufficiency of evidence, *Rose v Clark, supra.* In *Ege I,* 380 F.Supp.2d at 880-81 the court stated:

> ... Since the bite-mark evidence was the only physical evidence trying the petitioner to the crime, its erroneous admission put the petitioner at an actual and substantial disadvantage.
>     Admission of the bite-mark evidence and opinion testimony violated the petitioner's right under the Due Process Clause to a fair trial, the court finds that the evidence, already found by

the state judge to be improperly admitted, "had a substantial and injurious effect or influence in determining the jury's verdict." There can be no question that the bite-mark evidence together with Dr. Warnick's 3.5 million-to-one odds making was powerful evidence against the petitioner. The evidence plainly was "material in the sense of a crucial, critical highly significant factor.

Dr. Warnick's evidence was unreliable and grossly misleading. The evidence was so extremely unfair that it's admission violates fundamental concepts of justice.

The Court is not convinced that the trial, which included Dr. Warnick's testimony produced a just result.

The Sixth Circuit in *Ege v Yukins*, 485 F.3d 364 (6th Cir. 2007) (*"Ege II"*) in relationship to

Dr. Warnick's testimony held:

Trial court's erroneous admission of prosecution expert's testimony in murder trial that among 3.5 million residents of the Detroit metropolitan area, petitioner's teeth, and only her teeth, could have made the mark on victim's cheek substantial prejudiced the outcome of petitioner's trial, even in light of other circumstantial evidence against her, and deprived petitioner of her due process right to a fair trial.

The Michigan rule on "harmless error statute" is stated in *People v Nichols*, 341 Mich 311, 332

(1954):

"MCL 769.26 provides in effect that a verdict shall not be set aside in a criminal case on the ground of improper admission of evidence unless, from an examination of the entire cause, it affirmatively appears that such error resulted in a miscarriage of justice. Plaintiff urges that the entire record is persuasive of defendant's guilt. As we held in a civil case, we were urged against a claim of misdirection of the jury, the rule always in effect in Michigan, both before and after the enactment of the mentioned statutes and unaffected thereby, has been and is that the question of reversal is controlled by determination of whether it was prejudicial. Having been prejudicial, it follows that the resulting verdict and judgment must be and are reversed, with new trial."

It must be noted that in Argument I, *supra*, Petitioner placed his constitutional claims before the trial court pursuant to MCL 769.26. Of which, the trial court was bound to decide Petitioner claims.

Dissenting in *Fahy v Connecticut*, 375 U.S. 85, 94; 84 S.Ct. 229, 234 (1963), Mr. Justice Harlan said:

"It is obvious that there is no necessary connection between the fact that evidence was unconstitutionally seized and the degree of harm caused by its admission. The question of harmless error turns not on the reasons for inadmissibility but on the effect of the context of a particular case."

The error here was not harmless as the trial court opined when it regarded Dr. Warnick's expert testimony of "mathematical probability" that the odds of anyone else other than Petitioner's dentition making the bite-mark on the victim as being "2.5 billion to one." The trial court in Petitioner's Motion for New Trial acknowledged that Dr. Warnick's evidence of bite-mark "mathematical probability" analysis was improperly admitted and should not have been admitted but the error was harmless in nature. To affect "substantial rights", an error must have a substantial and injurious effect or influence in determining the ...verdict." *Kotteakos, supra.*

In *Ege II*, 485 F.3d at 373, the Court stated that Dr. Warnick's statistical probability testimony "WAS BUNK." The trial court in this case stated:

The question then arises, whether Dr. Warnick's testimony was error harmless in nature. In determining whether the error was harmless, the Court WILL CONSIDER THE **GREAT WEIGHT OF EVIDENCE AT TRIAL.**

This application of "great weight of evidence" is against *Chambers v Mississippi,* 410 U.S. 284; 93 S.Ct. 1038 (1973). Any review of due process claims based on improper admission of evidence must be cognizant of the Supreme Court's mandate that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v McGuire,* 502 U.S. 62, 68; 112 S.Ct. 475 (1991). Under this very deferential standard, due process is violated, and thus habeas relief warranted, only if an evidentiary ruling is "so egregious that it results in a denial of fundamental fairness." *Bugh v Mitchell,* 329 F.3d 496, 512 (6th Cir. 2003). "Whether the admission of prejudicial evidence constitutes a denial of fundamental fairness turn upon whether the evidence is material in the sense of a crucial, critical highly significant factor." *Brown v O'Dea,* 227 F.3d 642, 645 (6th Cir. 2000).

These principles have their roots in *Chambers,* which held that trial errors cannot "defeat the ends of justice" or otherwise deprive a defendant of his right to a fair trial. In *Chambers,* the Court was looking at a state trial court's improper exclusion of certain evidence that would potentially have assisted the defendant, but its tenets are equally applicable to situations involving a state trial court's improper ADMISSION of certain evidence injurious to the defendant. The ultimate question is therefore whether the trial court, in finding that admission of Dr. Warnick's testimony was not prejudicial to the ultimate outcome of Petitioner's case, unreasonably applied *Chambers.*

Since Petitioner's trial, MRE 702 has been amended explicitly to incorporate *Daubert's* standards of reliability. This modification of MRE 702 changes only the factors that a court may consider in determining whether expert opinion evidence is admissible. It has not altered the court's fundamental duty of ensuring that ALL expert opinion testimony -- regardless of whether the testimony is based on "novel"[16] science -- is reliable. Expert forensic testimony regarding identification of the defendant based upon a statistical analysis requires a proper foundation. *People v Adams,* 195 Mich App 267, 272 (1992). Dr. Warnick inappropriately adopted a scientific technique from the proper scope of its application. He was allowed to apply mathematical probability of someone or something else being able to produce a bruise on the Victim's arm of a shape and size, that had changed considerably between it's infliction and six months later when compared to the Petitioner.

This gatekeeper role applies to "**ALL STAGES**" of expert analysis. MRE 702 mandates a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data. Thus, it is insufficient for the prosecutor to introduce

---

16. *See e.g., People v Young.* 418 Mich 1, 24 (1983). Because the court's gatekeeper role is mandated by MRE 702, rather than *Davis/Frye,* the question whether *Davis/Frye* is applicable to evidence that is not "novel" has no bearing on whether the court's gatekeeper responsibilities extend to such evidence. These responsibilities are mandated by MRE 702 irrespective of whether proffered evidence is "novel." See MRE 702; see also *General Electric Co. v Joiner,* 522 U.S. 136, 142; 118 S.Ct. 512 (1997) (noting that FRE 702 overruled *Frye* but left intact the court's gatekeeper responsibilities.)

Dr. Warnick's expert opinion merely to show that he opinion rest on data viewed as legitimate in the context of a particular area of expertise (bite-mark statistical/mathematical probability/conclusions). The proponent must also show that any opinion based on those data expresses conclusions reached through reliable principles and methodology. *Gilbert v Daimler Chrysler Corp.*, 470 Mich 749 (2004).

As a result, Dr. Warnick's "mathematical probabilities about the comparison between Petitioner's dentition and the bite-mark on the victim being 2.5 billion to 1" as being a positive identification of Petitioner, of which, the trial court accepted without a *Davis/Frye* hearing, (and acknowledged in the denial of Petitioner's Motion for a New Trial), allowed discredited testimony and was an IMPROPER ADMISSION OF EVIDENCE (MCL 769.26) that facilitated the surreptitious advancement of the junk/"bunk" science of "mathematical probability data" to unreliable opinion bite-mark evidence in this case.

In other words, the trial court erred reversibly in allowing the erroneous "mathematical probability positive identification" testimony of Dr. Warnick to be presented to the jury. of which the prosecutor also relied upon in his closing argument:

> "...And he testified that in his expertise and he testified -- you can look at his credentials -- that there was no doubt. Beyond any doubt, he has identified that bite-mark as being made by the teeth of Gilbert Poole." (T-IV, 86).

And again in rebuttal argument the prosecutor stated:

> Dr. Warnick testified, and I won't go through it again that based on his experience, those teeth bit the victim. No other way around it. And then he went back to the basis for this type of testimony, the book where they did the study with all the identical twins, and they got the **MATHEMATICIANS** to say what's the **POSSIBILITY** that someone else has teeth exactly like that. And, if I recall, it was two and one-half billion to one. That makes the lottery look like a sure thing. It was his teeth. (T-IV, 126). (Emphasis added).

Such "testimony expressing opinions or conclusions in terms of statistical probabilities can make the uncertain seem all but proven, and suggest, but quantification, satisfaction of the requirement that guilt be established 'beyond a reasonable doubt.'" *Ege II*, 485 F.3d at 376-77.

The trial court cited *People v Lukity*, 460 Mich 484 (1999) to deny Petitioner's Motion for a New Trial:

> "The defendant has not established that but for Dr. Warnick's testimony, it is more probable than not that a different outcome would have resulted. The alleged error was, therefore, harmless in nature."

The court in *Lukity* sought to give meaning to the semantics of *People v Mateo*, 453 Mich 203 (1996), in the application of MCL 769.26. Specifically, § 26's statement that the error must have "affirmatively appear to undermine the reliability of the verdict." *Id.* The court in *Lukity* unquestionably stated that § 26 controls judicial review of preserved, non-constitutional error. In contrast, § 26 does not apply to preserved constitutional error as the Petitioner has established in this case. *Id.* 460 Mich at 495, n.3. Again, Petitioner must make note that he raised his constitutional claims pursuant to MCL 769.26 and

the trial court, refusing to determine these claims under 769.26, used § 26 to deny Petitioner.

In this case, in the context in which mathematical probabilities were made and used, the statistics did not assist the trier of fact in evaluating whether the bite-marks matched Petitioner's teeth. Dr. Warnick's statements did, however, suggest that degree of knowledge when he attached all dental certainty to his opinion of Petitioner's guilt. And they carried considerable weight coming from the mouth of an "expert". The unfair prejudicial impact of the misused "positive identification" testimony grossly outweighed their probative value. The disapproval of statistical evidence based on the product theory has been a consistent refrain from courts over the years. *See e.g., Hart v Sec'y of Health and Human Serv's.,* 60 Fed.cl 598, 606 (2004). Reversal would be justified on this ground alone given the identification of the "biter" was the crucial inquiry at trial -- even more so since Dr. Warnick's testimony has not stood up to judicial scrutiny.[3] Forensic dentists have not yet gathered the data to perform those types of calculations, so opinion testimony based on that information cannot reflect a certainty in the information given to the factfinders.[17]

When the trial court allowed Dr. Warnick to testify as to his certainty of Petitioner's guilt using mathematical calculations of someone else, and to come up with the statement that the "odds of the same individual making all these patterns are 2.1 billion to one, and that in all dental certainty it was the Petitioner that bit the Victim," the Court abridged Petitioner's fundamental Due Process rights "to a fair opportunity to defend against the state's accusations." *Turpin v Kassulke,* 26 F.3d 1392, 1396 ( 6th Cir. 1994).

The trial court, in denying Petitioner's Motion for a New Trial, applied the wrong standard of review when concluding that "PETITIONER HAS NOT ESTABLISHED THAT, BUT FOR WARNICK'S TESTIMONY, IT IS MORE PROBABLE THAN NOT THAT A DIFFERENT OUTCOME WOULD HAVE RESULTED." The correct standard of review as announced in *Fahy supra,* clearly states:

> "We are not concerned here with whether there was sufficient evidence the petitioner could have been convicted of without the evidence complained of. The question is whether there is a **REASONABLE POSSIBILITY THAT THE EVIDENCE COMPLAINED OF MIGHT HAVE CONTRIBUTED TO THE CONVICTION**." (Emphasis added).

The trial Court's denial of Petitioner's Motion for a New Trial was contrary to or involved an unreasonable application of clearly established federal law. *Wiggins v Smith,* 539 U.S. 510, 520-521; 123 S.Ct. 2527 (2003). For legal guidance, this Court must abide by the decisions of the Michigan Supreme Court in *People v Moldowan, supra, People v Wright, supra,* and the federal decision in *Ege II, supra,* in that identical testimony from Dr. Warnick and similar facts as those in the instant case were the cause of those cases to be reversed.

> "A rule of law laid down by the Supreme Court in the decision of a cause is to be applied on the same facts in all subsequent proceedings in the cause." *Id. Terrill v Mich. United Traction Co.,* 214 Mich 478 (1921).

---

17. David L. Faigman, David H. Kaye, Michael J. Saks & Joseph Sanders, Modern Scientific Evidence, The Law and Science of Expert Testimony, *Identification from Bitemarks: The Scientific Questions; Uniqueness of the Human Dentition,* § 30-2.1.5, 552 (1997).

III    NEWLY PRESENTED EVIDENCE REQUIRES A COURT TO EITHER REVERSE THE CONVICTIONS OR PROVIDE A HEARING TO DETERMINE WHETHER BITE MARK INTERPRETATION HAS MET THE DAVIS-FRYE/DAUBERT STANDARD FOR ADMISSIBILITY OF PURPORTEDLY SCIENTIFIC EVIDENCE UNDER MRE 702.

STANDARD OF REVIEW:

When a prisoner who filed his habeas petition after the effective date of AEDPA properly raises a claim in state court, yet that court does not review the claim's merits, AEDPA deference does not apply, and the federal habeas court reviews legal issues, *de novo*. *Williams v Coyle*, 260 F.3d 684, 706 (6th Cir. 2001).

ARGUMENT:

Where a state court should have made a finding of fact but neglected to do so, the state-court factual determination is perforce unreasonable and there is nothing to which the presumption of correctness can attach in a federal habeas corpus case. *Taylor v Maddox*, 366 F.3d 992 (9th Cir. 2004).

The trial court in this matter did not address this constitutional claim in denying the Delayed Motion for a New Trial. A Motion for a new trial based on newly [presented] evidence may be granted upon a showing that (1) the evidence itself, not merely it's materiality, is newly [presented], (2) the evidence is not merely cumulative, (3) the evidence is such as to render a different result probable on retrial, and (4) the defendant could not have produced it at trial. *People v Canter*, 197 Mich App 550 (1992).

**A. PRONG 1 – NEWLY PRESENTED EVIDENCE:**

The Supreme Court in *Schlup v Delo*, 513 U.S. 298; 115 S.Ct. 851 (1995) requires that a defendant furnish "NEW RELIABLE EVIDENCE[18] ... that was not PRESENTED at trial." (emphasis added). Items of evidence of which defendant and his lawyer were not aware of at the time of trial Meet the test of newness in discovery as grounds for new trial. *People v LoPresto*, 9 Mich App 318 (1967).

Petitioner was convicted in 1989. In September, 2005[19] (after he exhausted his appeal of right), he was able to first learn that the credibility of Dr. Warnick has not only been destroyed, but cases that he testified in were vacated based upon his "MATHEMATICAL PROBABILITY" testimony.

**B. DR. WARNICK'S PREVIOUS FALSE TESTIMONY ON PROBABILITY STATISTICS:**

In this case, the problems inherent in using probability statistics in the bite-mark identification area

---

18. Because a gateway claim invoking actual innocence exception involves evidence the trial jury did not have before it, the inquiry requires the federal habeas court to assess how reasonable jurors would react to the overall, newly supplemented record. *House v Bell*, 126 S.Ct. at 2078.

19. Dr. Warnick's expert testimony, which was later to be in essence a sham by a party on whose behalf the testimony was given, may be analogized to cases where, for example, a DNA expert later admits to lying numerous times regarding tests results, or a key eyewitness later admits to perjury in identifying a defendant. *See* Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 5.2b n. 45 (5th ed. 2005). In such cases, the petitioner could not have been reasonably expected to discover the misconduct during trial. As a consequence, an otherwise untimely petition may be deemed timely in the proper circumstances. *Ege II*, 485 F.3d at 374 n. 4.

were compounded by the fact that the prosecution's expert, Dr. Warnick, proved to be uniquely unqualified to offer such testimony. In support of Petitioner's "Motion for New Trial Based Upon Newly Presented Evidence of Actual Innocence and Miscarriage of Justice", he placed before the trial court the track record for erroneous "positive" bite-mark identifications (using probability statistics) in Michigan state courts. Petitioner has established that Dr. Warnick's evidence has been discredited in other courts, such as the case of *People v Otero*, Detroit Recorder's Court No. 94-13624, a rape-murder case in which Dr. Warnick, explaining his opinion that Otero had made the bite mark found on the victim, stated that upon finding five unique points of identity between a bite mark and suspects teeth, the chance of someone else having made the mark would be 4.1 billion to one. The Wayne County Prosecutor sought a second opinion when the sperm did not match Otero. A second Forensic odontologist examined the bite mark and was unable to find any class characteristics. The expert suggested that the bite marks may have come from the victim's own dentures which came out during the struggle. The prosecution dismissed it's case against Otero.

The investigation in *Otero* led the prosecutor in *People v Ricky Alan Amolsch*, Westland District Court No. 94-419057 (charged with murder), seek a second opinion since Dr. Warnick testified in Amolsch's trial. Dr. Warnick testified to his opinion that the dentition of Amolsch matched a bite-mark on the body of the deceased. Other than the bite-mark testimony , the only source of evidence was from a person named Anthony Walker, the prosecution's "star" witness who claimed to have observed the vehicle of the defendant in front of the deceased's trailer (where the deceased was found) on the night of the homicide. Walker also testified as to the sound of arguing coming from the trailer on the night of the homicide. Dr. Warnick stated, "it is my expert opinion that the dentition of Ricky Alan Amolsch is consistent with the bite-mark found on the left cheek of the victim. Again, not satisfied to couch his opinion in terms of mere consistence, Dr. Warnick then offered that "I feel strongly that there's probably nobody in this Detroit metropolitan area that would match up to him." Astoundingly, approximately a week after Walker testified at the preliminary examination of Amolsch, a sexual assault occurred in the same trailer park and "star" witness Walker was subsequently charged with that assault.

Because the circumstances surround Walker's other sexual assault now made him a prime suspect in the Amolsch murder case, and because of Dr. Warnick's horrendous work in the Otero case, Wayne County prosecutors decided to seek a second bite-mark opinion. The evidence was supplied to John P. Kenny, Chief Forensic Odontologist for the Cook County Medical Examiners Office . His conclusion was as follows. "After careful review of the evidence it is my conclusion that the injury to the cheek of the victim was to a reasonable degree of scientific certainty caused by the teeth of Mr. Walker rather than those of Mr. Amolsch." As a result, as in the Otero case, the prosecution against Amolsch was dismissed.

Both Otero and Amolsch attempted to sue Dr. Warnick for gross negligence while investigating their murder cases. The trial courts granted summary judgment in favor of Dr. Warnick. Otero and Amolsch appealed to the Michigan Court of Appeals. In *Otero v Warnick*, 241 Mich App 143, 153-54

(2000) the Court in affirming stated:

> Accepting as true the allegations in [Otero's] complaint, it is apparent that Warnick performed his tasks with respect to the Airasolo murder in an incompetent, if not reprehensible manner. [Otero] ends his brief to us with an impassioned plea:
>
>> Defendant Warnick, for whatever reason, crossed the line between prosecution and persecution, turning a system of justice into a system of oppression. In so doing, he trampled upon the rights of [Otero] and caused him enormous, horrific harm. [Otero] now turns to you jurists, simply seeking and demanding a fair trial in his quest for a measure of justice. No self-respecting system of justice Would deny him access to the courts and to our cherished jury system.
>
> We note that a substantially similar request was made in another case brought against [Warnick], unpublished opinion, *Amolsch v Warnick*, per curiam of the Court of Appeals, issued April 27, 1999 (Docket No. 203198). As in *Amolsch*, we sympathize with [Otero] but conclude that , regardless of how BADLY [WARNICK] PERFORMED HIS INVESTIGATION AND THE HARM THAT RESULTED, [Otero's] claims are so clearly unenforceable as a matter of law that they cannot go to a jury. (Emphasis Added).

Further unreliability of Dr. Warnick's "mathematical probability" testimony is found in a letter of Richard J. Dadzieski, Chief of Operations of the Office of Wayne County Prosecuting Attorney, dated June 19, 1995. Mr. Padzieski is reportedly to have stated that "The Office of the Wayne County Prosecuting Attorney will not approve warrants where the main evidence as to identify a potential defendant is the opinion of Dr. Warnick that he/she source of the bite marks."

In addition, to the foregoing examples, the conviction in *Wright* was overturned when on remand from this Court, prosecutors stipulated that Dr. Warnick's bite-mark/probability testimony did not satisfy *Davis/Frye* test, and the prosecutor confessed error. Following the hearing, on remand, this Court ADOPTED the circuit court's CONCLUSIONS OF LAW, vacated the conviction and remanded the case to the trial court or a new trial based upon:

1. The identification of suspected biters from marks in skin to a statistical/Probabilistic degree of certainty is not supported by recognized scientific knowledge and is, therefore, not admissible against an accused in a criminal prosecution.

2. It is misleading and unfairly prejudicial for an expert to claim a statistical degree of uniqueness of a bite mark, or to claim that no one else in the world could have made certain bite marks.

3. The claims of uniqueness, statistical improbability of another biter, ad certainty of guilt were extremely misleading and unfairly prejudicial to Mr. Wright's ability to have a fair trial.

In addition, this Court in *Moldowan* ruled that Dr. Warnick's bite-mark/statistical/probability testimony "has now been discredited." On remand, Moldowan and his co-defendant Christini were retried. On retrial, bite-mark identification was barred in Moldowan's trial, and he was acquitted. In Christini's trial, bite-mark identification was admitted, but no probability statistics were allowed, and Christini was also acquitted.

The Court in *Ege I* ordered a new trial based upon the false statistical/probability testimony of Dr. Warnick, of which, that the Sixth Circuit in *Ege II* stated "that the SUBSTANCE of the physical evidence

-- was complete bunk. *Id.*, 485 at 373.

As of this date Gilbert L. Poole, Petitioner, is the only person still incarcerated with a conviction still standing as a result of Dr. Warnick's bite-mark identification/probability statistic testsimomy.

Since Dr. Warnick's **MATHEMATICAL PROBABILITY** testimony has since been discredited well after Petitioner's trial it is evidence which defendant was not aware of at his trial. *LoPresto.* Therefore, the cases that have since discredited Dr. Warnick's testimony is "newly presented evidence," for the purpose of overcoming procedural default on miscarriage of justice; such evidence was never offered or presented to the trial court. *Griffin v Johnson* 350 F.3d 956 (9th Cir. 2003).

Prong 1 -- newly presented evidence has been satisfied.

### C. PRONG 2 NEWLY PRESENTED EVIDENCE IS NOT CUMULATIVE:
None of the newly presented evidence "**CONSISTING**" of Dr. Warnick's false testimony of statistical probability was ever "**PRESENTED**" at Petitioner's trial in this matter.

Therefore, prong 2 is satisfied because none of the newly presented evidence is cumulative.

### D. PRONG 3 -- NEWLY PRESENTED EVIDENCE WOULD RENDER A DIFFERENT RESULT PROBABLE ON RETRIAL:
Would newly presented evidence render a different result on retrial?  The answer comes from the rebuttal closing argument of the prosecutor. (T-IV, 125-129).

Dr. Warnick testified, ...that based on his experience, those teeth bit the victim.  No other way around it.  And then he went back to the basis for this type of testimony, the book where they did the study with all the identical twins, and they got the MATHEMATICIANS to say what's the POSSIBILITY that somebody else has teeth exactly like that.  And, if I recall, it was two and one-half billion to one.  That makes the lottery look like a sure thing.  It was his teeth. (Emphasis added).

\* \* \*

Don't take the bait. Just look at the evidence that you have ... You got three eyewitnesses, the three people at Poppers.  That alone should be enough. Throw that out.  You got a full confession that matches the facts, detail by detail from Connie Cook.  That alone is enough. throw that out.  Your got Dr. Warnick, who's the foremost bite mark expert around .  He says it's those teeth.  That alone is enough.

\* \* \*

Mr. Wilhelm then said it's a difficult case. I submit to you that if you look at the evidence in this case, the testimony; Dr. Warnick, the three identification eyewitnesses, the confession of Connie Cook, this is a simple case; this is an easy case; this is a Straightforward case.  Any one of those three things alone would be enough to convict.  But if you only had one, he's right. It might be a difficult case.  Your like a little corroboration, and you've got it.  You got Bob Lisk; you got Mike DePlaunty; you got Chuck York; you got the full statement of Connie Cook, and I've already gone through everything that happened that corroborated the admission he made to her, and you got Dr. Warnick.  You got corroboration upon corroboration.

As the Supreme Court in *Fahy*, 375 U.S. at 86-87; 84 S.Ct. at 230 stated: "We are NOT concerned here with whether there was sufficient evidence on which the petitioner could have been convicted without the evidence complained of. *THE QUESTION IS WHETHER THERE IS A REASONABLE POSSIBILITY THAT THE EVIDENCE COMPLAINED OF MIGHT HAVE CONTRIBUTED TO THE CONVICTION.*"

Therefore, Petitioner has met Prong (3) requirements.

### E. PRONG (4) -- PETITIONER COULD NOT HAVE PRODUCED THE NEWLY PRESENTED EVIDENCE AT TRIAL.

The Supreme Court in *Schlup* held that "allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial. *Id.* 513 U.S. at 324; 115 S.Ct. at 865. A correct reading of Schlup reveals that the examples following the words "new reliable evidence" were not meant to be an exhaustive list of everything upon which an actual innocence claim may be based. *Schlup* specifically stated that "the newly presented evidence may indeed call into question the credibility of the witnesses at the trial. *Souter v Jones*, 395 F.3d 577, 593 n.8 (6th Cir. 2005).

The discredited testimony of Dr. Warnick goes to the "credibility of his testimony of mathematical probability" should not have been presented at trial. An evidentiary hearing must be held where non-record evidence forms the basis for a claim of newly [presented] evidence. *People v Burton*, 74 Mich App 215 (1977).

Therefore, Petitioner has met Prong (4) and his petition for writ of habeas corpus should be granted, or alternatively, remand for an evidentiary hearing pursuant to *Davis/Frye/Daubert.* on his "newly presented evidence".

IV    PURSUANT TO 18 U.S.C.A. § 3600, PETITIONER IS ENTITLED TO DNA TESTING OF ALL BIOLOGICAL EVIDENCE PRESENTED AT TRIAL, DUE TO THE PREJUDICIAL IMPACT OF THE PROSECUTOR'S USE OF BLOOD-TYPE TESTIMONY, WHEN DNA TESTING WOULD SIGNIFICANTLY UNDERMINE THE PROSECUTOR'S THEORY IF TEST RESULTS WERE AVAILABLE AT THE TIME OF TRIAL.

STANDARD OF REVIEW:

Under *Williams v Taylor*, 529 U.S. 362; 120 S.Ct. 1495 (2000), this Court need not defer to the state courts' decision as to the federal questions of (a) whether or not Petitioner was deprived of a fundamentally fair trial as a resuklt of the error, or as to (b) whether Petition defaulted this claim under federal law, or as to (c) whether counsel's ineffectiveness was the "cause" for the default.

Purpose of Innocene Protection Act -- 18 U.S.C. § 3600 -- is to permit collateral review of convictions through DNA testing, no matter how much time has transpired, or what the other deadlines have passed; what the statute seeks, with its narrow tailoring, is justice itself. *United States v Boose*, 498 F.Supp.2d 887 (N.D.Miss. 2007).

ARGUMENT:

In denying Petitioner's petition of DNA testing, the trial court stated:

MCL 770.16(3)(b)(i) requires that the defendant in this case establish by clear and convincing evidence that a biological material identified during the investigation in this case is available for DNA testing. The Petitioner's motions state that such biological material once existed, BUT DOES NOT ESTABLISH BY CLEAR AND CONVINCING EVIDENCE THAT SUCH BIOLOGICAL MATERIAL IS AVAILABLE FOR DNA TESTING 18 YEARS AFTER THE OFFENSE

OCCURRED. (emphasis added).

It is VERY apparent that the trial court copied this material from the Prosecutor's responsive pleading. However, Petitioner is puzzled as to why the trial court refused to acknowledge the Prosecutor's supplemental Reply Brief Dated April 17, 2006, which states;

"1. That Plaintiff's Brief In Opposition... was field [sic] with the Court on March 27, 2006. Subsequent to the filing of that brief, the People were informed by Ms. Melinda Jackson of the Michigan State Police that some blood sample evidence involved in the Petitioner's case has been preserved  The People instructed Ms. Jackson to preserve those samples."

Petitioner presents "Exhibit N" obtained by the Cooley Law School that "biological material has been found." This Court cannot turn a blind eye to the "clear and convincing evidence", *House v Bell*.

### A. TESTING OF CAR CONSOLE:
Biological material was collected at the crime scene. A search warrant stated that if a Melinda Jackson, laboratory specialist, was provided with blood and hair from the Petitioner she could determine whether Petitioner was the source of biological material collected from the crime scene. The biological material in this case has never been subjected to DNA testing.

Ms. Jackson testified that one of the items she tested was a black console removed from the Petitioner's car in North Carolina. Under direct examination the following colloquy took place:

A    There was traces of blood on the inside compartment of the console that were human in origin. ...

Q    What was the blood type from that bloodstain that you found? First of all, was there enough for you to do a typing on that?

A    Yes, there was.

Q    Okay. And what was the blood type that you found?

A    The blood type on that was type O.

Q    And that would be consistent with the blood type of Roberto Mejia, is that correct?

A    That's correct. (T-IV, 10-11).

The prejudicial impact from the prosecutor's line of questioning, i.e., suggesting that the blood found on the console of Petitioner's car was the same type as the Victim, and therefore, "originated from the Victim". There was no foundation testimony regarding the admission of that evidence. There was no testimony as to how the console got from North Carolina to Michigan. No testimony as to the chain of custody. There was no indication if the console was previously tested by Woodford and subsequently re-tested along with the other evidence. And even though the console  was laying on the floor in front of the jury -- displayed and referred to  by the prosecutor, there was no testimony as to who had custody and control  over the item. The console was never admitted into evidence.

During the prosecutor's closing argument he argued facts that were not of the record. He told the jury that the Victim's blood type was found in the Petitioner's car. (T-IV, 82,96). Argument suggesting the existence of other inadmissible evidence is highly improper. *People v Sterling*, 154 Mich App 223 (1986). It is a long-standing rule of law that an attorney may not argue or refer to facts not of the record. *People v Viaene*, 119 Mich App 690 (1982).

The trial court denied Petitioner's petition for DNA testing by stating:

"Even if the defendant established that such biological material existed, the defendant could not meet the requirements of MCL 770.16(3)(a) that such evidence was material to the defendant's identity as the perpetrator of the murder of Robert Mejia. Evidence presented during the defendant's trial already established that the defendant's blood was not found on the victim. There is no other suspect to attempt to match with DNA testing."

Petitioner is unable to find the section of MCL 770.16 that requires a defendant to provide a court with a suspect in order to have the biological material tested. Petitioner's identity as the perpetrator of the crime was the only issue the jury was asked to decide. So identity was an issue. Pursuant to 18 U.S.C. § 3600(a)(8)(B) "The proposed DNA testing of the specific evidence may produce new material evidence that would -- raise a reasonable probability that the applicant did not commit the offense."

To deny Petitioner the benefit of excluding the Victim as the source of the blood on the car console, simply because there is no one to test it against is ridicules. Furthermore, the trial court denied the Petitioner the opportunity to undermine the prosecutor's theory if blood on the Victim, that just happened to be type O, did not originate from the Victim. Suppression of this information would be a corruption of the truth-seeking process. As Mr. Justice Fortas in *Giles v Maryland*, 386 U.S. 66, 100-01; 87 S.Ct. 793, 809-10 (1967) (concurring in judgment serves to illustrate this point:

"[L]et us assume that the State possesses information that blood was found on the victim, and that this blood is of a type which does not match that of the accused or of the victim. Let us assume that no related testimony was offered by the State. The suppression of the information unquestionably corrupts the truth-seeking process, and the burden on the defendant in establishing his entitlement to a new trial ought be no different from the burden he would face if related testimony had been elicited by the prosecution."

### B. BIOLOGICAL TESTING OF OTHER EVIDENCE:

Ms. Jackson, (testifying for Mr. Woodford) was late for trial. When questioned by the trial court about her tardiness, she stated that she received a phone call from the lab stating that **SOME EVIDENCE IN THIS CASE WAS MISSING**. There was no inquiry as to the missing evidence with the exception of one question by defense counsel; "In this case?"

Ms. Jackson testified that blood taken from the Victim's shirt was Blood Type "O" and that Petitioner's Blood Type was "**AB**". (T-IV, 9). She then testified that she tested the fingernail clippings taken from the Victim. And that on seven of the ten clippings she detected human blood consisting of Blood Type "O". (T-IV, 12). She was then asked about the hair samples that were taken as evidence. She stated that she was not qualified in hair analysis and was not able to match any of the hair samples collected with anyone. (T-IV, 13).

28

On cross-examination she stated that she **DID NOT** find any "AB" type blood under the Victim's fingernails. She did however, find type **"O"**, of which, is consistent with 43% of the white population. "AB" blood type is an rare type, found in only 3% of population. She **DID NOT FIND** any "**AB**" type blood on any of the evidence that she tested. (T-IV, 17).

On cross-examination she testified that the hairs found on the Victim did not match the Petitioner. (T-IV, 20-21). She was asked if she examined the hairs found on the Victim with anyone else. She stated that the hair samples were just compared against the Petitioner and the Victim. (T-IV, 21). She was then asked if she conducted any test on the blood found on the stones that were found at the homicide scene, or on the body. She stated that the examination was done by David Woodford, serologist. (T-IV, 22).

The biological evidence in this case has never been subjected to DNA testing. The evidence used at trial, according to Ms. Jackson and non-testfiying Mr. Woodford, does not match Petitioner, then the issue of DNA testing would raise the reasonable probability that Petitioner is "actually innocent" of the crime for which he stands convicte if the DNA tests show someone other than Petitioner or the Victim contributed to the samples collected from the crime scene or the Victim.

Therefore, Petitioner's Motion for DNA testing pursuant to 18 U.S.C. § 3600 should be granted.

V      PETITIONER'S CONFRONTATION RIGHTS UNDER THE SIXTH AMENDMENT AND DUE PROCESS RIGHTS TO A FAIR TRIAL UNDER THE FOURTEENTH AMENDMENT WERE VIOLATED WHEN:

A. A composite drawing was represented as the sole drawing that "nails Petitioner", when there were other drawings that were suppressed by the prosecution.

STANDARD OF REVIEW:
Confrontation Clause errors are subject to harmless-error analysis. *Vasquez v Jones*, 486 F.3d 135 (6th Cir. 2007).

ARGUMENT:
The trial court in denying the Confrontation Clause claim stated:

> The defendant argues that in three instances he was denied his right to confront witnesses against him. The defendant did not preserve this issue in the trial court. The defendant also did not raise this issue in his prior appeal as of right and, therefore, may not raise it for the first time in a motion for relief from judgment. If the defendant had raised this issue in a timely manner, the standard of review for this question of law would be de novo. The defendant was not denied his right to confront witnesses. (Citations omitted).

The suppression by the prosecution of evidence favorable to and requested by an accused violates due process where the evidence is material either to guilt or punishment, irrespective of the good or bad faith of the prosecution. *Brady v Maryland*, 373 U.S. 83; 83 S.Ct. 1194 (1963).

In this case, two days after the homicide, Mr. Lisk was requested by Det. Serna, to come to the Oakland County's Sheriff's Department and do a composite drawing of the last person he saw with the Victim. (T-III, A, 96). Two composites were printed in the July 16, 1988, Oakland Press newspaper.

Exhibit O.

During the prosecutor's closing argument he stated that Exhibit P, "it nails him--that composite nails him." (T-IV, 96). The prosecutor deliberately misrepresented the truth at trial by stating Exhibit P was the only composite prepared by the only witness to do a drawing--six months before the arrest of the Petitioner. (T-IV, 82-83, 96,124). The undisclosed facts indicate that the composite that Lisk helped to prepare was released to the press and appeared in the paper on June 16, 1988. Exhibit O. Petitioner has recently obtained a copy of that paper. However, the composite produced in the paper does not come close to the one presented in court as the one and only drawing "that nails him." Exhibit P. It is well established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. *Napue v Illinois,* 360 U.S. 264; 79 S.Ct. 1173 (1959). In *Miller v Pate,* 386 U.S. 1; 87 S.Ct. 785 (1967, the Court held that petitioner's conviction was invalid because the prosecutor had deliberately misrepresented the truth at trial. There is no difference in the instant case.

A *Brady* violation exists when evidence is : (1) suppressed (Exhibit O was kept from the jury), (2) MATERIAL TO THE QUESTION OF GUILT (Exhibit O does not resemble the Petitioner)", and (3) FAVORABLE TO THE ACCUSED. (there is a night and day difference between Exhibit P and the never shown Exhibit O). *Elmore v Foltz,* 768 F.2d. 773, 777 (6th Cir. 1985). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the jury, the result of the proceeding would have been different. *Unites States v Bagley,* 473 U.S. 667, 682: 105 S.Ct. 3375 (1985). See Also *Kyles v Whitney,* 514 US 419; 115 S.Ct. 1555 (1995) (A reasonable probability of a different result is shown when the government's evidentiary suppression undermines confidence in the outcome of the trial.

The prosecutor, in his closing argument, stated as fact that Exhibit P, "it nails him -- that composite nails him. (T-IV, 96). That comment by the prosecutor implied personal knowledge of evidence that was not presented to the jury. Those comments amounted to new evidence against the Petitioner, unsupported by evidence, and presented to the Jury. As Such, it became testimony OF THE PROSECUTOR against the Petitioner. A prosecutor may not make a statement of fact unsupported by trial evidence. *People v Viaene, supra.*

There can be no doubt that false evidence[20] -- Exhibit P swayed the jury's thoughts since the prosecutor vouched for the false evidence by stating "it nails him." But what would have the jury thought if they were given Exhibit O and were told that it had appeared in the Oakland Press was the original composite of the suspect that the police were looking for? A conviction may be set aside only if the error "had substantial and injurious effect of INFLUENCE IN DETERMINING THE JURY'S

---

20. "it has long been established that the prosecutor's 'deliberate deception' of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio, supra.*

VERDICT. *Kotteakos*, 328 U.S. at 776; 66 S.Ct. 1253.

B.    Forensic Scientist David Woodford's presence as a res gestae witness was waived by defense counsel -- (WITHOUT Petitioner's consent) -- and Mr. Woodford's hearsay report was misrepresented to the jury and entered into evidence -- when the report actually established that Blood-type A found on the Victim did not match Petitioner or the Victim.

On June 6, 1988, the police in this case collected various items of evidence from the crime scene. On June 14, 1988, those articles were turned over to Mr. Woodford. (Exhibit ). Mr. Woodford conducted various tests on the items of evidence given to him and he made his conclusions. (Exhibit ).

At trial the prosecutor called Ms. Jackson. She was late for trial. When questioned as why she was late for trial, she admitted that she was called back to the evidence room to check out some evidence that was missing in this case. (T-IV, 6). Ms. Jackson stated that she received a packet of evidence on January 19, 1989. She also stated that after conducting tests she concluded that Petitioner had blood-type AB and that the Victim had Blood-Type O. (T-IV, 9).

Ms. Jackson stated in February, 1989 she received evidence that had been examined by Mr. Woodford, that she conducted tests on that evidence. She stated that she discovered Blood-type O on seven of the ten fingernail clippings from the Victim. (T-IV, 12). On cross-examination she stated that blood type O appears in 43% of the white population, that blood type A appears in 42% and that blood-type AB appears in 3% of the white population. She also stated that she found no blood-type AB on the Victim's shirt. (T-IV, 16-17). She went on to testify that hairs found on the Victim's body did not match any of the hairs that were obtained from Petitioner per search warrant. (T-IV, 20, 21). She was then questioned about stones that were collected that had suspected blood on them. She stated that she did not do any tests on the stones, that Mr. Woodford did the tests. (T-IV, 22). On re-direct examination by the prosecutor she was asked if Mr. Woodford was back at work from his illness and she stated yes. (T-IV, 22).

After Ms. Jackson was excused, the prosecutor addressed the court. (T-IV, 25-26):

"I would like to put something on the record. There is a laboratory expert named David Woodford, who until a few moments ago, I believe was unavailable, which is the information I gave, which is why we had Miss Jackson redo many of the tests. Now, learning he's available, I had Detective Serna get him on the phone, and he could come in and testify. We do, however, have his report, which I'm assuming he would testify to. There were several questions that Counsel was asking with regard to his report. If we could stipulate to that, then I wouldn't--in other words, I'm in a position where I feel like I almost deceived defense counsel and this court, and I wish to indicate at this time I can produce this witness.

The trial court asked defense counsel his position. (T-IV, 26):

I would indicate to the Court that I have received Dr. Woodford's reports. I have only one concern which may be able to be answered by Dr. Jackson, if she hasn't left yet, or by a telephone call to the doctor. the concern is this: As I understand from the Doctor's report, the stones and the blood on the stones were analyzed, and either were not of sufficient quantity for analysis or did not produce anything of evidentiary value. However, Dr. Melinda Jackson, -- in the search warrant for the taking of hair samples from Mr. Gilbert Poole, in that Paragraph H3, it states that the affiant

spoke to Melinda Jackson who indicated that blood on the stones recovered from Mejia's -- blood on the stone recovered from Mr. Mejia's clothing was compared with the known sample of Mejia's blood and they did not match.

Mr. Mejia's Blood type is "O", as stated in the reports of Ms. Jackson and Mr. Woodford.

Defense counsel told the trial court that he wanted to verify that the samples did not match, no evidence of semen on the assault kit and that there was no blood. The prosecutor stated that Mr. Woodford was on the telephone. A recess was taken. (T-IV, 28). After the recess defense counsel informed the court that he had talked with Mr. Woodford and stated "I'm ready to stipulate to his introduction of his laboratory report." (T-IV, 28).

The report is hearsay. MRE 801(c).[21] Hence, the police laboratory report is inadmissible because "the source of information or the method or circumstances of preparation indicate the lack of trustworthiness." *People v McDaniel*, 469 Mich 409 (2003). More so in this case, since evidence in this case tested by Mr. Woodford was missing from the police laboratory.

It must be noted in Mr. Woodford's report (Exhibit ), page 2, that he tested the stones obtained from the victim's pants for blood and reported that Item 14 (pants [stones]) tested positive for human blood. The report stated that Blood type "A" and "O" were detected. Petitioner has type "AB" blood. During the prosecutor's closing argument (T-IV, 84), (in reference to Mr. Woodford's report) he stated:

"...his report is also significant because it does talk about some to the blood types on the stones; and it ALL MATCHES BOB MEJIA'S BLOOD TYPE." (emphasis added).

In *Berger v United States*, 295 U.S. 78; 55 S.Ct. 629 (1935) the Court recognized that the prosecutor has a duty not only to the government by refraining from improper tactics to obtain a conviction:

A prosecutor is a servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnest and vigor -- indeed, she should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce wrongful convictions as it is to use every legitimate means to bring about a just one.

This duty to refrain from improper methods extends fro the United States Attorney to state and local prosecutors, pursuant to U.S. Const. Am XIV. *Sizemore v Fletcher*, 921 F.2d. 67 ( 6th Cir. 1990). "The law seeks to protect an accused against suppression of evidence to him and to give him the benefit of cross-examination; therefore, a prosecutor may not select a part of a transaction to make out his case against a criminal defendant while leaving to the defendant the proof of the other part." *People v Jones*, 64 Mich App 659 (1975). "The possibility of suppression mandates reversal where there was the possibility

---

21. Hearsay is a statement, other than the one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted.

Where constitutional rights directly affecting the assortainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice. *Alley v Bell*, 307 F.3d 380 ( 6th Cir. 2002.)

that certain test results may have been intentionally suppressed. In such instances, the courts have remanded the cases to the trial courts for evidentiary hearings to determine the quality of the prosecutor's conduct and the nature of the lost evidence. *People v Drake*, 64 Mich App 671 (1975).

In this case, Ms. Jackson told the court that there was missing evidence that was tested by Mr. Woodford. Most certainly Mr. Woodford should have been produced to explain that the missing evidence was and what were the scientific test results. "the issue is whether the EXISTENCE of the missing evidence should have been disclosed to the defense in order for [Petitioner] to receive a fair trial." *O'Guinn v Dutton*, 88 F.3d 1409 (6th Cir. 1996), *cert. denied* 117 S.Ct. 742 (1977). Petitioner was unable to cross-examine the evidence that Mr. Woodford had received and tested in this case -- stones with a blood type that did not match Petitioner or the Victim, and was missing from the evidence room. Defense counsel in this case did not have the authority to waive Mr. Woodford as a witness. The record is clear that Petitioner did not waive Mr. Woodford as a witness. The question of a waiver of a federally guaranteed constitutional right is, of course, a federal question controlled by federal law. *Brookhart v Janis*, 384 U.S. 1; 86 S.Ct. 1245 (1966). There is a presumption against the waiver of Constitutional rights. Id. And for a waiver to be effective it must be clearly established that there was "an intentional relinquishment or abandonment of a known right or privilege." Id. There was NO waiver by the Petitioner.

The Confrontation Clause, providing that accused has right to confront and cross-examine witnesses against him, applies not only to in-court testimony but also to out-of-court statements introduced at trial, regardless of admissibility of statements under law of evidence. Out-of-court statements by witnesses that are testimonial are barred under the Confrontation Clause, unless the witnesses are unavailable and defendant's had prior opportunity to cross-examine the witnesses, regardless of whether such statements are deemed reliable by the court; where testimonial statements are at issue, only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes, i.e., confrontation. *Crawford v Washington*, 541 U.S. 36; 124 S.Ct. 1354 (2004). The notes and laboratory report of a nontestifying crime lab serologist -- Mr. Woodford -- are "testimonial" statements whose admissibility at trial was subject to the strict limitation on the use of such statements established in *Crawford*. The notes and reports by Mr. Woodford introduced at trial was essentially a trial by affidavit, precisely what the Sixth Amendment prohibits. Any argument that a state forensic analyst's report analyzing evidence seized by the police is not testimonial misapprehends *Crawford* and *Davis v Washington*, ___ U.S. ___; 126 S.Ct. 2266 (2006), both of which hold that such formalized statements made for prosecutorial purposes are clearly testimonial. The Confrontation Clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination" before a jury. *Crawford*, 541 U.S. at 61.

Under the definitions of "testimony" and "testimonial" in *Crawford*, as well as the "primary purpose" test in *Davis*, it is clear that the laboratory report by Mr. Woodford in this case constituted a "core" testimonial statement subject to the requirements of the Confrontation Clause. The laboratory report

was prepared at the request of law enforcement for [the Petitioner's] prosecution. It was offered to prove an element of the charged crime (i.e., first degree murder). The report was a sworn and formal statement offered in lieu of testimony by the declarant. Use of sworn *ex parte* affidavits to secure criminal convictions was the principal evil at which the Confrontation Clause was directed. *Crawford*, 541 U.S. at 50. The laboratory report of Mr. Woodford, that was prepared solely for prosecution to prove an element of the crime charged is "testimonial" because it bears all the characteristics of an *ex parte* affidavit.

In *Crawford*, the Court held that the Confrontation Clause prohibits the prosecution from introducing "testimonial" hearsay against a criminal defendant unless the declarant is unavailable and the defendant has (or had) an opportunity for cross-examination. *Crawford* returned the Confrontation Clause to its traditional mode of operation, which forbids the government from introducing "testimonial" hearsay in place of live testimony at trial. A classic form of testimonial hearsay is an *ex parte* affidavit, *id.* at 43-49. Modern forensic laboratory reports closely resemble such affidavits.[22]

Strange as it may be in this case that Mr. Woodford was missing and Ms. Jackson testifyied to Mr. Woodford's test results in Petitioner's case. In *People v Lonsby*, 268 Mich App 375 (2005) the trial court the court faced the same scenario with the same actors, of which, the court was faced with similar facts. Ms. Jackson tested evidence, and wrote the lab reports. The prosecutor in *Lonsby* did not call Ms. Jackson for trial. Instead, the prosecutor called Mr. Woodford. In *Lonsby*, Mr. Woodford testified about the contents of his colleague's [Ms. Jackson's] written statements. Throughout the trial, the prosecutor urged the jury to conclude that the Crime Lab's findings, as summarized by Woodford, proved the presence of semen and thus, defendant's guilt. The *Lonsby* court stated:

> "We hold that under the guidelines articulated in Crawford, the non-testifying serologist's notes and lab report constitute testimonial hearsay and that the admission of these statements through Woodford's testimony violated defendant's right under the Confrontation Clause.

In this case there is the reverse tag-team match-up. Ms. Jackson testified at Petitioner's trial from the notes prepared by Mr. Woodford who did not appear at Petitioner's trial. The prosecutor used Mr. Woodford's report in his closing argument:

> "his report is also significant because it does talk about some of the blood types on the stones; and it ALL MATCHES BOB MEJIA'S BLOOD TYPE. (emphasis added).

Therefore, the hearsay report of Mr. Woodford, that was introduced as evidence against Petitioner,

---

22. Laboratory reports produced by government agents as part of the investigation and prosecution of a case are testimonial under *Crawford*. The reports are clearly produced in anticipation of being used in the criminal process, and they fit all three definitions of "testimonial" mentioned in *Crawford* ([1] "ex parte in-court testimony or its functional equivalent -- that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially, ... [2] extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions, ... and [3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. at 541 U.S. 51-52. The issue is clear -- lab reports are testimonial.

and relied upon by the prosecutor in his closing arguments, denied Petitioner his Confrontation Rights. "State's presentation of witnesses deposition with defendant's counsel consent, **BUT WITHOUT DEFENDANT'S CONSENT,** violated defendant's confrontation rights, thus warranting habeas Relief." (Emphasis added). *Clemmons v Delo,* 124 F.3d 944 (8th Cir. 1997). Truth is more likely to be arrived at by hearing testimony of all persons or competent understanding who may seem to have knowledge of facts involved in the case leaving credit and weight of such testimony to be determined by jury or by court. *Washington v Texas,* 388 U.S. 14: 87 S.Ct. 1920 (1967).

C. The Victim's mother's presence was waived by defense counsel--(**WITHOUT** Petitioner's consent) -- when she was a res gestae witness that would have refuted the testimony/theory that the victim and Petitioner were present at the victim's apartment, that the Petitioner "cleaned up and searched for car keys at the apartment after killing the victim."

The trial court denying this constitutional issue simply stated "The Petitioner was not denied his right to confront the witnesses."

At the beginning of trial the prosecutor began asking the trial court to strike certain witnesses. After they were stricken, the prosecutor then sought to strike Ms. Mejia. (T-I, 14-15).

Christina Mejia, Your Honor, is the mother of the deceased. She lived with him at the time and she does have some testimony that might be **SIGNIFICANT** to the trial; However, I spoke to counsel. I'm going to ask to use any statements she may have made in the police report. She's elderly, she's sickly, and this would be a terrible-- (Emphasis added).

THE COURT: In other words, you want to strike her provided you stipulate to certain testimony?

Mr. WILHELM [Defense Counsel]: that is correct, Your Honor.

Mr. SPEAKERMAN: Thank you very much, counsel."

Ms. Cook, Petitioner's girlfriend, was called to testify. She stated that on the night of the alleged homicide that Petitioner arrived at their home between 1:00 and 4:00 a.m. (T-III, 57. That after he went to the bathroom he came to the living room, began watching TV an then stated "I killed somebody." (T-III, 62). Ms. Cook went on to state that the Petitioner confessed to her in January. (T-III, 74). It must be noted that the homicide was committed in June. She then testified that:

"He said he went back to the man's apartment to clean up anything that was there, because they had had a drink there and so he took care of that, and he said that he looked for the keys and the keys weren't there, and he went to the car, and the keys weren't in the car, so he went back to the body, got the keys off the body to the guy's car, and went to the car. " (-III, 76).

Ms. Christina Mejia, mother of the Victim, was questioned by Det. Serna. At trial, while Det. Serna was on the stand, the prosecutor brought up the issue of Mrs. Mejia. (T-III-A, 88-89).

MR. SPEAKERMAN: Just one moment Your Honor. Your Honor, the reason I hesitated is earlier in the case we had stricken the mother of Robert Mejia, Mrs. Christina Mejia, from the information. She's elderly. We had agreed to enter into a stipulation as to what her testimony would be. I thought this would be an appropriate time.

35

THE COURT: All right.

MR. SPEAKERMAN: I'm going to read it in. It's my understanding that counsel will agree that this is what Mrs. Mejia told the detective and what she would testify to if she were here today.

THE COURT: All right.

MR. SPEAKERMAN: She stated she last saw her son on Sunday. Around noon he was at the apartment with Richard Gonzales. He was wearing blue jeans and a blue shirt at this time. She stated Roberto left home about 2:00 p.m. with Richard and they left again at 3:00 p.m. At that time Roberto was wearing blue jeans, a green t-shirt and tennis shoes.
Mrs. Mejia stated that at Approximately 1:30 a.m. she was in her bedroom and heard Roberto say, "I'm home, mom," but that he did not come in her room and she did not see him. At about 2:00 a.m. she looked for him but was unable to find him. She stated she looked in the bathroom and his room but did not see Roberto or Richard. That would be it.

THE COURT: Mr. Wilhelm, [defense counsel], so you stipulate that in lieu of her being here that that would be her testimony?

MR. WILHELM: Yes, Your Honor."

Mrs. Mejia's statement was hearsay and is not permitted. MRE 804(a)(4) provides: "Unavailability as a witness" includes situations in which the declarant -- is unable to be present or to testify at the hearing because of death or then existing physical or mental infirmity. All that the prosecutor presented to the trial court, (in an effort to circumvent the hearsay rule,[21] and deny Petitioner his confrontation rights), was that she was "**ELDERLY**". "It is reversible error for the prosecution to fail to produce res gestae witnesses who had been interrogated by the police without a showing why they were not produced at trial." *People v Belleville*, 56 Mich App 275 (1974) -- "elderly" does not fit the interrogation res gestae rule. A defendant has a constitutional right to confront the witnesses against him and to cross-examine them to expose any falsehoods and to reveal the truth. *Pointer v Texas*, 380 U.S. 400; 85 S.Ct. 1065 (1965).

The prosecutor told the trial court "she does have some testimony that might be **SIGNIFICANT** to the trial." How significant would her testimony have been to impeach Ms. Cook's testimony that the Petitioner told her that he went to the Victim's apartment, cleaned up and searched for the Victim's car keys. If the Petitioner performed all those tasks at the Victim's apartment, with Ms. Mejia being present, most certainly she would have been woken up by someone using the bathroom cleaning himself and then searching the apartment for keys. Most certainly if Petitioner was searching for the keys, he would have entered Mrs. Mejia's bedroom. Therefore, Ms. Mejia was a crucial witness. Her testimony was "testimonial" in nature. "Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard." *Crawford*, 124 S.Ct. at 1364:

"The Confrontation Clause, providing that accused has right to confront and cross-examine witnesses against him, applies not only to in-court testimony, but also to out-of-court statements introduced at trial, regardless of admissibility of statements under the law of evidence. Out-of-court statements by witnesses that are testimonial are barred, under the Confrontation Clause, unless witnesses are unavailable and defendants had prior opportunity to cross-examine witnesses, regardless of whether such statements are deemed reliable by court; where testimonial statements

are at issue, only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes, i.e., confrontation."

As previously stated, there were no witnesses to the homicide, no physical evidence linking Petitioner to the Victim. The only way that Petitioner was arrested was because of Ms. Cook, who had admitted at trial that she tied the date of the homicide with the night that Petitioner punched her brother in the face and broke his teeth -- in "January", **SIX MONTHS** before the actual death of Mr. Mejia. Ms. Mejia's testimony was crucial in this case because Ms. Cook stated that after Petitioner came home Between 1:00 and 4:00 a.m. he stated that he killed someone and that he went to the Victim's apartment to clean up and search for car keys. One purpose of the confrontation clause is to expose to the fact-finders relevant and discrediting information "revealing ... ulterior motives of the witness as they may cast doubt on the honesty of the witness's testimony. *Davis v Alaska*, 415 U.S. 308; 94 S.Ct. 1105 (1974). Mrs. Mejia's testimony was crucial to determine if she heard anything else at the apartment after 2:00 a.m., and **WHAT TIME SHE WENT TO SLEEP THAT NIGHT**! Therefore, Petitioner was denied his Confrontation rights, to establish the falsehoods of Ms. Cook.

VI     PETITIONER WAS DENIED A FAIR TRIAL BASED UPON THE PROSECUTOR'S IMPROPER COMMENTS DURING CLOSING REBUTTAL ARGUMENT BECAUSE DEFENSE COUNSEL WAS UNABLE TO RESPOND EXCEPT BY OBJECTION.

STANDARD OF REVIEW:

A prosecutor's deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice. *Giglio, supra.*

ARGUMENT:

The trial court in denying Petitioner's delayed motion for new trial stated:

      The defendant contends that the assistant prosecutor's closing and rebuttal arguments were improper and deprived the defendant of a fair trial. The defendant raised this issue for the first time in his application to the Supreme Court. The standard of review concerning allegations of prosecutorial misconduct is whether a defendant was deprived of a fair and impartial trial. Reversal of a defendant's conviction is not warranted if a cautionary instruction could have cured any prejudice resulting from the prosecutor's comments. The record in this case establishes that the assistant prosecutor did not engage in any improper conduct which deprived the defendant of a fair trial. (Citations omitted). **Exhibit L**.

A prosecutor should take pains to avoid even the appearance of improper argument. *People v Bennett*, 393 Mich 445 (1975). During closing argument the prosecutor stated:

"... So if the witnesses are available, you get the testimony, not their report.

      However, in this case of Mr. Woodford, we put in his report, rather than delay the trial and wait for him or wait for his availability. And **HIS REPORT IS ALSO SIGNIFICANT** because it does talk about some of the blood types on the stones: and it all matches Bob Mejia's blood type." (emphasis added).

Irrespective of what the prosecutor led the jury to believe, Mr. Woodford's report states that both type "A" and "O" blood were found on the stones. The Victim's blood-type is "O" and Petitioner's is "AB."

The **UNPRESENTED QUESTION** remains: **WHO** is responsible for leaving blood-type "A"

on the Victim's body and stones at the crime scene?????

During the prosecutor's rebuttal argument (referring to defense counsel closing argument), the

prosecutor referred to the state's evidence against Petitioner: (T-IV, 125-129).

And you have to weigh who's telling the truth and who's not. That's your determination, and you use that in determining who's telling the truth and who took the stand and lied to you.

[Would] Three people in the bar would lie and convict an innocent man of a crime like this, just to solve this crime; to avenge their friend. Connie Cook is a monster who would make up a story to put Gilbert Poole away, when she knows he didn't do it. So they all lied, she's a monster, and Dr. Warnick is incompetent. That's the Defense.

Dr. Warnick testified, and I won't go through it again, that based on his experience, those teeth bit the Victim. No other way around it. And then he went back to the basis for this type of testimony, the book where they did the study with all the identical twins, and they got the mathematicians to say what's the possibility that somebody else has teeth exactly like that, And, if I recall, it was two and one-half billion to one. That makes the lottery look like a sure thing. It was his teeth.

\* \* \*

Don't take the bait. Just look at the evidence that you have. ... You got three eyewitnesses, the three people at Poppers. That alone should be enough. Throw that out. You got a full confession that matches the facts, detail by detail from Connie Cook. that alone is enough. Throw that out. You got Dr. Warnick, who's the foremost bite mark expert around. He says it's those teeth. That alone is enough.

The test of -- Mr. Woodford's report indicates there's no blood on Hank Clayton's knife, and we went through that luminol shows iron and stuff. But the laboratory specialist says no blood.

\* \* \*

Mr. Wilhelm [defense counsel] then said it's a difficult case. I submit to you that if you look at the evidence in this case, the testimony; Dr. Warnick, the three identification eyewitnesses, the confession of Connie Cook, this is a simple case; this is an easy case; this is a straightforward case. Any one of those three things alone would be enough to convict. But if you only had one, he's right. It might be a difficult case. You like a little corroboration, and you've got it. You got Bob Lisk; you got Mike DePlaunty; you got Chuck York; you got the full statement to Connie Cook, and I've already gone through everything that happened that corroborated the admission he made to her, and you got Dr. Warnick. You got corroboration upon corroboration."

The prosecutor then ended his rebuttal argument.

Petitioner contends that the comments made by the prosecutor in his closing arguments deprived

the Petitioner of a fair trial under the Fourteenth Amendment. The prosecutor vouched for the credibility

of the witnesses; the validity of the "mathematical probability" testimony by Dr. Warnick that the Petitioner

made the bite mark; prosecutor's vouching that is was Petitioner's teeth that bit the victim; and, reference to

a hearsay report prepared by Mr. Woodford -- a witness that did not appear at trial. If the government has

made improper remarks to a jury, a court must determine whether they deprived the defendant of a fair trial

by examining the "cumulative effect of such misconduct," the "strength of the properly admitted evidence

of the defendant's guilt," and the "curative actions taken by the trial court." *United States v Hernandez*,

779 F.2d. 456 (8th Cir. 1985).

When denying the motion for a new trial the trial court stated:

"Reversal of defendant's conviction is not warranted if a cautionary instruction should have cured

any prejudice resulting from the prosecutor's comments."

There was no cautionary instruction.

The prosecutor vouched for the witnesses credibility by positing would three people in a bar lie and convict an innocent man of a crime like this? (T-IV, 125). The prosecutor may not base his argument on the credibility of a witness. *People v Nichols*, 159 Mich 355 (1909). Since prosecutorial vouching for a witness's credibility is tantamount to presenting unsworn testimony, even a cautionary instruction may be insufficient to cure the error. *People v Erb*, 48 Mich App 622 (1973). *People v Treat*, 77 Mich 348 (1889).

The prosecutor vouched for Dr. Warnick's testimony for his **"MATHEMATICAL PROBABILITY"** credibility and vouched for the belief of Petitioner's guilt. "And, if I recall, it was two and one-half billion to one. That makes the lottery look like a sure thing. It was his teeth." (T-IV, 126). A prosecuting attorney may argue that the testimony presented at trial shows the defendant's guilt, but may not state what he personally believes of defendant's guilt except as shown by proof. *People v Montevecchio*, 32 Mich App 163 (1971).

In Argument V, B, Petitioner presented evidence that laboratory specialist Mr. Woodford did not appear as a witness even though he examined the evidence collected during the course of the investigation of the homicide. Mr. Woodford's report was erroneously admitted since it was inadmissible hearsay, *Crawford, Lonsby*. During the closing and rebuttal argument the prosecutor referred to Mr. Woodford's report by saying "his report is also significant because it does talk about some of the blood types on the stones and it all matches Bob Mejia's blood type. (T-IV, 84). And the report "indicates there's no blood on Hank Clayton's knife, and we went through that luminol, shows iron and stuff. But the LABORATORY SPECIALIST SAYS NO BLOOD." (Emphasis added). The prosecutor may not argue what an absent witness would have testified to had he been present. Such argument exceeds the permissible scope of comment on the evidence and becomes, in effect, unsworn testimony by the prosecutor. *People v Ellison*, 133 Mich App 814 (1984). The Confrontation Clause, providing that accused has right to confront and cross-examine witnesses against him, applies to out-of-court statements introduced at trial, regardless of admissibility of statements under law of evidence. *Crawford, supra*.

The comments in this case were made during closing and rebuttal phase of closing argument, inter alia, vouching for witnesses credibility; introducing a hearsay report from a witness; vouching for Dr. Warnick as a **"MATHEMATICAL PROBABILITY"** expert. Because the remarks came during closing arguments, defense counsel was unable to respond except by objection. Of which, he did not. *See United States v Carter*, 236 F.3d 777 (6th Cir. 2001) (improper comments during rebuttal constituted "the last words from an attorney that were heard by the jury before deliberations"). An improper argument is less likely to have affected the verdict in a case where the evidence is overwhelming than in a case where the evidence is weak. *United States v Johnson*, 968 F.2d. 768 (8th Cir. 1992).

Here the prosecutor's case was less than overwhelming. Witnesses identification of the Petitioner

was quite different from each witness; False evidence in the form of composite drawings; No physical evidence from the Petitioner; discredited mathematical probability testimony from Dr. Warnick; a supposedly confession made to Connie Cook who attributed the confession to a date six months before the death of the Victim when Petitioner supposedly broke her brother's teeth out. Also She admitted that she lied to the police and failed a polygraph examination. When assessing the relative strength of the prosecutor's case and the potential for prejudice, a court must consider the cumulative effect of the fact that relevant evidence favorable to the Petitioner was improperly excluded. i.e.; the testimony of Mrs. Mejia to contradict the testimony of Ms. Cook; the admission of a hearsay report by Woodford and lost evidence; the false presentation of a composite drawing that was shown to the jury but not the actual drawing that appeared in the Oakland Press. "Whether the admission of Prejudicial evidence constitutes a denial of fundamental fairness turns upon 'whether the evidence is material in the sense of a crucial, critical highly significant factor.'" *Brown v O'Dea*, 227 F.3d 643 (6th Cir. 2000). If a federal habeas court is left with "grave doubt" whether the erroneous admission of evidence has "a substantial and injurious effect of influence in determining the jury's verdict" the "petitioner must win." *O'Neal v McAninch*, 513 U.S. 432, 445; 115 S.Ct. 992 (1995). The improper cumulative comments merit reversal.

VII  PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AMENDMENT WHEN COUNSEL:

A. Failed to object and present evidence available to him that would have substantially undermined the prosecution's theory and given Petitioner a reasonable probability of a different outcome:

STANDARD OF REVIEW:
State court's findings of fact on a habeas determination are prsumed to be correct unless they are rebutted by clear and convincing evidence. *Ivory v Jackson*, 509 F.3d 284 (6th Cir. 2007).

ARGUMENT:
The trial court in denying this claim stated:

The defendant alleges that he was deprived of the effective assistance of counsel by the performances of his trial and appellate attorneys. The defendant did not preserve this issue by raising it in this Court. The defendant did, however, raise this issue in his appication to the Supreme Court. The defendant's application was denied by an order of the Supreme Court and the defendant may not, therefore, be granted relief based upon this issue. MCR 6.508(D)(2). Furthermore, the record in this case establishes that the Petition was afforded competent representation by his trial and appellate attorneys. The defendant was convicted and his conviction was affirmed because there was strong evidence of the defendant's guilt and because the Appellant received a fair trial." The defendant is not entitled to any relief from judgment based upon his claim of ineffective assistance of counsel.

It is true that Petitioner did file ineffective assistance of trial and appellate counsel in the Michigan Supreme Court on his original appeal of right by ~~Application for Leave to Appeal~~. However, the Michigan Supreme Court in accepting the ~~application~~ prepared by Petitioner, ~~▮~~, denied the ~~application~~ by form letter.

The Michigan Supreme Court denied an application for leave to appeal "the issues should not be reviewed by that court." This gave Petitioner the impression that he should first file the constitutional claims with the trial court. Therefore, there was no ruling on Petitioner's constitutional claims of ineffective assistance of trial and appellate counsel for failing to raise ineffective assistance of trial counsel.

The trial court used MCR 6.502(D)(2) as a basis for denying the ineffectiveness claim's. MCR 6.502 states:

> (D) The defendant has the burden of establishing entitlement ot the relief requested. The court may not grant relief to the defendant if the motion --
> (2) alleges grounds for relief which were decided against the defendant in a prior appeal or proceeding under this subchapter, unless the defendant establishes that a retroactive change in the law has undermined the prior decision; ...

The Michigan Supreme Court in Petitioner's original appeal of right, in addressing the *pro se* ~~application~~ *application* clearly stated that the claims should not be reviewed by that Court. If the claims were not to be reviewed by that court, then what court should decide Petitioner's ineffectiveness claims? The logical answer would be the trial court! First of all, ineffective assistance of appellate counsel claims cannot be raised on direct appeal as they do not arise before the appeal.[23]

Secondly, "appellate counsel" **REFUSED** to raise ineffective assistance of **TRIAL** counsel! Thus, Petitioner file a supplemental brief with the Michigan Court of Appeals, which was refused without explanation. Thereafter, Petitioner attempted to raise ineffective assistance of trial **AND** appellate counsel in an in *pro per* application for leave to appeal to the Michigan Supreme Court.

Whether the allegedly ineffective assistance of Petitioner's appellate counsel excuses Petitioner failure to raise the issue of his trial counsel's ineffectiveness on direct appeal presents a complex question. As the Court in *Howard v Bouchard*, 405 F.3d 459, 478 (6th Cir. 2005) held: "ineffectiveness of appellate counsel can suffice to show sufficient cause and prejudice for failure to raise an ineffective-assistance-of-counsel claim." Counsel's failure to raise an issue on appeal, however, constitutes ineffective assistance "only if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *Id.* Whether raising the issue might have changed the result of the appeal, in turn, goes to the merits of the claim itself. Thus, in order to determine whether the procedural default of Petitioner's ineffective-assistance-of-trial-counsel claim may be excused by the ineffective assistance of appellate counsel, this Court must examine the merits of his ineffective-assistance-of-trial-counsel claim.

The familiar *Strickland* test governing a claim of ineffective assistance of counsel has two prongs. First, the defendant must demonstrate that counsel's performance fell "below the objective standard of reasonable." *Strickland v Washington*, 466 U.S. 668, 688; 104 S.Ct. 2052 (1984). The defendant must then demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of

_____

23. *Hicks v Straub*, 377 F.3d 538, 558, n. 17 (6th Cir. 2004) ("Petitioner did not procedurally default his claim of ineffective assistance of appellate counsel. State collateral review was the first opportunity that petitioner had to raise this claim.")

the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. This Court should be mindful, however, of the Supreme Court's explanation that:

> a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

*Id.* at 697, 104 S.Ct. 2052.

Taking *Strickland* to heart, this Court should find no need to delve into Petitioner's allegations regarding counsel's performance. Even if this Court were to assume for the sake of argument that trial counsel's performance fell below an objective standard of reasonableness, the Petitioner's claim is whether he can demonstrate a reasonable probability that, but for trial counsel's alleged unprofessional conduct, the result would have been different.[24] Rather than attempting to meet this test in the first instance, Petitioner argues that trial counsel's representation was so deficient as to give rise to per se prejudice under *United States v Cronic,* 466 U.S. 648, 658-61; 104 S.Ct. 2039 (1984) (suggesting that there are circumstances when a presumption of prejudice is appropriate, but requiring the defendant in the case before it to demonstrate that his trial counsel had made specific errors). As the Sixth Circuit has explained, three types of cases can lead to a presumption of prejudice under *Cronic:*

> The first is the complete denial of counsel, in which the accused is denied the presence of counsel at a critical state. The second is when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing. The third is when counsel is placed in circumstances in which competent counsel very likely could not render assistance.

*Mitchell v Mason,* 325 F.3d 732, 742 (6th Cir. 2003) (citations and quotation marks omitted). Petitioner's argument focuses on the second type of case, asserting that trial counsel failed to subject the government's case to meaningful adversary as the following issues "a" through "e" present, that appellant counsel failed to raise.

### a. FAILING TO OBJECT TO FALSE EVIDENCE OF COMPOSITE DRAWING:

Defense counsel at trial was cognizant of the composite drawings that appeared in the June 16, 1988 Oakland Press newspaper. Exhibit Q. He also knew that he composite that the prosecutor introduced at trial, (Exhibit P), was not the original composite drawing. Counsel is ineffective in which he failed to object to inadmissible tangible evidence. *People v Thomas,* 184 Mich App 480 (1990). Counsel was ineffective when he failed to object to improper identification evidence. *Tomlin v Myers,* 30 F.3d 1235 (9th Cir. 1994).

---

24. In other words, the issue is "whether counsel's performance was so **MANIFESTLY** ineffective that defeat was snatched from the hands of probable victory." *United States v Morrow,* 977 F.2d 222, 229, ( 6th Cir. 1992) *(en banc), cert. denied,* 113 S.Ct. 2969 (1993) (Emphasis in original).

### b. FAILING TO OBJECT THAT EXPERT TESTIMONY ON MATHEMATICAL PROBABILITY ANALYSIS DID NOT HAVE A PROPER FOUNDATION.

Counsel requested to voir dire Dr. Warnick outside the presence of the jury to determine his credentials and the method that he used, (T-I, 5), however, counsel never followed through with the voir dire. Counsel failed to object to the Prosecutor introducing the following testimony from Dr. Warnick that did not have a proper foundation:

> "You can see here from this radiograph here -- this is the upper area now -- you'll see a very distinct area here (indicating). And than with the lighting here, but it's this area here and this here; shows again over here in this area here and this point here (indicating). This could not be done coincidentally because everybody's teeth are unique, and there's been studies of that that individuals are very, very unique. The chance of the same individual making all these patterns are 2.1 billion to one." (T-III, A, 26).
>
> * * *
>
> As I stated, 1984, Rawson and Sonnaes did the most work-up of this time in bite mark identification on the uniqueness of teeth.[25] They worked with a hundred identical twins with almost perfect dentition. I want you to sort of visualize somebody that's, you know, paid their $2000 to the orthodontist and have this super nice smile. The took that type of individual and they ran tests with these individuals and they found that for the same individual to make the same bite that somebody else did, they came out with this 2.1 billion to one."

Trial by mathematics is not permitted. *People v Adams, supra.*

"The flaw in Dr. Warnick's mathematical probability opinion should have been obvious and its admissibility readily assailable. The opinion was based on the mathematical product theory, a proposition that long has been condemned. Even if defense counsel could not have anticipated the prosecutor's questioning soliciting the unsupported statistical evidence, one might expect that lodging a contemporaneous objection and moving to strike the evidence, or perhaps for a mistrial, would be standard operating procedure for a competent defense lawyer." *Ege*, 380 F.Supp 2d. at 876. When Defense counsel failed to object, Petitioner received ineffective assistance of counsel.

### c. FAILING TO RETAIN AN EXPERT WITNESS TO REBUT DR. WARNICK'S TESTIMONY OF MATHEMATICAL PROBABILITY:

As presented in Issues II and III, Dr. Warnick's mathematical probability testimony should not have been permitted. The trial by mathematics has been condemned since 1968, People v Collins, 68 Cal.2d 319 (1968). Dr. Warnick's mathematical probability testimony has been discredited -- *Amolsch,*

------

25. Major aspect of bite mark comparison process targets the three-dimensional characteristics of the suspect's teeth. Two studies[26] report data suggesting a high degree of variability in these features, and the authors argue that it shows bite marks to be unique (infinitely variable) among human population. Unfortunately, there are no studies relating this hypothesis to actual bite marks on skin or other substrates. In addition, neither study attempted to prove the independent occurrences of each dental feature. The latter study misapplied probability theory to reach a conclusion of uniqueness of any human being. David L. Faigman, David H. Kays, Michael J. Sak & Joseph Sanders, Modern Scientific Evidence The law And Science of Expert Testimony. *Science Methods applied to Comparison Techniques.* 30-2,1.4 546.

26. Reidar F Sognnaes & Raymond D. Rawson, *Computer Comparison of Bite Mark Patterns in Identical Twins,* 15 J. AM Dental Assoc. 449 (1982); Raymond D. Rawson & Ronald K. Ommen, *Statistical Evidence for the Individually of the Human Dentition,* 29 J. Forensic Sci. 245 (1984).

*Otero, Wright, Moldowan, Christini, and Ege, supra.* Defense counsel should have challenged mathematical probability and positive identification testimony.

### d. FAILING TO INVESTIGATE BLOOD EVIDENCE:

Blood evidence was introduced at trial that the Victim had Blood-Type "O", Petitioner had type "AB". Not presented to the jury was the fact that found at the crime scene on the Victim's clothes and stones found in the pathway was Blood-Types "O" and "A". The prosecutor told the jury that the Woodford indicates that "ALL BLOOD FOUND WAS MEJIA'S TYPE." It is a proven fact that Petitioner's BLOOD TYPE was not found on the Victim. The question that has to be answered is: **whose blood was found at the crime scene?** Counsel should have investigated the Woodford report since Blood-Type "A" was found on the Victim. The court in *Sims v Livesay*, 970 F.2d, 1575, 1579 (6th Cir. 1992) has recognized that counsel's failure to investigate key evidence or to make a reasonable decision that a particular investigation is not necessary constitutes ineffective assistance, and thus precludes an argument that counsel's course of action was based on legitimate strategic choice. Defense counsel waited until trial to talk to Woodford on the phone, then counsel let the prosecutor ● misrepresent the report to the jury without objection.

Petitioner's trial attorney withheld documents from the Petitioner until after his appeal of right had been filed in the Michigan Court of Appeals. In addition to Petitioner's Delayed Motion for a New Trial, he sought to have an evidentiary hearing conducted pursuant to a *Ginther*[7] hearing to place these facts upon the record concerning trial counsel's interfering with Petitioner's appeal of right. The trial court did not rule upon this motion.

### e. FAILING TO INTERVIEW WITNESSES:

Under Prong 1 of *Strickland* a defendant must "show that counsel's representation fell below an objective standard of reasonableness." *id.* at 689:

> indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

Then *Strickland*, at 690-91 set forth a defense counsel's duty to investigate:

> counsel has a duty to make reasonable investigations or to make a reasonable decision that makes a particular investigation unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

As to the second prong "prejudice" element, *Strickland, id* at 694 instructs:

> the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Constitutionally effective counsel must develop trial strategy in the true sense -- not what bears a false label of "strategy" -- based on what investigation reveals witnesses will actually testify to, not based on what counsel guesses they might say in the absence of a full investigation. In this case, defense counsel

44

did not investigate Woodford or Jackson as to the biological blood evidence. In fact, defense counsel questioned Woodford outside of the presence of the "JURY"-- "PETITIONER" and the trial court by telephone. Defense counsel then went on to stipulate (without Petitioner's conssent) the Woodford report. Of which, was misrepresented by the prosecutor to the jury that it was all blood from the Victim. This error by defense counsel led to the following jury instruction:

> "A stipulation of fact is an agreed statement of facts between the attorney's. You may regard such stipulated facts as true." (T-V, 17).

Had counsel challenged the Woodford report or insisted that Woodford appear as a witness to explain his report that was inconsistent with the prosecutor's assertions that "all the blood was of the Victim," when in fact, blood was found that did not match either the Victim or the Petitioner, then when the jury when instructed:

> "If the direct and circumstantial evidence taken together, is open to two reasonable constructions, one indicating the guilt and the other indicating innocence, it is your duty to accept the construction indicating innocence." (T-V, 10).

When the blood evidence did not match either match the Victim or the Petitioner, "it was the duty of the jury to accept the construction indicating innocence."

The court in *Towns v Smith*, 395 F.3d 251, 258 (6th Cir. 2005) dispels any doubt that a lawyer's *Strickland* duty "includes the obligation to investigate all witness who may have information concerning his or her clients guilt or innocence. Had defense counsel in this case only engaged in the minimal-and essential -- step of interviewing Woodford and had Woodford appear in court to testify to his own report and not what Ms. Jackson said, counsel would have learned that blood on the Victim did not match the Victim or Petitioner, then it would have been the juries duty "to accept the indication of innocence."

Since there was no blood and hair evidence at the homicide scene, or recovered from the Victim, or from under the finger nails, linking the Petitioner to the crime, and, without the false testimony bite-mark by Dr. Warnick, And without the false evidence of the composite drawings, then the trial became in principle part boiled down to a credibility contest between Ms. Cook who testified that the Petitioner came home on night of the homicide with scratch marks on his face and body and confessed to the crime. Therefore, the contradiction between what Mr. Woodford would have testified to from his report that there was no evidence linking the Petitioner to the homicide, Then, the contradiction on those points influenced the jury.

The trial court in denying Petitioner's motion for new trial, stated:

> The questions then arises, whether Dr. Warnick's testimony was error harmless in nature. In determining whether the error was harmless, the Court will consider the great weight of evidence at trial.
> In this respect, we note the testimony from witnesses. The defendant was seen by Robert Lisk and Charles York leaving the bar with the victim and in the victim's car with the victim a short time before the victim was murdered. The defendant described in detail to his girlfriend, Connie Cook, the manner in which he murdered and robbed the victim. The defendant has not established that, but for Dr. Warnick's testimony, it is more probable than not that a different

outcome would have resulted. The alleged error was, therefore, harmless in nature. Exhibit I.

What the trial court has really done is to state it's view that there is not a reasonable probability that the jury would believe the testimony of Woodford that there was no evidence linking the Petitioner to the crime and thus change its verdict. As *Matthews v Abramajtys*, 92 F.Supp.2d 615 (E.D.Mich. 2000), aff'd in part, rev in part, 319 F.3d 780 ( 6th Cir. 2003), has stated:

> The actual resolution of the conflicting evidence, the credibility of witnesses, and the plausibility of competing explanations is exactly the task to be performed by a rational jury, considering a case presented by competent counsel on both sides.

The court in *Barker v Yukins*, 199 F.3d 867, 874 (6th Cir. 1999) has made it clear that our Constitution leaves it to the jury, not the judge, to evaluate the credibility of witnesses in deciding a criminal defendant's guilt or innocence .

In the end, weighing the prosecution's case against the proposed testimony of Woodford is at the heart of the ultimate question of the *Strickland* prejudice prong, and thus is a mixed question of law and fact not presumption. Even though the jury could have discredited the potential witnesses here based on factors such as bias and inconsistencies in their respective stores, there certainly remained a reasonable probability that the jury would not have. Petitioner's case was therefore prejudiced where the testimony of Woodford would have corroborated his report and contradict the false testimony of Ms. Cook. "A new trial is required  if 'the false testimony could ... in any reasonable likelihood have affected the judgment of the jury. ...'" *Napue*, 360 U.S. at 271; 79 S.Ct. 1173. *See also Workman v Tate*, 957 F.2d 1339 1346 (6th Cir. 1992), but where counsel's failure in carrying out his constitutional obligations resulted in that testimony not being introduce at trial. All it would have taken is for "one juror [to] have struck a different balance" between competing stories. *Wiggins*, 529 U.S. at 537. Wiggins was a death penalty case in which single juror's vote would have spared defendant's life. In Petitioner's case, even a single juror's  holdout would have resulted in a hung jury rather than a conviction.

Therefore, given the jury instructions that mandates the acquittal if the jury is given a "reasonable construction ... indicating innocence," Petitioner was prejudiced by counsel's failure to present these facts that indicate actual innocence. That is, the blood found at the scene didn't match the Petitioner. The hair found on the body didn't match Petitioner. False testimony of Ms. Cook. And, given the fact that the bite-mark evidence would be removed from the equation on retrial, the greater weight of the evidence would indicate actual innocence. Where a failure to investigate does not reflect sound professional judgment, deference to counsel's strategic decisions is not appropriate in assessing ineffective assistance of counsel claims. *Dando v Yukins*, 461 F.3d 791 (6th Cir. 2006).

Therefore, the trial court and the Michigan Court of Appeals denied Petitioner DUE PROCESS rights to a fair trial and appeal by not addressing whether counsel failed to subject the prosecution's  case to meaningful adversarial testing. *Cronic*. The trial court had a DUTY to assess counsel's reasoning for not protecting Petitioner's rights. Counsel's reasoning is not part of the record. Just to say counsel passed the

bar exam and is therefore competent does not address issue of trial conduct or strategy. *Ramonez v Berghuis*, 490 F.3d 482 (6th Cir. 2007).

A *Ginther*[7] hearing must be held to ascertain "why" counsel acted before a determination can be made that counsel's conduct Has not failed to subject the prosecution's case to an adversarial testing but also whether it was "reasonable" choice under "professional norms." Petitioner sought evidentiary hearing on trial and appellate counsel ineffectiveness at all levels of post-conviction review. All the courts refused to conduct an evidentiary hearing. Federal habeas petitioner is generally entitled to evidentiary hearing if he alleges sufficient grounds for release, relevant facts are in dispute, and state courts did not hold full and fair evidentiary hearing. *Sawyer v Hofbauer*, 299 F.3d 605 (6th Cir. 2002).

VIII PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL UNDER THE SIXTH AMENDMENT ON PETITIONER'S APPEAL OF RIGHT WHEN COUNSEL FAILED TO FOLLOW PETITIONER'S INSTRUCTIONS REGARDING THE APPEAL OR RAISE THE ABOVE DEAD BANG WINNERS ON APPEAL.

STANDARD OF REVIEW:
State court's findings of fact on a habeas determination are presumed to be correct unless they are rebutted by clear and convincing evidence. *Ivory, supra*.

ARGUMENT:
The trial court in denying this claim stated that:

> The defendant alleges that he was deprived of the effective assistance of counsel by the performances of his trial and appellate attorneys. The defendant did not preserve this issue by raising it in this Court. The defendant did, however, raise this issue in his appication to the Supreme Court. The defendant's application was denied by an order of the Supreme Court and the defendant may not, therefore, be granted relief based upon this issue.

Petitioner did not procedurally default his claim of ineffective assistance of appellate counsel. State collateral review was the first opportunity that petitioner had to raise this claim. *Howard, supra*. Furthermore, under the Supremacy Clause, (Const. Art. 6, cl. 2) if a state rule is contrary to the United States Constitution, it cannot serve as the basis for the state court's judgment, so as to preclude federal habeas review under the adequate and independent state ground doctrine. *Doan v Brigano*, 237 F.3d 722 (6th Cir. 2001).

The sixth Amendment guarantees a defendant the right to the effective assistance of counsel on the first appeal of right. *Evitts v Lucey*, 469 U.S. 387; 105 S.Ct. 830 (1985). In order to decide whether Petitioner can present his claim of ineffective assistance of trial/appellate counsel, a court has to decide whether there is a reasonable probability that the claim[s] would have prevailed at the time counsel failed to raise it. *McFarland v Yukins*, 356 F.3d 688 ( 6th Cir. 2004).

Petitioner first alleges that appellate counsel was not acting on Petitioner's behalf when he (1) failed to assist in filing Petitioner's supplement brief; (2) refused to visit and discuss issues germane; (3) filing appellate brief without first showing it to Petitioner to determine if the facts were correct; (4) failed to

obtain Petitioner's trial file from trial attorney; and (5) **FOUND GUILTY OF VIOLATING ETHICS AFFECTING** Petitioner's **APPEAL RIGHTS** by the Michigan Attorney Grievance Commission!

Secondly Petitioner alleges that appellate counsel omitted raising: (A) Dr. Warnick's **MATHEMATICAL PROBABILITY TESTIMONY** was a trial by mathematics; (B) Denial of Confrontation rights by allowing testimonial hearsay laboratory reports and a testimonial witnesses statement into evidence without confrontation; (C) Refused to raise ineffective assistance of trial counsel.[27] (There was authority for the omitted issues.) See Issues II; V-A, B, C; VI; VII-A; An attorney who has presented strong but unsuccessful claims on appeal may nonetheless deliver a deficient performance and prejudice a defendant by omitting a "dead bang winner" on appeal, i.e.; and issue obvious from the trial record which would have resulted in reversal. ... failure to raise a "dead bang winner" claim on appeal constitutes ineffective assistance of appellate counsel even though counsel may have raised other strong but ultimately unsuccessful claims ... appellate counsel may be ineffective where the trial error is so obvious from the record and "must have leaped out upon even a casual reading of the transcript." *Matthews v Abramajtys, supra.*

A court evaluating a claim of ineffective assistance of appellate counsel should consider several factors to determine whether counsel's performance fell below an objective standard of reasonableness, *Strickland,* including:

1. Were the omitted issues "significant and obvious?
2. Was there arguably contrary authority on the omitted issues.
3. Were the omitted issues clearly stronger than those presented?
4. Were the omitted issues objected to at trial?
5. Were the trial court's rulings subject to deference on appeal?
6. Did appellate counsel testify in a collateral proceeding as to his/her appeal strategy and, if so, were the justifications reasonable?
7. What was the appellate counsel's level of experience and expertise?
8. Did the petitioner and appellate counsel meet and go over possible issues?
9. Is there evidence that counsel reviewed all the facts?
10. Were the omitted issues dealt with in other assignments of error?
11. Was the decision to omit an issues an unreasonable one which only an incompetent attorney would adopt?

*Mapes v Coyle,* 171 F.3d 408, 427-28 (6th Cir. 1999); *see also Franklin v Anderson,* 434 F.3d 412, 429 (6th Cir. 2006). A simple review of the record establishes that "appellate counsel" meets the above requirements of #1, 2, 3, 4, 8 (refused to meet and discuss -- guilty of ethics violation on Petitioner's appeal of right), #9 (failed to get record from trial counsel), and #11 (failed to raise "statistical/ mathematics/ probability theory) -- forty years ago this theory was condemned in *People v Collins,* 68 Cal.2d 319, 66 Cal.Rptr. 497, 438 P.2d 33 (1968). And MOST IMPORTANTLY has become a **CLASSIC FOR LAW**

---

27. Appellate counsel's failure to raise ineffective assistance of trial counsel on direct appeal establishes both a separate constitutional defect and cause and prejudice sufficient to excuse procedural default. *Carver v Straub,* 349 F.3d 340 (6th Cir. 2003). A claim raising trial counsel ineffectiveness will no longer be considered waived because new counsel on direct appeal did not raise a claim related to prior counsel's ineffectiveness. *Massaro v United States,* 538 U.S. 500; 123 S.Ct. 1690 (2003).

**STUDENTS IN BASIC EVIDENCE.** Therefore, "appellate attorney" in Petitioner's original appeal should have been aware of the "**CLASSIC.**"

A petitioner is prejudiced by appellate counsel's deficient performance if a reasonable probability exists that, but for counsel's deficient performance, he would have prevailed on appeal. *Riley v Jones,* 476 F.Supp.2d 696, 709 (E.D.Mich. 2007).[28]

## RELIEF REQUESTED

For these reasons, Petitioner, Gilbert Lee Poole, asks:

A. Accept jurisdiction over this case pursuant to 28 U.S.C. 2254;

B. Require the Respondent to answer the allegations of the Petition and Brief in Support;

C. Hold such evidentiary hearings as this Court may deem necessary or appropriate;

D. Grant Petitioner's 18 U.S.C. § 3600 Motion for DNA testing;

E. That after full consideration, this Court grant this Petition and order that Petitioner Gilbert Lee Poole either be promptly retried or released from custody;

F. That this Court grant such other, further, and different relief as the Court may deem just and proper under the circumstances;

G. That this Court appoint counsel;

H. That this Court grant oral argument.

Respectfully submitted,

*Gilbert Lee Poole N.*

Gilbert Lee Poole #202095
Kinross Correctional Facility
16770 Watertower Drive
Kincheloe, MI 49788

Dated: July 7th, 2008

---

28. Appellate counsel's ineffectiveness warrants reinstatement of appeal. *Allen v United States,* 938 F.2d 664 (6th Cir. 1991).

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GILBERT LEE POOLE,

     Petitioner,

Civil Action No. _____

vs.

JEFFERY WOODS, Warden,

     Respondent,

_____/

### APPENDIX

A -- AFFIDAVIT FOR SEARCH WARRANT BY DETECTIVE MATHES

B -- LETTER FROM DR. ALLAN WARNICK  FOR SEARCH WARRANT

C -- MOTION'S TRANSCRIPTS

D -- APPELLANT'S MOTION FOR SUBSTITUTION OF COUNSEL

E -- 9-20-91 ATTORNEY GRIEVANCE COMMISSION FINDINGS: *IN RE KAPLOVITZ*

F -- 9-3-92 MICHIGAN COURT OF APPEALS DENYING SUPPLEMENTAL BRIEF

G -- *PEOPLE V WRIGHT*, 463 MICH 905 (2001)

H -- TRIAL TRANSCRIPTS OF TESTIMONY OF DR. ALLAN WARNICK

I -- JOURNAL ARTICLE OF NOT USING STATISTICAL MATHEMATICS IN BITE-MARKS

J -- 10-5-88 LABORATORY REPORT OF DAVID WOODFORD

K -- DETECTIVE MATHES CALL FROM MILΛIAN HOLT ON MURDER SUSPECTS

L -- 8-1-06 TRIAL COURT DENYING DELAYED MOTION FOR NEW TRIAL

M -- NEWSPAPER ARTICLE ON CRISTINI

N -- 7-13-06 COOLEY LAW SCHOOL STATING THAT DNA EVIDENCE IS AVAILABLE

O -- 7-16-88 OAKLAND PRESS COMPOSITE DRAWINGS

P -- COMPOSITE DRAWING PRODUCED AT TRIAL

Q -- MICHIGAN COURT OF APPEALS DENYING APPLICATION FOR LEAVE TO APPEAL AND
    MOTION'S FOR *GINTHER* HEARING, *WRIGHT* HEARING, REMAND FOR DNA TESTING

S -- MICHIGAN SUPREME COURT DENYING APPLICATION FOR LEAVE TO APPEAL AND
    MOTION'S FOR *GINTHER* HEARING, *WRIGHT* HEARING, REMAND FOR DNA TESTING

EXHIBIT A

AFFIDAVIT FOR SEARCH WARRANT

STATE OF MICHIGAN)
             ) SS
COUNTY OF OAKLAND)

      Det. Oliver Mathos, affiant, being first duly sworn, on oath deposes and says:

      (1) That the following property constitutes evidence of criminal conduct:

Dental impression of his teeth using a resilient dental impression material, occlusal and incisal with bite registration, an oral examinaton and dental charting of his oral structures as well as frontal and lateral intra oral and extra oral photographs as well as a whole blood sample in a red top tube as well as 20 pulled head hairs and 20 pulled pubic hairs. All evidence to be recovered at the Oakland County Jail, 1201 N. Telegraph, City of Pontiac, County of Oakland, State of Michigan by medical personnel.

      (2) Affiant further says that the above-mentioned person is located at the following described place:

Gilbert Lee Poole Jr., DOB: 1/14/65, aka a white male, approximately 5'7", 160 lbs. who is presently incarcerated in the Oakland County Jail, 1201 N. Telegraph, City of Pontiac, State of Michigan.

      (3) Affiant further says that he has probable cause to believe the above-listed property to be searched for and seized is now located upon said described person, based upon the following facts:

      A. That he is a Detective with the Pontiac Police Department and presently is in charge of the investigation and prosecution of Gilbert Lee Poole Jr., DOB: 1/14/65 for the murder of Robert Meija.

      B. That on June 7, 1988 the body of Robert Meija was found in a field in the City of Pontiac.

      C. That he has spoken with Al Rayner who indicates:

            1. That he is a expert in processing crime scenes and is employed as a Identification Technician with the Pontiac Police Department.

            2. That on June 7, 1988 he was dispatched to the field where the body of Robert Meija was found and he processed it for evidence.

            3. That he located a stone in the clothing of Robert Meija which was covered with dried blood and he placed it into evidence for analysis at the Michigan State Police Crime Lab.

            4. That he also recovered and placed into evidence for lab analysis, several loose hairs from the body of Robert Meija which based upon their color did not belong to Meija.

      D. That he has spoken with Dr. Lynda Biedrzycki who indicates:

            1. That she is a Medical Doctor who is employed by Oakland County as the Chief Deputy Medical Examiner.

            2. That on June 8, 1988 she conducted the autopsy on Robert Meija and determined that he died of multiple stab wounds to the face and neck.

3.    That   during   the   autopsy   she   observed   and
teeth impression in the form of a bite mark on the back
of Meija's right upper arm and she subsequently called
in Allan J. Warnick, D.D.S. for consultation as a
forensic odontologist.

4.  That she retrieved a blood sample from Robert Meija
to be furnished to the crime lab for further analysis.

   E.    That on December 1st, 1988, Affiant obtainted an arrest
warrant for Gilbert Lee Poole Jr. charging him with Open Murder
in the death of Robert Meija

   F.  That Gilbert Lee Poole Jr. was subsequently arrested in
North Carolina and was returned to the State of Michigan on
January 12, 1989 and he presently resides in the Oakland County
Jail, 1201 N. Telegraph, Pontiac, Michigan.

   G.    That on Janary 17, 1989, Affiant spoke with Allan J.
Warnick, D.D.S. who indicated:

        1.  That he is a Board Certified expert in forensic
        odontology which in part deals with the comparison of
        bite marks.

        2.  That he was called to the Oakland County Medical
        Examiner's office to assist Dr. Lynda Biedrzycki at the
        autopsy of Robert Meija where he obscured, photographed
        and recovered the tissue bearing the bit marks.

        3.  That if he was provided with photographs, dental
        impressions, bite registration and dental charting of a
        suspects oral structure from Gilbert Poole Jr. he would
        be able to determined whether or not the suspect was the
        source of the bite mark.

   H.    That on January 17, 1989, Affiant spoke with Melinda
Jackson who indicated:

        1.  That she is employed at the Michigan State Police
        Crime Lab as a laboratory specialist and is an expert
        in making scientific comparisions of blood and hair
        samples.

        2.  That she assisted another specialist David Woodford
        in making his initial evaluation of the physical
        evidence in the Meija homicide and she presently is in
        charge of the laboratory evaluation of the evidence.

        3.  That the blood on the stone recovered from Meija's
        clothing was compared with the known sample of Meija's
        blood and they did not match. Whos blood?

        4.  That if she was provided a whole blood sample from
        the suspect in this case she would be able to compare
        it with the blood on the stone recovered at the
        homicide scene and determine whether Gilbert Poole Jr.
        was the source of the blood on the stone.

        5.  That if she was provided with human hair samples
        from the suspect she would be able to compare them with
        the hair recovered on Meija's body and determine
        whether or not they matched Gilbert Poole Jr. was the
        source of the hair.

Who?

I. That therefore, Affiant requests authority to secure the requested evidence to be obtained by medical personal at the Oakland County Jail, in order to have experts compare it with the bite mark on the victims body as well as the other recovered physical evidence, hair and blood samples.

_Det. Oliver Mothes, Affiant_

Subscribed and sworn to before me this 18, day of January, 1989.

_Judge in and for the_

_50TH_ , Court,

Oakland County, State of Michigan.

EXHIBIT B

willow wood professional village
31632 schoolcraft road
livonia, michigan 48150
(313) 425-6920

ALLAN J. WARNICK D.D.S., P.C.
Consultant Forensic Odontology.

## BITE MARK CASE MANAGEMENT

Evidence:  Search Warrant to contain the following:

1.  photographs of suspect (frontal and lateral views)
    photographs of suspects dentition frontal and lateral
    views, occlusal and incisal views – both intra-oral
    and extra oral views.

2.  Saliva sample

3.  Blood sample.

4.  Dental impressions of the suspects teeth – utilizing a
    resiliant dental impression material

5.  Occlusal and incisal wax bite registrations.

6.  Oral examination and dental charting of the suspects
    dentition and surrounding oral structures.

If there is any question about the Warrant – please
contact me!

Sincerely,

Allan J. Warnick D.D.S.
Senior Dental Consultant
Wayne County M.E.O.

**EXHIBIT C**

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

PEOPLE OF THE STATE OF MICHIGAN

Plaintiff,

VS.                    NO. 88-90203 FC

GILBERT LEE POOLE,

Defendant.

MOTIONS

BEFORE THE HONORABLE EDWARD SOSNICK, CIRCUIT JUDGE

Pontiac, Michigan - Wednesday, March 22, 1989

APPEARANCES:

CHARLES SPIEKERMAN (P27240)
On behalf of the Plaintiff
THOMAS VINCENT WILHELM (P29436)
On behalf of the Defendant

Ruth Ann Hall
CSR, CER 0110

---

Pontiac, Michigan

Wednesday, March 22, 1989

THE CLERK: Your Honor, calling

docket No. 47, case number 89-90203 FC, People v

Gilbert Poole.

MR. SPIEKERMAN: May it please

the Court, Your Honor, my name is Charles

Spiekerman. I appear on behalf of the People.

Your Honor, defendant has

brought three motions this morning. I think, if

I might, if the Court would permit me, I can --

THE COURT: Let me get your

appearance, please?

MR. WILHELM: For the record,

Your Honor, Thomas Wilhelm appearing on behalf

of Mr. Gilbert Poole.

MR. SPIEKERMAN: Your Honor,

with regard to the motions for discovery, if we

could briefly go through them, I will indicate

what I have no objection to and counsel can

raise the other issues.

There are two discovery motions.

One is entitled Motion for Discovery and

Inspection, and on that defendant has asked for

several items that I do not object to. One item

APPENDIX C -- PRE-TRIAL MOTIONS TRANS.

1   that I do object to is defendant has asked for
2   all original notes of police officers involved
3   in the case.  Since many of the officers I know
4   destroy their notes when they make their initial
5   report, I did not want to agree to that.  I will
6   agree to any notes that are still in existence.
7          THE COURT:  If available.
8          MR. SPIEKERMAN:  If available.
9          THE COURT:  Do you agree to
10  that?
11         MR. WILHELM:  Yes, Your Honor,
12  I'll agree to that.
13         MR. SPIEKERMAN:  I will provide
14  all police reports, all admissions or statements
15  by defendant, and I will provide a list of
16  witnesses that we intend to call and those that
17  may be res gestae witnesses that we do not
18  intend to call.  When defendant asks for any and
19  all names of all persons who have knowledge
20  regarding the events, that's very open-ended and
21  could actually include anybody who has read
22  newspaper accounts of this incident.
23         THE COURT:  Can you incorporate
24  then the various phone directories?
25         MR. SPIEKERMAN:  That's the

APPENDIX C -- PRE-TRIAL MOTIONS TRANS.

1   problem I have in providing that information to
2   counsel.
3          THE COURT:  That does seem a
4   little overbroad.  Can you be more specific?  He
5   can give you the names of everybody that has
6   anything to do with the case.
7          MR. WILHELM:  I believe that in
8   this case there have been -- a number of names
9   have been given to me in the police reports.
10  I'm more interested -- I'm not interested in
11  everybody, as he says, who read the newspapers.
12  I am interested in one important thing that I've
13  made a request for, and that is I would like the
14  addresses or the phone numbers of the witnesses
15  who are listed on the information.
16         MR. SPIEKERMAN:  Your Honor, I
17  am opposed to that.  It's my practice and the
18  practice of my office never, ever to give
19  addresses and phone numbers of witnesses
20  involved in a murder case to the defendant.  I
21  mean, it just --
22         THE COURT:  You want to be able
23  to contact these people?
24         MR. WILHELM:  Yes, Your Honor.
25         THE COURT:  Is there some

APPENDIX C - PRE-TRIAL MOTIONS TRANS.

1   alternative method that can be available?
2           MR. SPIEKERMAN: Many of these
3   people are relatives of the victim and they're
4   not -- they don't have to talk to the defense
5   attorney and they're not going to want to.
6           MR. WILHELM: Your Honor, I
7   understand that they don't have to talk to me,
8   Nobody has to talk with me. I've hired an
9   investigator who has been working on this case.
10  We need to --
11          THE COURT: Can you contact --
12  I'm just trying to come up with some remedy.
13  Somehow notify the people and make some
14  arrangements if they desire to talk with the
15  investigator?
16          MR. SPIEKERMAN: I will so
17  instruct the officer in charge. There are 15
18  people that have been listed here, so it will
19  take a little time.
20          THE COURT: Why don't we -- that
21  the officer in charge will contact the listed
22  people and make them available for an interview.
23  They can be made available at the police
24  department. Obviously, they do not have to
25  cooperate if they don't want to.

6

APPENDIX C - PRE-TRIAL MOTIONS TRANS.

1           MR. WILHELM: I understand that.
2           THE COURT: But instead of names
3   and addresses, make them available at the police
4   department for an interview.
5           MR. SPIEKERMAN: I will get that
6   started. Perhaps we can come up with some sort
7   of form letter to send all these people.
8           THE COURT: Okay. What else?
9           MR. SPIEKERMAN: Any and all
10  papers, documents, tangible evidence obtained
11  from defendant; I have no objection to defense
12  counsel observing or seeing those.
13          Results of any scientific or
14  mechanical test, no objection. There are more
15  lab tests being done and they will be provided
16  to counsel when I get them.
17          Drawings, photographs, diagrams,
18  no problem; and any statements of the defendant,
19  any video, oral or tape recordings made with or
20  without a search warrant, no problem.
21          THE COURT: So that --
22          MR. WILHELM: I would just ask
23  when would I be able to -- when does he
24  anticipate receiving all the scientific test
25  results?

7

APPENDIX C - PRE-TRIAL MOTIONS TRANS.

1   MR. SPIEKERMAN: Your Honor,
2   there is trace evidence tests that we hope to
3   have completed in the next two weeks and I'll
4   provide —
5   THE COURT: When is the trial?
6   MR. SPIEKERMAN: There is a
7   trial date set April —
8   MR. WILHELM: April 13th, Your
9   Honor.
10  MR. SPIEKERMAN: Thirteenth.
11  THE COURT: Are you going to be
12  ready for trial April 13th?
13  MR. WILHELM: I will be
14  involved, or start a trial April 3rd in US
15  District Court in Flint, Your Honor. That may
16  last over April 13th.
17  THE COURT: I'm going to need a
18  motion.
19  MR. WILHELM: I understand that.
20  THE COURT: Acquiesced to by the
21  defendant if there's going to be a request for
22  an adjournment.
23  At least that the discovery is
24  completed, I will sign an order to that effect.
25  MR. SPIEKERMAN: There's also

APPENDIX C - PRE-TRIAL MOTIONS TRANS.

1   been a bite mark analysis done providing a
2   positive identification of the defendant. I'm
3   awaiting that report and I'll provide that to
4   counsel. So I have no problem with those
5   reports. As soon as I get them, I'll forward
6   them to him.
7   Your Honor, the second discovery
8   motion is one that I do take more objection to.
9   It's entitled Motion for Discovery of
10  Exculpatory and Impeaching Evidence, and this,
11  if I could just indicate to the Court, is very
12  open-ended and this information, a lot of it
13  obviously the prosecution will have absolutely
14  no access to; such as paragraph (f), any and all
15  personnel files for the witnesses and the
16  existence and identity of all government files
17  for the witnesses. I don't even know where to
18  look for that type of thing.
19  THE COURT: Do you want to
20  respond to that?
21  MR. WILHELM: Your Honor, again,
22  in this motion I'm more concerned with items
23  numbers 5(a) and 5(b) which is essentially
24  records or information concerning bad acts or
25  crimes of certain people who will be witnesses.

APPENDIX C - PRE-TRIAL MOTIONS TRANS.

1 for that, as the Court knows from my motion to
2 quash the information, essentially the evidence
3 against my client comes from -- well, it comes
4 from Connie Cook. Now, the reason I want these
5 responses or this memorandum is that it is my
6 understanding that during that investigation the
7 Pontiac Police Department came under a lot of
8 pressure from the citizens regarding the
9 investigation of this case and the progress of
10 its investigation, which I believe --
11 THE COURT: Can't you just
12 question the officers on that? You could get
13 into the specifics. I don't understand what you
14 want.
15 MR. WILHELM: I would like --
16 THE COURT: You're getting
17 everything, the whole file.
18 MR. SPIEKERMAN: He's going to
19 get everything that I've got.
20 MR. WILHELM: Right, but he's
21 not going to be interested in getting materials
22 that I'm specifically requesting in 5th).
23 THE COURT: Do you know if these
24 materials exist in the police file?
25 MR. SPIEKERMAN: No, I don't. I

11

APPENDIX C - PRE-TRIAL MOTIONS TRANS.

1 MR. SPIEKERMAN: Your Honor,
2 this is what I would propose. I'll provide --
3 THE COURT: Can you run a record
4 check on the witnesses?
5 MR. SPIEKERMAN: Record checks
6 on the witnesses. When you talk about
7 information revealing prior bad acts, I mean
8 that could be police reports in other States.
9 THE COURT: No, no, no. That's
10 what you're looking for, record checks on the
11 witnesses.
12 MR. WILHELM: Record checks.
13 MR. SPIEKERMAN: Things that can
14 be used to impeach.
15 THE COURT: Yes.
16 MR. SPIEKERMAN: I'll ask that
17 all civilian witnesses have LEIN check done on
18 them and provided to defense counsel.
19 MR. WILHELM: Your Honor, I'm
20 also interested in item number 5th), and this is
21 any and all letters, police department internal
22 memoranda, directives, newspaper clippings,
23 press releases or reports of complaints in any
24 form regarding the citizens' reaction to the
25 investigation and its progress. Now, my reason

10

1         MR. WILHELM: Your Honor --
2         THE COURT: I've read your
3 motion. Anything additional you want to say on
4 that?
5         MR. WILHELM: No, nothing else
6 additional, Your Honor.
7         MR. SPIEKERMAN: Has the Court
8 read my memorandum in response, Your Honor?
9         THE COURT: I have read your --
10 I have read it. I just happen to have something
11 written down here.
12         This is before the Court on
13 defendant's motion to quash. The defendant in
14 this case is charged with murder of one Robert
15 Mejhia. Mejhia died of multiple stab wounds.
16 The incident occurred allegedly on or about June
17 7th, 1988. Connie Cook, then defendant's girl
18 friend, went to the law enforcement authorities
19 in North Carolina and reported the alleged
20 murder. Defendant was bound over for trial
21 after a preliminary examination in the 50th
22 District Court. The question is whether or not
23 the examining magistrate did, in fact, abuse his
24 discretion in binding the defendant over.
25         Defendant argues that the

1 sean, this was a murder --
2         THE COURT: I'll deny that
3 without prejudice and ask if you could, Mr.
4 Spiekerman, inquire of the officers if they have
5 any of that kind of material, and I'm going to
6 ask you to disclose that information, and then
7 we can take it from there.
8         MR. SPIEKERMAN: With regard --
9         THE COURT: I don't think that's
10 all --
11         MR. SPIEKERMAN: In that
12 paragraph, with regard to newspaper clippings, I
13 mean defendant has as much access to that as the
14 prosecution. He can read the paper.
15         THE COURT: Yes, I would agree
16 on that. But if they have newspaper clippings,
17 it's just a question of Xeroxing them.
18         MR. SPIEKERMAN: That's true.
19         THE COURT: I'm going to deny
20 the motion for discovery, but ask that you
21 disclose that by making inquiry of your officer
22 in charge.
23         MR. SPIEKERMAN: Fine, Your
24 Honor. That leaves defendant's motion to quash
25 and I'll hear from defendant.

examining magistrate erred in binding defendant
over for trial because the prosecutor did not
meet the burden of proving that the defendant
committed the alleged crime, and the Court
failed to consider the credibility of the
prosecutor's key witness and that the Court
failed to consider the defense presented by the
defendant at exam. Specifically, defendant
argues that the only witness for the People who
identified the defendant as having been in
Popper's Bar with the decedent was contradicted
by a bartender, Kerry Johnson, who testified
that the decedent was with a person named Hank
and that the decedent and Hank left the bar
together between 1:45 and 2:00 a.m.

The Court is of the opinion that
there was no abuse of discretion and that the
motion to quash should be denied. Probable
cause is a question for the consideration and
determination of the examining magistrate. The
function of a Circuit Court in reviewing such a
decision is to determine whether, as a matter of
law, the magistrate abused his discretion. If
the Appellate or Circuit Court does not agree
with the judgment of the magistrate, the

magistrate's findings will still stand except in
case of a clear abuse of discretion. People v
Paille #2, 383 Michigan 621, a 1970 case.

Here, this Court agrees with the
magistrate's findings and does not find that the
examining magistrate abused its discretion. It
is the duty of the examining magistrate to bind
the defendant over for trial if it appears that
a crime has been committed and there is probable
cause to believe the defendant committed the
crime. MCLA 766.13. The examining magistrate
has the right and duty to pass judgment not only
on the weight and competency of the evidence,
but also the credibility of the witnesses in
determining whether a crime has been committed.
People v Paille #2, 383 Michigan 621 (1970).
Here, the examining magistrate properly weighed
and accepted the testimony of Connie Cook and
found through her testimony there was probable
cause to believe that the defendant, in fact,
committed the crime. Where there is a conflict
in testimony, it still would be up to the trier
of fact to resolve that particular conflict, and
clearly if believed, her testimony would be
sufficient to establish the probable cause