UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GILBERT POOLE,

                Petitioner,                      Civil Action No. 08-cv-12955

        v.                          District Judge George Caram Steeh
                                        Magistrate Judge Laurie J. Michelson

JEFFREY WOODS, Warden,

                Respondent.

_____/

**REPORT AND RECOMMENDATION TO DENY
PETITIONER'S APPLICATION FOR WRIT OF HABEAS CORPUS**

Petitioner Gilbert Lee Poole, an inmate confined at the Kinross Correctional Facility in Kincheloe, Michigan, filed a *pro se* Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254. (Dkt. 1, Pet. for Habeas.) The Petition has been referred to this Court for Report and Recommendation. (Dkts. 6, 11.) Respondent Jeffrey Woods filed an Answer in Opposition to Petition for Writ of Habeas Corpus arguing that Poole's Petition is time-barred and that the state habeas court did not unreasonably apply clearly established federal law. (Dkt. 5.) Petitioner filed a Reply. (Dkt. 8.) For the following reasons, this Court recommends that Poole's Petition for Writ of Habeas Corpus be DENIED.

**I.  BACKGROUND**

In June 1989, Petitioner was convicted of the murder of Robert Mejia and sentenced to life imprisonment without the possibility of parole. In deciding Petitioner's first appeal as of right, the Michigan Court of Appeals summarized the facts supporting his conviction as follows:

> On June 5, 1988, the defendant left a bar with Robert Mejia. Connie
> Cook, the defendant's ex-girlfriend, testified that when the defendant
> returned home that evening with scratches on his face, chest, and

> arms, he stated that he had killed someone. He related to her how he left the bar with a man, ingested cocaine with him, and then went for a walk in the woods. Defendant told her that he pulled a knife on the man. When the man refused to give the defendant his money, the two men fought. With his pocket knife, the defendant slit the man's throat.

(Dkt. 7-12 at ECF 1-3, *People v. Poole*, No. 120955, slip op. at 1 (Mich. Ct. App. Jan. 21, 1993).)

Although Petitioner seeks federal habeas relief on several grounds, chief among them is that the admission of the testimony of Dr. Allan Warnick deprived him of a fundamentally fair trial in violation of the Due Process Clause. Dr. Warnick testified that the odds of anyone other than Petitioner having made a bite mark appearing on the murder victim was "2.1 billion to one." (Trial Transcript Vol. III-A at 26.) In the years following Petitioner's June 1989 conviction there have been other cases where Dr. Warnick testified similarly, and the criminal defendant was subsequently granted habeas relief or otherwise released from custody. *See Ege v. Yukins*, 380 F. Supp. 2d 852, 857 (E.D. Mich. 2005) *aff'd in part*, *rev'd in part* 485 F.3d 364 (6th Cir. 2007) ("[T]he post-conviction evidence demonstrates . . . [that] Dr. Warnick thoroughly has been cast into disrepute as an expert witness and several convictions based on his testimony have been undermined and overturned. This case presents another."). In particular, the statistical certainty associated with Dr. Warnick's testimony has been called into serious doubt, and Dr. Warnick's reputation as an expert witness severely tarnished. *See* Amber Martin, *Now, Bite Evidence Falls Out of Favor; A Rising Detective Tool Fading to Junk Science*, Detroit Free Press, April 19, 2004, at 1A ("Judges, coming to consider bite-mark analysis as more art than science, began in the mid-1990s to reexamine some cases in which Warnick had testified."); Erica Beecher-Monas, *Reality Bites: the Illusion of Science in Bite-mark Evidence*, 30:4 Cardozo L. Rev. 1369, 1377-87 (2009).

**A. Facts**

2

Before the start of Petitioner's 1989 murder trial, Petitioner's then-counsel filed a motion *in limine* to exclude Dr. Warnick's bite-mark testimony.  (Dkts. 7-6 to 7-11, Trial Transcript ("Tr.") Vol. I at 4-5.)  The trial court, relying on then very recent precedent, ruled that Dr. Warnick's testimony satisfied the *Davis-Frye* test (which Michigan courts use to determine if novel scientific evidence has gained general acceptance in the scientific community).  (*Id.* at 5.)  The trial court permitted, however, Petitioner's counsel to conduct *voir dire* on Dr. Warnick regarding his credentials outside the presence of the jury.  (Tr. Vol. I at 6.)  Petitioner asserts that no such *voir dire* was ever performed.  (Dkt. 1-3, Pet.'s Br. in Supp. for Pet. for Habeas at 43.)

Petitioner's defense at trial was that "hell hath no fury like [a] lover's scorn" (Tr. Vol. I at 159; Tr. Vol. IV at 100): through opening, closing, and cross examination of the State's witnesses, Petitioner attempted to show that the murder victim, Robert Mejia, was in a relationship with Franklin (Hank) Clayton, and that Mejia shunned Clayton on the night of June 5, 1988.  Counsel also suggested that Mejia shrugged-off a long-time friend, Basilio (Richard) Gonzalez, on the night of the murder, and that Gonzalez gave a questionable account of where he went after last seeing Mejia.  Counsel further aimed to demonstrate that various witnesses described the person last seen with Mejia differently, and that Clayton and Petitioner looked similar enough for the witnesses to have confused the two.

### 1. The Events Leading Up to Mejia's Death

Petitioner was 23 years old at the time Mejia was killed.  He was living in Pontiac, Michigan with his then-girlfriend, Connie Cook.  (Tr. Vol. III at 52.)  Both Petitioner and Cook were out of work prior to Mejia's murder, and there was some discussion between the two about returning to North Carolina where Petitioner had family, could more readily find work, and generally get away

3

from their lifestyle in Pontiac which involved some cocaine use.  (Tr. Vol. III at 55, 85-86.)

Robert Mejia lived and worked in Pontiac and had just turned 35 years-old days before he was killed.  On the afternoon of Sunday, June 5, 1988, Mejia and Gonzalez, who was also homosexual and had been Mejia's friend since childhood, drove from Pontiac to go bar-hopping in Detroit.  (Tr. Vol. I at 270; Tr. Vol. II at 6-8, 16.)  Gonzalez testified that the two were celebrating Mejia's birthday and Gonzalez's new job.  (Tr. Vol. II at 6-8, 16.)  After enjoying some drinks, the two headed back to Pontiac; Gonzalez testified that they arrived at Popper's Bar, a gay bar that Mejia frequented, around 6:30 or 7:00 p.m.  (Tr. Vol. II at 8-9.)

Hank Clayton was 22 years old when Mejia was killed and admitted that his hair was about collar length at the time of the incident, and that he then had about a three-day growth of beard. (Tr. Vol. III at 44-45.)  Clayton told the jury that he was not in a relationship with Mejia and that Mejia was merely an "acquaintance."  (Tr. Vol. III at 30.)  He admitted, however, that he was one of six or seven people who attended a small birthday celebration for Mejia the Friday before his death.  (Tr. Vol. III at 30-31.)  Further, Robert Lisk, who had known Mejia for five years and considered Mejia a "good friend," testified that he "understood [Clayton] was a new guy [Mejia] was going out with."  (Tr. Vol. II at 106-07, 116.)

Clayton testified that he arrived at Popper's at 8 p.m. on June 5 and saw Mejia and Gonzalez there.  (Tr. Vol. III at 32, 47-48.)  Soon after his arrival, he and Mejia left Popper's Bar and went to Clayton's house which was about a 45-50 minute drive away.  (Tr. Vol. III at 33-40.)  The two stayed only briefly at Clayton's house and from there, headed to Floyd Taylor's house—a friend of Mejia's.  (Tr. Vol. III at 41.)  Taylor testified that Mejia and Clayton arrived around 9:00 p.m. and stayed until around 10:30 p.m.  (Tr. Vol. III-23-24.) The three were enjoying a few beers, "just

4

partying a little bit," and Taylor recalled that he and Mejia had probably ingested some cocaine.  (Tr. Vol. III at 23-24, 33.)  Taylor believed that Clayton and Mejia left his house around 10:30 p.m. and were headed back to Popper's.  (Tr. Vol. III at 24.)

According to Clayton, he and Mejia returned to Popper's around 11:30 p.m.  (Tr. Vol. III at 34.)  After finishing part of one drink, Clayton suggested that the two go outside to smoke marijuana, after which Clayton would go home.  (Tr. Vol. III at 34.)  According to Lisk, Mejia came back into Popper's around 12:30 a.m. on June 6, 1988 and Clayton was not with him.  (Tr. Vol. II at 107, 117, 119.)  Mejia had told Lisk that he "got rid" of Clayton and he did not want him around anymore.  (Tr. Vol. II at 107, 117, 119.)

Gonzalez testified that he left Popper's around 12:30 a.m. on June 6, 1988 with someone named David, and when he was leaving, he saw Mejia and Clayton coming into the Popper's parking lot in Clayton's pickup truck.  (Tr. Vol. II at 10, 21, 24.)  Gonzalez explained that after he left Popper's, he went to his sister's home to pick up his car, and—although he had to be at work back in Pontiac around 7:30 a.m.—he then drove some two hours back to Saginaw to pick up a personal check from his roommate and grab a change of clothes.  (Tr. Vol. II at 21, 24.)  During the investigation into Mejia's death, however, Pontiac police were unable to locate the person(s) in Saginaw that Gonzalez allegedly went to see that night.  (Tr. Vol. III-A at 78-79.)

Lisk testified that around 1:20 a.m. on June 6, Petitioner "came in [to Popper's], was standing over by the tables by himself, and Bob [Mejia] was talking to us, and next thing I know, [Mejia] turned around and was talking with this guy."  (Tr. Vol. II at 108.)  Lisk said that Mejia introduced Petitioner as "Lee"—Petitioner's middle name—and bought Petitioner a beer.  (Tr. Vol. II at 112.)  On cross, however, Lisk admitted that he had talked with police officers shortly

5

after Mejia was killed, and did not give authorities the name "Lee." (Tr. Vol. III at 4.)  In fact, Lisk conceded that he had not told Pontiac police Petitioner's (middle) name until just shortly before trial, and by that point, the Oakland Press had run some articles on the incident and "[t]hat's when I recognized [Petitioner's] picture and I recognized the name . . . .  I recognized it out of the newspaper." (Tr. Vol. III at 7.)

Lisk described Petitioner as looking like "a drifter," like he "belonged to a motorcycle gang." (Tr. Vol. II at 110.)  He said Petitioner was wearing "jeans, boots, a black leather vest, and a red and black checkered shirt, and . . . kind of like a biker cap." (Tr. Vol. II at 111.)  Petitioner had a "bushy" beard, a "full mustache," and his hair was "feathered on the side and long in the back." (Tr. Vol. II at 122.)  Lisk described Clayton as having "light brown hair, glasses, kind of scruffy looking," with hair not-quite shoulder length; he could not recall whether Clayton had a mustache. (Tr. Vol. II at 116-17.)  Lisk continued, "[w]hen [Mejia] was leaving the bar, they walked right in front of me and I asked [Mejia] not to leave with the guy." (Tr. Vol. II at 110.)  Lisk said he made the plea to Mejia "[b]ecause nobody [had] ever seen [Petitioner] before.  He didn't look like he was anybody I would want my friend to leave with.  He didn't look trustworthy." (Tr. Vol. II at 108, 110.)  Lisk testified that Petitioner and Mejia left Popper's together at 2:00 a.m. on June 6, 1988.

In addition to Gonzalez, Lisk, and Clayton, three Popper's employees and a self-described "drinking friend" of Mejia's, Mike DePlaunty, recounted to the jury what they had witnessed at Popper's the night of June 5, 1988.  DePlaunty stated that he arrived at Popper's just after midnight and stayed until "one-thirty, maybe a quarter to 2:00" in the morning of June 6, 1988. (Tr. Vol. II at 51-52.)  He also attested, however, that he left the bar with Gonzalez, who, as noted, said he left Popper's around 12:30 a.m. (Tr. Vol. II at 55.)  DePlaunty told the jury that Mejia left the bar before

6

he did, that he did not see whom Mejia left with, but that Petitioner was still at Popper's after he (and therefore Mejia) had left.  (Tr. Vol. II at 52, 54.)

Charles York was one of two bartenders working at Popper's the night of the incident. (Tr. Vol. II at 27-28.)  York testified that in the half hour before Mejia left Popper's on the night of June 5, Mejia was "down in my section of the bar."  (Tr. Vol. II at 30.)  In accord with Lisk's testimony, York told the jury that Mejia bought Petitioner a beer and "talked to him for about twenty, thirty minutes."  (Tr. Vol. II at 30-31, 48.)  He testified that Petitioner and Mejia left Popper's around 1:40 a.m., and York was absolutely certain that it was Petitioner who left with Mejia.  (Tr. Vol. II. at 29, 38.)  Unlike Lisk, however, he recalled Petitioner wearing an aqua blue shirt and similarly colored shorts.  (Tr. Vol. II at 36.)  Implicitly, York indicated that he was not confused as to the identities of Clayton and Petitioner as he agreed that he had seen Clayton "quite often" at Popper's but had never seen Petitioner prior to that evening.  (Tr. Vol. II at 36, 43.)

Kerry Johnson was the other bartender working at Popper's the night of June 5, 1988.  (Tr. Vol. III at 9.)  Unlike York, however, Johnson could not recall whether he saw Petitioner in the bar that night.  (Tr. Vol. III at 12.)  He did recall Mejia talking with Clayton that night, and told the jury, "later on that evening, they had left for a little while, and they came back and then all of them stood way down at the end of the bar, so I really didn't see . . . ."  (Tr. Vol. III at 10.)  On direct, Johnson, who was the bartender working closest to the bar's exit, testified that Mejia left in a group and he was unsure of who was in the group.  (Tr. Vol. III at 11-12.)  At Petitioner's preliminary exam, however, Johnson testified that he had told police that Mejia left with a "Brian" between 1:45 and 2:00 a.m. on June 6, and that he later understood that this Brian was in fact Hank Clayton.  (Pr. Exam Tr. at 86-87.)  When Petitioner raised this issue on cross, Johnson explained, "I mean, I was

working.  I was cleaning up when everybody was walking out the door, so my attention wasn't drawn on people that were walking out the door."  (Tr. Vol. III at 16.)  When pressed, Johnson replied, "I testified [at the preliminary exam] that . . . there was a bunch of people that left."  (Tr. Vol. III at 16.)          The jury also heard from James Scherrer, the doorman working at Popper's the night Mejia was killed.  (Tr. Vol. II at 92-93.)  He testified that Mejia left with someone he could not identify but who was "kind of out of the ordinary for [Popper's]."  (Tr. Vol. II at 96.)  He only saw the individual from the back, but testified that he had "longish," "kind of scruffy-type of hair," a "red flannel shirt" of sorts, something akin to a "motorcycle-type outfit."  (Tr. Vol. II at 96, 98-99.)  And while he agreed with the characterization that Clayton had longish, blonde hair, he had seen Clayton on prior occasions and stated that Mejia did not leave Popper's with Clayton, and that Clayton left alone. (Tr. Vol. II at 97, 101-02).

Taylor, whom Clayton and Mejia had partied with earlier on the night of June 5, testified that around 2:00 a.m. Mejia returned to his house to pick up some cocaine that he had sold Mejia.  (Tr. Vol. III at 25.)  He did not notice whether anyone else was with Mejia, but believed he saw Mejia's car parked in his driveway.  (Tr. Vol. III at 25.)

### 2. The Investigation Into Mejia's Death

Sometime on Monday, June 6, 1988, Robert Mejia was killed.  (*See* Tr. Vol. I at 192.) Around 9:00 a.m. that morning, Ernesto Mejia, Robert's brother, received a call from Christina Mejia, Robert's mother.  (Tr. Vol. I at 232.)  Apparently, Mejia had not show up to work.  (Tr. Vol. I at 232.)  Eventually, Ernesto found Mejia's car at Popper's and contacted the Pontiac police.  (Tr. Vol. I at 238-39; Tr. Vol. II at 71, 81-82.)

On Tuesday, June 7, 1988, Pontiac Police Officer Albert Rayner, an identification technician,

8

attempted to obtain fingerprints from the exterior of Mejia's vehicle, but testified that "the finish on the car was so rough that there was no sign of fingerprints on the exterior of the car at all." (Tr. Vol. III at 113.) Rayner also attempted to obtain fingerprints from the interior surfaces of the car but the only prints he obtained anywhere were from a Pepsi bottle in the vehicle. (Tr. Vol. III at 117.) Rayner noticed no blood in Mejia's car. (Tr. Vol. III-A at 58.) He found a piece of paper with a "doper fold": a fold "consistent with the way drugs are packaged." (Tr. Vol. III at 116.) White powder residue from the paper tested positive for cocaine. (Tr. Vol. III at 116.)

The same day, Robert Mejia's body was found near his apartment. Mejia, who shared a two-bedroom apartment with his mother, lived in a large apartment complex in Pontiac three to five miles away from Popper's. (Tr. Vol. I at 234-35; Tr. Vol. II at 74.) Behind that complex was a vast, relatively isolated wooded area. (Tr. Vol. I at 229, 259; Tr. Vol. II at 85.) On the evening of June 7, 1988, a pair of joggers were running along a dirt path in this wooded area. Witnesses at trial indicated that the track was wide enough for a vehicle, and, in fact, both joggers testified that a pickup truck could probably make it down the path. (Tr. Vol. II at 62, 66.) About a half mile into the path, the two joggers came upon Mejia's body. (Tr. Vol. II at 61.)

At least three Pontiac police officers, Conway Thompson, William Pummill, and Edward Pittman, responded to the joggers' call around 8:00 p.m. on June 7. (Tr. Vol. I at 265-66.) Mejia was found alongside the pathway, on his back in some bushes with blood covering his shirt and pants. (Tr. Vol. II at 66, 75-76.) Mejia's pants were pulled down below his waist, and the medical examiner indicated that this could be consistent with a homosexual killing or a robbery. (Tr. Vol. II at 219-20.) Officer Pittman noticed what he believed was blood on some pebbles on the path, but he did not notice any drag marks indicating that the body had been dragged over the path.

9

(Tr. Vol. II at 78.)

Around 10:00 p.m. on June 7, Identification Technician Rayner, along with another identification technician, Officer Milosic, gathered evidence from the scene. (Tr. Vol. III at 123.) Along with photographs and measurements they took "four stones with blood on them" into evidence. (Tr. Vol. III at 123-24.) Rayner believed that because of the small amount of blood found at the scene, the body had been driven and dumped there. (Tr. Vol. III-A at 61.) Rayner noted that the only vehicle tracks he noticed "appeared to be of [a] tractor-type ATV" and the tracks went right past where Mejia was laying. (Tr. Vol. III at 125.) Officer Pittman testified that he did not notice any tire tracks or marks in the area. (Tr. Vol. II at 75.)

The following morning, June 8, 1988, Mejia's body was taken to the Oakland County Morgue, (Tr. Vol. III at 125-26), and Dr. Lynda Biedrzycki performed an autopsy, (Tr. Vol. I at 171). She attested that along with abrasions, scratches, and a bite mark, Mejia suffered "eight stab wounds to the face and neck and upper chest area" and the stab wound to the right side of Mejia's neck severed the carotid artery which likely proved fatal. (Tr. Vol. I at 175, 180, 188.)

On June 8, 1988, Detectives Santiago Serna and Robert Mathes became involved with the investigation. (Tr. Vol. III-A at 86.) Mathes and Serna interviewed many witnesses, including some from the area where Mejia lived and others who had been at Popper's. (Tr. Vol. III-A at 68-71, 90.) Among the interviewees was Mejia's mother, Christina. Christina's stated[1] that at about 1:30 a.m. on June 6, she was in her bedroom and heard Mejia say "I'm home, mom." (Tr. Vol. III-A at 89.)

---

[1]Prior to the start of trial, the State moved to strike Christina Mejia as a witness because she was elderly, and Petitioner's counsel stipulated to having Christina's account, as told to Detective Serna, read to the jury. (Tr. Vol. III-A at 88.) Petitioner asserts that the reading of Christina's testimony at trial violated rights protected by the Confrontation Clause.

Christina did not see Mejia at that time, however, and about 2:00 a.m. she looked around their apartment for Mejia and did not find Mejia or Gonzalez. (Tr. Vol. III-A at 89.)

On June 9, 1988, Detectives Serna and Mathes checked Mejia and Gonzalez's vehicles. They were looking for evidence of mud, dirt, or sand suggesting that one of the vehicles drove down the two-track. No such evidence was found on the vehicles. (Tr. Vol. III-A at 72-73, 91.)

On June 10, 1988, Serna interviewed Hank Clayton and asked him to bring his vehicle in for inspection. (Tr. Vol. III-A 91-92.) Serna explained that the truck was dirty and had "a lot of items in the back that had not been moved for quite a while." (Tr. Vol. III-A at 92.) Upon inspection, he found no bloodstains or any marks in the dust suggesting that a body had been placed there recently. (Tr. Vol. III-A at 94.) No mud or sandy substance was found on the truck's undercarriage that would have indicated its use on the two-track leading to where Mejia was found. (Tr. Vol. III-A at 95.)

At their meeting, Serna asked Clayton whether he had a knife, and Serna testified that Clayton answered in the negative. (Tr. Vol. III-A at 94.) Serna, however, found a suitcase in the cab of the truck, behind the front seats. (Tr. Vol. III-A at 94.) In that suitcase, there was a strap holding "a little pocket knife." (Tr. Vol. III-A at 94.) According to Serna, Clayton explained that he had forgotten about the knife. (Tr. Vol. III-A at 101.) Serna provided the knife to Identification Technicians Milosic and Rayner for testing. (Tr. Vol. III-A at 95.)

According to Rayner, Clayton's pocketknife had "rust on it and areas that appeared to have brown stains" and the testing report he read stated that "there was no blood found" on the knife. (Tr. Vol. III-A at 53-54.) On cross, however, he admitted that the Luminal test performed on the knife, which tests for the presence of iron, returned positive. (Tr. Vol. III-A at 62-63.) He explained

11

however, that iron is found in both blood and rust.  (Tr. Vol. III-A at 63.)

### 3. Petitioner's Confession and Subsequent Arrest

Along with Dr. Warnick, Petitioner's girlfriend, Connie Cook, provided the most incriminating testimony at trial.  Cook had met Petitioner in late 1987 and moved in with him around February 1988.  (Tr. Vol. III at 53-54.)  She testified that in June 1988, neither her nor Petitioner were working and, early on the evening preceding Mejia's death, they had gotten into a fight about money.  (Tr. Vol. III at 55.)  According to Cook, Petitioner said that "he was going out to get some money."  (Tr. Vol. III at 56.)  Cook testified that Petitioner had a beard during the time in question, and wore a motorcycle-type vest and a "biker's hat" on the evening of June 5, 1988.  (Tr. Vol. III at 58.)

Cook then told the jury that the following events took place.  When Petitioner returned home between 1:00 and 4:00 a.m. on the morning of June 6, 1988, she noticed scratches on Petitioner's face, chest, and arms, and that he was "red in the face."  (Tr. Vol. III at 57-58, 60.)  Petitioner headed straight to the bathroom, and then came into the living room where Cook was watching TV.  (Tr. Vol. III at 62.)  "[A]nd then out of the blue, he just come out and said 'I killed somebody.'"  (Tr. Vol. III at 62.)  According to Cook, Petitioner had bragged about previous fights, and she thought that he was merely exaggerating this time.  (Tr. Vol. III at 62.)  Petitioner explained how he went to Popper's and "there was a party going on," and how a guy "started talking with him, and they got on the subject of doing coke, and the guy offered to take [Petitioner] home and do some with him, and he went."  (Tr. Vol. III at 63.)  Petitioner told Cook that "they went to somebody's house to pick it up 'cause they didn't have any," and after that, they went to Mejia's house.  (Tr. Vol. III at 64.)  Petitioner then confessed that the two of them went for a walk in the woods, and

12

Petitioner "pulled a knife on the guy and told him [to] give him all of his money."  (Tr. Vol. III at 64.)  According to Cook, Petitioner always carried "[a] small pocket knife" with him.  (Tr. Vol. III at 64.)  When Mejia refused to give Petitioner the money, the two started fighting over the knife, and, after a protracted struggle, Petitioner "held [Mejia] down with his left hand and slit his throat and watched him drown in his own blood."  (Tr. Vol. III at 65.)  Petitioner told Cook that he took "six dollars and some odd cents" from Mejia.  (Tr. Vol. III at 76.)  After the fight, he went back to Mejia's apartment to "clean up anything that was there," including a drink he had at Mejia's apartment.  (Tr. Vol. III at 76.)  He also looked for the keys to Mejia's BMW but could not find them.  Accordingly, he went back to the body to get the keys and then drove Mejia's car back behind Popper's Bar.  (Tr. Vol. III at 76-77.)

Cook testified that she did not believe Petitioner at first.  So, according to Cook, Petitioner went out to his car and brought in a watch that Cook had given him.  (Tr. Vol. III at 62.)  Cook explained that Petitioner kept the watch in the armrest of his car.  (Tr. Vol. III at 79.)[2]  She testified that he "showed it to me.  It was covered with blood.  There wasn't any gold on it at all.  It was all dried blood . . . ."  (Tr. Vol. III at 62.)  Cook told the jury that it was then that she believed what Petitioner had confessed to.  (Tr. Vol. III at 66.)

A few days after Mejia was murdered, Petitioner and Cook moved to North Carolina together—a move that had been discussed prior to June 5, 1988.  (Tr. Vol. III at 86.)  According to Petitioner, the decision to go to North Carolina was made around May 1, 1988, and, in fact, Petitioner produced a U-Haul receipt from May 31, 1988 for a trailer hitch installation on his car.

---

[2]It is a bit unclear as to whether Cook meant that Petitioner kept the watch in the armrest as a matter of course, or whether Cook meant that Petitioner had kept the watch in the armrest on this night.

13

(Tr. Vol. IV at 35.)  Petitioner relayed that he was going to move down to North Carolina alone at first, with Cook and her young son to follow, but that "[Cook] wanted to go with me because she didn't trust me in North Carolina by myself."  (Tr. Vol. IV at 35.)  Cook testified, however, that she had agreed to move with Petitioner "'cause he told me he'd kill me if I didn't."  (Tr. Vol. III at 67.)  Around June 10, 1988, Petitioner and Cook moved to North Carolina with Cook's 5-year-old son temporarily remaining in Pontiac with his grandparents.  (Tr. Vol. IV at 36, 44; *see also* Tr. Vol. III at 88.)

After arriving in North Carolina, Petitioner and Cook stayed with Petitioner's grandmother until they could move into their own place.  (Tr. Vol. IV at 45; Tr. Vol. III at 91.)  Soon thereafter, Petitioner obtained a job as a plumber and  sometime in late June, the two returned to Pontiac to pick up Cook's son who then lived with Petitioner and Cook in North Carolina.  (Tr. Vol. IV at 47, 49-50; Tr. Vol. III at 90-91.)

Cook testified that Petitioner warned that she would be considered an accessory if she told anyone what he had confessed to her.  (Tr. Vol. III at 66.)  Cook said that she did not tell her family about the confession—despite frequent phone calls with her parents—but she also told the jury that "[I told] [e]verybody I worked with.  I told my whole church."  (Tr. Vol. III at 69-70, 97.)

Cook said she and Petitioner had a rocky relationship after moving to North Carolina: "[w]e fought a lot, and it was like a game almost."  (Tr. Vol. III at 67.)  In late November 1988, Cook and Petitioner had one of their many fights.  Petitioner explained that the two had made plans for an early Thanksgiving dinner but that when he got home Cook was not there.  (Tr. Vol. IV at 54.)  According to Petitioner, Cook came home at 3:00 a.m., intoxicated, "dragging her son with one hand, had a bottle of liquor in the other hand," and Petitioner asked her to leave.  (Tr. Vol. IV at 54.)  For

14

her part, Cook testified that while the two were arguing, Petitioner "had me by the throat and said he was tired of me and I broke lose from him; I sucker punched him." (Tr. Vol. III at 71.) Petitioner allegedly told her to "get the hell out" of their home, and Cook told the jury that she felt "happy" and "glad" about her freedom. (Tr. Vol. III at 71, 105.) Cook left and called North Carolina police.

Cook testified that she made an anonymous call to North Carolina police and informed them that there was man of a different "nationality" that had been murdered "in Pontiac in the woods off Walton."[3] (Tr. Vol. III at 72-73.) Cook then went to work, and after work she made a second call to North Carolina police, and inquired into whether a murder matching her prior description had taken place. (Tr. Vol. III at 73.) Cook told the jury that when the officer answered affirmatively, "I couldn't believe it. Then again, it was like I did believe it because of the watch. Then I told [the officer] who I was." (Tr. Vol. III at 73.) While Cook recounted to the police what Petitioner had told her, she also incorrectly informed them that Petitioner had only confessed to her after they moved to North Carolina, and that the murder took place in January 1988—as opposed to June. As to the first discrepancy, Cook testified that "I was scared for myself. I don't want to go to prison. I didn't want to lose my son." (Tr. Vol. III at 74.) As to the second, she attested that she misremembered the time of the murder because she associated the murder with the Petitioner fighting, and Petitioner had fought and pulled a knife on her brother on or around Petitioner's January 1988 birthday. (Tr. Vol. III at 74, 98, 106.)

On cross, Petitioner's counsel emphasized weaknesses in Cook's testimony. Petitioner pointed out that moving to another state is a major event in one's life, an event that a person is likely

---

[3]The woods of Walton and Gambrell in Pontiac is where Mejia was found. (Tr. Vol. I at 258-59.)

15

to remember, and that Cook moved only days after Mejia's murder and Petitioner's alleged confession. (Tr. Vol. III at 100.) Cook also admitted that a murder confession is rare and something she would certainly remember, but that she nonetheless remembered the event in connection with Petitioner's January birthday. (Tr. Vol. III at 99.) In connection with questioning regarding her fear of telling authorities the truth, Cook acknowledged that the North Carolina police told her she was not going to be prosecuted. (Tr. Vol. III at 110.) Cook was also asked whether she was lying or mistaken when she told North Carolina police "that it all happened in January," Cook testified, "I was lying." (Tr. Vol. III at 107.) Yet, as noted, on direct Cook had explained that she confused the June incident with a fight Petitioner had with her brother in January.

Further, when Cook came back to Pontiac and met with Detectives Serna and Mathes, she first told them that the murder had occurred in January and that she only learned about it when she was in North Carolina. (Tr. Vol. III at 81, 108-09.)  It appears that Mathes or Serna may have provided Cook with some particulars, such as the name "Mejia," and, at a second interview, Cook told authorities that Petitioner had confessed on June 6, 1988. (Tr. Vol. III at 81-83.)  Although articles about the murder appeared in the Oakland Press, Cook denied receiving or reading that paper. (Tr. Vol. III at 100-01.)[4]

Petitioner was arrested by North Carolina authorities around 5:00 p.m. on a workday in late

---

[4]Petitioner has provided the Court with an article from the Oakland Press dated June 16, 1988. (Br. in Supp. for Pet. for Habeas, Ex. O.) Notably, the publication date is after Petitioner and Cook moved to North Carolina. (*See id.*)  The Oakland Press article states that witnesses from Popper's described the suspect as a person they had not previously seen at Popper's. (*Id.*)  The article describes the suspect as having strawberry-blonde hair, a scruffy beard, 5' 9" tall and weighing between 165 and 175 pounds. (*Id.*)  The article also notes that the victim was found in the woods accessible via a path "passable with difficulty by a car or more easily by truck or off-road vehicle." (*Id.*)

December 1988.  (Tr. Vol. IV at 68.)

### 4.  The Physical Evidence Introduced at Trial

Although David Woodford had tested much of the physical evidence in Petitioner's case and prepared a corresponding report, at the start of trial the State believed that he would be unavailable to testify.  Accordingly, the State called Melinda Jackson, an expert in forensic serology who had conducted some of the same tests as Woodford.  (Tr. Vol. IV at 8.)[5]  She testified that the blood found on Mejia's clothing was type O, and, therefore, that was likely Mejia's blood type.  (Tr. Vol. IV at 9.)  Petitioner's blood type is type AB, however—a type shared with only 3% of the population.  (Tr. Vol. III at 9, 17.)  She also testified that she was given ten fingernail clippings from Mejia, and on seven of the clippings she found blood—all type O.  (Tr. Vol. III at 17.)  Authorities had seized Petitioner's watch, a small knife found in Petitioner's mother's house,[6] and a console from Petitioner's car.  (Tr. Vol. IV at 13, 19; *see also* Tr. Vol. IV at 56.)  No blood was found on

---

[5]Jackson was late to court, and when the trial judge asked for an explanation, the following curious colloquy ensued:

> THE COURT: May I ask, Ma'am, why you weren't here on time this morning?
> MISS JACKSON: I received a call at the lab about 8:00 o'clock, and then --
> THE COURT: I want to put this on the record, okay?
> MISS JACKSON: Oh, okay. And then they called back to have me check our evidence room for some property that was missing.
> *THE COURT: In this case?*
> *MISS JACKSON: Yes, and then I checked our evidence room, checked the paperwork, and got dressed and came here.*

(Tr. Vol. III at 6 (emphasis added).)

[6]Petitioner testified that the knife that was seized in North Carolina belonged to his mother's boyfriend, and that the knife was never brought to Michigan.  (Tr. Vol. IV at 55-56.)  Cook testified that the knife used in the murder was tossed.  (Tr. Vol. III at 79.)  At closing argument, the State asserted that neither the knife taken from Clayton nor the knife taken from North Carolina was the murder weapon.  (Tr. Vol. IV at 119-120.)

either the watch or knife.  But Cook had testified that Petitioner had cleaned the watch with jewelry cleaner, (Tr. Vol. III at 59), and Jackson testified that if that was so, her testing would not have necessarily revealed blood, (Tr. Vol. III at 23).  The car console tested positive for type O blood: the same as Mejia's but also the same 43% of the general population.  (Tr. Vol. III at 21.)  Finally, Jackson testified that while she was still completing her training in hair analysis, she believed that the hairs collected from Mejia's vehicle did not match those of Petitioner.  (Tr. Vol. III at 13, 20-21.)

Because Woodford did not testify, the parties discussed the possibility of his report being entered into evidence.  (Tr. Vol. IV at 26.)  Petitioner's counsel remarked that because a search warrant affidavit stated that blood on a stone recovered from Mejia's clothing did not match a sample of Mejia's blood, he wanted clarification on this point prior to stipulation.  (Tr. Vol. IV at 26.)  After Petitioner's counsel called Woodford (off the record), the parties stipulated and they entered Woodford's report into evidence.  (Tr. Vol. IV at 28.)  At closing, the State informed the jury that Woodford's " report is also significant because it does talk about some of the blood types on the stones; and it all matches Bob Mejia's blood type."  (Tr. Vol. IV at 84.)  However, Petitioner has produced Woodford's report and, as Petitioner points out, it appears to indicate that Woodford found type A blood—which matches neither Mejia nor Petitioner's type—on a stone taken from Mejia's pants.  (Br. in Supp. for Pet. for Habeas, Ex. J.)

Dr. Allan Warnick, then a clinical professor at the University of Detroit School Dentistry and a 20-year practicing dentist in restorative and cosmetic work, testified as an expert in forensic dentistry on behalf of the State.  (Tr. Vol. III-A at 5-6.)  Warnick testified to taking "six to seven hundred" hours of post-graduate study in forensic dentistry and being board certified in forensic dentistry.  (Tr. Vol. III-A at 7.)  At the time, there were only 85 such certified dentists in the country,

with Warnick being the only one in Michigan.  (Tr. Vol. III-A at 7-8.)

Warnick explained to the jury about the condition of a bite mark found on Mejia's right arm above the elbow, how he preserved that mark, and how he obtained molds of Petitioner's teeth for comparison.  He testified that the bite mark found on Mejia was well-preserved despite exposure to warm weather for some time.  (Tr. Vol. III-A at 18.)  He explained that he excised the bite mark from the body in a manner that maintained its dimensions and then placed the tissue into formalin to harden.  (Tr. Vol. III-A at 15-16.) Warnick testified that the removal and hardening process caused only a "very small change [to the bite mark], one percent shrinkage."  (Tr. Vol. III-A 16.) Warnick took an impression of Petitioner's mouth—but not of any other individuals'—"using a resilient dental material."  (Tr. Vol. III-A 20.)  Warnick testified that "[i]t's very accurate material" meaning that there was "extremely small change, .03 percent of any change."  (Tr. Vol. III-A 20.)

Dr. Warnick then explained his comparison technique.  (Tr. Vol. III-A 24-26.)  Warnick pointed out a number of similarities to the jury and attested "[t]his could not be done coincidently because everybody's teeth are unique, and there's been studies of that the individuals are very, very unique.  The chance of the same individual making all these patterns are 2.1 billion to one."  (Tr. Vol. III-A 26.)  He testified, "So we come up with numerous points of matching with no inconsistencies at all, and it's my expert opinion that the marks made on the victim's arm were made by Mr. Poole."  (Tr. Vol. III-A at 28.)

On cross, Warnick admitted that forensic odontology was a new area of dentistry.  (Tr. Vol. III-A at 32-33.)  Warnick also admitted that there could be distortions in a bite mark from a number of causes including the fact that skin is not a very good medium for holding the imprints, and that

there could be "some sliding or some movement in the tissue" if the victim was struggling in a fight while being bitten. (Tr. Vol. III-A at 34, 43.) He also acknowledged that Mejia had been wearing a long-sleeved shirt, but stated that he had considered that fact and it did not change his opinion. (Tr. Vol. III-A at 47.)

### 5. Petitioner's Testimony at Trial

Petitioner was the only person who testified in his defense. He attested that on the night of June 5, 1998 he was not at Popper's, that he did not leave Popper's with Mejia, that he had never been in the field where Mejia's body was found, that he did not bite Mejia, that he did not make a confession to Cook, that he never cleaned blood off the watch that Cook had given him, and that he did not kill Mejia. (Tr. Vol. IV at 34, 55-57, 60.) Petitioner told the jury that on June 5th, he and Cook's brother were helping to load the trailer for moving to North Carolina and were also cleaning out a garage which "took basically all night." (Tr. Vol. IV at 39.) However, on cross, he said that he could not recall if he cleaned out the garage on the 5th or not, but that it was "approximately" on June 5, and that he worked "into the evening hours." (Tr. Vol. IV at 59.) Poole admitted to owning a leather vest (but did not think he wore it on the evening of June 5, 1988), having a beard at the time in question, and fighting with Cook's brother. (Tr. Vol. IV at 58.) He denied, however, having a biker-type hat. (Tr. Vol. IV at 70.)

### 6. Closing Arguments and the Jury's Deliberation

In closing, Petitioner argued that Clayton and Mejia were lovers, that Mejia "perhaps dumped" Clayton on the night of the murder, and Dr. Biedrzycki's description of the knife that killed Mejia matched the one taken from Clayton's truck. (Tr. Vol. IV at 100-02.) Petitioner also argued that Johnson, one of the Popper's bartenders on the night of the murder, should be a

20

"barometer" of how the State's witnesses should be evaluated. (Tr. Vol. IV at 102.) In particular, Petitioner emphasized that Johnson's testimony that Petitioner left the bar with Mejia was impeached by his preliminary exam testimony.     (Tr. Vol. IV at 102-03.) Regarding Cook, Petitioner argued that she "told quite a story" and stated,

> How did she come about the story? I submit to you she came about the story in the same way that Mr. Lisk came up with the name Lee. She read about it in the papers, or she heard about it from her family members. This incident did get an awful lot of newspaper coverage shortly after the event. It was—where the body was found, where the car was found, all those items received a lot of coverage. And that is why she was confused as to when the event happened. If somebody confessed a murder to you, you'd remember it on, you know, on the time of year and stuff like that, as to what happened. But if you read about something in the paper, you may—will not remember it as well. Or if somebody tells you a story, and you have to put a time frame to it, you will not remember it as well; and that is what she did. She got all that information from the newspapers.

(Tr. Vol. IV at 107.)

On rebuttal, the State summarized the evidence presented at trial as follows:

> I submit to you that if you look at the evidence in this case, the testimony; Dr. Warnick, the three identification eyewitnesses, the confession of Connie Cook, this is a simple case; this is an easy case; this is a straightforward case. Anyone of those three things alone would be enough to convict. But if you only had one, [defense counsel is] right. It might be a difficult case. You like a little corroboration, and you've got it. You got Bob Lisk; you got Mike DePlaunty; you got Chuck York; you got the full statement to Connie Cook, and I've already gone through everything that happened that corroborated the admission he made to her, and you got Dr. Warnick. You got corroboration upon corroboration.

(Tr. Vol. IV at 129.) Regarding Dr. Warnick, the State emphasized,

> Dr. Warnick testified, and I won't go through it again, that based on his experience, those teeth bit the victim. No other way around it. And then he went back to the basis for this type of testimony, the book where they did the study with all the identical twins, and they

21

> got the mathematicians to say what's the possibility that somebody else has teeth exactly like that.  And, if I recall, it was two and one-half billion to one.  That[] makes the lottery look like a sure thing.  It was his teeth.

(Tr. Vol. IV at 126.)

The jury was "out" for deliberation for about four hours.  (Tr. Vol. V at 41, 52 .)[7]  During this time, at the jury's request, the trial court replayed about one hour's worth of Cook's testimony.  (Tr. Vol. V at 49.)  Over Petitioner's objection that the jury should rehear the entirety of Cook's testimony, the trial court allowed the jury to return a verdict once they indicated that they had heard enough.  (Tr. Vol. V at 51-52.)  The jury found Petitioner "guilty of deliberate and premeditated murder and guilty of felony murder."  (Tr. Vol. V at 53.)

**B.  Procedural History**

*1.  Direct Appeal*

On June 6, 1989, Petitioner was convicted of first-degree murder and felony murder and sentenced to life without parole.  On January 31, 1993, the Michigan Court of Appeals affirmed the conviction.  (*See generally* Dkt. 7-17 at ECF 27-29.)  As to the alleged erroneous admission of Dr. Warnick's testimony, the appellate court concluded: "The trial court did not abuse its discretion by admitting this evidence without a *Davis-Frye* hearing because the science of bite mark analysis is sufficiently established that a trial court may admit the evidence without a hearing."  (Dkt. 7-17 at ECF 27-29.)[8]  The Michigan Supreme Court denied Petitioner's request for leave to appeal on June

---

[7]This includes an hour-and-half recess during which the jury had the option to continue deliberations.  (Tr. Vol. V at 49-50.)

[8]It appears Petitioner had some difficulties with his appellate counsel.  Petitioner's appeal was not timely filed.  (*See* Dkt. 7-19 at ECF 24.)  On March 22, 1990, Petitioner filed a motion with the trial court to have appellate counsel removed for, *inter alia*, lack of communication.  On

22

25, 1993, *People v. Poole*, 442 Mich. 933, 503 N.W.2d 907 (table) (1993), and denied his motion

for reconsideration on August 27, 1993, *People v. Poole*, 506 N.W.2d 875 (table) (Mich. 1993).

### 2. *State Post-Conviction Relief*

On July 22, 2005, a court of this district issued a published opinion in *Ege v. Yukins*, 380

F. Supp. 2d 852 (E.D. Mich. 2005), which granted Carol Ege a conditional writ of habeas corpus

because the admission of Dr. Warnick's bite-mark testimony deprived her of a fundamentally fair

trial.  Shortly thereafter, on November 21, 2005, Petitioner filed a Delayed Motion for New Trial

seeking post-conviction relief from the original trial court.  Initially, the State responded that

physical evidence containing biological material was not available, but later filed a supplemental

brief stating that Jackson had "blood sample evidence" that was being preserved for testing.  (Dkt.

7-21 at ECF 26-27.)

On August 1, 2006, the trial court denied Petitioner's request for post-conviction relief.

(Dkt. 7-21 at ECF 17-21, *People v. Poole*, No. 89-90203FC (Oakland County Cir. Ct. Aug. 1, 2006)

(opinion and order denying relief from judgment).)  The Michigan Court of Appeals issued an order

on October 23, 2007 denying, without opinion, Petitioner's delayed application for leave to appeal.

(Dkt. 7-22.)  On April 28, 2008, the Michigan Supreme Court did the same.  (Dkt. 7-19.)

### 3. *Proceedings before this Court*

On July 10, 2008, Petitioner filed a Petition for Writ of Habeas Corpus with the U.S. District

_____

December 27, 1990, Petitioner attempted to file a self-authored supplemental brief but the Court of
Appeals returned the brief to Petitioner explaining that all such pleadings had to go through
appellate counsel. (Pet.'s Br. in Supp. for Pet. for Habeas, Ex. F.)  After the Michigan Attorney
Grievance Commission "admonished" appellate counsel (Dkt. 7-19 at ECF 24), counsel apparently
agreed to submit the supplemental brief but informed Petitioner that doing so would jeopardize the
appeal that had been won by default, (Pet.'s Br. in Supp. for Pet. for Habeas at 8).  (Apparently, the
State did not file a timely brief in opposition.)

Court for the Eastern District of Michigan.  (Dkt. 1.)

Petitioner has also filed a Motion for Evidentiary Hearings wherein he asks the Court to (1) conduct a *Daubert* hearing regarding the admission of Dr. Warnick's testimony and (2) hold an evidentiary hearing on his ineffective assistance of appellate counsel claim.  (Dkt. 1 at ECF 40-50, Dkt. 1-2 at ECF 1-15.)  The Court finds that an evidentiary hearing to decide whether Dr. Warnick's testimony should have been admitted under *Daubert* unnecessary: the Court agrees with Petitioner that Dr. Warnick's statistical certainty testimony should not have been admitted.  As to an evidentiary hearing for his ineffective assistance counsel claim, for reasons set forth below, this Court finds those claims time-barred.  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("Prior to [AEDPA] the decision to grant an evidentiary hearing was generally left to the sound discretion of district courts. . . .That basic rule has not changed."); *see also* 28 U.S.C. § 2254, Rule 8(a) ("[T]he judge must review the answer [and] any transcripts and records of state-court proceedings . . . to determine whether an evidentiary hearing is warranted").

Petitioner further filed a Motion for DNA Testing pursuant to 18 U.S.C. § 3600.  (Dkt. 1 at ECF 7-37.)  That section of the U.S. Code provides, in relevant part:

> Upon a written motion by an individual under a sentence of imprisonment or death pursuant to a conviction *for a Federal offense* (referred to in this section as the "applicant"), *the court that entered the judgment of conviction* shall order DNA testing of specific evidence if the court finds that all of the following apply . . . .

18 U.S.C. § 3600(a) (emphases added).  Petitioner is not under a sentence pursuant to a conviction for a federal offense so 18 U.S.C. § 3600 is inapplicable.  This Court therefore recommends that his motion for DNA testing be DENIED.

## II. DISCUSSION

This Court analyzes Poole's Petition for Writ of Habeas Corpus in three steps. First, the Court addresses Respondent's claim that Poole filed his Petition out-of-time, i.e., that it is barred by the statute of limitations set forth in 28 U.S.C. § 2244(d). Because this Court finds that through reasonable diligence Petitioner could not have discovered that Dr. Warnick had fallen into disrepute sooner than he actually did, the Court next analyzes which habeas claims are timely (i.e., those claims that depend on the discovery of this factual predicate). Third, the Court analyzes whether Petitioner's timely due process claim warrants habeas relief.

**A. Statute of Limitations**

*1. The Statute of Limitations Under 28 U.S.C. § 2244(d) Does Not Bar Petitioner's Application In Its Entirety*

Under AEDPA, a one-year statute of limitations period applies to an application for writ of habeas corpus filed by a person, such as Petitioner, in custody pursuant to a judgment of a state court. As relevant here, the limitation period starts to run from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> . . .
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). The limitations period tolls, however, during the period that a prisoner seeks state-court collateral review of a conviction. 28 U.S.C. § 2244(d)(2). A habeas petition filed after the time period prescribed by 28 U.S.C. § 2244(d) must be dismissed. *Chisolm v. McQuiggin*, No. 10-CV-12388, 2011 WL 1296761, at *3 (E.D. Mich. Apr. 4, 2011).

As an initial matter, Petitioner's claims are not timely under 28 U.S.C. § 2244(d)(1)(A). For

25

habeas petitioners whose state-court "direct appeal became final before AEDPA became effective, the 1-year limitations period beg[ins] to run from April 24, 1996, AEDPA's effective date." *Allen v. Siebert*, 552 U.S. 3, 5 (2007). Poole is such a petitioner. The Michigan Supreme Court denied his request for leave to appeal on June 25, 1993, *People v. Poole*, 442 Mich. 933, 503 N.W.2d 907 (table) (1993), and denied his motion for reconsideration on August 27, 1993, *People v. Poole*, 506 N.W.2d 875 (table) (Mich. 1993). It appears that Petitioner did not seek certiorari from the United States Supreme Court within the 90-day window for filing that writ. Petitioner's direct appeal therefore concluded, at latest, on November 25, 1993—before AEDPA's effective date of April 24, 1996. Yet, Petitioner did not file this Petition until well after one-year from that effective date.

Petitioner asserts that § 2244(d)(1)(D) governs this case.[9] Petitioner claims that he first learned of the factual predicate for his Petition — that Dr. Warnick's bite-mark testimony lacked scientific basis —"at the beginning of September 2005, when the soft bound copy of the [published, Eastern District of Michigan opinion in] *Ege* appeared in the prison law library." (Pet. for Habeas at 10.) Two months later, on November 27, 2005, Petitioner tolled the one-year statute of limitations clock by seeking state court post-conviction relief. (Pet. for Habeas at 10.) The clock remained tolled until April 28, 2008 when the Michigan Supreme Court denied leave to appeal the denial of post-conviction relief. (Dkt. 7-19 at 1.) A little over two months later, on July 10, 2008, Petitioner filed the present Petition. Thus, under Petitioner's timeline, well under one year (in fact, just over 4 months) had run off the limitations clock prior to Petitioner applying for the present writ. *See* 28 U.S.C. § 2244(d)(2); *McSwain v. Davis*, 287 F. App'x 450, 454 (6th Cir. 2008) ("A fair reading of

---

[9]As will be discussed below, it is not proper to consider the statute of limitations as it applies to an entire habeas petition, but, rather, as it applies to each claim.

§ 2244(d)(1)(D) requires us to find that the time that elapsed between the discovery of the new evidence and the commencement of state post-conviction proceedings as well as the time that elapsed after the conclusion of the state post-conviction proceedings must both be factored into the calculation of the one-year limitations period."). Accordingly, Petitioner argues, his application is timely.

The question, however, is not when Petitioner himself became aware of the factual predicate for his claim, but rather, when "the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D); *see also Sanders v. Harry*, No. 2:10-CV-10107, 2010 WL 3447247, at *3 (E.D. Mich. Aug. 27, 2010). Although Petitioner "has the burden of proof in establishing that he exercised due diligence in searching for the factual predicate of the habeas claims," *Bey v. Capello*, No. 10–15068, 2011 WL 2271316, at *2 (E.D. Mich. June 8, 2011) (citing *Stokes v. Leonard*, 36 F. App'x 801, 804 (6th Cir. 2002)), section 2244(d)(1)(D) "does not require the maximum feasible diligence, only 'due,' or reasonable, diligence," *DiCenzi v. Rose*, 452 F.3d 465, 470 (6th Cir. 2006) (internal quotation marks omitted). In addition, "a due diligence inquiry should take into account that prisoners are limited by their physical confinement." *Moore v. Knight*, 368 F.3d 936, 939-40 (7th Cir. 2004).

Respondent argues that a person in Petitioner's circumstances, exercising reasonable diligence, should have first learned that Dr. Warnick's testimony was readily assailable in 1999 when the Michigan Court of Appeals issued two unpublished opinions regarding Dr. Warnick. *See Amolsch v. Warnick*, No. 203198, 1999 WL 33446484 (Mich. Ct. App. Apr. 27, 1999) (denying plaintiff's gross negligence claim against Dr. Warnick where plaintiff had been detained on Dr. Warnick's testimony that he bit the murder victim); *People v. Wright*, No. 179564, 1999 WL

33446496 (Mich. Ct. App. Apr. 23, 1999) *remanded by* 461 Mich. 906, 605 N.W.2d 314 (Table) (Mich. 1999) ("[I]t is clear that the subject of bite mark analysis is not known to a certainty. However, we conclude the facts and data underlying Dr. Warnick's conclusion that defendant was the person who made the bite marks on the victim were derived from recognized scientific knowledge.").  Petitioner responds that the prison law library did not provide access to unpublished Michigan Court of Appeals decisions.  (Dkt. 8, Pet.'s Reply at 2.)  Petitioner further explains that he did not have computer access.  (*Id.*)  It follows then, that Petitioner also lacked access to internet search engines and online databases such as Westlaw or Lexis.  There is no reason to doubt that Petitioner lacked access to unpublished legal decisions and online research tools.  *See Easterwood v. Champion*, 213 F.3d 1321, 1323 (10th Cir. 2000) ("Unlike the general population which has greater access to court opinions, prisoners must rely exclusively upon the prison law library to discover information contained in new cases.").

The Court further notes that Respondent makes no mention of a published Court of Appeals opinion or several newspaper articles that also  pertain to Dr. Warnick's questionable testimony. In May 2000, the Michigan Court of Appeals published an opinion stating:

> During plaintiff's preliminary examination . . . [Warnick suggested] that plaintiff was the only person in the world who could have inflicted the bite marks on [the victim's] body. . . .
>
> [Later], following the issuance of the favorable DNA report, plaintiff—who by that time had spent five months in jail—was released . . . . [Warnick] solicited a second opinion from [another] forensic odontologist . . . [who] issued a report concluding that, while the injury patterns on [the victim's] body were consistent with human bite marks, the details of the injuries were too indistinct to be used to include or exclude any suspect.  As a result of this second opinion, the charges against plaintiff were dismissed.

*Otero v. Warnick*, 241 Mich. App. 143, 144-45, 614 N.W.2d 177, 178-79 (Mich. Ct. App.  2000).

This Court also located several Detroit Free Press ("Free Press") articles, published between 1999 and 2004, discussing cases in which Dr. Warnick gave his now discredited bite mark testimony. For example, in August 1999, the Free Press discussed the gross negligence action brought against Dr. Warnick by Ricky Amolsch who spent 10 months in jail based, at least in part, on Dr. Warnick's testimony that Amolsch bit the victim:

> "The guy's a fraud" whose dead-wrong testimony was launching an innocent man toward life in prison, [Amolsch's lawyer] said. . . .
>
> In the wake of the Otero and Amolsch [criminal] cases, the Wayne County Prosecutor's Office does not recommend warrants based solely on bite mark identification, said Richard Padzieski, the chief of operations.
>
> "We are being extremely careful . . . I can foresee no case where we would issue [warrants] with just bite marks. Is it reliable as fingerprints? I don't honestly think so."

Joe Swickard, *Freed Suspect Asks Justice He Seeks Right to Sue Dentist For Testimony That Helped Jail Him*, Detroit Free Press, August 25, 1999, at 1A; *see also* Nancy Youssef, *Bite Marks in Doubt; Inmate Freed For Trial*, Detroit Free Press, July 12, 2002, at B1; Amber Martin, *Now, Bite Evidence Falls Out of Favor; A Rising Detective Tool Fading to Junk Science*, Detroit Free Press, April 19, 2004, at 1A ("[A]s the years passed, Warnick was proved wrong in other metro Detroit cases . . . . Judges, coming to consider bite-mark analysis as more art than science, began in the mid-1990s to reexamine some cases in which Warnick had testified.").

Although these materials constitute substantial notice that Dr. Warnick's testimony was not reliable, this Court nonetheless finds that a prisoner in Poole's position would not have discovered that factual predicate through the exercise of reasonable diligence. Indeed, their lack of obviousness might explain the AG's failure to mention them. In *Wilson v. Beard*, 426 F.3d 653 (3d Cir. 2005),

the court dealt with the post-conviction discovery of a videotape, known as the "McMahon Tape,"

which captured the petitioner's prosecutor making "a number of highly inflammatory comments

implying that he regularly [sought] to keep qualified African-Americans from serving on juries."

*Id.* at 656.  The respondent argued that the habeas petition was untimely because the petitioner, who

"had cable television in his cell and could have subscribed to local newspapers but apparently chose

not to do so," could have discovered the videotape through due diligence sometime during the three-

day news coverage of the tape instead of when he actually discovered it a few days later (which,

respondent argued, pushed the petition beyond the one-year period in § 2244(d)(1)(D)).  *Id.* at 655.

The Third Circuit disagreed:

> The District Court determined that [Petitioner] had not failed to
> exercise due diligence during the period in question, finding that "it
> would not be logical or fair to read the concept of due diligence as
> imposing upon a criminal defendant the duty of continuously
> monitoring the local news for a period of 12 or more years in the
> hope of possibly learning facts which could be helpful to his case."
> We agree. . . .
>
> [A]bsent some reasonable basis for concluding that the local news is
> likely to be a source of information at the particular time, due
> diligence does not require a prisoner in [Petitioner's] position to
> monitor the news on a regular basis on the unlikely chance that he
> might learn something which would be useful to his case.

*Id.* at 661.

Similar to *Wilson*, this Court does not equate reasonable diligence with requiring Petitioner

to regularly scour the Detroit Free Press and Michigan Court Reporters more than a half-decade after

his direct appeal was exhausted in the off-chance that something unforeseeable yet useful to his case

would be found.  Petitioner was convicted in 1989, the Michigan Court of Appeals affirmed in 1993,

and the Michigan Supreme Court denied leave for further appeal the same year.  By 1993, however,

Dr. Warnick's testimony had not yet fallen into disrepute. In fact, it appears that 1999 was the earliest that such information was publically available—six years after Petitioner's direct appeals had been exhausted.[10] During those six years Petitioner could have, and probably did, search for ways to challenge his conviction. *See Wilson*, 426 F.3d at 651 ("No person in [Petitioner's] position would reasonably expect that the local news would be a source of information relevant to his case, given that his conviction had occurred thirteen years ago and his final appeal had been rejected by the Supreme Court the previous year.").

Given the forgoing, this Court recommends finding that Petitioner could not have discovered the factual predicate underlying his due process claim earlier than he did through the exercise of due diligence.[11]

---

[10]As the Sixth Circuit explained in *Ege v. Yukins*:

> Ege draws our attention to a letter, dated June 19, 1995, which was signed by the Chief of Operations of the Wayne County Prosecutor's Office. The letter concerns two cases in which Dr. Warnick provided expert testimony regarding the identity of persons suspected of leaving bite marks on murder victims. In noting that Dr. Warnick's testimony was totally unreliable—in one case, because DNA evidence later excluded the defendant as a possible suspect; in the other, because a second expert undermined Warnick's probability determination—the Wayne County Prosecutor's Office concluded that it "will not approve warrants where the main evidence as to the identity of a potential defendant is the opinion of Dr. Warnick that he/she is the source of the bite marks." Ege notes that while the letter dates from 1995, it was not a public document, and thus she could not have known that Dr. Warnick had been thrown into disrepute until her receipt of the letter in 1999.

485 F.3d 364, 372 (6th Cir. 2007).

[11]In a subsequent case involving the McMahon Tape, *Watkins v. Klopotoski*, the court distinguished *Wilson* and noted that "[o]ur expectation is not that [Petitioner] would be closely watching or reading the news on a daily basis [to discover the requisite factual predicate], but simply that a reasonable investigation of his potential claims would have disclosed the information underlying his current challenges before January 8, 1999, almost two years after the Philadelphia

*2. Only Petitioner's Due Process Claim Is Timely Under 28 U.S.C. § 2244(d)(1)(D)*

In his Petition for Writ of Habeas Corpus, Petitioner raises seven claims, which can be summarized as follows:

> I. Petitioner was denied a fundamentally fair trial in violation of due process of law through the admission of Dr. Warnick's testimony that there was a "statistical/mathematical probability" that the odds are "2.1 billion to one" that the bite mark was made by anyone other than the petitioner.

> II. Newly presented evidence requires a court to either reverse the convictions or provide a hearing to determine whether bite mark interpretation has met the *Davis-Frye/Daubert* standard for admissibility of purportedly scientific evidence under MRE 702.

> III. Pursuant to 18 U.S.C.A. § 3600, petitioner is entitled to DNA testing of all biological evidence presented at trial.

> IV. Petitioner's confrontation rights under the Sixth Amendment and due process rights to a fair trial under the Fourteenth Amendment were violated when:

> > A. A composite drawing was represented as the sole drawing and that it "nails" Petitioner;

---

Magazine article and the McMahon tapes were publicly released." No. 08-5802, 2009 WL 6593918, at *4 (E.D. Pa. Dec. 11, 2009) *report and recommendation adopted by* 2010 WL 2431610 (E.D. Pa. June 14, 2010). However, it was fair to demand more diligence of the petitioner in *Watkins* than of Petitioner here because at the time the McMahon Tape came to light, Watkins was actively pursuing his state-court habeas petition:

> [a]lthough his first [state-court habeas] petition was initially denied on September 18, 1996, the Superior Court did not affirm the [lower] court's denial of his claim until December 8, 1998. Thus, we can impose upon Petitioner a proposition that a reasonable person in his position would be investigating opportunities for post-conviction relief, such as discussing any factual developments with his [state-court habeas] counsel or considering the potential impact of widely publicized news on his case.

*Id.* at *4. Petitioner's case, however, was dormant for years (with no foreseeable hope for revival) before the frailty of Dr. Warnick's testimony came to light. Further, nothing suggests Petitioner was working with counsel.

B.  Forensic Scientist David Woodford's presence as a res gestae witness was waived by defense counsel—(without Petitioner's consent)—and Mr. Woodford's hearsay report was misrepresented to the jury and entered into evidence—when the report actually established that [b]lood-type A found on the Victim did not match Petitioner or the Victim;

C.  The victim's mother's presence was waived by defense counsel—(without Petitioner's consent).

V.  Petitioner was denied a fair trial based upon the prosecutor's improper comments during closing rebuttal argument.

VI.  Petitioner was denied effective assistance of counsel under the Sixth Amendment.

VII.  Petitioner was denied effective assistance of appellate counsel under the Sixth Amendment.

(Br. in Supp. for Pet. for Habeas at 13, 22, 26, 29, 31, 35, 37, 40.)  For the following reasons, this Court recommends that only Claim I (that Petitioner was denied a fundamentally fair trial in violation of the Due Process Clause through the admission of Dr. Warnick's testimony) is timely under 28 U.S.C. § 2244(d)(1)(D).[12]

"The Sixth Circuit has suggested that the provisions of 28 U.S.C. § 2244(d)(1)(D) should be decided on a claim-by-claim basis, rather than with respect to all of the claims contained within the petition." *Webb v. Wolfenbarger*, No. 2:08-12692, 2009 WL 369482, at *5 (E.D. Mich. Feb. 11,

---

[12]Claim II of the Petition is unclear.  It does not appear to independently allege a constitutional error warranting habeas relief.  Rather, Petitioner, citing *Schlup v. Delo*, 513 U.S. 298 (1995) and *House v. Bell*, 547 U.S. 51 (2006), argues that his discovery that Dr. Warnick's testimony lacked scientific basis constitutes newly presented evidence requiring this Court to grant a new trial or hold a *Frye-Davis* hearing.  At issue in *Schlup* and *House* was whether the petitioner's showing of actual innocence was sufficient to allow the habeas court to look past procedural bars and address the merits of the petition.  Accordingly, this Court will interpret Claim II as asserting a claim of actual innocence in an effort to remove any potential statute of limitations bar to Petitioner's other claims of constitutional error.

33

2009) (citing *Ege v. Yukins*, 485 F.3d 364, 373-74 (6th Cir. 2007); *DiCenzi v. Rose*, 452 F.3d 465, 469-70 (6th Cir. 2006); *Jackson v. Hofbauer*, No. 05-CV-74916, 2007 WL 391405, at *8 (E.D. Mich. Jan. 31, 2007)). Further, the Supreme Court has noted in dicta that § 2244(d)(1)(B), (C), and (D), as contrasted with § 2244(d)(1)(A), require a claim-by-claim consideration for calculating the limitations period. *See Pace v. DiGuglielmo*, 544 U.S. 408, 416 n.6 (2005). Accordingly, each of Petitioner's claims should be evaluated separately to determine whether they are timely under § 2244(d)(1)(D).

Some of Petitioner's claims quite plainly do not rely on discovering that Dr. Warnick's reputation as an expert witness had been thrown into disrepute. Claim III asks for DNA testing pursuant to 18 U.S.C. § 3600 and is based on an allegedly improper line of questioning at trial where the State "suggest[ed] that . . blood found on the console of Petitioner's car was the same type as the [v]ictim's," and that Petitioner's blood type, the rare type AB, was not found on the victim or where the victim's body was discovered. (Br. in Supp. for Pet. for Habeas at 28-29.) Claim IV is a Confrontation Clause claim based on (1) the prosecutor's alleged misrepresentations to the jury, (2) the inability to cross examine the victim's mother whose statement was read to the jury, and (3) the inability to cross examine an expert whose report was admitted into evidence. (Br. in Supp. for Pet. for Habeas at 29-36.) Claim V involves allegedly improper prosecutorial vouching for witnesses' credibility (including Dr. Warnick) during closing argument. (Br. in Supp. for Pet. for Habeas at 37-40.) Each of these claims could have been brought by Petitioner without knowing whether Dr. Warnick's testimony had been called into doubt, and, accordingly, these claims are not timely under § 2244(d)(1)(D).

In addition, portions of Claims VI and VII do not implicate Dr. Warnick's testimony. In

34

Claim VI, Petitioner asserts, among other things, that his trial counsel was constitutionally ineffective because he failed to (1) object to a composite drawing presented to the jury, (2) investigate why an expert report appears to state that some blood at the scene did not match either the Petitioner's or the victim's type, and (3) call certain witnesses, including the expert who authored the report just referenced. (Br. in Supp. for Pet. For Habeas at 40-46.) In Claim VII, Poole asserts, among other things, that his appellate counsel was constitutionally ineffective because counsel failed to (1) assist him in filing a supplemental brief, (2) adequately communicate with him, (3) obtain his approval before filing appellate briefs, (4) obtain his case file from trial counsel, and (5) raise various "winners" on appeal, including that Petitioner was deprived of his Confrontation Clause rights and that trial counsel was constitutionally ineffective. (Br. in Supp. for Pet. for Habeas at 47-49.) None of these alleged points of error at trial rely on the discovery of the factual predicate Petitioner has asserted as triggering § 2244(d)(1)(D).

At first blush, the remainder of the errors Petitioner has alleged in Claims VI and VII appear to rely on discovering the impropriety of Dr. Warnick's testimony. Count VI additionally asserts that trial counsel's performance was constitutionally deficient because counsel failed to object to Dr. Warnick's statistical analysis, conduct voir dire on Dr. Warnick, and retain an expert to rebut Dr. Warnick's testimony. (Br. in Supp. for Pet. for Habeas at 40-46.) Similarly, Count VII additionally asserts that appellate counsel was constitutionally ineffective because counsel failed to properly appeal the admission of Dr. Warnick's statistical testimony. (Br. in Supp. for Pet. for Habeas at 47-49.)[13] Although Petitioner references Dr. Warnick's testimony in these claims of error,

---

[13]Petitioner does not explain exactly how appellate counsel erred in regards to challenging Dr. Warnick's testimony. Petitioner's appellate counsel in fact asserted that it was error to admit Dr. Warnick's testimony without a *Davis-Frye* hearing, (Dkt. 7-12 at 71-95), and the Michigan

the Sixth Circuit has provided a finer distinction, one that requires this Court to find that these claims do not come within the subsequent-discovery rule of § 2244(d)(1)(D).

In *Ege v. Yukins*, the petitioner, Carol Ege, sought habeas relief because Dr. Warnick had erroneously testified that nobody in the Detroit Metropolitan Area other than Ege could have left the bite found on the victim. 485 F.3d 364, 368 (6th Cir. 2007). Ege, like Petitioner here, faced a potential § 2244(d)(1) statute of limitations bar. The district court, finding that Ege could not have discovered that Dr. Warnick's testimony was unreliable until 1999, held that both her ineffective assistance of counsel claim for failure to object to Dr. Warnick's testimony and her Due Process Clause claim for deprivation of a fundamental fair trial could were timely under § 2244(d)(1)(D). *See id.* at 370. The Court of Appeals disagreed:

> We must analyze Ege's two habeas claims separately with regard to the State's argument and the section 2244(d)(1) bar. On the one hand, the strength of Ege's free-standing ineffective assistance claim—that her counsel blundered in not objecting to Dr. Warnick's bite mark evidence and that the state [habeas] court's failure to recognize the impact of this was an unreasonable application of clearly established federal law—clearly does not rest on Ege's counsel only having been made aware of the Wayne County letter [regarding Dr. Warnick] in 1999. If it "should have been obvious" to trial counsel to object to Dr. Warnick's testimony, and trial counsel did not have the benefit of the Wayne County letter, then so too should it have been obvious to Ege (or to her appellate counsel) that she should promptly file for habeas relief under *Strickland*. In other words, as styled by the district court, it would seem that Ege's otherwise meritorious ineffective assistance claim in no way rests on the April 1999 discovery of the Wayne County prosecutor's letter. The letter, which only points to the unreliability of Warnick, cannot logically constitute a "factual predicate" for Ege's free-standing

---

Court of Appeals addressed this claim in its opinion affirming the trial court verdict, (Dkt. 7-12 at 1). Most likely, Petitioner challenges appellate counsel's failure to raise an ineffective assistance of trial counsel claim for trial counsel's failure to adequately rebut or impeach Dr. Warnick's testimony.

ineffective assistance claim. Her ineffective assistance claim is therefore barred under 28 U.S.C. 2244(d)(1), and we reverse the district court as to this point.

On the other hand, the strength of Ege's due process claim does not rest solely on her trial counsel's inadequate performance. Rather, it rests on the adequacy of the physical evidence presented against her at trial. While it should have been obvious to Ege's trial attorney that the *manner* in which this physical evidence was presented was objectionable (i.e., that Dr. Warnick's probability determination was entirely without foundation), we cannot say that it should have been similarly obvious to Ege that the *substance* of the physical evidence—at least as presented by Dr. Warnick—was complete bunk. Thus, it is reasonable to assume that Ege did not fully appreciate the strength of her due process claim until she found out, entirely fortuitously, that the man who provided critical, physical trial testimony against her was now considered to be a charlatan by a sister office of the very state prosecutors who had chosen to put him on the witness stand. This is especially true because Ege's due process claim was "hybrid" in nature—that is, Ege identified both Dr. Warnick's probability determination in her particular case, as well as his general record of unreliability, as flaws denying her right to a fair trial.

*Id.* at 373.

This Court finds that the Sixth Circuit's reasoning controls on the facts of this case. As the Court of Appeals explained, the strength of Poole's free-standing ineffective assistance of counsel claims — that his trial counsel erred in not objecting to Dr. Warnick's bite mark evidence, conducting voir dire on Dr. Warnick, or offering rebuttal witnesses, and that his appellate counsel erred by not raising an ineffective assistance of trial counsel claim based on these errors — does not rest on Petitioner's 2005 discovery of Dr. Warnick's "general record of unreliability." *See Ege*, 485 F.3d at 373. Accordingly, Claims VI and VII are also not timely under § 2244(d)(1)(D).

In sum, the Court finds that while Petitioner did not fully appreciate the strength of his due process claim until he found out, through *Ege*, that Dr. Warnick's bite-mark testimony had generally

37

fallen into disrepute, that discovery only renders Claim I of the Petition timely under § 2244(d)(1)(D).

### 3. Actual Innocence

Petitioner argues that because he can satisfy the actual innocence standard set forth in *Schlup v. Delo*, 513 U.S. 298 (1995), equitable tolling applies to save his time-barred claims. (Pet.'s Reply at 2-13.) For the following reasons, this Court disagrees.

The Sixth Circuit has held that a credible claim of actual innocence equitably tolls AEDPA's one-year statute of limitations. *See Souter v. Jones*, 395 F.3d 577, 588-90 (6th Cir. 2005). In determining whether a petitioner is actually innocent for purposes of equitable tolling, this Court applies "the same actual innocence standard developed in *Schlup v. Delo* . . . for reviewing a federal habeas applicant's procedurally defaulted claim." *McCray v. Vasbinder*, 499 F.3d 568, 571 (6th Cir. 2007) (citing *Souter*, 395 F.3d at 596).

"The *Schlup* standard is demanding and permits review only in the 'extraordinary' case." *House v. Bell*, 547 U.S. 518, 538 (2006) (citation omitted). Under *Schlup*, a petitioner must be able "to support his allegations of constitutional error with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness account, or critical physical evidence — that was not presented at trial." *Schlup*, 513 U.S. at 324. This Court must then consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House*, 547 U.S. at 538 (internal quotation marks omitted). "Based on this total record, the court must make 'a probabilistic determination about what reasonable, properly instructed jurors would do.'" *Id.* (quoting *Schlup*, 513 U.S. at 329). This probabilistic determination does not require absolute certainty about the

38

petitioner's guilt or innocence:

> A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.

*House*, 547 U.S. at 538.   Accordingly the Court considers the total record absent Dr. Warnick's prejudicial testimony.

This Court begins by examining the remaining inculpatory evidence.  First, in contrast to Petitioner's testimony that he was not even there, the overwhelming weight of the evidence is that Petitioner was seen at Popper's the night of the murder and was the last person seen with Mejia. Petitioner's girlfriend testified that Petitioner was wearing a biker vest when he left their home on the evening of June 5, 1988.  Lisk described Petitioner as wearing a black leather vest.  Further, Scherrer, the Popper's doorman, testified that he saw Mejia leave the bar with someone in a motorcycle-type outfit.  Both Lisk and York, one of two bartenders working at Popper's the night of Mejia's death, were certain that it was Petitioner who left with Mejia; in fact, both identified Poole in the courtroom as the person they had seen.  Additionally, DePlaunty, another friend of Mejia's, testified that he saw Petitioner at Popper's on the night in question, although DePlaunty also stated that Petitioner was still at the bar after Mejia left.  Further, although there may been certain similarities between the way Clayton and Petitioner looked on the night of June 5, a review of Lisk, DePlaunty, and York's testimony suggests that they were not confused as between Clayton and Petitioner.  Petitioner relies on the preliminary exam testimony of Kerry Johnson, the other bartender working at Popper's on June 5.  But at trial, Johnson appeared to back off his earlier testimony that Petitioner left with Clayton, instead explaining that he was focused on his work and

that Mejia left in a group.  In short, at least three witnesses saw Petitioner at Popper's the night of the murder, and two of those witnesses were convinced it was Poole that left the bar with Mejia.

The Court next turns to Petitioner's confession as recounted by Cook.  As pointed out during cross-exam, there were questionable aspects of Cook's testimony.  She initially told the North Carolina and Pontiac authorities that the murder happened in January—as opposed to June—and also initially told them that Petitioner had confessed to her while they were in North Carolina, instead, as she told the jury, on the night that Mejia was killed.  There was also Cook's questionable decision to move to North Carolina, bringing her 6-year-old son, with a self-confessed murderer.  And there is the manner the confession came forth—Cook remained silent until she had a fight with Petitioner and was told to leave their North Carolina home.

Cook's testimony was not wholly impeached, however.  Cook testified that Petitioner kept his watch in his car's arm rest.  Blood was found in Petitioner's car counsel, and the blood type, while common, matched Mejia's type.  Second, Cook's testimony was quite detailed, and witnesses corroborated certain details.  Cook testified that Petitioner and Mejia "started talking . . . and they got on the subject of doing coke, and the guy offered to take [Petitioner] home and do some with him, and he went."  She further attested that "they went to somebody's house to pick it up 'cause they didn't have any."  Tony Taylor, Mejia's friend, testified that Mejia came by his home at 2:00 a.m. on June 6 requesting cocaine.  And although Taylor admitted to being sleepy, he nonetheless testified that he saw Mejia's vehicle in his driveway.  Cook also testified that Petitioner confessed to her that he "slit [Mejia's] throat."  Dr. Biedrzycki, who performed the autopsy on Mejia, testified that a stab wound to the right side of Mejia's neck severed the carotid artery and was likely the wound that proved fatal.  She also testified that if the carotid artery was cut, blood "would squirt out

40

and there would be rapid blood loss" which is consistent with the bloody watch Cook testified to and Petitioner's scratched and bloody condition when he arrived home. At trial, Petitioner argued that Cook could have obtained these details from the newspaper. But Petitioner has only provided the Court with a June 16, 1988 Oakland Press article, which does not discuss the aforementioned details about cocaine or a fatal stab wound to the neck, and, moreover, according to Petitioner's own trial testimony, the two began driving to North Carolina on June 10, 1988.

In terms of the  exculpatory evidence, although Clayton testified otherwise, according to Lisk, Clayton and Mejia were dating at the time of the murder. This was corroborated in part by Clayton's admission that he had attended an intimate birthday party for Mejia days before Mejia was killed. Further, Lisk testified that Mejia said he "got rid" of Clayton on the night of June 5, apparently because Clayton did not want to party with Mejia. Around June 1988, Clayton and Petitioner apparently had similar head and facial hair. Suspiciously, Clayton told Detective Serna that he did not have a knife, but then Serna found a knife in Clayton's truck fitting the description of the murder weapon. Dr. Biedrzycki also testified that finding Mejia's pants pulled down below his waist could be consistent with a homosexual murder.

Some of the physical evidence is also troubling. First, Petitioner's blood type is AB and Woodford's report appears to show that type A blood was found on a stone taken from Mejia's pants:

> Evidence Received:
> One sealed manila envelope (Item #14) which label "2 stones recovered at autopsy" containing two manila envelopes each containing a stone (from chest area and pants).
> . . .
>
> Results:
> Chemical and serological analysis revealed the following:

| Item # | Blood | Human Blood | A,  B, O Blood Group Substances |
| --- | --- | --- | --- |

41

|  |  |  | Detected |
|---|---|---|---|
| . . . | | | |
| 14 (pants) | + | + | A, O |
| 14 (chest) | + | + | [I n s u f f i c i e n t quantity of blood] |

(Br. in Supp. for Pet. for Habeas, Ex. J.)  And while Woodford's report was presented to the jury, at closing argument the prosecutor (incorrectly) told the jury that his report showed that all the blood tested was consistent with Mejia's.  Second, according to Cook, Petitioner came home on the night of the murder with scratches on his face, chest, and arms.  Yet blood was found on seven of the ten fingernail clippings taken from Mejia, and testing proved that the blood was type O.  Third, no physical samples, such as blood or bite mark impressions, were taken of any other individuals in this case, including Clayton.

Considering this evidence in accordance with *Schlup*'s very demanding standard, this Court concludes that Petitioner has not carried his burden of showing that, absent Dr. Warnick's testimony, more likely than not any reasonable juror would have reasonable doubt.  *See House*, 547 U.S. at 538; *Pudelski v. Wilson*, 576 F.3d 595, 606 n.2 (6th Cir. 2009) ("The magistrate judge's finding that [Petitioner's] 'at least colorable' actual innocence claim satisfied this demanding standard was erroneous; a claim of actual innocence must be more than simply 'colorable' to invoke the *Schlup* gateway.").  Upon careful review of Connie Cook's testimony, impeached though it was, a reasonable juror could certainly credit her account of Petitioner's confession.  And blood matching Mejia's type was found in Petitioner's car console where Cook said Petitioner kept his watch.  Further, a reasonable juror could find Petitioner not credible in view of his testimony that he was never at Popper's while numerous witnesses testified that he was.  Additionally, while Petitioner testified that he worked with Cook's brother that night, the brother did not testify on Petitioner's behalf.  In short, while it might be reasonable for a juror to conclude that, stripped of Dr. Warnick's

testimony, the remaining evidence does not prove Petitioner guilty beyond a reasonable doubt, that falls short of the actual innocence standard. Rather, it must be *likely* that *not one* reasonable juror would convict Petitioner on the remaining evidence. *House*, 547 U.S. at 538. The Court is unable to so conclude on this record.

### B. The Merits of Petitioner's Due Process Claim

For similar reasons, the Court also does not find that the admission of Dr. Warnick's testimony deprived Petitioner of a fundamentally fair trial as guaranteed by the Due Process Clause.

#### 1. Standard of Review

As relevant here, a state prisoner is not entitled to a writ of habeas corpus unless the state court's adjudication of his claims on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A decision is also contrary to federal law where the "state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Id.* at 406. If a state court decision is contrary to clearly established federal law, a federal habeas court need not give the state court's decision deference. *See Dyer v. Bowlen*, 465 F.3d 280, 284 (6th Cir. 2006); *Fulcher v. Motley*, 444 F.3d 791, 799 (6th Cir. 2006).

A state court decision unreasonably applies federal law "if the state court identifies the

correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts." *Slaughter v. Parker*, 450 F.3d 224, 232 (6th Cir. 2006) (citing *Williams*, 529 U.S. at 407-08). As the Supreme Court has recently emphasized, "'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Harrington v. Richter*, __ U.S. __, 131 S.Ct. 770, 785 (2011) (quoting *Williams*, 529 U.S. at 410). Therefore, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Moreover, in determining whether the state court unreasonably applied a rule, a federal habeas court must consider the rule's specificity: "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* (quoting *Yarborough*, 541 U.S. at 664).

### 2. Clearly Established Federal Law

Habeas due process claims based on improper admission of evidence are reviewed under a very deferential standard: due process is violated, and thus habeas relief warranted, only if an evidentiary ruling is "so egregious that it results in a denial of fundamental fairness." *Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir. 2003). The Sixth Circuit has "typically held that to show a due-process violation under AEDPA rooted in an evidentiary ruling, there must be a Supreme Court case establishing a due-process right with regard to that specific kind of evidence." *Collier v. Lafler*, 419 F. App'x 555, 558 (6th Cir. 2011) (unpublished). But in *Ege*, a similar case involving bite-mark evidence, the Sixth Circuit majority held that the question of whether an evidentiary ruling violated the Due Process Clause was governed by more general Supreme Court precedent:

> These principles [that the admission of prejudicial evidence may constitute a denial of fundamental fairness] have their roots in the

44

> Supreme Court decision of *Chambers v. Mississippi*, 410 U.S. 284, 302-03, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973), which held that trial errors cannot "defeat the ends of justice" or otherwise deprive a defendant of her right to a fair trial. In *Chambers*, the Court was looking at a state trial court's improper exclusion of certain evidence that would potentially have assisted the defendant, but its tenets are equally applicable to situations involving a state trial court's improper admission of certain evidence injurious to the defendant. The ultimate question is therefore whether the state habeas court, in finding that admission of Dr. Warnick's testimony was not prejudicial to the ultimate outcome of Ege's case, unreasonably applied *Chambers*.

*Ege*, 485 F.3d at 375 (emphasis omitted). The Court further noted that "'[w]hether the admission of prejudicial evidence constitutes a denial of fundamental fairness turns upon whether the evidence is material in the sense of a crucial, critical[,] highly significant factor.'" *Id.* (quoting *Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000)).

Although the state court on collateral review concluded, "[t]he defendant has not established that, but for Dr. Warnick's testimony, it is more probable than not that a different outcome would have resulted," (Dkt. 7-21, *People v. Poole*, No. 89-90203FC, slip op. at 2-3 (Oakland County Cir. Ct. Aug. 1, 2006) (emphasis added)), AEDPA deference is warranted. First, this Court is not aware of any Supreme Court holding that the admission of bite-mark evidence violates a defendant's due process rights. *See Ege*, 485 F.3d at 383 (Boggs, J., dissenting). Further, the state court's more-likely-than-not test does not contradict the governing law set forth in *Chambers*' which stands for the broad principle that evidentiary rulings cannot deprive a defendant of a fundamentally fair trial. Thus, as in *Ege*, "the ultimate question is . . . whether the state habeas court, in finding that admission of Dr. Warnick's testimony was not prejudicial to the ultimate outcome of [Petitioner's] case, unreasonably applied *Chambers*." 485 F.3d at 375. Relevant to this inquiry is "the frequency and pervasiveness of the alleged misconduct in the context of the entire trial"; "the weight of the

evidence supporting guilt"; and "whether the trial judge gave a cautionary instruction to the jury."

*Lafler*, 192 F. App'x at 420 (internal quotation marks and citations omitted).[14]

---

[14]The terms "crucial, critical, highly significant" have distinct meanings and do not lend themselves to a straightforward application. These words first appeared in *Luna v. Beto* as a way of emphasizing that federal habeas courts do not upset state court convictions where an evidentiary error is not substantial:

> [F]or an otherwise valid state conviction to be upset years later on federal habeas, surely something more than an evidentiary mistake must be shown. If mistake is enough, then never, simply never, will the process of repeated, prolonged, postconviction review cease. For in every trial, or at least nearly every trial, there will be, there are bound to be, some mistakes. . . .
>
> What elevates the 'mistake' to a constitutional plane is at least twofold. First, the mistake must be material in the sense of a crucial, critical, highly significant factor. Second, it must have some State complicity in it.

395 F.2d 35, 40-41 (5th Cir. 1968) (en banc) (Brown, C.J., concurring specially).

Notably, however, the Sixth Circuit in *Brown v. O'Dea* (which the Court in *Ege* quoted) took the "crucial, critical, highly significant" language from *Redman v. Dugger*, 866 F.2d 387, 390 (11th Cir. 1989). There, the Eleventh Circuit used the Supreme Court's standard from a line of cases stemming from *Brady v. Maryland*, 373 U.S. 83 (1963), including *United States v. Bagley*, 473 U.S. 667 (1985). And "*Bagley*'s touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *see also Sims v. Stinson*, 101 F. Supp. 2d 187, 194 (S.D.N.Y. 2000) (explaining that at least by 1993 the Second Circuit announced "that unfairly prejudicial evidence renders a trial fundamentally unfair when there is a reasonable probability that without it the verdict would have been different" and that "[a]t least five other circuits follow similar rules . . . .").

However, to this Court's knowledge, the Supreme Court has never held that the "reasonable probability" test applies to all erroneously admitted evidence; therefore, the state court's more-likely-than-not test does not contradict any holdings of the Supreme Court. *See Earhart v. Konteh*, 589 F.3d 337, 343 (6th Cir. 2009) ("[Under AEDPA] [w]e must base our decision solely on the holdings of the Supreme Court, not . . . the holdings of the courts of appeals." (citing *Williams*, 529 U.S. at 412 (O'Connor, J., writing for the majority)); *Palmer v. Bagley*, 330 F. App'x 92, 96 (6th Cir. 2009) ("Only if the state court's reasoning or ruling contradicts [the] holdings [of the Supreme Court] is the decision 'contrary to' clearly established Supreme Court precedent."). Further, as noted, the governing clearly established federal law as determined by the Supreme Court comes from *Chambers*. *Ege*, 485 F.3d at 375.

### 3. The State Court Did Not Unreasonably Apply Chambers v. Mississippi

In denying Petitioner's request for post-conviction relief, the state court explained:

> [W]e note the testimony from witnesses. The defendant was seen by Robert Lisk and Charles York leaving the bar with the victim and in the victim's car with the victim a short time before the victim was murdered. The defendant described in detail to his girlfriend, Connie Cook, the manner in which he murdered and robbed the victim. The defendant has not established that, but for Dr. Warnick's testimony, it is more probable than not that a different outcome would have resulted. The alleged error was, therefore, harmless in nature. *People v. Lukity*, 460 Mich. 484, 495 (1999).

(Dkt. 7-21, *Poole*, No. 89-90203FC, slip op. at 2-3 (emphasis added).)

The basic facts, stripped of Dr. Warnick's testimony, are in accord with what the state court relied upon: (1) three witnesses saw Petitioner at Popper's the night Mejia was killed; (2) two of these witnesses were certain that it was Petitioner who left the bar with Mejia; (3) contrary to these witnesses, Petitioner testified that he was not at Popper's that night, yet offered no one who could corroborate his absence; (4) Cook testified that Petitioner confessed to her in detail how he killed Mejia; (5) while Cook's testimony was far from unassailable, some important aspects of her testimony were corroborated, including (a) that she said Petitioner kept his watch in his car's armrest and blood in the car console matched Mejia's type, and (b) that she said Petitioner told her that he stabbed Mejia in the neck and Dr. Biedrzycki testified that the fatal stab wound was likely the one to the carotid artery; and (6) to the extent Clayton looked similar to Poole, a review of the testimony of three people who were at the bar on the night of June 5 suggests that those witnesses were not confused as between the two. These facts present a strong case against Petitioner. In view of this non-bite mark evidence, the state court on collateral review could reasonably have concluded that Dr. Warnick's testimony was not a "crucial, critical, highly significant" factor.

An examination of the pervasiveness of the erroneous admission of Dr. Warnick's testimony does not alter this conclusion.  It is true that in opening and closing remarks the State emphasized Dr. Warnick's testimony:

> Dr. Warnick [will] tell you a lot better than [what I just said]. . . . He's going to testify to all his experience, to his expertise, foremost experience in this area in the State of Michigan for sure; the only board certified odontologist.  He will testify that he is without doubt that the bite mark on Bob Mejia's arm, the defensive wound that was suffered when he was killed, that the bite mark was placed there by these teeth of Mr. Poole.

> \* \* \*

> Dr. Warnick testified, and I won't go through it again, that based on his experience, those teeth bit the victim.  No other way around it. And then he went back to the basis for this type of testimony, the book where they did the study with all the identical twins, and they got the mathematicians to say what's the possibility that somebody else has teeth exactly like that.  And, if I recall, it was two and one-half billion to one.  That's makes the lottery look like a sure thing.  It was his teeth.

(Tr. Vol. I at 153; Tr. Vol. V at 127.)  But to the extent that Dr. Warnick's testimony was showcased, the State often presented the testimony alongside other testimony, including Cook's and the witnesses at Popper's:

> Dr. Warnick, the foremost bite mark expert in Michigan, the only board certified, the guy who identified all the people from Flight 255, he gets involved, and he does his analysis and he said beyond any dental certainty, those teeth—those teeth bit Bob Mejia when he was being killed. You got a full confession of Connie Cook that matches in every detail with what was actually found by the police.  You got three people that say, "That's the man who walked out of the bar with him," and you've got the foremost bite mark expert in this part of the country that says those teeth bit the victim. . . .

> [The defense is that] [t]hree people in the bar would lie and convict an innocent man of a crime like this, just to solve this crime; to avenge their friend. Connie Cook is a monster who would make up

48

> a story to put Gilbert Poole away, when she knows he didn't do it.
> So they all lied, she's a monster, and Dr. Warnick is incompetent.
> That's the defense. . . .
>
> [In closing argument, defense counsel] said I wonder if we would
> have submitted Hank Clayton's teeth. What about Gary Lynch; what
> about Bob Lisk? They all knew where [Mejia] lived. They all had
> been friends with him; they were all there that day or that night.
> They all—I mean these are red herrings. . . . Don't take the bait. Just
> look at the evidence that you have. It's always possible there could
> have been more evidence, but look what you've got. You've got
> three eyewitnesses, the three people at Popper's. That alone should
> be enough. Throw that out. You got a full confession that matches
> the facts, detail by detail from Connie Cook. That alone is enough.
> Throw that out. You got Dr. Warnick who's the foremost bite mark
> expert around. He says it's those teeth. That alone is enough.
> You've got all three of them. You've got all three of them.

(Tr. Vol. V at 96-97, 125, 127.) Moreover, the Court notes that Dr. Warnick was subjected to cross

exam during which he admitted (1) that forensic odontology was a new area of dentistry, (2) that

there could be distortions in a bite mark from a number of causes including the fact that skin is not

a very good medium for holding the imprints and that there could be "some sliding or some

movement in the tissue" if the victim was struggling in a fight while being bitten, and (3) that Mejia

had been wearing a long-sleeved shirt.

Petitioner, rightly, places heavy reliance on the factually similar case of *Ege v. Yukins*, 485

F.3d 364 (6th Cir. 2007), where a divided panel of the Sixth Circuit granted the petitioner, Carol

Ege, habeas relief. There are, however, two critical differences between this case and *Ege*. First,

the Sixth Circuit itself has emphasized that *Ege* was a unique case because there was only one piece

of physical evidence: "[In *Ege*] we found that the improper inclusion of bite-mark evidence

amounted to a denial of due process because it was the only physical evidence linking the defendant

to the crime." *Collier*, 419 F. App'x at 559 (citing *Ege*, 485 F.3d at 376-78). Here, as discussed,

49

there was other physical evidence linking Petitioner to the crime: blood matching the victim's type, while common, was found in Petitioner's car counsel.  Second, and more importantly, when weighing the non-bite mark evidence against Ege, the Sixth Circuit emphasized that the state's nine-year delay in bringing the charges against the petitioner distinguished the case before it from other circumstantial cases:

> This case differs from other circumstantial evidence cases, however, in that it appears the prosecution was not willing to try Ege until it had Dr. Warnick's bite mark testimony, indicating its desire to have in hand the one piece of physical evidence potentially linking Ege to the crime.  After all, nothing in the record suggests that a single one of the "compelling" circumstantial proofs offered by the prosecution at trial in 1993 could not also have been offered nine years earlier in 1984, far closer in time to when the murder was actually committed. We are thus led to believe that while the State may have had a good circumstantial case against Ege in 1984, it was not until 1993, when the State finally obtained expert physical evidence connecting Ege to the murder victim, that it felt comfortable moving forward with Ege's prosecution.  If the prosecution felt that the bite mark evidence was so important, it does not take much of a cognitive leap to believe that the jury viewed it as important as well.

485 F.3d at 377.  In this case there is no comparable indication by the prosecution that Dr. Warnick's testimony was the keystone of its case against Petitioner.  In fact, Petitioner was arrested based on the accounts of Petitioner's confession that Cook gave to North Carolina and Pontiac police.  It is true that the State sought bite-mark evidence when it had Cook's confession in hand, but nothing suggests, as was the case in *Ege*, that the case would not have gone forward without Dr. Warnick's testimony.  In short, the Sixth Circuit concluded that Dr. Warnick's testimony in *Ege* was a "crucial, critical, highly significant" factor in the jury's determination because it was the only physical evidence connecting the petitioner with the victim *and* because Ege's case probably would never have proceeded to trial—despite a strong circumstantial case—but for Dr. Warnick's bite-mark

analysis.  Such facts are simply not present here.

Even assuming that Dr. Warnick's testimony prejudiced Petitioner's trial, *see Ege*, 485 F.3d at 376 ("Dr. Warnick's statement that among the 3.5 million residents of the Detroit metropolitan area, Ege's teeth, and *only* Ege's teeth, could have made the mark on Thompson's cheek, was without doubt highly prejudicial.  It strains credulity to think that a jury hearing Dr. Warnick's testimony would not immediately place Ege at the scene of Thompson's violent murder . . . ."), *Ege* itself teaches that the prejudicial nature of Dr. Warnick's testimony cannot be considered in a vacuum.  *Id.* at 377 ("[W]e must assess the relative influence of the prosecution's non-bite-mark evidence . . . .").  Here, a strong case existed against Petitioner absent Dr. Warnick's testimony. Petitioner's application does not come before this Court on a clean slate, and, ultimately, this Court cannot say that the state court acted objectively unreasonably when it concluded that the admission of Dr. Warnick's testimony—in light of all the other evidence presented at trial—did not deprive Petitioner of a fundamentally fair trial.  *Harrington*, 131 S.Ct. at 786-87 ("[E]ven a strong case for [habeas] relief does not mean the state court's contrary conclusion was unreasonable. . . .  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."); *see also Collier*, 419 F. App'x at 558-59 (finding that the improper admission of prejudicial testimony did not fundamentally undermine petitioner's right to a fair trial in light of the other evidence of guilt against him).  Accordingly, this Court finds that Petitioner's due process claim fails on the merits.

## III.  RECOMMENDATION AND CONCLUSION

For the foregoing reasons, this Court finds that (1) all of Petitioner's claims, save his Due Process Clause claim, are barred by the by the applicable statute of limitations set forth in 28 U.S.C. § 2244(d), (2) the actual innocence exception does not apply to save Petitioner's time-barred claims, and (3) Petitioner's timely due process claim fails on the merits.   Accordingly, this Court RECOMMENDS that Poole's Petition for Writ of Habeas Corpus be DENIED.

## IV.  FILING OBJECTIONS TO THIS REPORT

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.   *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  A copy of any objections is to be served upon this magistrate judge.  E.D. Mich. LR 72.1(d)(2).  Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  August 9, 2011

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 9, 2011.

s/J. Johnson
Deputy Clerk